1   EDWARD R. REINES (Bar No. 135960)
    edward.reines@weil.com
2   DEREK C. WALTER (Bar No. 246322)
    derek.walter@weil.com
3   AARON Y. HUANG (Bar No. 261903)
    aaron.huang@weil.com
4   MICHELE A. GAUGER (Bar. No. 281769)
    michele.gauger@weil.com
5   WEIL, GOTSHAL & MANGES LLP
    Silicon Valley Office
6   201 Redwood Shores Parkway
    Redwood Shores, CA 94065
7   Telephone: (650) 802-3000
    Facsimile: (650) 802-3100
8
    Attorneys for Plaintiffs/Counterclaim-Defendants
9   VERINATA HEALTH, INC. and
    THE BOARD OF TRUSTEES OF THE LELAND
10  STANFORD JUNIOR UNIVERSITY

11                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
12                    SAN FRANCISCO DIVISION

13  VERINATA HEALTH, INC. and THE BOARD        Case No. 3:12-cv-00865-SI
    OF TRUSTEES OF THE LELAND
14  STANFORD JUNIOR UNIVERSITY,

15              Plaintiffs,                    **VERINATA AND STANFORD'S
                                              OPENING CLAIM CONSTRUCTION
16      v.                                    BRIEF FOR U.S. PATENT NOS.
                                              7,888,017; 8,008,018; AND 8,195,415**
17  SEQUEOM, INC., and SEQUENOM CENTER
    FOR MOLECULAR MEDICINE LLC,                JURY TRIAL DEMANDED
18
                Defendants/Counterclaim        Hon. Susan Illston
19              Plaintiffs,
                                              Tutorial: July 31, 2013 3:30 p.m.
20      v.                                    Hearing: August 7, 2013 3:30 p.m.

21  VERINATA HEALTH, INC. and THE BOARD
    OF TRUSTEES OF THE LELAND
22  STANFORD JUNIOR UNIVERSITY,

23              Counterclaim Defendants,

24      and

25  ISIS INNOVATION LIMITED,

26              Nominal Counterclaim-
                Defendant.
27

28

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................ 1

LEGAL FRAMEWORK .................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.    U.S. Patent Nos. 7,888,017 and 8,008,018 ........................................................ 2

    A.    Background ................................................................................................ 2

    B.    "massively parallel sequencing of the random fragments of genomic DNA" / "massively parallel DNA sequencing of DNA fragments randomly selected" ................................................................................... 4

        1.    The Claim Language And Specification Support Verinata's Proposed Constructions .................................................... 5

        2.    Sequenom's Contention That Claim 17 Of The '017 Patent Is Restricted To "Targeted" Sequencing Is Unfounded .............................. 7

    C.    "massively parallel DNA sequencing" ................................................... 10

    D.    "reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule" ............................... 12

    E.    "identifying the chromosomes"/"identifying chromosomes" ............................ 14

        1.    The Phrase "Identifying [The] Chromosomes" Is Clear On Its Face ........ 15

        2.    Sequenom's "Target Sequence/Chromosome" Should Not Be Imported Into The Phrase "Identifying [The] Chromosomes" ................. 16

    F.    "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome" ......................................................................................... 17

        1.    The Sequencing Embodiments Of The '017 Patent Do Not Require Determining An "Integer" Number Of Copies Of Chromosomes ........... 18

        2.    The Support Offered By Sequenom For Its Construction Is Mischaracterized And/Or Directed At Non-Sequencing Embodiments ..................................................................................... 19

    G.    "wherein" clauses referring to the "first" and "second" chromosomes ............... 21

        1.    Inclusion Of The Word "Affirmative" In Sequenom's Proposed Constructions Adds Ambiguity, Not Clarity, To These Claim Terms ...... 21

        2.    Chromosomes Need Not Be Divided Into Mutually Exclusive Categories ................................................................................... 23

    H.    "compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture" ...................................................................... 25

    I.    "solid phase amplification of the attached fragments to create a high density sequencing flow cell" ........................................................................ 27

    J.    "four-color DNA sequencing by synthesis process" ...................................... 28

K.  "determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f)" ..................... 29

II.  U.S. Patent No. 8,195,415 ....................................................... 29

A.  Background ................................................................... 29

B.  "a first value and a second value" ..................................... 30

C.  "the mixed sample" ....................................................... 32

D.  "determine the differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists" ........ 33

E.  "GC content" ................................................................ 35

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Baldwin Graphic Sys. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)..................................................................... 26, 32

*KJC Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000)........................................................................ 26

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005)........................................................................... 5

*O2 Micro Intl' Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)......................................................................... 15

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................... 1, 2, 15

*ProconGPS, Inc. v. Skypatrol, LLC*, No. 11-03975, 2012 U.S. Dist. LEXIS
    112382, 2012 U.S. Dist. LEXIS 112382 (N.D. Cal. Aug. 9, 2012)........... 15, 29

*St. Clair Intellectual Property Consultants, Inc. v. Acer, Inc.*,
    2012 WL 3536454 (D. Del. Aug. 7, 2012) ....................................................... 35

*Sun Pharm. Industries, Ltd. v. Eli Lilly and Co.*,
    611 F.3d 1381 (Fed. Cir. 2010)......................................................................... 12

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)......................................................................... 32

Pursuant to the Court's May 20, 2013 Order granting the parties' stipulated claim construction briefing schedule, Dkt. No. 82, Verinata Health, Inc. ("Verinata") and The Board of Trustees of the Leland Stanford Junior University ("Stanford") submit this Opening Claim Construction Brief on the proper construction of disputed claim terms of U.S. Pat. Nos. 7,888,017 ("the '017 patent"), 8,008,018 ("the '018 patent") and 8,195,415 ("the '415 patent").

## INTRODUCTION

The law is clear that the proper scope of a patent claim must be grounded in an understanding of "what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc). Sequenom's proposed claim constructions repeatedly ignore the law and instead transparently reflect Sequenom's attempt to improperly shape the claim language to its own ends.

Sequenom's claim construction positions with regard to the '017, '018 and '415 patents are not supported by the patent claims themselves, the intrinsic evidence or the extrinsic evidence. Many of Sequenom's proposed constructions seek to read limitations into the claims from the specifications, contradicting well-established claim construction doctrine. Other of Sequenom's proposed constructions introduce limitations that are not at all discussed in the specifications. And, for the '017 and '018 patents, Sequenom contends that two nearly identical terms should be construed radically differently, even though the '017 and '018 patents share *an identical specification*. In short, Sequenom's claim construction positions are repeatedly at the extreme ends of the law, artificially fashioned to improperly narrow the scope of the claimed inventions and/or bolster Sequenom's invalidity contentions. In doing so, Sequenom fails to give meaning to the true scope of the claimed inventions.

## LEGAL FRAMEWORK

Verinata and Stanford's proposed constructions for the disputed terms in the '017, '018 and '415 patents are in accordance with well-established principles of claim construction: a claim term must be accorded the full breadth of its ordinary meaning that one of skill in the art, at the time of the invention and in light of the patent's specification and prosecution history, would have given it, except in those circumstances in which the intrinsic record provides a definition for the

term. *See Phillips*, 415 F.3d at 1316-17.  Because the Court is familiar with these principles, Verinata and Stanford will discuss specific claim construction principles and authorities below only within the context of issues to which they apply.

**ARGUMENT**

**I.      U.S. PATENT NOS. 7,888,017 AND 8,008,018**

**A.      Background**

The '017 and '018[1] patents relate to processes for non-invasively detecting fetal chromosomal aneuploidy in a mixture of fetal and maternal DNA.  *See* Exh. 1 [Brown Opening Decl.] ¶¶ 10-13; *see also* Exh. 2 ['017 patent] at 1:63-2:9.[2]  The fetal and maternal DNA used in the methods claimed in the patents can be obtained via non-invasive procedures, such as from maternal blood obtained through a simple blood draw, obviating the need for invasive procedures thought to pose harm to the developing fetus and/or mother, such as amniocentesis and chorionic villus sampling.  *See, e.g.*, generally Exh. 3 [Quake, "Sizing Up Cell-Free DNA"].

Early efforts to develop a non-invasive method for diagnosing chromosomal aneuploidies using cell-free fetal DNA were largely unsuccessful.[3]  Because "aneuploidies do not present a mutational change in sequence, and are merely a change in the number of chromosomes," researchers believed that determining whether the fetus was carrying an extra chromosome required distinguishing fetal DNA from maternal DNA.  *See* Exh. 2 ['017 patent] at 2:4-9.  Put another way, researchers believed one needed a method of distinguishing the copies of chromosome 21 coming from the fetus from those that came from the mother.  Without some way of making this distinction, researchers believed, it would be impossible to look at just the fetal DNA and measure whether there were too many copies of a chromosome in *just the fetus*.

Researchers attempted to make this distinction by assaying just specific loci in DNA that are highly variable among individuals (and hence might be different in the fetus and mother),

---

[1] The '018 patent is a continuation of the '017 patent and thus has an identical specification.

[2] All exhibit cites are to exhibits attached to the accompanying declaration of Derek C. Walter.

[3] For a summary of the ten years of failed research into detecting aneuploidy using cell-free fetal and maternal DNA prior to the inventions of Drs. Quake and Fan, *see, e.g.*, Dkt. No. 83 at 3-4.

known as "single nucleotide polymorphisms" or SNPs. Other avenues included assaying loci known to be absent in the mother—for example, loci found on the Y-chromosome or the Rhesus D gene where the mother is Rh-negative. In both of these examples, if the Y-chromosome or Rhesus D locus was detected it would have to be arising from the fetal DNA (*i.e.*, paternally inherited DNA, inherited only from the father). This is the approach of Sequenom's U.S. Pat. No. 6,258,540 ("the '540 patent"). *See, e.g.*, Exh. 4 ['540 patent] (including claims directed to detecting only "paternally inherited" nucleic acids). However, none of these methods offered a viable approach to detecting aneuploidies using cell-free DNA, and this remained the holy grail of fetal diagnostics. A 2005 news article called a solution to this problem "the big prize." Exh. 5 [An Earlier Look at Baby's Genes] at 1478.

