1  EDWARD R. REINES (Bar No. 135960)
   edward.reines@weil.com
2  DEREK C. WALTER (Bar No. 246322)
   derek.walter@weil.com
3  AARON Y. HUANG (Bar No. 261903)
   aaron.huang@weil.com
4  MICHELE A. GAUGER (Bar. No. 281769)
   michele.gauger@weil.com
5  WEIL, GOTSHAL & MANGES LLP
   Silicon Valley Office
6  201 Redwood Shores Parkway
   Redwood Shores, CA  94065
7  Telephone: (650) 802-3000
   Facsimile: (650) 802-3100
8
   Attorneys for Plaintiffs/Counterclaim-Defendants
9  VERINATA HEALTH, INC. and
   THE BOARD OF TRUSTEES OF THE LELAND
10 STANFORD JUNIOR UNIVERSITY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| VERINATA HEALTH, INC. and THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>SEQUENOM, INC., and SEQUENOM CENTER FOR MOLECULAR MEDICINE LLC,<br><br>Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>VERINATA HEALTH, INC. and THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>Counterclaim Defendants,<br><br>and<br><br>ISIS INNOVATION LIMITED,<br><br>Nominal Counterclaim-Defendant. | Case No. 3:12-cv-00865-SI<br><br>**VERINATA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 6,258,540**<br><br>JURY TRIAL DEMANDED<br><br>Hon. Susan Illston<br><br>Tutorial: July 31, 2013 3:30 p.m.<br>Hearing: August 6, 2013 3:30 p.m. |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................ 1

II. PROCEDURAL BACKGROUND ...................................................................................... 3

III. DISPUTED CLAIM TERM ................................................................................................. 3

    A. "paternally inherited nucleic acid of fetal origin"/"paternally inherited nucleic acid"/"paternally inherited fetal nucleic acid" ............................................ 3

        1. Verinata's Proposed Construction Comports With The Court's Previous Construction .................................................................................. 4

        2. The Claim Language Confirms Verinata's Proposed Construction ............ 6

        3. The Specification Further Confirms Verinata's Proposed Construction ................................................................................................. 8

        4. The Prosecution History Further Confirms Verinata's Proposed Construction ............................................................................................... 10

IV. CONCLUSION ................................................................................................................... 13

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Dippin' Dots, Inc. v. Mosey*,
    476 F.3d 1337 (Fed. Cir. 2007) .................................................................................................. 6

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*,
    554 F.3d 1010 (Fed. Cir. 2009) ................................................................................................ 10

*Schindler Elevator Corp. v. Otis Elevator Co.*,
    593 F.3d 1275 (Fed. Cir. 2010) ......................................................................................... 10, 11

Pursuant to the Court's May 20, 2013 Order granting the parties' stipulated claim construction briefing schedule, Dkt. No. 82, Verinata Health, Inc. ("Verinata") submits this Responsive Claim Construction Brief on the proper construction of disputed claim terms of U.S. Patent No. 6,258,540 ("the '540 patent"). Rather than submit three separate briefs addressing all disputed claim terms, Verinata, Ariosa Diagnostics, Inc. ("Ariosa"), and Natera, Inc. ("Natera") (collectively, the "'540 plaintiffs") have endeavored to divide the briefing up. In particular, Verinata and Natera have agreed to join the responsive claim construction brief submitted by Ariosa in Related Case No. 11-cv-06391, which addresses issues where the '540 plaintiffs take common positions. This brief addresses only specific issues where Verinata wishes to present additional evidence and argument, focusing on one issue where Verinata proposes a slight modification to the construction adopted by this Court in the preliminary injunction proceedings between Ariosa and Sequenom. For all other claim terms, Verinata relies on the brief submitted by Ariosa in Related Case No. 11-cv-06391.

