# EXHIBIT 2

1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                            NORTHERN DISTRICT OF CALIFORNIA

10                              SAN FRANCISCO DIVISION

11   VERINATA HEALTH, INC., and THE BOARD          Case No. C-12-00865 SI
     OF TRUSTEES OF THE LELAND
12   STANFORD JUNIOR UNIVERSITY,                   **DECLARATION OF STEPHEN A.
                                                   BROWN, M.D, REGARDING CLAIM**
13                   Plaintiffs,                   **CONSTRUCTION OF U.S. PATENT
                                                   NOS. 7,888,017 AND 8,008,018**
14           v.

15   SEQUENOM, INC. and SEQUENOM CENTER
     FOR MOLECULAR MEDICINE, LLC,
16
                     Defendants/Counterclaim-
17                   Plaintiffs,

18           v.

19   VERINATA HEALTH, INC. and THE
     BOARD OF TRUSTEES OF THE LELAND
20   STANFORD JUNIOR UNIVERSITY,

21                   Counterclaim-Defendants,

22           and

23   ISIS INNOVATION LIMITED,

24                   Nominal Counterclaim-
                     Defendant.
25

26

27

28

1.      I, Stephen A. Brown, hereby declare:

2.      I have been retained by Plaintiffs Verinata Health, Inc. ("Verinata") and The Board of Trustees of the Leland Stanford Junior University ("Stanford") to offer opinions regarding certain claim terms in U.S. Pat. Nos. 7,888,017 ("the '017 patent") and 8,008,018 ("the '018 patent").  This declaration summarizes my opinions relating to the claim construction issues addressed below.

3.      This declaration is based on information currently available to me.  I may continue my investigation and study, which may include a review of documents and information that may be produced, as well as deposition testimony from depositions that have yet to be taken in this case. Therefore, I may expand or modify my opinions as my investigation and study continues, and I may supplement my opinions and/or provide rebuttal opinions in response to any additional information that becomes available to me, any matters raised by Sequenom and/or opinions provided by Sequenom's expert(s), and/or in light of any relevant orders from the Court. In particular, I understand that Sequenom has not yet offered any explanation of the rationale underlying its proposed claim constructions, and may provide further discovery on this issue.  To the extent Sequenom provides such discovery, I will provide supplemental or rebuttal opinions as appropriate.

## I.

## BACKGROUND AND QUALIFICATIONS

4.      I am currently an Associate Professor in the Department of Obstetrics and Gynecology at the University of Vermont.  While I regularly see patients as part of my work, I am also engaged in substantial research activities related to, among other topics, prenatal diagnosis, and have been for some time.  Indeed, since 1990, I have been the recipient of one or more grant awards from the National Institute of Health to conduct original medical research.  My research has focused on various of aspects of pregnancy, and I have published articles regarding prenatal diagnosis (including prenatal diagnosis of genetic defects such as deletions, aneuploidies, enzyme deficiencies, and sickle cell disease), gene expression during pregnancy, and aspects of fetal development during pregnancy.  As part of my research activities, I have used and/or applied

a range of laboratory, bioinformatics, and molecular biology techniques, including the types of massively parallel sequencing and polymerase chain reaction techniques that are discussed in the '017 and '018 patents.

5.      A more complete description of my educational background, experience, publications, and qualifications is set forth in my CV, which is attached hereto as Appendix A to this Declaration.

## II.

## LEGAL STANDARD

6.      I am not a legal expert and offer no opinions of the law.  However, I have been informed by counsel of the legal standards that apply with respect to claim construction, and I have applied them in arriving at my conclusions.

7.      I am informed and understand that the claims of a patent define the invention. The Court determines the meaning of the disputed claim terms from the perspective of a person of ordinary skill in the art at the time the patent is filed or on the relevant priority date.  The person of ordinary skill in the art is considered to read a claim term not only in the context of the claim in which the term appears, but also in the context of the entire patent.

8.      I understand that the Court first considers the "intrinsic evidence" to determine what a person of ordinary skill in the art would have understood the claim language to mean.  The intrinsic evidence includes the claim language, the specification, the prosecution history of the asserted patent, and any prior art cited during prosecution.  Particularly, I understand that the Court first considers the words of the claims themselves, giving those words their customary and ordinary meaning as understood by one skilled in the art.  The claims themselves provide substantial guidance as to the meaning of particular claim terms.  After reviewing the text of the claims, I understand that the Court then considers the specification, of which the claims are a part, to determine a construction that is consistent with a term's use in the patent.  After considering the claims and specification, the Court also reviews the patent's prosecution history, including any express representations made by the applicant to the Patent Office regarding the scope of the claims as well as prior art cited during prosecution. I further understand that, while reference to

STEPHEN BROWN DECLARATION REGARDING
CLAIM CONSTRUCTION

C 12-00865(SI)

the specification often aids in understanding the meaning of a claim term, it is improper to import limitations into the claims.

9.      After reviewing the intrinsic evidence, if ambiguity still remains with regard to the disputed claim terms I understand that the Court may consider extrinsic evidence to ensure that a claim construction is not inconsistent with clearly expressed and widely held understandings in the pertinent technical field.  Such extrinsic evidence may come in a variety of forms, including technical treatises, dictionaries, articles, and expert and/or inventor testimony.  I further understand that one may not rely on extrinsic evidence to contradict or vary the meaning of claims provided by the intrinsic evidence of record.

**III.**

**BACKGROUND OF THE '017 AND '018 PATENTS**

10.     The '017 and '018 patents generally relate to processes for detecting fetal genetic abnormalities from a mixture of fetal and maternal DNA.  *See, e.g.*, Exh. 1 ['017 Patent] at Abstract; 1:63-67, 4:40-43, 6:10-14, 7:36-44.  For instance, the patents allow for the detection of fetal aneuploidy (such as the trisomy that causes Down Syndrome) by using DNA obtained through noninvasive techniques, such as a blood draw, followed by the application of molecular counting techniques to the fetal and maternal DNA fragments contained in the DNA sample. *See, e.g.*, *id*. at Abstract; 2:4-13, 8:35-37.

11.     Briefly, the patents describe first obtaining a mixture of maternal and fetal genetic material from maternal tissue, *id.* at 8:34-35, 8:47-51,  which is then analyzed through one of a number of different counting mechanisms to determine the number of DNA molecules arising from various chromosomes, in order to determine the relative quantity of those chromosomes.  *See, e.g.*, *id*. at 8:56-67, 12:21-29, 19:13-20.  Statistical analysis is then used to compare the relative quantity of specific chromosomes to one or more reference chromosomes in order to assess the presence or absence of a fetal aneuploidy.  *See, e.g.*, *id.* at 9:1-2.  The principle underlying the statistical analysis is that, when a chromosomal aneuploidy is present in a fetus, one expects the amount of DNA arising from that chromosome in a mixture of maternal and fetal DNA, relative to the amount of DNA from other chromosomes, would differ from the amount of

1    that chromosome that would otherwise be expected. *See, e.g.*, *id.* at 7:52-54.