At roughly this time, Dr. Stephen Quake in Stanford University's bioengineering department was engaged in pioneering work on molecular counting and detection (such as DNA sequencing and digital PCR).[4] In this light, Dr. Quake devised an original angle to aneuploidy detection using cell-free DNA that had previously gone unseen by medical researchers in the field. Specifically, Dr. Quake realized that one could use sophisticated molecular counting techniques to detect subtle changes in the quantity of an aneuploid chromosome relative to the quantity of presumably diploid (*i.e.*, present in the normal quantity) chromosomes in a maternal blood sample. The inventors of the '017 and '018 patents, Dr. Quake and colleague Dr. Christina Fan, understood that using molecular counting techniques in this manner would allow for the detection of a tiny over- or under-representation of a chromosome that revealed aneuploidy— without having to distinguish fetal DNA from maternal DNA at all. *See, e.g.*, Exh. 2 ['017 patent] at 21:26-27 ("While this difference is small, it can be measured.").

This concept is disclosed in the '017 and '018 patents and finally allowed a viable test for fetal aneuploidy after ten years of failed research. *See, e.g.*, Exh. 6 [Brown Dep. Tr.] at 57:23-58:3 ("The fundamental idea of the '017 patent is that one can assess fetal aneuploidy from a mixed sample obtained from that plasma by counting molecules of DNA and then statistically

---

[4] Indeed, in 2003, Dr. Quake co-founded a company, Helicos Biosciences, that developed and sold the first DNA sequencing instrument that operated by imaging individual DNA molecules.

analyzing, or rather, analyzing those counts."). Sequenom is now exploiting these inventions without permission.

### B. "massively parallel sequencing of the random fragments of genomic DNA" / "massively parallel DNA sequencing of DNA fragments randomly selected"

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "massively parallel DNA sequencing of the random fragments of genomic DNA" ('017 patent, Claim 17) | "Massively parallel DNA sequencing" refers to "any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel (e.g., the Illumina sequencing platform)." No additional construction necessary. | "Massively parallel DNA sequencing of the random fragments of genomic DNA in each discrete reaction samples to detect the presence of the target sequence." |
| "massively parallel DNA sequencing of DNA fragments randomly selected" ('018 patent, Claim 1) | "Massively parallel DNA sequencing" refers to "any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel (e.g., the Illumina sequencing platform)." No additional construction necessary. | "Random, not targeted, massively parallel DNA sequencing." |

Sequenom contends that "massively parallel DNA sequencing of the random fragments of genomic DNA" in claim 17 of the '017 patent should be construed to mean only "targeted sequencing" of preselected DNA fragments whose sequences are "known in advance" prior to sequencing and that have been preselected through some sort of "enrichment" process.[5] At the same time, Sequenom contends that the nearly identical term "massively parallel DNA sequencing of DNA fragments randomly selected" in claim 1 of the '018 patent should be construed to mean "random, *not targeted*, massively parallel DNA sequencing."[6] In fact, those of skill in the art would understand that *both* of these terms refer to random—not targeted—DNA

---

[5] Neither Sequenom nor its expert Dr. Metzker has ever clearly defined "targeted sequencing." The term does not appear anywhere in the '017 or '018 patents. While there thus remains some confusion regarding Sequenom's constructions, based on the testimony and report of Dr. Metzker, Sequenom contends that "targeted sequencing" refers to methods in which only certain known DNA fragments in the maternal sample are either preselected or "enriched" for prior to being subject to the massively parallel sequencing process. Indeed, in his report, Dr. Metzker contends that a "target sequence" is "known in advance." *See, e.g.*, Exh. 7 [Metzker Decl.] ¶ 109. And, at deposition, Dr. Metzker testified that Sequenom's interpretation of claim 17 of the '017 patent requires an "enrichment step." Exh. 8 [Metzker Dep. Tr.] at 256:18-258:8, 225:15-23.

[6] Emphasis added unless otherwise stated.

sequencing.

By its constructions, Sequenom argues for two radically different interpretations of nearly identical claim terms appearing in patents *having the same specification*, an approach the Federal Circuit has rejected. *See, e.g.*, *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."). As set forth below, Sequenom's inconsistent constructions are not just at odds with each other, but also contrary to the intrinsic and extrinsic evidence, including the testimony of its own expert. Verinata and Stanford's consistent constructions comport with Federal Circuit guidance, and are fully supported by the claim language, specification, and the understanding of one skilled in the art. *See* Exh. 1 [Brown Opening Decl.] ¶¶ 22-24; Exh. 6 [Brown Dep. Tr.] at 81:22-82:12.

## 1. The Claim Language And Specification Support Verinata's Proposed Constructions

The claim language shows that Verinata and Stanford's constructions are correct, and that both of these claim terms encompass random—not targeted—DNA sequencing. The claims in which these terms appear in the '017 and '018 patents explicitly state that the sequencing is performed upon DNA fragments that are "random:" "*random fragments* of genomic DNA" ('017 patent); "DNA fragments *randomly selected*" ('018 patent). Likewise, the claims call for the analysis of a "mixture of fetal and maternal genomic DNA from said maternal tissue sample." Those of skill in the art recognize that this sample contains *random* fragments of maternal and genomic DNA, a point with which Sequenom's expert agrees. *See* Exh. 7 [Metzker Decl.] ¶ 150 ("The fragments of maternal and fetal DNA in the maternal tissue are *random fragments* of the mother's and fetus' genomic DNA. That is, the genomic DNA is naturally broken up into random fragments."); Exh. 8 [Metzker Dep. Tr.] at 176:6-14 ("A. Your question is where do the random fragments come from? Q. Yes. A. From the mixture of fetal and maternal genomic DNA."). These "random" fragments are subjected to massively parallel sequencing. For instance, as claim 17 of the '017 patent recites, one "distribute[s] random fragments from the mixture of fetal and maternal genomic DNA . . . to provide reaction samples" and then "conduct[s] massively parallel

DNA sequencing of the random fragments of genomic DNA in the reaction samples." Exh. 2 ['017 patent] at claim 17; *see also* Exh. 9 ['018 patent] at claim 1 ("conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA").

That the claimed methods are performed on "random" DNA fragments whose chromosomal origin is not known prior to sequencing is further confirmed by the limitations in both claim 17 of the '017 patent and claim 1 of the '018 patent of "identifying chromosomes to which the sequences obtained [] belong." Exh. 1 [Brown Opening Decl.] ¶ 26. An "identifying" step would not be necessary if the chromosomal origin of the sequenced fragments was known prior to sequencing. *Id.* In short, given the claim language, the claims of the '017 patent should not be limited to "targeted sequencing," as Sequenom suggests. *See* Exh. 10 [Brown Rebuttal Decl.] ¶ 17-32; Exh. 6 [Brown Dep. Tr.] at 175:21-176:3.

Verinata and Stanford's proposed construction is further compelled by the specification, which provides clear guidance that the claimed methods contemplate sequencing "random" DNA fragments whose sequence is not known prior to sequencing: "Also, while detection may be conveniently [] carried out by a sequence specific probe, detection may also be carried out by directly sequencing a region of interest to determine *if* it is the target sequence of interest." Exh. 2 ['017 patent] at 12:30-33. If the specification only contemplated sequencing only "target sequences" that were "known in advance" (as Sequenom contends), there would be no reason to determine "if" the thing that was sequenced was a "target sequence;" one would have already known that it was a "target sequence." This reference to determining "if" the thing sequenced was a "target sequence" supports Verinata's construction that the things sequenced in '017 patent, claim 1 may not all be "target sequences." The specification thus makes clear that sequencing of a DNA fragment can be carried out *without* prior knowledge of whether it is a sequence of "interest" that will be used in the aneuploidy analysis—an approach that involves random sequencing and is permitted only under Verinata's proposed constructions for the '017 patent.

Consistent with this, the specification further teaches that "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human

chromosome. Longer sequences can uniquely identify more particular targets." *Id.* at 20:15-19. In other words, the specification not only contemplates obtaining sequence information unknown prior to massively parallel sequencing, but further teaches the length of sequence needed to determine the chromosomal origin of a sequenced DNA fragment through, for instance, an alignment technique. *See, e.g.*, Exh. 10 [Brown Rebuttal Decl.] ¶¶ 49-57. Of course, if the DNA sequences were limited to preselected sequences "known in advance" and whose chromosomal origin was already known, there would be no need to "identify a sequence as belonging to a specific human chromosome."[7] In this regard, the specification leaves no doubt that "targeted sequencing" is not what was contemplated.

### 2. Sequenom's Contention That Claim 17 Of The '017 Patent Is Restricted To "Targeted" Sequencing Is Unfounded

In contrast to Verinata and Stanford's constructions, Sequenom's proposed constructions simply make no sense in the context of the '017 and '018 patents. Indeed, Sequenom's proposed constructions for "massively parallel DNA sequencing of the random fragments of genomic DNA" and "massively parallel DNA sequencing of DNA fragments randomly selected" introduce the concept of "targeted sequencing," a term that does not appear anywhere in the claims or specification of the '017 or '018 patents.