## I.   INTRODUCTION

When Drs. Dennis Lo and James Wainscoat, the named inventors on Sequenom's '540 patent, first confirmed for themselves the phenomenon of cell-free fetal DNA, they quickly set about to describe and claim this phenomenon in the most straightforward manner that sprung to mind: Detecting known DNA sequences that are known to be "paternally inherited" and can hence be easily distinguished from the maternal DNA in the sample.[1] Indeed, this is the only thing that Drs. Lo and Wainscoat put in their patent specification. As the '540 specification states, "[t]he method *according to the invention* can be applied to the detection of any paternally-inherited sequences which are not possessed by the mother . . . ."[2] Exh. 2 ['540 patent] at 2:57-

---

[1] Sequenom cannot dispute that this reflects nothing more than the "simplest" incarnation of observing cell-free fetal DNA. In a 2012 publication, Dr. Lo acknowledged that "[t]he simplest type of clinical applications using fetal DNA in maternal plasma are those that are based on the detection of sequences that the fetus has inherited from its father and which are absent in the genome of its mother." Exh. 1 [Yuk Ming Dennis Lo, "Fetal Nucleic Acids in Maternal Blood: The Promises," Clin. Chem. Lab. Med. 2012; 50(6): 995-998] at 995.

[2] Emphasis added unless otherwise noted.

59. Consistent with this, every example and teaching in the specification describes and enables nothing but the straightforward detection of known DNA sequences (using known techniques) that are known in advance to have been "paternally inherited," as the claims recite.

It is clear why Drs. Lo and Wainscoat did not describe anything more sophisticated than this. As Dr. Lo acknowledged in a recent publication, the inventors simply did not envision that anything more was possible. In fact, it was not until long after the filing of the '540 patent—when new single molecule counting technologies became available—that they first understood they were not confined to the most basic approach set forth and claimed in the '540 patent. To wit, in 2012, Dr. Lo stated "[w]ith the development of single molecule counting technologies for maternal plasma DNA, new possibilities have also emerged for the non-invasive prenatal diagnosis of fetal monogenic diseases. ***Thus, one is no longer confined to the detection of DNA sequences that the fetus has inherited from its father but which are absent in its pregnant mother's genome.***" Exh. 1 [Yuk Ming Dennis Lo, "Fetal Nucleic Acids in Maternal Blood: The Promises," Clin. Chem. Lab. Med. 2012; 50(6): 995-998] at 996.[3]

It is thus clear that Sequenom's '540 patent represents nothing more than an attempt to claim the observation of cell-free fetal DNA in the simplest way possible—by detecting known sequences of DNA known to be paternally inherited and not possessed by the mother. This is the only thing that is described and enabled in the specification, and it is the only thing the inventors thought was possible when they filed for their patent. Notably, in an apparent concession that the claim scope it originally sought when seeking a preliminary injunction against Ariosa was indefensibly broad, Sequenom recently narrowed its proposed construction for the claim term "paternally inherited nucleic acid" to make clear that this term is limited to a nucleic acid "not possessed by the mother." Similarly, in *inter partes* review proceedings before the Patent Office, Isis Innovation (the owner of the '540 patent) has rejected the overbroad construction that Sequenom originally proposed to this Court. However, as set forth below, Sequenom still seeks claim scope far beyond what Drs. Lo and Wainscoat actually invented. Sixteen years after the

---

[3] All exhibit cites are to exhibits attached to the accompanying declaration of Derek C. Walter.

filing date, Sequenom should not be permitted to secure claim constructions that allow this, nor should it be permitted to distort this Court's previous claim constructions to achieve the same effect.

## II. PROCEDURAL BACKGROUND

On February 22, 2012, Verinata commenced this action against Sequenom, Inc. ("Sequenom"), seeking, *inter alia*, a declaratory judgment that Verinata did not infringe the '540 patent and that the '540 patent was invalid.[4] Sequenom counterclaimed, alleging that Verinata's verifi® prenatal test infringed the '540 patent.