2           12.      Thus, the concept set forth in the patents is the detection of aneuploidy by

3    applying molecular counting techniques to a mixture of maternal and fetal DNA fragments (as

4    obtained from a maternal blood draw) followed by statistical analysis to assess over or

5    underrepresentation of one or more chromosomes.  This general concept is set forth repeatedly in

6    the specification in various ways.  *See, e.g.*, *id.* at 1:43-53 (explaining that the aneuploidy

7    detection problem can be solved by "quantitative examination of large numbers of chromosome

8    samples through the use of highly scalable techniques"); *id.* at 5:42-44 ("[A]ccording to the

9    present method, there will be a differential in the case of an abnormal fetal target sequence"); *id.*

10   at 5:54-6:9 (summarizing the relationship between the number of samples that are analyzed to

11   detect over or underrepresentation with statistical confidence and the concentration of the genetic

12   material in the mixture); *id.* at 6:28-31 ("In one aspect, the present method of ***differential***

13   ***detection*** of target sequences may involve direct sequencing of target sequences . . . . ")

14   (emphasis added); *id.* at 7:10-27 (general description of steps in the preferred embodiment,

15   including a "Detection and Quantification" step followed by a "Quantitative Evaluation" step); *id.*

16   at 7:30-35 ("The methods and materials described below apply techniques for analyzing

17   numerous nucleic acids contained in a tissue sample . . .  containing a mixture of DNA from both

18   the mother and the fetus, and ***allowing detection of small but statistically significant***

19   ***differences.***")(emphasis added); *id.* at 8:16-22 (describing an embodiment in which "chromosome

20   21 labels (primers) will generate more positives than chromosome 22 (a diploid chromosome)

21   specific labels (e.g., primers) due simply to the slightly greater abundance of chromosome 21 in a

22   trisomy containing sample"); *id.* at 19:14-16 ("It should be appreciated that methods involving

23   PCR or other amplification are not the only way to detect or enumerate the molecules in a given

24   discrete reaction sample."); *id.* at 21:10-55 (in describing "Quantitative Evaluation," stating that

25   "Digital PCR allows the detection of aneuploidy merely by counting transcripts" and explaining

26   that "[i]n comparing the amplicons of each type, one expects to find that for every e amplicons

27   from chromosome A there are $e(1-\varepsilon)+\alpha\varepsilon$ amplicons from chromosome B.  In the case of a

28   trisomy and $\varepsilon=3\%$, then for every 2 amplicons from chromosome A one expects 2.03 amplicons

STEPHEN BROWN DECLARATION REGARDING
CLAIM CONSTRUCTION                                              5                              C 12-00865(SI)

from chromosome B.  While this difference is small, it can be measured."); *id.* at 23:7-15 (describing "Preparation for Trisomy with Frequency Analysis" and stating "trisomy can be detected either by looking for an increased signal from a single well having multiple chromosomal DNA copies, or by diluting a sample and counting the frequency of responses of the trisomic marker versus a control diploid marker.").

13.     The particular counting mechanism used can vary, but the '017 and '018 patents discuss several possibilities.  *See, e.g.*, *id.* at 8:57-61, 12:21-29; *id.* at 12:35-15:36 (discussing digital PCR); *id.* at 15:38-18:3 (discussing Bead Emulsion PCR); *id.* at 18:5-19:11 (discussing Microfluidic dilution with PCR); *id.* at 19:13-21-9 (discussing single molecule detection and sequencing methods including massively parallel sequencing).  For example, one may use digital PCR, in which primers are used to selectively amplify sequences located on specific chromosomes so that the total number of specific chromosomes may be determined.  *See, e.g.*, *id.* at 12:35-15:36; 1:53-63.  Another contemplated method involves conducting massively parallel sequencing on a sample of random fragments of maternal and fetal genetic material, determining the corresponding chromosomes for each sequence, counting the number of sequences for each chromosome, and using this information to determine a representation of the amount of a particular chromosome that is present.  *See, e.g.*, *id.* at 20:1-8.  Once the DNA molecules arising from various chromosomes are counted, statistical analysis may be conducted to assess the existence of a fetal aneuploidy.  *See, e.g.*, *id.* at 9:1-6, 21:11-55.

## IV.

## STATEMENT OF OPINIONS

14.     A summary of my opinions regarding certain claim terms in the '017 and '018 patents is set forth below.

### A.     ORDINARY SKILL IN THE ART

15.     One of ordinary skill in the art relevant to the '017 and '018 patents in February 2006, the date the provisional application to which these patents claim priority was filed, would have a multi-disciplinary background.  That person would have at least a bachelor's degree in a life sciences area (*e.g.*, biology, cell biology, genetics, molecular biology) and at least

a master's degree or Ph.D. in computational biology, mathematics, or statistics, or equivalent training, for instance as acquired by earning a medical degree and carrying out relevant research activities.  One of ordinary skill in the art should understand both the operation and application of massively parallel DNA sequencing platforms.  Further, one of ordinary skill in the art should understand and have experience with techniques for aligning sequence reads to a reference genome.

16.      My opinion as to the level of ordinary skill in the art is based upon my personal knowledge and experience, and my consideration of such things as the level of education and experience of persons of skill working in the field, the sophistication of the technology, and the rapidity with which innovations are made in this field.

**B.      THE DISPUTED TERMS OF THE '017 AND '018 PATENTS**

**1.      "massively parallel DNA sequencing"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "massively parallel DNA sequencing" ('017 Patent claim 17; '018 Patent claim 1) | "Any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel (*e.g.*, the Illumina sequencing platform)." | No construction proposed. |

17.      In my opinion, the claim term "massively parallel DNA sequencing" would be understood by a person of ordinary skill in the art to refer to any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel, such as in the Illumina sequencing platform.  A person of ordinary skill in the art in February 2006 would have been familiar with the technique of massively parallel DNA sequencing.  This method of DNA sequencing had been described in the art and was known to be a technique of obtaining sequence information from a large number of DNA templates simultaneously in parallel.  Indeed, the specification of the '017 and '018 patents states as follows:

> A methodology useful in the present invention platform is based on massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of

clusters, each containing ~1,000 copies of template per sq. cm. These templates
are sequenced using four-color DNA sequencing-by-synthesis technology.

Exh. 1 ['017 Patent] at 20:1-8. Thus, "massively parallel sequencing" can involve "millions of fragments" that are attached to the surface of a flow cell and that are then sequenced at the same time using, among other things, "four-color DNA sequencing-by-synthesis technology."

18.     Consistent with this, the '017 and '018 patents refer to publications and products that describe massively parallel sequencing techniques and that characterize such techniques as offering the ability to sequence multiple sites in parallel. For instance, the '017 and '018 patents cite a 2003 article by Braslavsky et al. *Id.* at 2:19-25; 19:22-56. This article describes a method for single molecule sequencing and explains that the described method "lends itself to massive parallelism, and . . . the experiments described here . . . were able to monitor hundreds of templates simultaneously." Exh. 2 [Braslavsky] at VRNTA00006219.

19.     As another example, the Illumina sequencing platform, cited in the '017 and '018 patent specifications as a useful platform for performing the described methods, is one of the most widely used platforms for massively parallel sequencing. Illumina's sequencing platform was known in the art in February 2006 to be capable of sequencing multiple sites in parallel. For example, US 2003/0022207, a patent application by Balasubramanian et al. and assigned to Solexa Ltd. (a company which was acquired by Illumina and upon whose sequencing technology Illumina's platform is in part based) describes an invention in which "[e]ach polynucleotide of the array can be analysed simultaneously or, by scanning the array, a fast sequential analysis can be performed." Exh. 3 [Balasubramanian] at [0040]. Balasubramanian further describes that "arrays with a density of $10^6$ to $10^9$ single polynucleotides per $cm^2$ can be used. Preferably, the density is at least $10^7/cm^2$ to $10^9/cm^2$." *Id.* at [0042]. It is clear that the technique described by Balasubramanian allows the sequencing of multiple different DNA fragments simultaneously. *Id.* at [0049] ("Generally the array is produced . . . to generate a random array. The formation of the array then ***permits interrogation of each arrayed polynucleotide*** to be carried out.") (emphasis added).

20.     In Illumina's system, genomic DNA is randomly fragmented and adapters are ligated to both ends of the fragments. *See, e.g.*, Exh. 4 [Technology Spotlight:  Illumina®

1  Sequencing] at Figure 2 (VRNTA00005997).   The DNA fragments are then attached to the

2  surface of the flow cell via the adapters.  *See, e.g., id.* at Figure 3 (VRNTA00005997).   The

3  bound DNA fragments then undergo amplification to create clusters.  *See, e.g., id.* at Figures 4-7

4  (VRNTA00005997-5998).  After amplification, "the tens of millions of clusters on the flow cell

5  surface" are sequenced in parallel.  *See, e.g., id.* at Figures 8-12 (VRNTA00005997-5999); *see*

6  *also id.* at VRNTA00005996.