Sequenom adds a step to the '017 patent that their expert admits is not found in the language of the '017 patent. Neither Sequenom nor its expert has ever clearly defined "targeted sequencing." *See supra* n.5. However, Dr. Metzker testified that Sequenom's interpretation of

---

[7] Additionally, the specification points to publications describing random—not targeted—massively parallel DNA sequencing. For instance, the specification cites a 2003 publication by Braslavsky and Quake detailing Dr. Quake's early experiments on DNA sequencing and that sets forth the basis for the massively parallel random sequencing technique adopted by Helicos, a company co-founded by Dr. Quake in 2003. Exh. 2 ['017 patent] at 2:19-25 (referencing Braslavsky et al. as "[a]n example of a suitable method for single molecule analysis that may be adapted to the present methods"); Exh. 11 [Metzker 2010] at VRNTA00047415 (citing Braslavsky, and stating "Helicos BioSciences was the first group to commercialize a single-molecule sequencer, the HeliScope, which was based on the work of Quake and colleagues"). The specification also refers to the 2003 Balasubramanian patent application assigned to Solexa, which provides an early description of the method currently utilized in Illumina's random sequencing platform. *See* Exh. 2 ['017 patent] at 20:1-12 (referencing Balasubramanian et al. as an example of a "methodology useful in the present invention platform [] based on massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface").

claim 17 of the '017 patent requires an "enrichment step." Exh. 8 [Metzker Dep. Tr.] at 225:15-23. There is nothing in the claim language of claim 17 of the '017 patent to support Sequenom's position that an "enrichment step" is required, a point Dr. Metzker actually confirmed at deposition:

> Q.   You're calling the step that's targeting an enrichment step. We'll just call it enrichment.
>      Does Claim - - does Step A of Claim 17 itself require the enrichment step, according to you?
> A.   No, it does not require, but it does require an enrichment step before getting to Step B.
> Q.   The claim does, but not Step A?
> A.   Correct. I agree with you. It doesn't require in Step A.
> Q.   Okay. So then if that's true, what's the difference between Step A of Claim 17 and Step A - - of the '017 patent and Step A of Claim 1 of the '018 patent?
> . . .
> THE WITNESS:     It depends on whether the requirement is in Step A or the step between Step A and Step B in Claim 12 - - in Claim 17.
> BY MR. REINES:  I thought in Claim 17 of the '017 patent you say there is no requirement in Step A of the enrichment step itself in that step?
> A.   Right. But what I was trying to explain is that it can be done in Step A. It doesn't have to be done in Step A. But if it's not done in Step A, it has to be done before Step B.
> . . .
> Q.   If there's any requirement that you believe is from Step A of Claim 17 of the '017 patent beyond what's required of Step - - from Step A of Claim 1 of the '018 patent, please identify what it is.
> A.   ***I can't identify an additional requirement in Step A of Claim 17, but there has to be an enrichment step either optionally put into Step A or done between Step A and Step B of Claim 17***.

Exh. 8 [Metzker Dep. Tr.] at 256:18-258:8. Thus, Sequenom's own expert cannot identify any actual requirement in claim 17 of the '017 patent for an "enrichment" step. Rather, the most support Dr. Metzker could muster were garbled attempts to have an "enrichment" step "optionally put into Step A" (where he admitted ***there is no enrichment step***) or "done between Step A and Step B" (where one finds only white space in the patent claims). Dr. Metzker's testimony is clear evidence that Sequenom's proposed construction for "massively parallel DNA sequencing of the random fragments of genomic DNA" in claim 17 of the '017 patent is an attempt to import a

limitation into the claim that has absolutely no support in the claim language.

Sequenom's attempt to do this is particularly unprecedented, not just because it is without basis in the claim language, but because there is not a single embodiment in the '017 patent specification that teaches "targeted sequencing" or enrichment of DNA fragments prior to massively parallel sequencing. Exh. 10 [Brown Rebuttal Decl.] ¶¶ 33-34; *see also* Exh. 6 [Brown Dep. Tr.] at 97:20-98:6. In his report, Dr. Metzker does not identify any such "targeted sequencing" embodiment. Instead, to describe "targeted sequencing," Dr. Metzker relies upon a number of literature articles—***all of which post-date the '017 patent***. *See* Exh. 7 [Metzker Decl.] ¶¶ 44-45. In any event, for the Court to contemplate adding an "enrichment" step in the manner Sequenom contends—without any support in the claim language—there must be not just a disclosure of a "targeted sequencing" embodiment, but an exceptionally clear disavowal of claim scope or definition of a type rarely seen in patent jurisprudence. Yet there is no such thing, a point upon which Sequenom's expert agreed:

> Q. Okay. And did you invoke the clear disavowal concept either with respect to the prosecution history or the specification? Did you apply that -- did you see where that was applicable to any of the claim terms in your -- in this case?
>
> …
>
> Q. And, again, let's follow the same thing of if you -- if you think there's a term, just show me where the term is in your -- and where that opinion is in your report.
>
> A. Okay. I did look at the prosecution history.
>
> . . .
>
> THE WITNESS: Did look at the prosecution history, and I do not believe that there were any disavowal statements.
>
> Q. And that's with respect to both the specification and the prosecution history, correct?
>
> A. To the best of my understanding, yes.

Exh. 8 [Metzker Dep. Tr.] at 169:23-170:18; *see also id.* at 163:21-169:25 (Sequenom's expert agrees that the "own lexicographer" rule does not apply to any disputed claim terms).

Additional testimony and evidence from Dr. Metzker further undermines Sequenom's efforts to limit the claims of the '017 patent to "targeted sequencing." For instance, Dr. Metzker states in his declaration that "targeted sequencing" requires "that the target sequence is known in

advance," while "random sequencing does not involve the use of a known target sequence. To the contrary, random sequencing involves one or more DNA fragments that contain unknown sequences in advance of performing the method." Exh. 7 [Metzker Decl.] ¶¶ 109-10. But Dr. Metzker's characterization of "targeted sequencing" in his declaration is inconsistent with statements he has made both in this litigation and otherwise. Specifically, his position that "targeted sequencing" requires "that the target sequence is known in advance" directly contradicts his deposition testimony. *See* Exh. 8 [Metzker Dep. Tr.] at 238:15-24 (agreeing that "a target sequence which [Metzker defined] as just the thing to be sequenced" is "typically in the unknown portion of the reaction sample of the Step B of Claim 17"). Dr. Metzker's declaration is similarly at odds with his statements in a January 2010 review article, in which he described a "target sequence" as "typically an **unknown portion** to be sequenced." Exh. 11 [Metzker 2010] at VRNTA00047413. Dr. Metzker's inconsistent statements contradict Sequenom's proposed construction of "massively parallel DNA sequencing of the random fragments of genomic DNA."

Simply put, Sequenom argues for constructions that do not comport with the claim language, the specification, the knowledge of one of ordinary skill in the art, or Federal Circuit law. Such constructions cannot stand up to scrutiny and should be rejected.

C.  **"massively parallel DNA sequencing"**[8]

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "massively parallel DNA sequencing" ('017 patent, Claim 17; '018 patent, Claim 1) | "Any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel (e.g., the Illumina sequencing platform)." | See Sequenom's Proposed Constructions in Section I.B. |

As DNA sequencing technology developed, it became advantageous to sequence multiple DNA fragments simultaneously in parallel (*i.e.*, in one sequencing run). By February 2006, this technique had come to be known as "massively parallel DNA sequencing." For instance, the February 2006 provisional application to which the '017 and '018 patents claim priority describes

---

[8]  In addition to the analysis in this section with regard to the term "massively parallel DNA sequencing," Verinata and Stanford's analysis in Section I.B applies equally to this term.

one such DNA sequencing technique, explaining that it "lends itself to massive parallelism." Exh. 12 [Provisional 60/764420] at [0082]; *see also* Exh. 2 ['017 patent] at 19:30-31 ("This method lends itself to massive parallelism"). Along these lines, when Sequenom's expert was asked when he first became aware of the "sequencing by synthesis approach that was massively parallel sequencing," he explained that in 1994 he published an article on reversible terminators and "understood that an advantage could be multiplexing, to be doing lots of samples in a single experiment," thus confirming that he understands "massively parallel sequencing" to refer to sequencing multiple fragments in parallel. *See* Exh. 8 [Metzker Dep. Tr.] at 82:7-18.

Sequenom's primary complaint with Verinata and Stanford's proposed construction appears to be the phrase "e.g., the Illumina sequencing platform." According to Sequenom's expert, this phrase "would be unclear to a person of ordinary skill in the art in February 2006." Exh. 7 [Metzker Decl.] ¶ 115. Dr. Metzker further argues—without citing any evidence—that "[i]t would also not have been entirely clear to the person of [sic] sill in the art what this term meant in February 2007." *Id.* ¶ 162. This is unfounded: The Illumina sequencing platform is specifically referred to in the specification of the '017 and '018 patents to provide an example of one of the products contemplated by the patent to be used for massively parallel sequencing. *See* Exh. 2 ['017 patent] at 20:7-9 ("These templates are sequenced using four-color DNA sequencing-by-synthesis technology. See, products offered by Illumina, Inc., San Diego, Calif."). It is difficult to imagine how a reference to the "Illumina" sequencing platform would have been included in the specification at all if, as Dr. Metzker and Sequenom contend, such a product was not in existence or known in the art in February 2007. In fact, Sequenom's expert, though arguing that the specification is unclear, agreed at deposition that in February 2007 Illumina had just one product (the Genome Analyzer), establishing that there is no ambiguity in the specification. Exh. 8 [Metzker Dep. Tr.] at 120:14-121:15; *see also* 93:17-94:10.

Sequenom takes issue with Verinata's construction because "Illumina" is not mentioned in the February 2006 provisional application to which the patents claim priority, and it was not until late 2006 that Illumina acquired from Solexa, Inc. the sequencing technology upon which the Illumina sequencing platform is based. Therefore, Sequenom argues, the Illumina technology

might have gone by a different name in February 2006, making Verinata's construction inappropriate. However, "claim terms must be construed in light of the entirety of the patent, including its specification, and that the specification to be consulted is that of the issued patent, not an earlier application." *Sun Pharm. Indus., Ltd. v. Eli Lilly and Co.*, 611 F.3d 1381, 1388 (Fed. Cir. 2010).