At the time, Sequenom was engaged in litigation involving the '540 patent with Ariosa. On March 8, 2012, Sequenom filed a motion requesting a preliminary injunction against Ariosa, seeking to prevent Ariosa from making, using, selling, or offering for sale its Harmony™ Prenatal Test. The Court denied Sequenom's motion, finding "that Ariosa raised a 'substantial question' with regard to the validity as well as infringement of the '540 patent." *See* Dkt. No. 121 in 11-cv-06391 at 19. In its ruling, the Court construed two claim terms from the '540 patent as follows:

| Claim Term | Court's Construction |
| --- | --- |
| "paternally inherited nucleic acid" | "DNA sequence known to be received only from the father which is not possessed by the mother" |
| "amplifying a paternally inherited nucleic acid" | "increasing the concentration of a paternally inherited nucleic acid relative to the other DNA in the sample" |

The parties continue to dispute the construction of both of these terms.

Sequenom appealed the Court's preliminary injunction ruling to the Federal Circuit. Oral arguments were heard on January 9, 2013, but the Federal Circuit has not yet issued a decision.

## III. DISPUTED CLAIM TERM

A. **"paternally inherited nucleic acid of fetal origin"/"paternally inherited nucleic acid"/"paternally inherited fetal nucleic acid"**

| Verinata's Proposed Construction | Ariosa's Proposed Construction | Natera's Proposed Construction | Sequenom's Proposed Construction |
| --- | --- | --- | --- |
| "Known DNA sequence known to be received only from the father which is | "DNA sequence known to be received only from the father which is not | "DNA sequence from a primer binding region previously known to be | Sequenom's original construction: "a nucleic acid that originates from |

---

[4] Sequenom is the exclusive licensee of the '540 patent, which is owned by Isis Innovation Limited ("Isis").

| not possessed by the mother." | possessed by the mother" | possessed by the father but not possessed by the mother" | the fetus and is inherited from the father"<br><br>Sequenom's new construction: "a nucleic acid that originates from the fetus, is inherited from the father *and is not possessed by the mother*" |
|---|---|---|---|

Verinata's proposed construction—which is a slight modification of the Court's earlier construction—aligns the scope of the patent with the substance of what Drs. Lo and Wainscoat disclosed and enabled in the specification and ensures that the Court's earlier construction is not distorted by Sequenom to secure matter well beyond this. For the reasons set forth below, this construction should be adopted.

### 1. Verinata's Proposed Construction Comports With The Court's Previous Construction

During the preliminary injunction proceedings, the Court construed the claim term "paternally inherited nucleic acid" to mean "DNA sequence known to be received only from the father which is not possessed by the mother." Verinata proposes that this construction be modified slightly to "*known* DNA sequence known to be received only from the father which is not possessed by the mother."[5] Verinata does not believe that this modification reflects any substantive difference relative to what the Court intended with its previous construction.[6] Verinata proposes the modification to preclude Sequenom from distorting the Court's earlier

---

[5] As set forth in the Joint Claim Construction Statement, Verinata proposes that the terms that refer to "detecting a paternally inherited nucleic acid" be construed in similar fashion to mean "discovering (the presence of) a *known DNA sequence* known to be received only from the father which is not possessed by the mother; the discovery is not based on differences between maternal and fetal DNA." *See* Dkt. No. 60, Exh. E at 4-5. Likewise, Verinata proposes that the term "paternally inherited non-Y chromosome" be construed to mean "*known DNA sequence* from a chromosome other than the Y chromosome that is known to be received only from the father which is not possessed by the mother." *Id.* at 6. The rationale set forth in this brief applies equally to the construction of both of these terms, and they are thus not addressed separately herein.

[6] In its opening claim construction brief, although Sequenom correctly listed Verinata's proposed claim construction, Sequenom did not address Verinata's proposed modification to the Court's construction. In this regard, Sequenom appears to agree that Verinata's proposed construction does not reflect a substantive modification of the Court's earlier construction.

construction and contending that it encompasses embodiments well beyond anything disclosed and enabled in the specification.