7          21.          Again, Illumina's sequencing platform is based on sequencing technology

8  developed by Solexa Ltd., which was later acquired by Illumina.  Literature from 2006 describing

9  Solexa's massively parallel sequencing system makes clear that it is capable of sequencing

10  multiple different nucleic acids simultaneously.  *See, e.g.,* Exh. 5 [Solexa MPSS[TM] FAQs] at

11  VRNTA00046766 (explaining that Solexa's MPSS[TM] platform "quantifies gene expression by

12  ***simultaneously counting and identifying all mRNA species*** in a sample" and "captures and

13  identifies transcript sequences and analyzes the level of expression of ***virtually all genes***

14  ***expressed in a sample*** by counting the  number of individual mRNA molecules representing each

15  gene") (emphasis added).  Thus, literature regarding the Illumina massively parallel sequencing

16  platform further supports my opinion.

17                2.        **"massively parallel DNA sequencing of the random fragments of**
                           **genomic DNA" and "massively parallel DNA sequencing of DNA**
18                         **fragments randomly selected"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "massively parallel DNA sequencing of the random fragments of genomic DNA" ('017 patent claim 17) | "Massively parallel DNA sequencing" refers to "any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel (*e.g.*, the Illumina sequencing platform)." No additional construction necessary. | "Massively parallel DNA sequencing of the random fragments of genomic DNA in each discrete reaction samples to detect the presence of the target sequence" |
| "massively parallel DNA sequencing of DNA fragments randomly selected" ('018 patent claim 1) | "Massively parallel DNA sequencing" refers to "any sequencing method that allows for the acquisition of sequence information from multiple DNA | "Random, not targeted, massively parallel DNA sequencing." |

| | fragments in parallel (*e.g.*, the Illumina sequencing platform)." No additional construction necessary. | |
|---|---|---|

22.     The two terms addressed in this section of my declaration are very similar. The only difference between them is that one requires sequencing of "random fragments," while the other requires sequencing of "fragments randomly selected."  As set forth below, those of skill in the art interpreting these two terms in view of the claim language and common specification would conclude that there is no meaningful difference in how they should be understood.

23.     Nevertheless, I understand that Sequenom has proposed that these terms be construed very differently.  Specifically, I understand Sequenom contends the term "sequencing of the random fragments of genomic DNA" in the '017 Patent be construed to require detection of a "target sequence."[1]    At the same time, I understand that Sequenom contends the term "sequencing of DNA fragments randomly selected" in the '018 Patent should be understood to require "random, not targeted" sequencing.  I understand that in this litigation Sequenom has not offered a definition for either "random sequencing" or "targeted sequencing."   To the extent either Sequenom or its expert provides clarification as to the meaning of these terms, I will provide a rebuttal report addressing Sequenom's proposed construction in more detail.

24.     In any event, in my opinion, the discrepancy between Sequenom's interpretations of these terms in the two patents is unfounded and certainly not supported by the specification.  To the extent Sequenom's constructions reflect an effort to draw a distinction between sequencing of a subset of preselected DNA fragments in a mixture and the random sequencing of DNA fragments in a mixture, I believe Sequenom's proposed constructions are incorrect and inconsistent with how one of skill in the art would have interpreted the patents. Indeed, as set forth below, those of skill in the art would have understood that both of the claim

---

[1] I understand that Sequenom has included the word "target" or "targeted" in a number of its proposed constructions.  I do not believe that any of Sequenom's proposed constructions adding this term to the claim language are appropriate.  The opinions and reasoning set forth in this section apply equally to the other claim terms that Sequenom proposes to construe in terms of the word "target" or "targeted."

terms addressed in this section of my declaration cover massively parallel sequencing of random DNA fragments (as is possible using the Illumina sequencing platform) in addition to massively parallel sequencing methods that sequence preselected fragments.

### a. The Claim Language Shows That The Claims Are Not Limited To Certain Types of Massively Parallel Sequencing

25.     A plain reading of the claims to one skilled in the art supports my opinion. The claim language in both the '017 and '018 patents indicates that massively parallel sequencing is conducted upon "random fragments of genomic DNA" ('017 patent, Claim 17) or "DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA" ('018 patent, Claim 1).  Importantly, in both patents the claims containing this term specify that the fragments upon which massively parallel sequencing is performed are "random"—i.e., these fragments are not preselected or "target" sequences.  In my opinion, there is nothing in the claims that imposes a requirement of sequencing just preselected known DNA fragments.  Thus, those of skill in the art would understand that the claims cover, at a minimum, massively parallel sequencing of random DNA fragments (as is possible using the Illumina sequencing platform).

26.     Furthermore, Claim 17 of the '017 patent and Claim 1 of the '018 patent both include limitations of "identifying chromosomes to which the sequences obtained [] belong."  If, as Sequenom apparently suggests, the term "massively parallel DNA sequencing" in the '017 patent claims applied only to sequencing of preselected "target" sequences, it would make no sense to include a limitation of "identifying chromosomes to which the sequences obtained [] belong," because the identity of the chromosome on which the "target" sequence is found would be already known.

### b. The Specification  Shows That The Claims Are Not Limited To Certain Types of Massively Parallel Sequencing

27.     The specification to the '017 and '018 patents further supports my interpretation.  Though the specification describes examples using sequence-specific probes/primers, it does so in the context of embodiments that employ polymerase chain reaction ("PCR") as the technique by which to detect sequence fragments.  *See, e.g.*, Exh. 1 ['017 Patent] at 5:29-53.  However, other described embodiments do not require a sequence specific probe, as

made clear in the specification:  "Also, while detection may be conveniently carried out by a sequence specific probe, detection may also be carried out by directly sequencing a region of interest to determine if it is the target sequence of interest."  *Id.* at 12:30-33.  Massively parallel sequencing is just such an approach.  The '017 specification describes this category of approach as clearly distinct from PCR-based embodiments:

> It should be appreciated that ***methods involving PCR or other amplification are not the only way to detect or enumerate the molecules in a given discrete reaction sample.***  It is possible to use single molecule flow cytometry to count single molecules that have been labeled with a sequence-specific fluorescent probe.  ***It is also possible to sequence the target sequence in the reaction sample directly, either after amplification or at the single molecule level.***

*Id.* at 19:13-20 (emphasis added).

28.     Importantly, when describing methods of sequencing including massively parallel sequencing, the specification does not suggest that the sequencing must be carried out on preselected fragments using sequence-specific primers:

> As described in the above-referenced PNAS publication by Braslavsky et al., DNA polymerase may be employed to image sequence information in a single DNA template as its complementary strand is synthesized. . . . This method lends itself to massive parallelism.
> . . .
> ***The genomic DNA from the tissue taken from the mother, i.e. the mixture of fetal and maternal genetic material, may be distributed into discrete samples which are anchored to a surface and sequenced*** or monitored by labeled probes to detect a target specific sequence, e.g., a unique region of chromosome 21, e.g., AML1. . . . A methodology useful in the present invention platform is based on massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. cm.  These templates are sequenced using four-color DNA sequencing-by-synthesis technology.  See, products offered by Illumina, Inc., San Diego Calif.  Also, see US 2003/0022207 to Balasubramanian, et al., published Jan. 30, 2003, entitled "Arrayed polynucleotides and their use in genome analysis."
>
> ***Sequencing may be combined with amplification-based methods in a microfluidic chip having reaction chambers for both PCR and microscopic template-based sequencing.***  Only about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome.  Longer sequences can uniquely identify more particular targets.

*Id.* at 19:23-20:19 (emphasis added).

29.     Nowhere in the specification is there a requirement for the use of sequence-specific primers or probes in embodiments employing massively parallel sequencing.  To the contrary, the specification describes both PCR-based methods of detection (which may employ sequence-specific primers) and sequencing-based methods of detection (which are not necessarily sequence-specific).  *See, e.g.*, *id.* at 20:13-15; *see also id.* at 8:57-61 (stating that detection is done "***preferably with a sequence specific technique,***" indicating that other non-sequence-specific techniques are also contemplated) (emphasis added).  It would have been apparent to one skilled in the art upon reading the '017 specification that embodiments of the invention employing massively parallel sequencing are distinct from those employing techniques like digital PCR, and that the use of targeted, sequence-specific primers is not required in the massively parallel sequencing embodiments.