Moreover, Sequenom's complaint is about form, not substance. Regardless of whether the word "Solexa" or "Illumina" is used, the general technology that is being referred to is the same. The Illumina sequencing platform was first referred to by those in the art as the "Solexa" sequencing platform, and later the "Illumina/Solexa" sequencing platform upon Illumina's 2006 acquisition of Solexa.[9] In fact, in the declaration that Dr. Metzker submitted in this litigation just a few months ago, he refers repeatedly to the "Illumina/Solexa" sequencing platform. *See, e.g.*, Exh. 7 [Metzker Decl.] ¶¶ 43, 44, 50. Moreover, Dr. Metzker described the Solexa platform as early as 2005 in an article on emerging sequencing technologies, leaving no doubt that those of skill in the art were aware of such technology long before February 2006. By summer 2006, the Solexa Genome Analyzer was commercially available. *See* Exh. 8 [Metzker Dep. Tr.] at 91:20-93:24. Thus, contrary to Dr. Metzker and Sequenom's contention, by February 2006, those in the art knew of sequencing platforms of the kind referred to in Verinata and Stanford's proposed construction. The corporate entity used to refer to the exemplary technology in Verinata and Stanford's construction would not change the substance of this to one of ordinary skill in the art.[10]

**D.**   **"reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule"**

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|

---

[9] *See* Exh. 13 [Metzker 2005] at 1773 (describing the Solexa platform as one example of "CRT" technology that can be "highly parallel"); *see also* Exh. 14 [The Year of Sequencing] at 14 (explaining that in 2005 the Solexa sequencing method had a read length of 25 bases and had been used to sequence a 180,000 base pair artificial genome); Exh. 8 [Metzker Dep. Tr.] at 89:19-22 ("Q. With respect to Solexa, they had a technology that's massively parallel sequencing, correct? A. That's correct."); *id.* at 84:24-85:20 (Sequenom's expert testifies that the "454" massively parallel sequencing platform was in widespread commercial use in 2005).

[10] Should Sequenom continue to contend that Verinata and Stanford's construction is improper because Solexa was not acquired by Illumina until late 2006, Verinata and Stanford would not object to a construction that instead referred to the "Illumina/Solexa" platform.

| "reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule" ('017 patent, Claim 17) | "Reaction samples containing a single DNA fragment or the amplification products of a single DNA fragment." | "Discrete reaction samples where the target sequence can be analyzed and where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules." |
| --- | --- | --- |

Through its constructions, Sequenom seeks to add a number of "extras" that are simply not present in the claim language or compelled by the specification: (1) "target sequence/target," (2) "discrete," and (3) "statistically significant" number of samples. Sequenom's inclusion of the concept of a "target" and/or "target sequence" is just another variation of its effort to restrict the '017 patent to a "target specific analysis." *See* Exh. 7 [Metzker Decl.] ¶ 101. The reasoning set forth above is equally applicable here and will not be repeated. *See supra* Parts I.B, I.C. As to the remaining two "extras" Sequenom seeks to introduce, Sequenom's added language is not required by the claim language and is, in fact, contradicted by the specification.

First, neither "discrete" nor "statistically significant" appears in the claim language itself. While Sequenom purports to take the concept of "discrete" from the specification, the specification gives no indication that reaction samples must be "discrete," as shown by the appearance of the phrase "reaction samples" throughout the specification *without reference to "discrete."* Exh. 10 [Brown Rebuttal Decl.] ¶ 66 (citing multiple instances in the specification where "reaction samples" is not preceded by "discrete").

As for the concept of a "statistically significant" number of reaction samples, the specification similarly contradicts Sequenom's construction by explicitly stating the following with regard to the number of samples:

> *The number of discrete samples is chosen according to the results desired. In one aspect*, it is preferred that a high degree of statistical significance is obtained, and the number of samples is at least about 10,000 . . . . *However, as shown below, results can be obtained with less, e.g. on the order of about 500 samples*, placed in separate reaction samples.

Exh. 2 ['017 patent] at 5:54-6:3. This passage thus makes clear that, while a high degree of statistical significance is "preferred," it is not a requirement, as the method may be performed with a far lower number (*e.g.*, 500) of samples.

Sequenom's expert has no substantive disagreement with Verinata and Stanford's proposed construction. He objects to it merely "because it has simply replaced the phrase 'single genomic DNA molecule' with the phrase 'single DNA fragment.'" Exh. 7 [Metzker Decl.] ¶ 101. Sequenom's objection that Verinata's construction is insufficiently verbose is without basis.

More importantly, Verinata and Stanford's proposed construction is confirmed by the claim language and the specification. Within the context of claim 17 of the '017 patent, what is being distributed in step (b), in which this term appears, are "random *fragments*" of DNA from the mixture of fetal and maternal genomic DNA. Exh. 2 ['017 patent] at claim 17. Thus, after distributing the "fragments" into reaction samples, the reaction samples contain those "fragments." Verinata and Stanford's proposed construction reflects this, stating that the "DNA molecule" referred to in the term is a "DNA fragment." Moreover, step (c) clearly states that what are sequenced in the "reaction samples" are the "random *fragments of genomic DNA*." *Id.* The specification further supports Verinata and Stanford's proposed construction by explicitly stating that what is attached to the "planar, optically transparent surface" in a massively parallel sequencing platform is "randomly *fragmented genomic DNA*." *Id.* at 20:1-5; *see also* Exh. 1 [Brown Opening Decl.] ¶ 45.

**E.     "identifying the chromosomes"/"identifying chromosomes"**

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "identifying the chromosomes" ('017 patent, Claim 17) | No construction necessary. | "Determining the identity of the unique regions of the target chromosomes from the corresponding target sequences." |
| "identifying chromosomes" ('018 patent, Claim 1) | No construction necessary. | "Aligning sequences obtained from random massively parallel DNA sequencing to a reference genome." |

The terms "identifying the chromosomes" and "identifying chromosomes" appear in claim 17 of the '017 patent and claim 1 of the '018 patent, respectively. Once again, Sequenom proposes two different constructions for nearly the same phrase in claims based on a common specification, against logic and Federal Circuit law. Sequenom's proposed construction for claim 17 of the '017 patent—with its "target sequence" and "target chromosome" language—is a

transparent reiteration of its attempt to limit the claims to "targeted sequencing," once again without support. On the other hand, for the '018 patent, Sequenom ostensibly seeks to limit the claims to just particular chromosome identification methods. Verinata and Stanford properly propose that these terms need no construction and should be accorded their plain and ordinary meaning consistently across both patents.

### 1.    The Phrase "Identifying [The] Chromosomes" Is Clear On Its Face

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. In accordance with this reasoning, the term "identifying [the] chromosomes" as recited in claim 17 of the '017 patent and claim 1 of the '018 patent means what it says, and any further construction of the term would be the type of "obligatory exercise in redundancy" that this Court has sought to avoid. *See, e.g., ProconGPS, Inc. v. Skypatrol, LLC*, No. 11-03975, 2012 U.S. Dist. LEXIS 112382, at *9-10 (N.D. Cal. Aug. 9, 2012) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008)).

Nothing in the language of either claim 17 of the '017 patent or claim 1 of the '018 patent requires that "identifying [the] chromosomes" be done in a particular way or that it be part of a "targeted sequencing" procedure. Rather, as Verinata and Stanford's expert Dr. Brown testified, "the whole point of the sequencing is to figure out which chromosome the fragment arose from, and *that process of figuring out which chromosome the fragment arose from would be identifying the chromosomes* to which the sequences obtained" belong. Exh. 6 [Brown Dep. Tr.] at 127:11-16. This comports with the context of the claims, which both recite massively parallel sequencing of *random* DNA fragments whose chromosomal origin is not known prior to sequencing. *See supra* Section I.B. The specification further confirms this, stating that "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome." Exh. 2 ['017 patent] at 20:15-18. While the specification discloses possible techniques one of skill in the art could use to "identify a sequence as belonging to a specific human chromosome," it does not state that "identifying [the] chromosomes" requires

carrying out that or any other specific method.

### 2. Sequenom's "Target Sequence/Chromosome" Should Not Be Imported Into The Phrase "Identifying [The] Chromosomes"

As justification for its attempt to limit the claims of the '017 patent to "targeted sequencing," Sequenom points to the presence of the word "the" in claim 17 of the '017 patent. *See, e.g.*, Exh. 8 [Metzker Dep. Tr.] at 268:25-269:4 (testifying that "in Step D of Claim 17 it reads 'identifying the chromosomes.' Again, 'the' implying that they are targeted versus Step C of Claim 1 of the '018 patent that simply just says 'identifying chromosomes.'"); Exh. 7 [Metzker Decl.] ¶ 155. Thus, Sequenom and Dr. Metzker contend that the word "the" in claim 17 of the '017 patent demonstrates that it is limited to "targeted sequencing," while the claims of the '018 patent are not. However, one of skill in the art would not look at the word "the" in claim 17 of the '017 patent as connoting the dramatic difference in meaning that Dr. Metzker suggests. In particular, one of skill in the art would not agree that the word "the" in claim 17 of the '017 patent carries the significance Dr. Metzker and Sequenom suggest, because Dr. Metzker's proposed understanding crosses out the word "random" that appears in step (c) of the claim immediately prior to step (d) where the word "the" appears. Exh. 10 [Brown Rebuttal Decl.] ¶ 40.

Likewise, those of skill in the art would understand that this contradicts the clear language in the claim confirming that it is directed to random—not targeted—sequencing. *See supra* Part I.B.1. Importantly, nothing in either step (d) of claim 17 of the '017 patent or step (c) of claim 1 of the '018 patent makes any mention of a "target chromosome" or "target sequence." The phrase "target chromosome" appears in step (e) of claim 17 of the '017 patent—in a step related to ***data analysis***, not ***data gathering*** (*i.e.*, DNA sequencing). Exh. 10 [Brown Rebuttal Decl.] ¶ 44. As such, this phrase has no bearing on how the DNA sequencing is carried out, including whether it is done only on pre-selected fragments. In any event, those of skill in the art would not understand the term "target" as implying a "targeted sequencing" procedure, but would understand that the specification uses the term broadly to refer to any sequence that is of interest because it can be enumerated and used in the aneuploidy analysis. *See id.* ¶¶ 35-36, 44.