In its earlier claim construction ruling, the Court stated that "the question with respect to claim construction is whether 'paternally inherited nucleic acids,' as used in the claims, implies searching for a sequence that is known in advance to come only from the father and not the mother, or more generally covers detecting differences that would identify the paternally-inherited sequences in the fetal DNA at the conclusion of the analysis." Dkt. No. 121 in 11-cv-06391 at 11. Ultimately, the Court construed the claims to cover only the former situation, and not the latter situation. In particular, after reviewing evidence in both the specification and prosecution history, the Court stated as follows:

> In short, it appears that the PTO was concerned because there was no enablement of a claim that covered detection of fetal DNA by reference to maternal DNA, given the state of art at that time. Instead the state of the art only enabled a detection of fetal DNA with reference to a ***known sequence*** of paternally inherited DNA, *e.g.*, the Y chromosome or the RhD gene.

*Id.* at 12. Based on this, the Court issued its earlier construction for this claim term.

Despite the foregoing, Sequenom may nonetheless contend that the language of the Court's construction permits the detection of not just "known sequences" received from the father, but also the detection of all unknown sequences—without regard to whether they are paternally or maternally inherited—followed by a subsequent analysis that verifies which of the detected unknown sequences are paternally inherited, if any. To avoid this re-interpretation, Verinata proposes to modify the Court's construction slightly to make clear that the claims encompass searching only for a "***known*** DNA sequence known to be received only from the father which is not possessed by the mother." As indicated above, Verinata does not believe this modification works as a substantive change to what the Court intended with its earlier construction. And in any event, for the reasons stated below, this modified construction is fully supported by the intrinsic record.

### 2. The Claim Language Confirms Verinata's Proposed Construction

The claim language confirms that the claims are directed only to methods in which one searches for a ***known*** sequence that is known to be paternally inherited. Specifically, all the independent claims require "amplifying a paternally inherited nucleic acid." Thus, it is the "paternally inherited nucleic acid" that is targeted for "amplifying." As set forth more fully below, this can only be carried out if the "paternally inherited nucleic acid" to be amplified is a "known sequence." Accordingly, the claim language leaves no doubt that the "paternally inherited nucleic acid" is a "known sequence." Sequenom cannot legitimately dispute this logic.

At the outset, the claims do not recite that "the entire pool of nucleic acids" in the sample is subject to the "amplifying." Rather, the claims state that only the "paternally inherited nucleic acids" are targeted for amplification. As the Court explained in its preliminary injunction order, "in all the independent claims 'amplifying' modifies 'a paternally inherited nucleic acid.' ***This construction is not the same as amplifying fetal DNA in general, or all DNA in the sample***." *Id.* at 14. Sequenom did not address this aspect of the Court's opinion in its opening brief. In fact, the Federal Circuit confirmed the Court's logic in *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337 (Fed. Cir. 2007). In *Dippin Dots*, the claim recited "freezing said dripping alimentary composition into beads." *Id*. at 1340. However, the accused process produced a wide range of shapes, only some of which happened to be "beads." *Id.* at 1343. Noting that the claim limitation specifically recited forming "beads" (and not other shapes), the District Court construed the claims accordingly and concluded that the claim limitation did not cover the accused process. *Id.* The Federal Circuit affirmed, stating that "the term 'comprising' does not reach into [the claim limitations] to render every word and phrase therein open-ended-especially where, as here, the patentee has narrowly defined the claim term it now seeks to have broadened. The district court's limitation of the claim scope to exclude processes that produce some irregularly shaped particles is correct." *Id.* Similarly, in this case, the "amplifying" step of the '540 patent is not written in an open-ended manner covering amplification of DNA generally. Instead, as this Court observed in its initial opinion, the claim is narrowly defined to "amplifying a paternally inherited nucleic acid." For these reasons, in the context of the '540 patent, the Court properly construed the claim

1   term "amplifying" to require "increasing the concentration of a paternally inherited nucleic acid
2   relative to the other DNA in the sample."[7]