30.     Consistent with this, in describing massively parallel DNA sequencing techniques, the specification cites Balasubramanian, which teaches the following with respect to such a high-throughput DNA sequencing technique:

> Generally the array is produced by dispensing small volumes of a sample containing a mixture of the fragmented genomic DNA onto a suitably prepared solid surface, ***or by applying a dilute solution to the solid surface to generate a random array.  The formation of the array then permits interrogation of each arrayed polynucleotide to be carried out.***

Exh. 3 [Balasubramanian] at [0049] (emphasis added); *see also* Exh. 1 ['017 patent] at 20:1-12.

31.     A "random array" as described by Balasubramanian would facilitate sequencing of any DNA fragments present in a DNA sample, rather than only those containing certain preselected sequences.  Balasubramanian explicitly describes the use of non-specific primers to attach randomly fragmented DNA to an array.   In the method disclosed by Balsubramanian, an array of hairpin structures may be used to anchor the DNA fragments to the array.  The hairpins are made to contain ***"a 3' overhang containing all possible sequences of a few nucleotides."*** Exh. 3 [Balasubramanian] at [0056].  Using such a hairpin would facilitate sequencing of any DNA fragments and would not require preselection of desired fragments for

1    sequencing.

2         32.      The specification likewise cites Braslavsky et al. as a description of a method

3    of sequencing that "lends itself to massive parallelism" and which can be used "to detect or

4    enumerate the molecules in a given discrete reaction sample." Exh. 1 ['017 patent] at 19:13-31.

5    Like Balasubramanian, the method described in Braslavsky can be used to sequence random

6    DNA fragments whose sequence is not yet known. *See, e.g.*, Exh. 2 [Braslavsky] at

7    VRNTA00006222 (explaining that "these data show that *a priori* sequencing in which the

8    template sequence is not known can be accomplished with an error rate of 0.04").

9         33.      Finally, the specification of the '017 and '018 patents states that "[o]nly about

10   30 bp of random sequence information are needed to identify a sequence as belonging to a

11   specific human chromosome." Exh. 1 ['017 patent] at 20:15-18. This statement is made in the

12   context of the specification's discussion of massively parallel DNA sequencing. *See id.* at 20:1-

13   28. The specification also states that detection of the DNA sequence or chromosome of interest

14   "may also be carried out by directly sequencing a region of interest to determine if it is the target

15   sequence of interest." *Id.* at 12:30-33; *see also* Exh. 6 [US 60/764420 provisional application] at

16   [0052]. Again, those of ordinary skill in the art would understand that if the '017 patent

17   contemplated only massively parallel sequencing of targeted, preselected DNA sequences, there

18   would be no need to obtain enough sequence information to "identify a sequence as belonging to

19   a specific human chromosome" or "determine if [the sequenced region] is the target sequence of

20   interest" since the sequence's chromosomal origin would already be known, and the preselection

21   of the target sequence would result in sequence tags from a known location on a chromosome.

22        34.      Both the Balasubramanian and Braslavsky references, cited in the '017 and

23   '018 patent specifications, further disclose aligning sequence tags obtained from massively

24   parallel sequencing to a reference sequence or genome. *See, e.g.*, Exh. 3 [Balasubramanian] at

25   [0069] (explaining that "[i]t is not necessary to determine the sequence of the full polynucleotide

26   fragment" because one may "determine the sequence of 16-30 specific bases, which is sufficient

27   to identify the DNA fragment by comparison to a consensus sequence, e.g. to that known from

28   the Human Genome Project."); Exh. 2 [Braslavsky] at VRNTA00006223 (explaining that "it will

only be necessary to sequence 15-20 nucleotides to get a unique gene fingerprint that can be used in conjunction with a genome sequence to determine the identity of the expressed gene.").  Again, in the massively parallel sequencing described in the Balasubramanian and Braslavsky references cited in the '017 and '018 patent specification as examples of massively parallel DNA sequencing, it would make no sense to compare the obtained sequence tag(s) to a consensus sequence to "determine the identity of the expressed gene" if the sequence tag's chromosomal origin had been preselected.

c.      The Extrinsic Evidence Shows That The Claims Are Not Limited To Certain Types of Massively Parallel Sequencing

35.      For the reasons set forth above, the claim language and specification alone confirm that the term "massively parallel sequencing" used in  the '017 and '018 patents could pertain to both the sequencing of preselected and randomly selected DNA fragments.  The state of the art in February 2006, as reflected in relevant literature from the time frame, provides further confirmation of this.

36.      Indeed, those of skill in the art in February 2006 understood that massively parallel sequencing is capable of sequencing both preselected DNA fragments for which the sequence is known prior to sequencing, as well as DNA fragments randomly selected without *a priori* knowledge of any sequence information.  Accordingly, those of skill in the art would have been unlikely to conclude that the description in the '017 and '018 patents of massively parallel sequencing was limited to just the former narrow type of massively parallel sequencing.  This is particularly so because those of skill in the art understood that key advantages and applications of massively parallel sequencing were in fact based on the latter type of sequencing of random fragments without *a priori* knowledge of sequence information.

37.      For instance, those of skill in the art understood that one of the distinct advantages of massively parallel sequencing over prior techniques was "that expression of unknown genes can be observed since no sequence specific nucleic acid probes are required for detection."  Exh. 7 [Oudes] at VRNTA00046690.  Likewise, those of skill in the art understood that a further application of massively parallel sequencing that was well known in the art long

before February 2006 was the sequencing of random DNA fragments in a nucleic acid sample, followed by comparison of the obtained sequences to known reference sequences.  *See, e.g.*, Exh. 8 [Brenner II] at VRNTA00046711 (describing that "[s]ignatures were searched for homology in three yeast databases . . . . a match was recorded if at least 16 consecutive bases matched those of a database sequence."); Exh. 9 [Meyers] at VRNTA00046758 ("We matched the MPSS signatures with genomic sequence information to link the expression data to specific genes and genomic positions.  The genomic locations of expressed signatures were determined . . . ."); Exh. 10 [Lin] at VRNTA00046747 ("The resulting signatures, generally 20 bases long, were annotated using the then most recently annotated human genome sequence . . . . We considered only 100% matches between a MPSS signature and a genome signature.").

38.     A review of relevant literature and documentation in the field further confirms that those of skill in the art recognized that massively parallel sequencing of the type described in the '017 and '018 patents was intended to be used for sequencing of random fragments without *a priori* knowledge of sequence information.  For instance literature describing the Illumina sequencing platform (specifically referenced in the '017 and '018 specifications as a product that may be used for massively parallel sequencing in the disclosed methods) depicts the process of randomly fragmenting genomic DNA, randomly binding genomic DNA fragments to the surface of the flow cell channels, cluster amplification of the bound DNA fragments, and sequencing by synthesis of the amplified DNA clusters using primers complementary to an adapter sequence. *See, e.g.*, Exh. 4 [Technology Spotlight:  Illumina® Sequencing].[2]   Use of the Illumina sequencing platform as suggested in the specification of the '017 and '018 patents would thus result in the sequencing of random sequences from a DNA sample.  Such a process would be an example of the "random approach" to sequencing.   *See, e.g.*, Exh. 11 [Franca] at VRNTA00046715 (describing the "[r]andom approach" to DNA sequencing in which "there is no control of the region that is going to be sequenced").