The lack of support for Sequenom's position is further confirmed by Dr. Metzker's

declaration. He asserts "[a] person of ordinary skill in the art would have understood that, based on the language of Claim 17 and the disclosure of the specification, 'identifying the chromosomes' means 'determining the identity of the target chromosomes from the corresponding target sequences.'" Exh. 7 [Metzker Decl.] ¶ 117. But Dr. Metzker provides no support for this assertion, stating only that the phrase "target chromosomes" appears in claim 17 of the '017 patent and the phrase "target sequence" appears in the specification.[11]

Sequenom has provided no evidence supporting the inclusion of "*unique* regions" in its construction. The specification offers no such evidence. In fact, the specification explicitly states that "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome. *Longer sequences can uniquely identify more particular targets.*" Exh. 2 ['017 patent] at 20:15-19. This portion of the specification thus discusses both circumstances in which one obtains enough sequence information (*e.g.*, 30 bp) to identify the chromosome(s) *and* the more narrow circumstances in which one obtains enough sequence information (*e.g.*, "longer" sequences than 30 bp) to identify the "unique" region on a particular chromosome. Exh. 10 [Brown Rebuttal Decl.] ¶ 47.

F.    **"analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome"[12]**

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a | "Determining the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome, | "Determining the integer number of copies of the target chromosomes in said mixture of fetal and maternal genomic DNA from the identities of the target chromosomes determined in step |

---

[11] Dr. Metzker additionally cites a passage in the specification as alleged support for his and Sequenom's position, but without any analysis whatsoever of the passage that indicates the basis for any such support. Exh. 7 [Metzker Decl.] ¶ 120; Exh. 10 [Brown Rebuttal Decl.] ¶ 45.

[12] The analysis in this section applies equally to the term "the number of copies of at least one first target chromosome/the number of copies of a second target chromosome," which is subsumed in the expanded term discussed in this section. Additionally, it applies to any term where Sequenom has introduced the word "integer." This includes the disputed claim term "a statistical analysis that compares the number of copies of said at least one first target chromosome to the number of copies of said second target chromosome," where Sequenom's proposed construction modifies the claim language simply by introducing the term "integer" twice. Dkt. No. 58 [JCCS], Exh. A at 40.

| second target chromosome" ('017 patent, Claim 17) | as represented by the results of the identifying step d)." | d)." |
|---|---|---|

In its proposed construction for this term, Sequenom introduces a concept present neither in the claim language nor the specification of the '017 patent: "integer." As set forth below, there is no basis in the intrinsic record for introducing this word into the claims.

### 1. The Sequencing Embodiments Of The '017 Patent Do Not Require Determining An "Integer" Number Of Copies Of Chromosomes

Scouring the '017 patent for the term "integer number of copies of the target chromosome" yields no results—neither the term nor the concept appears anywhere in the patent claims or specification. The word "integer" never even appears. This is unsurprising. Maternal plasma, one of the "maternal tissue[s]" from which fetal and maternal genomic DNA can be obtained in claim 17, contains few if any whole chromosomes. Rather, the DNA in maternal plasma and serum is naturally fragmented, a point Sequenom's own expert has confirmed. *See* Exh. 7 [Metzker Decl.] ¶ 150; *see also* Exh. 1 [Brown Opening Decl.] ¶ 51; Exh. 10 [Brown Rebuttal Decl.] ¶ 70. Based solely on this fact, one of ordinary skill in the art would understand that determining the "number of copies" in step (e) of claim 17 is not restricted to "integer" numbers of chromosomes. Exh. 1 [Brown Opening Decl.] ¶ 51.

This is further confirmed by the logical flow of the claim language in claim 17 of the '017 patent. First, step (c) calls for "conducting massively parallel DNA sequencing of the ***random fragments*** of genomic DNA." Thus, the sequence information one obtains is not for an integer number of "chromosomes," but for a number of "fragments" of DNA that merely came from a chromosome. In step (d), one identifies the chromosome from which each fragment comes. In step (e), the claim language refers to analyzing the data from step (d) to determine the "number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA," a process that those of skill in the art would understand refers to enumerating the results from step (d) to generate a parameter that is merely a representative proxy for the number of copies of the chromosome of interest (based on DNA fragments identified corresponding to that chromosome). Because there are no whole chromosomes in the "mixture of fetal and maternal

genomic DNA" to speak of, it would be nonsensical to interpret this any other way.

The specification of the '017 patent further confirms that step (e) of claim 17 does not require determining an "integer" number of copies of a chromosome. As discussed above, the specification discusses the length of sequence information necessary to "identify a sequence as belonging to a specific human chromosome." Exh. 2 ['017 patent] at 20:15-18. The specification further cites to the Braslavsky and Balasubramanian references, both of which describe the amount of sequence information necessary to determine the human chromosome to which a sequence obtained by massively parallel sequencing belongs. *Id.* at 2:19-25; 19:22-56; 20:10-12. Thus, the specification shows that after identifying the chromosomes to which the obtained sequence tags correspond and counting the number of tags that correspond to each chromosome of interest, those counts are proxies representative of the amount present of each chromosome of interest. Exh. 1 [Brown Opening Decl.] ¶ 57. Verinata and Stanford's proposed construction reflects this, thus giving proper meaning to this claim term.

As Verinata and Stanford's expert Dr. Brown testified, in step (e) of claim 17 "what one ends up with is proxies for the underlying chromosomes in which the [corresponding DNA sequences obtained by massively parallel sequencing] belong." Exh. 6 [Brown Dep. Tr.] at 151:4-6; *see also* Exh. 1 [Brown Opening Decl.] ¶¶ 54, 56. That is, analysis of the results of "identifying the chromosomes to which the sequences obtained" by massively parallel sequencing belong (step (d) of claim 17) gives rise to a number of obtained sequence tags that correspond to at least one first target chromosome and a number of obtained sequence tags that correspond to a second target chromosome. *See supra* Part I.E. These numbers are representative of the amount of the at least one first target chromosome and the amount of the second target chromosome that are present in the sample. Exh. 1 [Brown Opening Decl.] ¶¶ 54, 56.

## 2. The Support Offered By Sequenom For Its Construction Is Mischaracterized And/Or Directed At Non-Sequencing Embodiments

To bolster its inclusion of "integer" in the proposed construction for this term, Sequenom offers an opinion by its expert Dr. Metzker that "[a] person of ordinary skill in the art would have understood that, based on the claim language and the disclosure of the specification, 'the number

of copies' means 'an integer number of copies.'" Exh. 7 [Metzker Decl.] ¶ 121. But Dr. Metzker's opinion does not hold up against the plain language of claim 17 and the specification.

Sequenom cannot point to any language in claim 17 itself justifying the concept of "integer" in its proposed construction. As such, Dr. Metzker points to passages in the specification that allegedly "expressly refer[] to integer, not fractional, number of copies of a chromosome." *Id.* ¶ 123. Though the passages cited by Dr. Metzker refer to ***numbers***, there is no indication in any of the passages that the numbers are confined to integers. In fact, in a passage conveniently not cited by Dr. Metzker, the specification refers specifically to a non-integer number of amplicons:

> In comparing the amplicons of each type, one expects to find that for every e amplicons from chromosome A there are $e(1-\varepsilon) + \alpha\varepsilon$ amplicons from chromosome B. In the case of a trisomy and $\varepsilon=3\%$, then for every 2 amplicons from chromosome A one expects ***2.03 amplicons from chromosome B***.

Exh. 2 ['017 patent] at 21:21-26.

Moreover, the passages Dr. Metzker cites in his declaration fall into at least one of two categories: (1) passages related to embodiments of the non-sequencing digital PCR methods claimed in the '017 patent; and/or (2) passages simply describing examples of the techniques described in the '017 patent. Exh. 10 [Brown Rebuttal Decl.] ¶ 74. Neither can justify Sequenom's unduly narrow construction. *See* Exh. 1 [Brown Opening Decl.] ¶ 58. In fact, in embodiments of the '017 patent employing digital PCR, one counts not the actual chromosomes present in a maternal tissue sample, but rather the number of fragments of maternal and fetal DNA present in the sample—the number of fragments of maternal and fetal DNA present in the sample are used as a proxy representative of the number of copies of a chromosome present in the sample. Indeed, the specification describes digital PCR as allowing detection of aneuploidy via "counting transcripts," not "chromosomes." Exh. 2 ['017 patent] at 21:12-14. The specification further describes amplification and detection of "representative segments"—not "chromosomes"—via digital PCR. *Id.* at 21:20-21.

In short, the concept of "integer" does not belong in the proper construction for his term. Sequenom's expert argues that "there is no such thing as a fraction of a chromosome in the digital

analysis of the '017 Patent." Exh. 7 [Metzker Decl.] ¶ 124. But there is such a thing: This is exactly the concept embraced in claim 17 of the '017 patent, that of sequencing and counting the *fragments* of chromosomes that are present in a maternal plasma or serum sample. Exh. 10 [Brown Rebuttal Decl.] ¶ 70.

### G. "wherein" clauses referring to the "first" and "second" chromosomes

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "wherein said at least one first target chromosome is presumed to be diploid" ('017 patent, Claim 17) | "Wherein said at least one first target chromosome is presumed to be of normal copy number." | "Wherein an affirmative presumption is made that the at least one first target chromosome, which cannot include the second chromosome suspected to be aneuploid, is of normal copy number." |
| "wherein said second chromosome is suspected to be aneuploid" ('017 patent, Claim 17) | "Wherein said second chromosome is suspected to be of abnormal copy number." | "Wherein there is an affirmative suspicion that the second target chromosome is of abnormal copy number." |
| "wherein said at least one first chromosome is presumed to be euploid" ('018 patent, Claim 1) | "Wherein said first chromosome is presumed to be of normal copy number." | "Wherein an affirmative presumption is made that at least one first chromosome, which cannot include the at least one second chromosome suspected to be aneuploid, is of normal copy number." |
| "wherein said at least one second chromosome is suspected to be aneuploid" ('018 patent, Claim 1) | "Wherein said second chromosome is suspected to be of abnormal copy number." | "Wherein there is an affirmative suspicion that at least one second chromosome is of abnormal copy number." |

With regard to these four terms, the parties agree that a proper meaning for "diploid" and "euploid" is "of normal copy number." Likewise, the parties agree that a proper meaning for "aneuploid" is "of abnormal copy number." However, the agreement ends there. While Verinata and Stanford propose constructions for these terms that reflect their plain meaning, Sequenom's proposed constructions continue its pattern of improperly including concepts nowhere to be found in the '017 or '018 patents: (1) "affirmative presumption" and "affirmative suspicion" and (2) a requirement that the "at least one first chromosome" in both claim 17 of the '017 and claim 1 of the '018 patent "cannot include the [at least one] second chromosome suspected to be aneuploid."