3   Further, there can be no dispute that to target a "paternally inherited nucleic acid" for
4   "amplifying," the "paternally inherited nucleic acid" must be a "known sequence," a point
5   confirmed by Sequenom's own expert. In his report, Sequenom's expert includes a 5-page
6   description of "Amplification and enrichment of nucleic acids." *See* Dkt. No. 89, Exh. A ¶¶ 19-
7   32. There, he describes multiple processes for "amplification" of specific DNA fragments, all of
8   which require the use of primers with known sequences that are complementary to the known
9   sequences that will be amplified. *See, e.g.*, *id.* ¶ 27 ("One of the key benefits of PCR is the ability
10  to isolate target sequences from a mixture using specific primers that flank the region of interest.
11  This allows for the selective amplification of only those nucleic acids in which a researcher is
12  interested . . . ."); *id.* ¶ 29 ("Like PCR, LCR used specific primers designed to bind to the target
13  nucleic acid."). Sequenom's expert describes only one amplification method that does not require
14  that the sequence to be amplified be a "known sequence," specifically, "universal PCR" methods
15  that involve "ligating common sequences" to the end of all fragments. *Id.* ¶ 28. However, as
16  Sequenom's expert concedes, this method is used not to "amplify a paternally inherited nucleic
17  acid," (as the claims require) but to "amplify the entire pool of nucleic acids present in the
18  starting mixture." *Id.* As noted above, this process is exactly what the Court found the claims to
19  exclude. As such, "universal PCR" is not encompassed by the claims of the '540 patent.

20  Simply put, one cannot target a "paternally inherited nucleic acid" for "amplifying" unless
21  it is a known sequence. By requiring that the "paternally inherited nucleic acid" be targeted for
22  an "amplifying" process, the claim language thus leaves no doubt that the "paternally inherited
23  nucleic acid" is a "known DNA sequence," as recited in Verinata's proposed construction.

---

[7] Of course, this argument confirms the correctness of the Court's earlier claim construction of the "amplifying" terms. The additional reasons stated in Ariosa's claim construction brief in Case No. 11-cv-06391 further confirm that the Court's earlier construction of the "amplifying" term was correct and should be maintained.

### 3. The Specification Further Confirms Verinata's Proposed Construction

Claim language does not stand in a vacuum. Here, the specification not only supports Verinata's proposed construction, but compels it. The requirement that the "paternally inherited nucleic acid" be a "known DNA sequence" is not borne from one or a handful of embodiments or disclosures in the specification. It is essential to the very character of the claimed invention and is foundational to every embodiment and disclosure in the '540 patent. Indeed, as explained above, the detection of known DNA sequences that are known to be paternally inherited and are not possessed by the mother is all that the inventors thought was possible at the time of filing and is the only thing they disclosed and enabled in their specification. The claims should be construed accordingly.

There is absolutely no disclosure in the '540 patent of any technique for the indiscriminate amplification or detection of unknown sequences of fetal origin. For instance, there is no disclosure in the '540 patent of any sort of "universal PCR" of the type Dr. Metzker points to in his report. The only disclosure of "universal PCR" that Dr. Metzker cites to is a patent that is completely unrelated to the '540 patent. *See* Dkt. No. 89, Exh. A ¶ 28. Likewise, there is no disclosure in the '540 patent of any method of "amplifying a paternally inherited nucleic acid" without the "paternally inherited nucleic acid" being a "known sequence." To the contrary, the specification discloses nothing but detecting known DNA sequences that are known to be paternally inherited.

In describing the invention as a whole in the Summary and Objects of the Invention, the specifications states first that "[t]he method *according to the invention* can be applied to the detection of any paternally-inherited *sequences* which are not possessed by the mother . . . ." Exh. 2 ['540 patent] at 2:57-59. Then, as part of this description, the specification immediately goes on to describe procedures that all require detection of known sequences that are known to be paternally inherited:

- First, the specification describes "the detection of rhesus D gene sequences in the plasma and serum of a rhesus D negative mother . . . ." *Id.* at 2:66-67. Referring to sequences of a specific gene, the specification confirms that it is describing the detection of "known sequences."

- Second, the specification describes detecting mutations in the beta-globin gene, stating that if one can determine that the father and mother carry different mutations, "the paternal mutation can be used as an ***amplification target*** on maternal plasma and serum . . . ." *Id.* at 3:7-9. Again, the specification describes detecting a known DNA sequence. Indeed, the specific sequence of the "paternal mutation" must be determined in advance for it to be detected as one that differs from the mother.