---

[2] Though this literature is more recent, in my opinion it nonetheless reflects the capabilities of Illumina's sequencing technology at the time of the '017 patent application as well, as further reflected in the Balasubramanian reference that is cited in the '017 and '018 patents and discussed herein

39.     Further support for my opinion is found in literature describing the massively parallel sequencing method used by Lynx Therapeutics ("Lynx"), which was acquired by Solexa in 2005 and upon whose method the Illumina sequencing platform is also partially based. Literature related to Lynx's sequencing method specifically states that a principle of the method is to facilitate sequencing of potentially "[e]ach nucleic acid molecule in a complex mixture." *See, e.g.*, Exh. 12 [Brenner I] at VRNTA00046703 (describing the labeling of nucleic acid molecules in a mixture with one of eight oligonucleotide tags made up of four-base "words" designed to "enable the unique tagging of all (or nearly all) the molecules in large libraries"). Literature related to Lynx's sequencing method also describes comparing obtained sequence information to known reference genomes. *See, e.g.*, Exh. 8 [Brenner II] at VRNTA00046711 (describing that "[s]ignatures were searched for homology in three yeast databases . . . . a match was recorded if at least 16 consecutive bases matched those of a database sequence."); Exh. 9 [Meyers] at VRNTA00046758 ("We matched the MPSS signatures with genomic sequence information to link the expression data to specific genes and genomic positions.  The genomic locations of expressed signatures were determined . . . ."); Exh. 10 [Lin] at VRNTA00046747 ("The resulting signatures, generally 20 bases long, were annotated using the then most recently annotated human genome sequence . . . . We considered only 100% matches between a MPSS signature and a genome signature.").

40.     A person of ordinary skill in the art in February 2006 would thus have understood that "massively parallel DNA sequencing," particularly when using Illumina's or a similar sequencing platform, is capable of the sequencing of DNA fragments randomly attached to an array (i.e., randomly dispersed into individual reaction samples), for which there is no *a priori* knowledge of sequence, and can generate sequence information on any DNA sequences from a tissue sample that attach to the array.  Those of skill in the art would have thus been unlikely to limit their understanding of the term "massively parallel DNA sequencing" to some narrow type of sequencing based on primers directed only to specific genetic loci.

41.     As a final example of literature from the field confirming my opinion, I understand that in a 2009 publication discussing next-generation sequencing, Dr. Yuk-Ming

Dennis Lo (who I understand is a paid consultant to Sequenom and an inventor on a patent asserted by Sequenom in this litigation) stated the following with regard to the massively parallel sequencing technologies used by the inventors of the methods described in the '017 and '018 patents:

> These approaches can be divided into 2 main types: the first type involves the random sequencing of DNA molecules in plasma/serum *(11,12)*, and the second type involves the deep sequencing of a selected (i.e., nonrandom) subset of circulating DNA molecules *(13)*.  As an illustration of the power of the random sequencing approach, Chiu et al. *(11)* and Fan et al. *(12)* used the Illumina/Solexa platform to randomly sequence a short (25-36 bp) tag on millions of DNA molecules obtained from the plasma of pregnant women.  The short tags allowed such molecules to be mapped back to the reference human genome.  The relative representation of each chromosome in plasma could then be calculated.

Exh. 13 [Lo and Chiu] at VRNTA00046763.  Although this paper was published in 2009, it is nevertheless consistent with the view that those in the field held in February 2006 regarding the technology described in the '017 and '018 patents.  In particular, Dr. Lo's citation of a 2008 paper authored by Dr. Hei-Mun Christina Fan and Dr. Stephen Quake, both named inventors on the '017 and '018 patents, as illustrating "the power of the random sequencing approach" indicates that those skilled in the art considered this paper by Drs. Fan and Quake to describe massively parallel sequencing of random DNA fragments.  In my opinion, the sequencing technique described in Drs. Fan and Quake's 2008 paper is an example of the invention disclosed in the '017 and '018 patents.

        **3.**        **"reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule" ('017 patent claim 17) | "Reaction sample containing a single DNA fragment or the amplification products of a single DNA fragment." | "Discrete reaction samples where the target sequence can be analyzed and where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules." |

42.        Sequenom's proposed construction for this claim term includes a number of

concepts not present in the claim language, including (1) the concept of "discrete reaction samples," (2) the concept of "target sequences," and (3) the concept of a "statistically significant" number of samples.  As noted above, I understand Sequenom has not stated what a "target sequence" is.  Likewise, I understand Sequenom has not explained what it means by introducing the words "discrete" and "statistically significant" into its proposed constructions.  To the extent either Sequenom or its expert provides explanation as to these issues, I will provide supplemental or rebuttal opinions.

43.     Regardless, in my opinion, the additional concepts Sequenom intends to introduce into its proposed construction are unwarranted.  Rather, one of skill in the art would have understood this term to simply mean "reaction samples containing a single DNA fragment or the amplification products of a single DNA fragment."

### a.     The Claim Language Supports Verinata's Construction

44.     The claim language including this term supports my opinion that Verinata's proposed construction is correct.  The language of claim 17 of the '017 patent states that "random fragments from the mixture of fetal and maternal genomic DNA" are distributed so as "to provide reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule."  A "single genomic DNA molecule" would have been understood by one of skill in the art to be simply a single DNA fragment from the mixture of fetal and maternal genomic DNA.  Notably, there is no mention of a "target sequence"[3] in claim 17; nor is there mention of the concept of a "statistically significant" number of samples or the concept of "discrete" reaction samples.

### b.     The Specification Supports Verinata's Construction

45.     The specification provides further support for my interpretation of this term. In describing massively parallel sequencing, the specification explains that this methodology uses "attachment of randomly fragmented genomic DNA to a planar, optically transparent surface."

---

[3] The opinions I provide above regarding Sequenom's proposed constructions using the word "target" apply equally here.  *See* Part IV.B.2 (discussion of Sequenom's attempt to insert the concept of "target sequence" into the claims).

Exh. 1 ['017 Patent] at 20:1-5. Thus, those of ordinary skill in the art would recognize from the specification that random DNA fragments become attached to the planar surface. The specification goes on to describe "solid phase amplification [of the attached random DNA fragments] to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. cm. These templates are sequenced using four-color DNA sequencing-by-synthesis technology." *Id.* at 20:5-8. Thus, the specification makes clear that, after solid-phase amplification is performed, the planar surface will contain "millions of clusters," each cluster consisting of the amplification products of a single attached DNA fragment.

46.      The specification further cites "products offered by Illumina" as exemplary of massively parallel sequencing. *See id.* at 20:9. In the Illumina sequencing platform, random fragments of DNA are attached to the inside surface of the flow cell. *See, e.g.*, Exh. 4 [Technology Spotlight: Illumina® Sequencing] at VRNTA00005996. The attached DNA fragments then undergo amplification to create clusters of each attached DNA fragment. *See, e.g., id.* Thus, from this reference it would have been clear to one of skill in the art that, in the method of massively parallel sequencing described in the '017 patent, each reaction sample would contain a single DNA fragment from the mixture of maternal and fetal DNA, or, after cluster generation, the amplification products of a single DNA fragment from the mixture of maternal and fetal DNA. *See also* Exh. 14 [Illumina Specification Sheet: Sequencing] at VRNTA00005986.

47.      The specification also cites the Balasubramanian and Braslavsky references in its description of massively parallel DNA sequencing. Braslavsky, entitled "Sequence information can be obtained from ***single DNA molecules***," (emphasis added) describes anchoring DNA molecules onto streptavidin beads by attachment of a biotin moiety onto the template DNA molecules. *See* Exh. 2 [Braslavsky] atVRNTA00006220. It is clear from Braslavsky that a single DNA molecule is attached to each streptavidin bead in the system described, since the system achieves sequencing of "single DNA molecules." Likewise, Balasubramanian describes the attachment of single DNA molecules to a solid support to create an array, the solid support "usually compris[ing] a flat (planar) surface, or at least a structure in which the polynucleotides to

be interrogated are in approximately the same plane." *See* Exh. 3 [Balasubramanian] at [0028].
Like Braslavsky, Balasubramanian makes clear that each attachment location (reaction sample)
on the solid support corresponds to a single DNA fragment or the amplification products of a
single DNA fragment. *See id.* at [0010] (". . . wherein each address of at least a subset of
addresses on the array corresponds to a single polynucleotide molecule . . . ."). Importantly, both
Braslavsky and Balasubramanian describe the attachment of random DNA molecules to a solid
surface. *See, e.g.*, Exh. 2 [Braslavsky] at VRNTA00006220; Exh. 3 [Balasubramanian] at [0049].