### 1. Inclusion Of The Word "Affirmative" In Sequenom's Proposed Constructions Adds Ambiguity, Not Clarity, To These Claim Terms

The words "presumed" and "suspected" themselves need no further construction. They are clear on their face and a person of ordinary skill in the art would understand their plain meaning. Specifically, one of ordinary skill in the art would understand that in the type of experimental assay being performed in the methods claimed in claim 17 of the '017 patent and claim 1 of the '018 patent, there must be a variable condition and a control condition. Exh. 1 [Brown Opening Decl.] ¶ 69. That is, when testing for aneuploidy of a particular chromosome, the variable condition is whether or not that chromosome is actually aneuploid—in which case that chromosome is "suspected" of being aneuploid for the purposes of the assay. *Id.* Likewise, the test has a control condition—a chromosome or chromosomes to which the variable, potentially aneuploid chromosome is compared. *Id.*

Sequenom has yet to explain what is added by including the concept of an "affirmative presumption" or "affirmative suspicion" in its proposed constructions. In fact, the word "affirmative" does not appear anywhere in the '017 or '018 patents. Furthermore, Sequenom has offered nothing more than a conclusory opinion, unsupported by any citations to the patent, by Dr. Metzker that "[t]he language of the claim element is 'suspected to be aneuploid' which a person of ordinary skill in the art would have read to mean there must be an 'affirmative suspicion' that the second chromosome is aneuploid." Exh. 7 [Metzker Decl.] ¶ 139. Sequenom and Dr. Metzker themselves cannot even explain what "affirmative" means in the context of Sequenom's proposed constructions, confirming that the phrases "affirmative suspicion" and "affirmative presumption" would be similarly ambiguous to one of ordinary skill in the art.

Sequenom's expert himself confirms that Verinata and Stanford's proposed constructions are the proper ones to be applied to these terms, stating in his declaration as follows:

> [a] person of ordinary skill in the art would have understood that the phrase "wherein said at least one first target chromosome is presumed to be diploid" means that a ***presumption must be made that the first target chromosome is diploid***, which means that it has the normal number of copies, *i.e.*, two. ***It is my opinion that a person of ordinary skill in the art would have understood the presumption of being diploid from the language of the claim term itself: "presumed to be diploid."***

Exh. 7 [Metzker Decl.] ¶ 129. Dr. Metzker's statement, which does not evoke or use the word

"affirmative," thus acknowledges that "presumed" needs no further construction than its plain and ordinary meaning.

Dr. Metzker likewise confirmed that the concept of an "affirmative" "presumption" or "suspicion" is not required in the claimed methods:

> Q. Okay. So if you're targeting, for example, Chromosome 21, but you don't have a reason to believe that there's actually Down syndrome because you just don't know, you don't know one way or the other, do you believe that that's not covered or is covered by Claim 17?
>
> . . .
>
> A. If I'm doing a test because I - - I'm suspecting aneuploidy, I'm testing for Down syndrome, I believe that's Claim - - that is covered by Claim 17.
>
> . . .
>
> Q. Okay. So if you take a random pregnant mother and it's just a routine case of wanting to determine whether there's Down syndrome and you run this test and you specifically look at Chromosome 21 to confirm whether there's aneuploidy or not, you're comfortable that Claim 17 would cover that; is that correct?
>
> A. Yes.
>
> Q. . . . In the case where you don't have a reason to believe one way or the other whether the fetus is aneuploidy, but you're performing a test to test whether they are or not, that would still be covered by Claim 1 of the '018 patent, correct?
>
> . . .
>
> Well, you don't have a reason to believe one way or the other whether there's actual aneuploidy, but you're doing the test to check whether there is.
>
> . . .
>
> You're testing Chromosome 21 specifically, for example, in the case of a Down syndrome test because you want to figure that out.
>
> That's covered by Step D of Claim 1, correct?
>
> A. Yes.

Exh. 8 [Metzker Dep. Tr.] at 260:21-263:3.

### 2. Chromosomes Need Not Be Divided Into Mutually Exclusive Categories

Nothing in the claim language of the '017 and '018 patents indicates that the category of the "at least one target chromosome [] presumed to be [diploid/euploid]" cannot overlap with the category of "second chromosome [] suspected to be aneuploid," as Sequenom contends. The

notion of what chromosome(s) are presumed to be diploid and what chromosome(s) are suspected to be aneuploid is relevant to the data analysis components of claim 17 of the '017 patent and claim 1 of the '018 patent. In such analysis, it is possible to both suspect a chromosome to be aneuploid *and* presume that same chromosome to be diploid. As inventor Dr. Quake testified with regard to statistical analysis generally, "[y]ou establish a known hypothesis and you try to establish a probability whether it's true or not. And you can suspect it's not true, presume it to be true but suspect it not to be true." Exh. 15 [Quake Dep. Tr. 2012-11-02] at 463:6-10.

Dr. Quake's explanation evokes the notion of a variable and a control, as discussed above. In analyzing a pool of data obtained from massively parallel sequencing of a mixture of fetal and maternal genomic DNA fragments, one could simultaneously suspect chromosome 21 of being aneuploid for the sake of determining whether the fetus has Down Syndrome (variable) *and* presume it to be diploid (control) for the sake of determining other conditions such as Edwards Syndrome, which results from aneuploidy of chromosome 18. Exh. 1 [Brown Opening Decl.] ¶ 73; *see also* Exh. 6 [Brown Dep. Tr.] at 126:11-127:6 (testimony by Verinata and Stanford's expert, in response to the question of whether a chromosome can be suspected of aneuploidy and presumed euploid in the same test, that "it could both be presumed aneuploid or euploid depending on how one posits the question" and that if "[y]ou want to find out if there's aneuploidy of chromosome whatever, 21 . . . the way you do that is you ask do the data support euploidy or aneuploidy, which are – which is the – are the data most consistent with."). The claim language reflects this, reciting that "at least one" chromosome is presumed to be diploid without otherwise confining that category.

The specification likewise fails to support the concept that "the at least one target chromosome [] presumed to be diploid" cannot include the second chromosome suspected to be aneuploid. Indeed, Dr. Metzker's declaration makes clear that Sequenom takes this concept merely from an *example* of the claimed methods, rather than from any requirement described in the specification: "The 'control' is only made up of 'a normal diploid chromosome' – not the 'chromosome suspected of being present in an abnormal copy number.' This is explicitly stated *in an example in the specification* concerning the detection of chromosome 21 . . . ." Exh. 7

[Metzker Decl.] ¶¶ 133-134. Other passages Sequenom purports to rely upon for its proposed construction are similarly merely describing examples, not requirements, of the claimed methods. *See* Exh. 1 [Brown Opening Decl.] ¶ 70 (describing that the passages cited by Sequenom explicitly state that they are an "example," "embodiment," "sample," "case," "illustration," or "aspect" of the claimed invention).

### H. "compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture"

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture" ('018 patent, Claim 1) | No construction necessary. | "Compare an amount of at least one first chromosome to an amount of at least one second chromosome, all chromosomes being within one maternal tissue sample." |

The dispute between the parties has nothing to do with the meaning of this claim term. This claim term is clear on its own and needs no further construction, a fact confirmed by the fact that Sequenom's "construction" recites the claim language almost verbatim. Rather, the dispute between the parties is whether the phrase "all chromosomes being within one maternal tissue sample" should be tacked on to the claim language, as Sequenom contends.

The specification makes clear that aneuploidy can be assessed by comparing data obtained from multiple separate tissue samples, thus contradicting Sequenom's construction. For instance, to assess aneuploidy one could compare a chromosomal representation from a sample that is being tested to a control chromosomal representation, as determined from a control set of samples each of which is obtained from a normal pregnancy. This is disclosed in Table 1, which shows ratios of chromosome 21 to chromosome 12 in a series of normal and Down Syndrome samples. Exh. 9 ['018 patent] at 28:10-25. The supporting text explains as follows: "The significance of the higher ratios in the Downs cases is shown in FIG. 4, and was also analyzed in a Student's T-test, with a value of 0.036599344." *Id.* at 28:30-33. In other words, aneuploidy can be assessed by looking to see if chromosomal representation is higher than normal by a statistically significant amount, a process that will involve comparison of multiple patient samples. In view

of this disclosure, Sequenom's "one tissue sample" construction should be rejected.

The claim language further confirms this. "[S]aid mixture," as recited in this claim term, refers back to "*a* mixture of fetal and maternal genomic DNA from said maternal tissue sample," which appears in step (a) of Claim 1. Exh. 9 ['018 patent] at claim 1. The Federal Circuit "'has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (quoting *KJC Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). The Federal Circuit treats the principle that "a" means "one or more" "as a rule, rather than merely as a presumption or even a convention."[13] *Id.* Carrying out this principle, "said mixture" in step (d) of Claim 1 carries the meaning of "one or more" mixtures and thus includes comparisons of data obtained from "one or more" mixtures. *Id.* at 1343 ("[T]he use of a definite article ('said' or 'the') to refer back to an initial indefinite article does not implicate, let alone mandate the singular. Because the initial indefinite article ('a') carries either a singular or plural meaning, any later reference to that same claim element merely reflects the same potential plurality.").