- Finally, the specification refers to the possibility of detecting "[p]aternally-inherited DNA polymorphisms," stating that this will require "prior genotyping of the father and mother." *Id.* at 3:11-24. Thus, the specification again calls for detecting a known DNA sequence that must be determined in advance by "prior genotyping" experiments.

Consistent with the description of the invention in the Summary and Objects of the Invention, every other description in the patent calls for the "paternally inherited nucleic acid" to be a known DNA sequence, thus further confirming Verinata's construction. First, Example 1 involves detection of nucleic acids bearing a sequence previously mapped to the Y chromosome (the DYS14 locus) using specific primers having a known sequence that is explicitly listed in the specification. *See id.* at 5:10-14 ("[t]he detection of Y-specific foetal sequence from material plasma, serum, and cellular DNA was carried out as described using primers Y1.7 and Y1.8, designed to amplify a single copy of Y sequence (DYS14)"); *id.* at 5:14-17 (listing the primer sequences). Thus, Example 1 calls for the paternally inherited sequences to be a "known DNA sequence," as recited in Verinata's construction.

Examples 2, 4 and 5 parallel Example 1 in that they all involve detection of a known DNA sequence from the Y chromosomes, this time the known DNA sequence of the SRY gene. Again, specific primers with known sequence were used to carry out the amplification of specific known sequences that are part of this gene. *See id.* at 6:60–7:3 ("[S]ystem consisted of the amplification primers SRY109-F, . . . SRY-245R . . . . and a dual labeled fluorescent TaqMan probe SRY-142T . . . . .Sequence data for the SRY gene were obtained from the GenBank Sequence Database . . . ."); *id.* at 6:60-66 (listing the sequences for the primers that map to the SRY gene); *id.* at 12:25-26 (in example 4, "PCR analysis was performed as described in Example 2"); *id.* at 14:14-15 (in example 5, "[r]eal time quantitative PCR analysis was performed as described in Example 2").

Finally, in Example 3, the known RhD gene sequence is detected in the blood samples of mothers that are known not to carry the RhD gene. *See* Exh. 3 [Metzker Dep. Tr.] at 160:9-19 (testimony by Sequenom's expert confirming that "the sample that is the subject of example 3, was prepared from the blood of a woman who was known to be RhD negative before the experiment was performed"); *see also* Exh. 2 ['540 patent] at 8:52-67 (explaining that the example is only designed to look for RhD gene sequences inherited from the father); *id.* at 10:33-34 (stating that "[t]he 21 pregnant women enrolled in this study were all serologically RhD-negative" thus confirming that the RhD gene was known in advance not to be inherited from the mothers in example 3); *id.* at 2:62-3:3. Like all the other examples in the specification, the detection was carried out using primers of known DNA sequence that are directed to a specific known DNA sequence that is known to be paternally inherited. *Id.* at 9:56-65 ("The RhD TaqMan system consisted of the amplification primers RD-A…RD-B…and a dual labelled [sic] fluorescent TaqMan probe….Sequence data for the RhD gene were as previously described (Le Van Kim et al 1992)."); *id.* (listing the sequence of the primers used in the RhD sequence amplification process).

Thus, in each of these examples, primers designed to hybridize with known DNA sequences that were known to be paternally inherited were used to amplify the paternally inherited nucleic acid. Nowhere does the '540 patent teach or enable the identification or amplification of a sequence not known before the amplification takes place, a fact that further confirms Verinata's proposed construction. *See, e.g.*, *Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) ("All of the examples described in the specification involve skin wounds. To construe 'wound' to include fistulae and 'pus pockets' would thus expand the scope of the claims far beyond anything described in the specification.").

### 4. The Prosecution History Further Confirms Verinata's Proposed Construction

"[A]n amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope." *Schindler*

*Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) . This rule applies here, as key claim amendments made during prosecution of the '540 patent confirm that the claims are limited to searching for "known DNA sequences known to be received only from the father."