> **4.** **"analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome" ('017 patent claim 17) | "Determining the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome, as represented by the results of the identifying step d)" | "Determining the integer number of copies of the target chromosome in said mixture of fetal and maternal genomic DNA from the identities of the target chromosomes determined in step d)." |

48.      Again, Sequenom's proposed construction for this term includes a concept not
present in the claim language: the concept of "determining an integer" number of copies of
chromosomes. I understand that Sequenom has not explained what it means by introducing the
word "integer" into its proposed construction for this term. Ostensibly, Sequenom's proposed use
of the word "integer" is a variation of its effort to introduce the term "target" into the claim
language to thereby limit claims to methods in which only preselected regions of "target
chromosomes" are sequenced.[4]    To the extent either Sequenom or its expert provides an
explanation as to this issue, I will provide a supplemental or rebuttal opinion.

---

[4] I understand that Sequenom has included the word "integer" in a number of its proposed constructions. I do not believe that any of Sequenom's proposed constructions that add this term to the claim language are appropriate. The opinions and reasoning set forth in this section apply equally to the other claim terms that Sequenom proposes to construe in terms of the word "integer."

49.      Regardless, in my opinion, the additional concept of "integer" that Sequenom attempts to introduce into its proposed construction is unwarranted.  One of skill in the art would have understood this term to mean "determining the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome, as represented by the result of the identifying step d)."

### a.      The Claim Language Shows That The Claims Do Not Require Determining An "Integer Number Of Copies"

50.      The claim language supports my opinion that the claims do not require determining an "integer" number of chromosomes.  Most importantly, the language of claim 17 of the '017 patent contains no mention that the "number of copies" of at least one first target chromosome and/or a second target chromosome must be an "integer."  To the contrary, the claim language leading up to this specific claim term provides context showing that Sequenom's proposed "integer" requirement is unwarranted.

51.      First, step (a) of the claim calls for "obtaining a mixture of fetal and maternal genomic DNA from [a] maternal tissue sample."  Those of skill in the art would understand that this encompasses, among other things, maternal plasma or serum samples, which contain few, if any, whole chromosomes.  Rather, those of skill in the art recognize that such samples contain short fragments of maternal and fetal DNA that are on the order of a few hundred base pairs in length.  Based on this, those of skill in the art would understand that this claim term simply is not referring to determining an "integer" number of chromosomes in the sample, as Sequenom contends.

52.      Consistent with this, step (b) of the claim calls for distributing "fragments" of DNA (not chromosomes) from the sample, which are then used in "massively parallel sequencing," as recited in step (c) of the claim.  As explained above, those of skill in the art would have been familiar with massively parallel sequencing and would have recognized that this technique generates short lengths of sequence information sufficient to identify a sequence as belonging to a specific human chromosome through, for example, alignment of the sequence data to a reference genome.

53.      Indeed, step (d) of claim 17 of the '017 patent recites "identifying the chromosomes to which the sequences obtained in step c) belong."  This step makes clear that random DNA sequences are being selected and sequenced such that there is no *a priori* knowledge of the chromosomes to which the sequences obtained belong; otherwise, it would have made no sense to include the limitation of step (d) in claim 17 because one would already know, before any sequencing was done, on which chromosome the pre-selected sequence is found.  Thus, to the extent Sequenom is contending that this claim term is referring to determining an "integer" number of chromosomes because the claims require targeted sequencing of just a single locus on a "target chromosome," those of skill in the art would reject this understanding based on the claim language.

54.      A person of ordinary skill in the art reading claim 17 of the '017 patent would have recognized that step (d) of claim 17 produces, for instance, a number of sequence reads aligning to "at least one first target chromosome in said mixture of fetal and maternal genomic DNA" recited in step (e).  The same can be said with regard to a "second chromosome" in the mixture of fetal and maternal genomic DNA.  This number of sequence reads may be used as the representation of the "number of copies" of the at least one first chromosome that can be used in subsequent statistical analyses to assess aneuploidy.  Put another way, the number of sequence tags that align to the at least one first chromosome is used as a proxy for the amount of or number of copies of the chromosome itself.  As set forth below, this understanding of the claims is the one that is consistent with the concept that is set forth in the '017 and '018 patents, which I describe above.  *See* Part III.

### b.    The Specification Shows That The Claims Do Not Require Determining "An Integer Number Of Copies"

55.      Consistent with how one of skill in the art would have interpreted the claim language in claim 17 of the '017 patent, the specification makes it clear that the method simply requires the determination of a numerical representation of the number of copies or amount of at least one first chromosome and a second chromosome in the maternal tissue sample so that one may subsequently carry out a statistical analysis to determine whether one of the chromosomes is

over or underrepresented.  Indeed, this is the interpretation that comports with the concept set forth repeatedly in the patents, which I have summarized above and supports my opinion.  *See* Part III.

56.     Additional evidence in the specification confirms this understanding. Likewise, in describing a sequencing embodiment, the specification states that "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome."  Exh. 1 ['017 Patent] at 20:15-18.  One of skill in the art familiar with massively parallel DNA sequencing would recognize that this is describing a sequence tag that can be aligned to a reference genome.  Thus, it would have been clear to one of skill in the art that, in the embodiments of the '017 patent using sequencing to detect the molecules in a reaction sample, one would not determine the "integer" number of copies of an entire chromosome in a mixture of fetal and maternal genomic DNA *per se*, but would rather determine the number of sequence tags (each arising from a random DNA fragment) that align to each chromosome. Again, this number would serve as a proxy for the number of copies of each chromosome.

57.     This would further have been clear to one of skill in the art given the specification's reference to Braslavsky and Balasubramanian.   As discussed above, the specification cites Braslavsky as an example of sequencing that may be used to detect DNA molecules in a mixture of fetal and maternal genomic DNA.  *See, e.g.*, *id.* at 2:19-25; 19:22-56. Braslavsky discusses the use of massively parallel sequencing to "make direct measurements of gene expression" by sequencing the messenger RNA from single cells.  Exh. 2 [Braslavsky] at VRNTA00006223.  Braslavsky explains that, in many instances "it will only be necessary to sequence 15-20 nucleotides to get a unique gene fingerprint that can be used in conjunction with a genome sequence to determine the identity of the expressed gene."  *Id.*  Thus, one of skill in the art would have recognized the method described in Braslavsky to determine the number of sequence tags aligning to a specific gene (which is likely much longer than 15-20 nucleotides), rather than the actual number of full transcripts of the gene present.  The number of sequence tags aligning to the gene would be a proxy for the actual number of full transcripts of the gene present, allowing the measurement of gene expression.  Likewise, Balasubramanian describes alignment

of "individual DNA sequence reads of at least 4 bases, and more preferably at least 16 bases in the case of human genomic DNA, and more preferably 16-30 bases" to a genomic sequence. Exh. 3 [Balasubramanian] at [0071]-[0072].

58.     As support for its proposed construction Sequenom appears to be relying upon portions of the specification specifically pertinent to embodiments of the '017 patent which employ digital PCR, and not DNA sequencing, to detect and enumerate chromosomes.  Indeed, in its disclosure of preliminary claim constructions, these are the portions of the specification that Sequenom places the most reliance upon.  However, the digital PCR embodiments of the '017 and '018 patents do not support Sequenom's construction.  Indeed, even in digital PCR embodiments of the invention, one is still counting fragments of maternal and fetal DNA present in a maternal plasma or serum sample, not chromosomes.  For instance, with regard to a digital PCR embodiment, the specification states "[d]igital PCR allows the detection of aneuploidy merely by counting *transcripts.*"  Exh. 1 ['017 Patent] at 21:11-12 (emphasis added).  Then, the specification goes on to provide an illustration in which one assesses aneuploidy by measuring overrepresentation of counts of "representative segments" from chromosomes.  *See id.* at 21:10-55 ("In comparing the amplicons of each type, one expects to find that for every e amplicons from chromosome A there are $e(1−\varepsilon)+\alpha\varepsilon$ amplicons from chromosome B. In the case of a trisomy and $\varepsilon=3\%$, then for every 2 amplicons from chromosome A one expects 2.03 amplicons from chromosome B. While this difference is small, it can be measured.").  As with the sequencing embodiments, these counts are representative of the number of chromosomes and are used in statistical analysis to assess under or overrepresentation of a chromosome in a genome, consistent with the overall concept set forth in the patent.  *See* Part III.