As to the specification, the evidence Sequenom points to in support of its proposed construction confirms the Federal Circuit guidance discussed above and shows that the '018 patent does not require that the chromosome amounts compared in the claimed method be within one maternal tissue sample. In the JCCS, Sequenom cites only two passages in the '018 patent specification (and cites *nothing* in claim 1 itself), neither of which support Sequenom's proposed construction.

Sequenom first cites a passage describing related art suggesting that non-invasive aneuploidy detection may be carried out on fetal nucleated cells obtained from a maternal blood sample. Dkt. No. 58, [JCCS] Exh. B at 22; Exh. 9 ['018 patent] at 3:52-56. This passage describes only related art, with no indication that it describes a *requirement* of the claimed

---

[13] In order to meet the "extremely limited" exception to this rule, "a patentee must 'evince[] a clear intent' to limit 'a' or 'an' to 'one.'" *Baldwin Graphics*, 512 F.3d at 1342 (citing *KJC Corp.*, 223 F.3d at 1356). Neither Sequenom nor Dr. Metzker contends that this circumstance applies to the '018 patent, nor could they.

method.  Exh. 1 [Brown Opening Decl.] ¶ 63.  Sequenom further cites a passage of the specification that discusses an illustration of how "[d]igital PCR allows the detection of aneuploidy merely by counting transcripts."  Dkt. No. 58, [JCCS] Exh. B at 22; Exh. 9 ['018 patent] at 21:2-3, 21:8-12.  This passage does not impose a requirement on the claims.  It simply describes an example of how an internal control can be used to determine the presence or absence of fetal aneuploidy.  Exh. 9 ['018 patent] at 21:8-12.

As for Sequenom's reference to the declaration of its expert Dr. Metzker as providing additional support for its proposed construction, no such support is to be found.  Dr. Metzker's only comments consist of a conclusory opinion that the comparison carried out in step (d) of Claim 1 "is done within one maternal tissue sample."  Exh. 7 [Metzker Decl.] ¶ 168.  To be sure, Dr. Metzker does claim that the phrase "in said mixture" in step (d) indicates that "[t]here is no suggestion in Claim 1 that there is any more than **one** mixture per maternal tissue sample."  *Id.* ¶ 169 (emphasis in original).  But, as explained above, the Federal Circuit has made clear that exactly the opposite is true.  This term directly refers back to "*a* mixture of maternal and fetal genomic DNA" which clearly contemplates multiple mixtures.

**I.** **"solid phase amplification of the attached fragments to create a high density sequencing flow cell"**

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "solid phase amplification of the attached fragments to create a high density sequencing flow cell" ('017 patent, Claim 21) | "Amplification (*e.g.*, by polymerase chain reaction) of DNA fragments attached to the surface of a container through or over which reagents can be flowed (*e.g.*, as in the Illumina sequencing platform)." | No construction necessary: "Solid phase polymerase-based amplification of the attached fragments to create a high density sequencing flow cell." |

The parties' dispute[14] again focuses on the fact that Verinata and Stanford's construction refers to "the Illumina sequencing platform," which is explicitly referred to in the patent.  *See* Exh. 2 ['017 patent] at 20:7-9; Exh. 7 [Metzker Decl.] ¶ 177.  This issue is addressed above and

---

[14] While Sequenom states that no construction is necessary for this term, Sequenom's expert opines that this term should be construed to be "polymerase based." Exh. 7 [Metzker Decl.] ¶ 143.  However, Dr. Metzker states no evidence or reasoning to support this position. *See id.*

the analysis will not be repeated. *See supra* Part I.C. Beyond this, Verinata and Stanford's proposed construction clarifies that a "flow cell" is a container through which reagents can be flowed. This description comports with the 2003 patent application by Balasubramanian that was assigned to Solexa and that offers a description of an early version of the Illumina/Solexa sequencing platform. *See* Exh. 16 [2003/0022207] at [0075]-[0076]. Importantly, this very patent application is cited in the '017 patent in connection with its reference to the Illumina sequencing product. *See* Exh. 2 ['017 patent] at 20:10-12.

### J. "four-color DNA sequencing by synthesis process"

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "four-color DNA sequencing by synthesis process" ('018 patent, Claims 3-4) | "Any DNA sequencing process in which sequence information is ascertained by detecting incorporation of four differently labeled nucleotides into a DNA strand during synthesis (*e.g.*, as in the Illumina sequencing platform)." | No construction necessary:<br><br>"DNA sequencing by synthesis process using four different dye-labeled dNTPs with photocleavable linkers in which all four dNTPs can be assayed simultaneously." |

Sequenom's sole complaint with Verinata and Stanford's construction again seems to be that it makes reference to "the Illumina sequencing platform." *See* Exh. 7 [Metzker Decl.] ¶ 179. This issue is addressed above and the analysis will not be repeated. *See supra* Part I.C. Verinata and Stanford's construction properly explains that the Illumina sequencing platform referenced in the patent is an example of four-color DNA sequencing by synthesis. *See* Exh. 2 ['017 patent] at 20:7-9. On the other hand, Sequenom's alternative construction introduces a number of inappropriate requirements. As one example, nothing in the '018 patent requires that the "four-color DNA sequencing by synthesis process" be carried out with "photocleavable linkers" (*i.e.*, linkers that can be cleaved by application of light). While photocleavable linkers could be used, others linkers are possible, and there is no basis to exclude them from the scope of the claims. As just one example, one could uses linkers that are cleaved enzymatically, as is done in the Pacific Biosciences sequencing system. *See, e.g.*, Exh. 17 [http://www.pacificbiosciences.com/products/smrt-technology/]; Exh. 8 [Metzker Dep. Tr.] at 64:1-65:23, 66:8-23, 68:10-69:23. As such, Sequenom's proposed construction is unduly narrow.

**K.** **"determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f)"**

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f)" ('017 patent, Claim 17) | No construction necessary. | "Making an affirmative determination that the fetus does or does not have a fetal aneuploidy from the comparison of the [integer] number of copies of the first target chromosome with the [integer] number of copies of the second target chromosome in step f)."[15] |

This term requires no further construction. The language used in this term includes no terms of art or technical terms, but rather uses words having common and ordinary meanings that would be understood by one of skill in the art. Any further construction would be "an obligatory exercise in redundancy" that has no proper place in claim construction. *See, e.g.*, *ProconGPS*, 2012 U.S. Dist. LEXIS 112382, at *9-10. The concept of an "affirmative determination," (Sequenom has never explained what this is) adds nothing to the meaning of this term—as evinced by the declaration of Sequenom's expert, which purports to support Sequenom's proposed construction with nothing more than a statement (lacking any citations to the patent or extrinsic evidence) that one of ordinary skill in the art would have understood that this claim term "requires an affirmative determination that the fetus does or does not have aneuploidy." Exh. 7 [Metzker Decl.] ¶ 142.

## II.     U.S. PATENT NO. 8,195,415

### A.     Background

The '415 patent relates to methods of non-invasively diagnosing fetal chromosomal aneuploidy in a mixture of fetal and maternal DNA. Exh. 18 ['415 patent] at 3:52-56. The claimed methods are based upon a similar principle to that which underlies the '017 and '018 patents, that of molecular counting of sequence tags generated by massively parallel sequencing

---

[15] Though Sequenom's proposed construction as submitted in the parties' Joint Claim Construction Statement does not include the word "integer," Dr. Metzker's declaration indicates that "integer" is part of Sequenom's proposed language. *Compare* Dkt. No. 58 [JCCS], Exh. A at 44, *with* Exh. 7 [Metzker Decl.] ¶ 142.

of cell-free fetal and maternal DNA in order to determine whether there is over- or under-representation of any chromosome or chromosome portion. *Id.* at 3:35-4:1. The '415 patent expands upon this principle, additionally teaching analysis of sequence tag density in "windows," predefined subsections of chromosomes. *Id.* at 4:9-12. Informatic sectioning of chromosomes into windows, as claimed in the '415 patent, allows one to account for non-uniform distribution of sequence tags across various chromosomes. *Id.* at 4:51-64. This, in turn, leads to more robust and statistically significant results in diagnosing fetal aneuploidy. *Id.*

An additional advance in the '415 patent is the use of "windows" to particularly correct for variations in sequence tag density caused by the amount of guanine and/or cytosine ("GC") present in the sequenced DNA fragments. Inter-sample variation in sequence tag density has been observed to be directly correlated with increased GC content. *Id.* at 11:50-64, Figure 1A. This variation can lead to biased results and overrepresentation of sequence tags corresponding to fragments with higher GC content; such bias in the context of molecular counting can in turn falsely suggest an aneuploidy. *Id.* at 19:65-20:1. Thus, the '415 patent teaches one how to correct for bias caused by fragments having high GC content in order to allow analysis of samples from which statistically significant results could not otherwise be obtained. *Id.* at 20:4-8.

### B. "a first value and a second value"

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "a first value and a second value" ('415 patent, Claim 1) | "A first value and a second value for numbers of sequence tags mapping to chromosome portions." | "A first value and a second value for mapping to different chromosome portions, all chromosome portions being from one sample/subject." |

As it has done so frequently, Sequenom again seeks to add extraneous language to the claims, this time the requirement that "all chromosome portions be[] from one sample/subject." While Sequenom's expert Dr. Metzker opines that this construction is proper for linking "the values of sequence tags mapping to chromosome portions to chromosomes from within the same sample," Exh. 7 [Metzker Decl.] ¶ 195, such a link is not required by the intrinsic evidence. In fact, such a "link" is contradicted by the intrinsic evidence, a point Dr. Metzker confirmed at deposition, as set forth below.