As filed, the application that eventually matured into the '540 patent included claims that were not limited to known sequences known to be "paternally inherited." In particular, the original claims attempted to cover a method for "detecting the presence of a nucleic acid of foetal origin in the sample." *See* Exh. 4 [U.S. Pat. App. No. 09/380696] at 39. That is, Isis attempted to capture detection of nucleic acid sequences that were simply unique to the fetus, including for instance, maternally inherited sequences that are different in the fetus as compared to the mother.[8] In view of the specification, the Patent Office refused to allow this, stating as follows in a rejection:

> [T]he specification, while being enabling for a method for detecting the presence of paternally inherited fetal DNA in maternal plasma after 15 weeks of gestation wherein the fetal DNA is from the Y chromosome and for detecting the presence of the RhD gene in maternal plasma from an RhD negative pregnant women [sic] after 15 weeks gestation, does not reasonably provide enablement for a detection method performed on serum or plasma for detecting fetal nucleic acid in general at any time during pregnancy or associated with desiease [sic] phenotype in serum.

Exh. 5 [Office Action, April 18, 2000] at 5.

After Isis submitted a response disagreeing with the Patent office, the Patent Office maintained its enablement rejection, stating that it "would require undue experimentation [to] determine whether the nucleic acid was a result[] of the maternal DNA found in the maternal plasma or whether in fact the nucleic acid was from the fetus. Thus, detection of a maternally inherited nucleic acid would be unpredictable and require undue experimentation." Exh. 6 [Office Action, November 2, 2000] at 11. The Examiner "advised that the claims would be allowable only if limited to 'paternally inherited' nucleic acid, since the specification is enabling

---

[8] This might arise where a mutation occurs in DNA contained in an egg. In this case, a maternally inherited gene would be different in the fetus as compared to the mother by virtue of the mutation.

for detecting paternally inherited nucleic acid in serum or plasma." Exh. 7 [Amendment After Final] at 3. Isis acquiesced, amending all the claims to recite "paternally inherited" nucleic acid. These events further establish that the claims cover only the detection of known sequences known to be received only from the father.

First, in its initial rejection, the Patent Office decreed that the specification was enabling only where the "fetal DNA is from the Y chromosome and for detecting the presence of the RhD gene in maternal plasma from an RhD negative pregnant women [sic] . . . ." Exh. 5 [Office Action, April 18, 2000] at 5. In other words, the Patent Office confirmed that the specification is enabled only with regard to the specific examples in the patent, all of which involve the use of specific primers that are directed to the detection of specific known sequences that are known to be "paternally inherited." *See supra* Part III.A.3. Rather than continue to dispute this, Sequenom amended the claims to recite only "paternally inherited" nucleic acids. Having made this amendment, the claims should not be construed to encompass subject matter beyond the material that the Patent Office found to be enabled in the specification.

Second, because the Examiner permitted Drs. Lo and Wainscoat to claim only "paternally inherited" sequences and not, more broadly, the detection of sequences that are merely unique to the fetus, the Patent Office made absolutely clear that the claims covered just the detection of "known DNA sequence known to be received only from the father which is not possessed by the mother." Indeed, the father's sequence must be known before one can set about detecting a "paternally inherited" sequence. This is so because simply detecting a sequence that is unique to the fetus relative to the mother is insufficient to establish that the sequence is "paternally inherited." The sequence could be unique to the fetus for other reasons besides being paternally inherited, including spontaneous mutation. The only way one can know with certainty that a sequence is "paternally inherited"—as the claims require—is if one searches for a "known DNA sequence known to be received only from the father which is not possessed by the mother," as recited in Verinata's construction. Because the applicant agreed to the Patent Office's amendment excluding the detection of sequences that are merely unique to the fetus and not necessarily "paternally inherited," the claims must be so limited.

## IV. CONCLUSION

For the foregoing reasons, Verinata's construction should be adopted.

Dated: July 3, 2013

WEIL, GOTSHAL & MANGES LLP

By: ____/s/ *Edward R. Reines*____
Edward R. Reines
Attorney for Verinata and Stanford