59.     Moreover, as with the sequencing embodiments, the digital PCR embodiments of the invention are not limited to the detection of a single region from a single chromosome that is selected in advance.  Indeed, the specification confirms that the digital PCR embodiments may be carried out in a "multiplexed" manner in which there are "multiple primers to multiple targets."  *See* Exh. 1 ['017 Patent] at 12:36-39.  And, those of skill in the art would have been aware that numerous chromosome 21 specific PCR primer sets were available at the time of

filing, a point noted in the specification. *See id.* at 22:25-29.  Like the sequencing embodiments disclosed in the specification, in such a "multiplexed" digital PCR approach, one would not be obtaining counts of fragments from just one locus per chromosome.  Accordingly, to the extent Sequenom contends that obtaining counts of fragments from just one locus per chromosome corresponds to determining an "integer" number of chromosomes, Sequenom seeks to exclude from the scope of the claims not just disclosed massively parallel sequencing embodiments but also disclosed digital PCR embodiments.  Such an approach takes an unduly narrow view of the overall approach set forth in the patent (*see* Part III) and would not be adopted by those of ordinary skill in the art.

5.   **"compare an amount of at least one first chromosome in said mixture of material and fetal genomic DNA to an amount of at least one second chromosome in said mixture"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "compare an amount of at least one first chromosome in said mixture of material and fetal genomic DNA to an amount of at least one second chromosome in said mixture" ('018 patent claim 1) | No construction necessary. | "Compare an amount of at least one first chromosome to an amount of at least one second chromosome, all chromosomes being within one maternal tissue sample." |

60.   It is my opinion that one of ordinary skill in the art relevant to the '017 and '018 patents in February 2006 would understand that the term "compare an amount of at least one first chromosome in said mixture of material and fetal genomic DNA to an amount of at least one second chromosome in said mixture" requires no further construction.

61.   Sequenom's proposed construction for this claim term includes a concept not present in the claim language: that all chromosomes must be within "one maternal tissue sample." As with Sequenom's other proposed constructions, I understand Sequenom has not explained precisely what this construction means or what it believes the implications of its proposed construction are.  To the extent either Sequenom or its expert offers any such explanation, I will provide rebuttal opinion as appropriate.

62.   In any event, Sequenom's "one maternal tissue" sample limitation does not

1   appear in the claims, and there is nothing in the claims that would suggest such a limitation.

2   Likewise, there is nothing in the specification that would require such a limitation. In this regard,

3   I understand that in support of its preliminary constructions Sequenom cited just two sources in

4   the specification, 3:52-56 and 21:8-12 as supporting its proposed construction.  Neither of these

5   passages require that the chromosome amounts that are compared be within one maternal tissue

6   sample.

7       63.     At 3:52-56, the specification describes a prior art method proposed by

8   Grundevikk and Rosen for detecting aneuploidy based on the use of fetal nucleated cells.  As

9   such, this passage has little, if anything, to do with the invention of the '018 patent.   Those of

10  skill in the art would certainly not read this description of this prior art method as imposing a

11  "one maternal tissue sample" limitation on the claims.

12      64.     At 21:8-12, the specification describes one method of quantitative analysis

13  that, though described in the context of digital PCR, one of ordinary skill in the art would

14  recognize could be used in connection with data obtained by sequencing or some other counting

15  mechanisms.   In particular, this passage describes one manner of using one type of internal

16  control to assess aneuploidy.    Notably, the passage is explicitly prefaced as being an

17  "illustrat[ion]."   *See* Exh. 15 ['018 Patent] at 21:3 ("Digital PCR allows the detection of

18  aneuploidy merely by counting transcripts, as ***illustrated*** by the following calculation.")

19  (emphasis added).  Those of skill in the art would understand that there are numerous additional

20  straightforward statistical analyses that could be carried out based on a range of different controls

21  (including based on controls that use data from more than one tissue sample) in order to assess

22  whether a particular chromosome is abnormally represented in a sample.   In this regard, the

23  specification refers generally to the use of a chi-square or t-test, which those of skill in the art

24  understand can be used in a wide variety of ways to assess abnormality in a parameter or

25  distribution.  *See id.* at 5:57-6:3 Accordingly, the illustration that Sequenom points to at column

26  21 of the specification does not support the additional limitation Sequenom seeks to impose

27  through its proposed construction.

28

STEPHEN BROWN DECLARATION REGARDING
CLAIM CONSTRUCTION                         27                              C 12-00865(SI)

### 6. "wherein said at least one first target chromosome is presumed to be diploid/euploid"

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "wherein said at least one first target chromosome is presumed to be diploid" ('017 patent claim 17)<br><br>"wherein said at least one first target chromosome is presumed to be euploid" ('018 patent claim 1) | No construction necessary. | "Wherein an affirmative presumption is made that the at least one target chromosome, which cannot include the second chromosome suspected to be aneuploid, is of normal copy number." |

65. It is my opinion that one of ordinary skill in the art relevant to the '017 and '018 patents in February 2006 would understand the term "wherein said at least one first target chromosome is presumed to be diploid" without any further construction. However, I understand that Sequenom has proposed the following construction for this term: "wherein an affirmative presumption is made that the at least one target chromosome, which cannot include the second chromosome suspected to be aneuploid, is of normal copy number." Sequenom's proposed construction for this claim term includes two concepts not present in the claim language: (1) the concept of an "affirmative presumption,"[5] and (2) the language that the "at least one first target chromosome" cannot include the second chromosome that is suspected of being aneuploid.

66. I understand that neither Sequenom nor its expert has offered any explanation of what an "affirmative presumption" is, nor have they offered any explanation for why the claims should be construed to require this concept. Similarly, I understand Sequenom has not offered any explanation for why it seeks to introduce the language "which cannot include the second chromosome suspected to be aneuploid" in its proposed construction. Should either Sequenom or its expert witness provide any further explanation of these aspects of its proposed

---

[5] Other of Sequenom's constructions introduce the requirement of an "affirmative suspicion." To the extent Sequenom introduces this language for the same purpose it introduces the "affirmative presumption" language, the opinions and reasoning set forth in this section apply equally to other terms where Sequenom proposes to introduce a requirement of an "affirmative presumption" or "affirmative suspicion." Likewise, I understand that other of Sequenom's proposed constructions introduce language similar to the "which cannot include the second chromosome suspected to be aneuploid" it introduces here. The opinion and reasoning set forth in this section apply equally to any such terms.

constructions, I will provide rebuttal opinion as appropriate.

67.     Based on the information presently available to me, these aspects of Sequenom's proposed construction ostensibly aim to divide chromosomes into two mutually exclusive and static groups: suspected aneuploidies and presumed diploids. I have reviewed the specification and claim language, including the portions Sequenom cites in support of its construction, and it is my opinion that neither the claims nor specification call for the limitation Sequenom seeks to impose.

68.     Sequenom's construction is based on the notion that a chromosome cannot be presumed to be a diploid while also being suspected to be aneuploid.  This interpretation is in error.  Claim 17(e) reads in whole: "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA, wherein said at least one first target chromosome is presumed to be diploid in both the mother and the fetus, and ii) the number of copies of a second target chromosome in said mixture of fetal and maternal genomic DNA, wherein said second chromosome is suspected to be aneuploid in the fetus."  Exh. 1 ['017 Patent] at Claim 17(e).  Corresponding language is present in claim 1 of the '018 Patent, and Sequenom seeks to have this language construed in the same way.