Although Sequenom contends that the claims should be limited to methods in which "all chromosome portions" are from "one sample/subject," the specification discloses embodiments in which chromosome portions come from both a single patient sample *and* multiple patient samples. Indeed, the specification generally contemplates comparing values of sequence tags mapping to chromosome portions between samples/subjects: "The median count of autosomal values (*i.e.*, number of sequence tags per autosome) is used as a normalization constant to account for differences in total number of sequence tags . . . *for comparison between samples* and between chromosomes." Exh. 18 ['415 patent] at 4:1-5; *see also id.* at 7:67-8:4 (discussing the necessity of normalization "to compare different patient samples since the total number of sequence tags (thus, the sequence tag density) for each patient sample is different. . . ."); Figure 5A (plotting mean sequence tag density for each chromosome, in order of increasing GC content, "of all samples" as discussed at 6:51-63).

Perhaps most notable, Example 9 of the '415 patent is directed to a method of determining aneuploidy that involves "Comparing Different Patient Samples Using Statistical Analyses (T Statistic)." *See id.* at 26:63-64. In this approach, an "average t statistic matrix" is computed based on data from multiple patient samples and is then used as a standard to assess aneuploidy. *See id.* at 27:36-51. Thus, in this approach, chromosome portions from multiple patient samples are utilized. Notably, at deposition, Sequenom's expert confirmed that this embodiment was within the scope of the claims, even under Sequenom's own constructions. *See* Exh. 8 [Metzker Dep. Tr.] at 282:19-285:11 (when asked whether the claim 1 covers Example 9 and after taking additional opportunity to review, answering "Yes, I believe it does"). Accordingly, any contention by Sequenom that the claims of the '415 patent do not include embodiments—such as Example 9—in which multiple chromosome portions are used should be rejected.[16] *See, e.g.*,

---

[16] The passages in the specification cited by Sequenom in the JCCS and by its expert are not requirements, but mere examples of embodiments. The first passage cited by Sequenom and its expert explicitly states that "the present invention comprises, *in certain aspects* . . . ." Exh. 18 ['415 patent] 4:29-52. A second cited passage similarly states only "that one would *prefer* to use as a reference chromosome in the mixed sample . . . ." *Id.* at 5:53-56. Sequenom's third cited passage, discussing provision of "an internal reference, derived from al [sic] of the sequence tags (genomic sequences)," in no way indicates that either "a first value or a second value" arises from the "internal reference" cited in the passage. *Id.* at 9:6-10. If this is the only support to which Sequenom can point as allegedly "supporting" a requirement that "a first value and a second

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting a proposed construction because it would "exclude several examples in the specification").

Nothing in the claim language compels the exclusion of such embodiments. Although the claim's preamble refers to examining a mixed sample for an abnormal distribution of a specified chromosome portion obtained from "a subject," step (c) of the claim—which includes the language Sequenom seeks to construe—does not include any requirement that all of the "chromosome portions" that are used come from just a single subject. Step (c) of the claim simply refers to "normally and abnormally distributed chromosome portions to obtain a first value and a second value therefrom," and this language is decoupled from any language in the claim referring to the sample (or samples) that are being tested.

Furthermore, even assuming this language was linked to the language in the preamble referring to "a subject," this would not support Sequenom's construction. As discussed above with respect to the '018 patent, "a" or "an" in an open-ended patent claim containing the word "comprising," as the preamble of claim 1 does, carries the meaning "one or more." *Baldwin Graphic Sys.*, 512 F.3d at 1342; *see supra* Part I.H. Thus, "a subject" as recited in claim 1's preamble denotes "one or more subjects." It logically follows that step (c) of claim 1 recites "determining values for numbers of sequence tags mapping to chromosome portions by using a number of windows of defined length within normally and abnormally distributed chromosome portions [obtained from one or more subjects] to obtain a first value and a second value therefrom." Exh. 18 ['415 patent] Claim 1.

### C.    "the mixed sample"

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "the mixed sample" ('415 patent, Claim 1) | "A sample of DNA extracted from the plasma of a pregnant woman, consisting of a mixture of maternal and fetal DNA." | "The mixed sample of normally and abnormally distributed chromosome portions obtained from a subject." |

Sequenom does not actually construe "the mixed sample." Rather, Sequenom just restates

value" be derived from a single subject, Sequenom's construction cannot stand.

"the mixed sample," and then tacks on the phrase "normally and abnormally distributed chromosome portions obtained from a subject," taken from the claim's preamble. Sequenom's intentions can be gleaned from its non-infringement positions. Sequenom has represented in discovery responses that at least one of its non-infringement bases is that the claims of the '415 patent "require knowledge that 'a mixed sample' contain 'normally and abnormally distributed chromosome portions obtained from a subject *prior to performing* the 'method of testing.'" In other words, Sequenom's non-infringement theory appears to be based on the truism that one does not actually know that an abnormal distribution (*e.g.*, an aneuploidy) is present in a maternal tissue sample "prior to performing" its MaterniT21 test.

Sequenom's position does not fit within the context of the '415 patent, which claims a "method of testing for an abnormal distribution of a specified chromosome portion . . . ." Exh. 18 ['415 patent] at claim 1. If one knows prior to testing that there is an abnormal distribution, there is no need to "test[] for an abnormal distribution"—that determination has already been made. Perhaps most evident of this fact is the admission of Sequenom's own expert at deposition:

> Q.    Okay. With respect to the method of Claim 1 of the '415 patent, prior to doing the test, you don't know whether there is an abnormally distributed chromosome portion, correct?
> . . .
> THE WITNESS.    I think that's right. *That's why you're doing the test.*

Exh. 8 [Metzker Dep. Tr.] at 285:12-18. On this point, Sequenom's expert is correct, and it is nonsensical to construe the claims to cover only the testing of samples for which one already knows there is an abnormal distribution of chromosomes.

### D.    "determine the differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists"

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "determine the differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists" ('415 patent, Claim 1) | "Determine a value showing or relating to a difference between the first and second value, which is used to determine whether or not the abnormal distribution exists." | "Determine the difference between the first value and the second value, both values determined from chromosome portions of one sample/subject." |

This dispute on this term is twofold. First, Sequenom again inserts into its proposed

construction the concept of "the first value and the second value" being "determined from chromosome portions of one sample/subject." As to this issue, the reasoning set forth above applies equally here and will not be repeated. *See supra* Part II.B. Second, Sequenom seeks to limit the term "differential" to just a numerical difference (*i.e.*, a subtraction), excluding from the scope of the claims all other mathematical manipulations that would demonstrate a difference between the first and second value that would be indicative of aneuploidy.

Sequenom's proposal to limit the claims to just a mathematical subtraction reflects an effort to limit the claims to just a single embodiment in the specification, and otherwise disregard the principle underlying the method claimed in the '415 patent: "[T]he summed contribution of both maternal and fetal sequences in a particular chromosome or chromosome portion will be different as between an intact, diploid chromosome and an aberrant chromosome, i.e., with an extra copy, missing portion or the like." Exh. 18 ['415 patent] at 3:57-62. In other words, nothing about the approach of the '415 patent limits the claims to methods that use just one type of mathematical operation (*i.e.*, subtraction).

In the context of the '415 patent, any comparison that shows or relates to a difference between the first and second value is "determining a differential" indicative of the presence of an abnormal chromosome number in the fetus' genome. This could include, for instance, comparing two numbers through their ratio. Figure 1B in the '415 patent is indicative of just such a comparison, which plots "sequence tag densities" for chromosome 21 that have been divided (*i.e.*, "normalized") by a number representing the "sequence tag density" in normal samples. *Id.* at Figs. 1B, 10, 5:34-60, 7:55-8:9. As reflected in the figure, ratios that are higher than normal are indicative of aneuploidy.

Sequenom's proposed construction for "differential" is based mainly on Internet dictionaries rather than the disclosure in the claims or specification, as indicated by its expert's declaration. *See* Exh. 7 [Metzker Decl.] ¶¶ 189-190. Notably, Sequenom's dictionary definitions are actually quite broad and, if anything, support Verinata's construction, not Sequenom's. To wit, Sequenom relies on certain definitions for the noun "differential," which simply refer to the term "difference;" they do not impose any requirement that the "difference" be shown by a

specific mathematical manipulation. Consistent with this, the definitions for the adjective "differential" broadly refer to anything that is "of, relating to, or constituting a difference" or anything "of, showing, or depending on a difference." Exh. 19 [Merriam Webster's Online Dictionary]; Exh. 20 [Oxford Online Dictionary]. Accordingly, the extrinsic evidence does not support limiting the claims to specific embodiments in the specification, but instead supports a broad understanding of the term "differential," consistent with Verinata and Stanford's proposed construction.

### E.    "GC content"

| Claim Term | Verinata and Stanford's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "GC content" (Claim 14) | "Any measure of the amount of a DNA molecule that is either guanine or cytosine." | No construction necessary: <br><br> "GC content associated with the sequence tags." |

Sequenom errs in contending that no construction is necessary for this term, which is not plain and ordinary, but technical. *See, e.g*, *St. Clair Intellectual Property Consultants, Inc. v. Acer, Inc.*, No. 09-354, 2012 WL 3536454, at *5, 13 (D. Del. Aug. 7, 2012). Verinata and Stanford's proposed construction accurately states that "GC content" is a "measure of the amount of a DNA molecule that is either guanine or cytosine."

The specification confirms this, referring to "G/C content" (*i.e.*, with a slash) dozens of times to make clear that this term pertains to the amount of two of the four bases (*i.e.*, guanine and cytosine) in DNA. Most notably, the specification refers to "G/C or A/T content," Exh. 18 ['415 patent] at 25:30-32, and repeatedly refers to the "GC Content" as a percentage. *Id.* at Figs. 5B-5C, 26:13-16, 26:33-36. Taken together, this evidence leaves no doubt that the term "GC content" refers to a measure of the amount a DNA molecule that is either guanine or cytosine (as opposed to adenine or thymine), as reflected in Verinata and Stanford's proposed construction.

Dated: June 5, 2013

WEIL, GOTSHAL & MANGES LLP

By:     /s/ *Edward R. Reines*

Edward R. Reines
Attorney for Verinata and Stanford