69.     To a person of ordinary skill in the art, the use of the words "suspected" and "presumed" do not create mutually exclusive categories because it is entirely possible for one to presume for the purposes of analysis that a chromosome is diploid yet at the same time suspect that it is aneuploid. Similarly, those of skill in the art would not understand this claim term to be conveying the requirement of a specific fixed mental state (such as an "affirmative presumption" or "affirmative suspicion") regarding chromosomes.[6]  Rather, those of skill in the art would recognize (without further construction) that this claim term simply reflects that in a scientific

---

[6] Sequenom's construction is also problematic for the simple fact that it adds ambiguity to the claim term:  a person of ordinary skill in the art would not understand what is meant by the language "affirmative presumption."  This is not a term of art, and it does not appear anywhere in the specification.

analysis there is a variable and a control.  Here, the variable is one or more chromosomes that may or may not be aneuploid while the control is one or more chromosomes that may be used to assess overrepresentation of potentially aneuploid chromosomes by way of a molecular counting technique and a statistical analysis, as set forth in the specification.  *See, e.g.*, Part III.  When properly understood in this context, there is no need for the variable and control to consist of mutually exclusive groups of chromosomes.  Accordingly, those of skill in the art would understand that the term "the first target chromosome" "presumed to be diploid" could include at least one (but up to all) chromosomes that are presumed to be diploid (including, in some cases, the second target chromosome that is suspected to be aneuploid).

70.     I understand that in its preliminary disclosure of proposed claim constructions, Sequenom has cited passages in the specification that allegedly support its proposed construction. I have reviewed the portions of the specification Sequenom points to, and none of them mandate the division of chromosomes into mutually exclusive groups or an "affirmative presumption" regarding chromosome status.  In fact, the citations Sequenom points to simply reflect one *exemplary* mode of carrying out the invention in which one attempts to assess aneuploidy in a single chromosome while using a single control chromosome, which is perhaps the simplest embodiment of the invention and hence most useful as an example.  Indeed, numerous of the passages Sequenom cites are explicitly described as being an "example," "embodiment," "sample," "case," "illustration" or "aspect".  *See, e.g.*, Exh. 1 ['017 Patent] at 4:54-58 ("For example . . . ); 5:23-28 ("In one aspect . . ."); 6:21-25 ("For example . . . ); 6:38-45 ("In another aspect . . ."); 8:16-26 ("Fig. 1C illustrates an embodiment . . ."); 9:2-6 ("In some cases . . ."); 9:33-36 ("For example . . ."); 11:66-12:4 ("Another form . . ."); 21:10-56 (". . . as illustrated by the following calculation."); 21:64-22:8 ("For example . . ."); 23:59-61 ("The following sample protocol . . ."); 25:45-51 ("IV. Examples . . .").  Nothing in the specification, however, states that such one to one analysis is necessary, and such a view would be entirely inconsistent with the claim language itself, which explicitly states that "at least one" chromosome is suspected to be diploid.  Likewise, none of the citations Sequenom cites, taken individually or collectively, would be understood by those of skill in the art to require the limitations Sequenom seeks to impose.

71.      For example, Sequenom points to 9:1-6 of the specification which states: "Quantitative Analysis of the detection of the maternal and fetal target sequences. *In some cases* this may include targets to different regions, such as probes to a target on a chromosome suspected of being present in an abnormal copy number (trisomy) compared to a normal diploid chromosome which is used as a control." Exh. 1 ['017 Patent] at 9:1-6 (emphasis added). Here, the specification suggests that "in some cases," a suspected abnormal chromosome may be compared to a normal diploid chromosome as a control. While this is entirely consistent with the claim language, nothing in this passage (or any other passage cited by Sequenom) would indicate to one of ordinary skill in the art that the claims should be limited to such examples.

72.      Indeed, in addition to providing such examples, the specification includes descriptions of the invention that are entirely general and make clear that the underlying concept of the invention is to count molecules and assess overrepresentation through a statistical analysis. Such descriptions do not limit the invention to embodiments where chromosomes are divided into static mutually exclusive groups and analyzed based on "affirmative presumptions" about their status. For instance, the specification states as follows

> The method may be performed with dilutions whereby more target sequences are detected in samples containing a trisomic or increased copy number of target sequence. That is, if one is analyzing chromosome 21, the mixture may be diluted such that, on average, one may detect two chromosomes present in a maternal DNA, and three chromosomes in a Down Syndrome fetal DNA. Alternatively, the method may be performed with dilutions whereby more reaction samples are positive in this situation. The presence or absence of different target sequences in the discrete samples is detected; and the results are analyzed whereby the number of results from the discrete samples will provide data sufficient to obtain results distinguishing different target sequences.

*See, e.g.*, *id.* at 5:10-23.

73.      Along these lines, the specification explains that there are numerous types of chromosomal abnormalities that may be detected using the invention, including aneuploidies of different chromosomes other than the aneuploidy of chromosome 21 that causes Down's syndrome. *See, e.g.*, *id.* at 21:59-22:8. Likewise, the specification states that in embodiments using digital PCR, the process can be "multiplexed" by simultaneously using multiples primers to multiple targets. *See, e.g.*, *id.* at 12:35-44. Additionally, as stated above, the specification

discloses embodiments in which the molecular counting technique is random sequencing of all DNA fragments obtained from a maternal plasma or serum sample, which would result in sequence data from potentially all chromosomes. *See, e.g.*, *id.* at 19:13-20:28.  In view of the foregoing, those of skill in the art would recognize that the invention encompasses procedures whereby one could simultaneously collect data from multiple targets on multiple potentially aneuploidy chromosomes so that the presence of different types of aneuploidies could be assessed simultaneously, a process that would involve simultaneously treating individual chromosomes as variable and control chromosomes.    Accordingly, to the extent Sequenom's proposed constructions foreclose such embodiments, those of skill in the art would not adopt them.

## V.

## MATERIALS REVIEWED

74.    A list of the materials that I reviewed in preparing this declaration is attached as Appendix B.

## VI.

## COMPENSATION

75.    My compensation for consulting on this matter is $500 per hour. My compensation does not depend on the outcome of this dispute.

1    Dated:  November 21, 2012

2

3                                                    _____
                                                     (Stephen Brown)
4                                                    Stephen A. Brown

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEPHEN BROWN DECLARATION REGARDING
CLAIM CONSTRUCTION                                                    C 12-00865(SI)

## DECLARATION OF SERVICE

I am a citizen of the United States, more than 18 years old, and not a party to this

action.  My place of employment and business address is 201 Redwood Shores Parkway,

Redwood Shores, California 94065.  On November 21, 2012, I caused a copy of:

**DECLARATION OF STEPHEN A. BROWN, M.D, REGARDING CLAIM CONSTRUCTION OF U.S. PATENT NOS. 7,888,017 AND 8,008,018**

to be served as follows:

[ **XX** ] **BY ELECTRONIC SERVICE**   I am readily familiar with the business practice at my place of business for electronically mailing a true and correct copy through Weil, Gotshal & Manges, LLP's electronic mail system to the e-mail address(es) set forth below, or as stated on the attached service list per agreement in accordance with Code of Civil Procedure section 1010.6.

Michael J. Malecek
michael.malecek@kayescholer.com
Peter E. Root
peter.root@kayescholer.com
Stephen C. Holmes
stephen.holmes@kayescholer.com
Sean M. Boyle
sean.boyle@kayescholer.com
**KAYE SCHOLER LLP**
Two Palo Alto Square Suite 400
3000 El Camino Real, Palo Alto, CA 94306
Telephone: (650) 319-4500
Facsimile: (650) 319-4700
Attorneys for Defendant SEQUENOM, INC.

Mario Aieta
maieta@ssbb.com
**SATTERLEE STEPHENS BURKE & BURKE, LLP**
230 Park Avenue Suite 1130
New York, NY 10169
Telephone: (212) 818-9200
Attorney for Counterclaim Defendant ISIS INNOVATION LIMITED

Executed on November 21, 2012 at Redwood Shores, California.  I declare under

penalty of perjury under the laws of the United States of America that the foregoing is true and

correct.

_/s/ Derek C. Walter_
Derek C. Walter

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STEPHEN BROWN DECLARATION REGARDING
CLAIM CONSTRUCTION

35