# EXHIBIT 4

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11 | VERINATA HEALTH, INC., and THE BOARD    Case No. C-12-00865 SI
   | OF TRUSTEES OF THE LELAND
12 | STANFORD JUNIOR UNIVERSITY,             **REBUTTAL DECLARATION OF**
   |                                         **STEPHEN A. BROWN, M.D.,**
13 |              Plaintiffs,                 **REGARDING CLAIM**
   |                                         **CONSTRUCTION OF U.S. PATENT**
14 |     v.                                  **NOS. 7,888,017 AND 8,008,018**

15 | SEQUENOM, INC. and SEQUENOM CENTER
   | FOR MOLECULAR MEDICINE, LLC,
16 |
   |              Defendants/Counterclaim-
17 |              Plaintiffs,                 **ATTORNEY'S EYES ONLY**

18 |     v.

19 | VERINATA HEALTH, INC. and THE
   | BOARD OF TRUSTEES OF THE LELAND
20 | STANFORD JUNIOR UNIVERSITY,

21 |              Counterclaim-Defendants,

22 |     and

23 | ISIS INNOVATION LIMITED,

24 |              Nominal Counterclaim-
   |              Defendant.
25

26

27

28

1     1.     I, Stephen A. Brown, hereby declare:

2.     I have been retained by Plaintiffs Verinata Health, Inc. ("Verinata") and The Board of Trustees of the Leland Stanford Junior University ("Stanford") to offer opinions regarding certain claim terms in U.S. Pat. Nos. 7,888,017 ("the '017 patent") and 8,008,018 ("the '018 patent"). This declaration summarizes my opinions relating to the claim construction issues addressed below.

3.     This declaration is based on information currently available to me. I may continue my investigation and study, which may include a review of documents and information that may be produced, as well as deposition testimony from depositions that have yet to be taken in this case. Therefore, I may expand or modify my opinions as my investigation and study continues, and I may supplement my opinions and/or provide rebuttal opinions in response to any additional information that becomes available to me, any matters raised by Sequenom and/or opinions provided by Sequenom's expert(s), and/or in light of any relevant orders from the Court. In particular, I understand that Sequenom has not yet offered any explanation of the rationale underlying its proposed claim constructions, and may provide further discovery on this issue. To the extent Sequenom provides such discovery, I will provide supplemental or rebuttal opinions as appropriate.

## I.

## THE DISPUTED TERMS OF THE '017 AND '018 PATENTS

A.     "massively parallel DNA sequencing of the random fragments of genomic DNA" and "massively parallel DNA sequencing of DNA fragments randomly selected"

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "massively parallel DNA sequencing of the random fragments of genomic DNA" ('017 patent claim 17) | "Massively parallel DNA sequencing" refers to "any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel (*e.g.*, the Illumina sequencing platform)." No additional construction necessary. | "Massively parallel DNA sequencing of the random fragments of genomic DNA in each discrete reaction samples to detect the presence of the target sequence." |

| "massively parallel DNA sequencing of DNA fragments randomly selected" ('018 patent claim 1) | "Massively parallel DNA sequencing" refers to "any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel (*e.g.*, the Illumina sequencing platform)." No additional construction necessary. | "Random, not targeted, massively parallel DNA sequencing." |

1.   **Those of Skill in the Art Would Understand The Scope of Verinata's Proposed Construction**

4.       Dr. Metzker argues that Verinata's construction should not be accepted because he believes that a person of ordinary skill in the art in February of 2006 would not have understood what the phrase "Illumina sequencing platform" meant. Metzker Decl. ¶¶ 115, 161. According to Dr. Metzker, "[e]ven in February 2007, the meaning of this phase would not have been clear." *Id.* ¶¶ 115, 161-62.

5.       However, the specification itself cites to the Illumina sequencing platform, providing that "[a] methodology useful in the present invention is based on massively parallel sequencing. . ." and citing to "products offered by Illumina." Exh. 16 ['017 patent] at 20:1-12. This reference in the specification provides an example of one of the products envisioned when it discusses massively parallel sequencing, and confirms that the Illumina sequencing platform was known to those of skill in the art in February 2007. *See id.* Likewise, the specification (and the 2006 provisional application from which the '017 and '018 patents originate) cites to the 2003 article by Braslavsky et al., which describes a single-molecule sequencing-by-synthesis platform that operates in a manner similar to the Illumina sequencing platform. Thus, by 2006, those of skill in the art were well aware of sequencing platforms of the type described in the '017 and '018 patents.

6.       Furthermore, those of skill in the art were well aware of the Illumina sequencing platform specifically long before February 2007. As Dr. Metzker notes, Illumina and Solexa signed an acquisition agreement on November 13, 2006. *Id.* ¶ 115. Prior to the acquisition by Illumina, those of skill in the art referred to the Illumina sequencing platform as the "Solexa" sequencing platform, and this sequencing platform was very well known in the field.

7.      Dr. Metzker himself reported on the Solexa massively parallel sequencing platform as early as 2005.  *See, e.g.*, Exh. 17 [Metzker 2005].  In Dr. Metzker's 2005 review, he lists twelve companies that "are active in the sequencing field" including Solexa.  *Id.* at 1768.  He also highlights the advantages of cyclic reversible terminator based sequencing—a method he explicitly states is used by Solexa's platform—over other sequencing methods.  *Id.* at 1773 ("An additional advantage is that unlike the pyrosequencing assay, which must be contained within a defined reaction well, the CRT assay can be performed on a number of highly parallel platforms. . . ."); *see also id.* ("At this year's *Advances in Genome Biology and Technology/Automation in Mapping and Sequencing* meeting, Solexa reported on a similar CRT chemistry with a sequence read-length of approximately 20 bases . . . and recently reported the complete sequencing of the φχ174 genome . . . .").

8.      In October of 2005, Solexa had sequenced an 180,000-base-pair chromosome, and by June 2006 the Solexa platform was commercialized.  *See, e.g.*, Exh. 18 [Chi].  At the time, Solexa issued a press release noting that shipping of the Solexa Genome Analysis System had started in the second quarter of 2006 and that multiple systems had been placed in leading genome centers.  Exh. 19 [Solexa Announces Second Quarter 2006 Financial Results; Provides Update on Early Access Program for Solexa Genome Analysis System].

9.      A few months after Illumina's acquisition of Solexa, the two names were used interchangeably to describe the Solexa platform.  *See, e.g.*, Exh. 20 [Shaffer].  Indeed, Dr. Metzker's own declaration continues to refer to the two platforms interchangeably.  *See, e.g.*, Metzker Decl. ¶¶ 43, 44, 50 (all referring to "Illumina/Solexa").  Thus, Dr. Metzker's own declaration confirms that the term "Illumina sequencing platform" refers to a massively parallel sequencing method that was well known as early as 2005.  At a very minimum, there is little doubt that by February 2007 this platform was widely known and understood without any ambiguity.

### 2.      The Evidence Does Not Support Sequenom's Proposed "Targeted Sequencing" Constructions

10.      Dr. Metzker and Sequenom's interpretations of the terms "massively parallel

DNA sequencing of the random fragments of genomic DNA" (claim 17 of '017 patent) and "massively parallel DNA sequencing of DNA fragments randomly selected" (claim 1 of '018 patent) are wholly inconsistent with one another and with the language of these claims. Indeed, Dr. Metzker and Sequenom adopt directly contrary positions for claim terms from the '017 patent versus the '018 patent even though they have nearly identical wording. As set forth below in more detail, those of ordinary skill in the art would recognize that there is no basis in either the '017 or '018 patent for Sequenom's proposed constructions.

> a. **Dr. Metzker Construes Claim 17 Of The '017 Patent To Require Preselection Of Specific Sequences Prior To Massively Parallel Sequencing**

11.  Notably, neither the '017 nor '018 patent refers to "targeted massively parallel sequencing." Dr. Metzker accordingly does not purport to identify a definition for this term anywhere in the specification of the '017 or '018 patent. In this regard, Sequenom and Dr. Metzker do not appear to be drawing their proposed claim constructions for either "massively parallel DNA sequencing of the random fragments of genomic DNA" (claim 17 of '017 patent) or "massively parallel DNA sequencing of DNA fragments randomly selected" (claim 1 of '018 patent)[1] from the '017 or '018 patent. Rather, as set forth below, Sequenom and Dr. Metzker appear to be drawing their proposed constructions for these terms from sources external to the '017 and '018 patents.

12.  Dr. Metzker first introduces the concept of "targeted fragments" in the background portion of his declaration, in a section entitled "Enrichment by sequence selection." *See* Metzker Decl. ¶ 32. There, he describes a method of "enriching" for certain sequences in which the "total pool of nucleic acids is passed over a matrix containing immobilized probes specific to the sequence of interest" such that "complementary sequences are designed to selectively hybridize to nucleic acid fragments of interests, *i.e.*, targeted fragments." *Id.* Dr.

---

[1] Sequenom's proposed construction for "massively parallel DNA sequencing of DNA fragments randomly selected," as it appears in claim 1 of the '018 patent, is "random, not targeted, massively parallel DNA sequencing." Metzker Decl. ¶ 147. Thus, "targeted sequencing" is relevant to this construction as well as to Dr. Metzker's interpretation of claim 17 of the '017 patent.

Metzker cites no sources in this portion of his declaration, and nothing in this portion of Dr. Metzker's declaration is drawn from the '017 or '018 patent.

13.     Dr. Metzker's declaration next introduces the concept of "targeted sequencing" in a section entitled "Nucleic acid sequencing – targeted sequencing."  *See* Metzker Decl. ¶¶ 44-45.  This section of Dr. Metzker's declaration is largely drawn verbatim from a 2010 Nature review article that Dr. Metzker wrote, and it cites a number of literature articles, all of which postdate the filing of the '017 and '018 patents.  These literature references all pertain to sequencing methods that involve preselection of certain DNA sequences or DNA regions prior to massively parallel sequencing using methods akin to the technique Dr. Metzker summarizes in the portion of his declaration entitled "Enrichment by sequence selection."  Again, nothing in this portion of Dr. Metzker's declaration is drawn from the '017 or '018 patent.

14.     The only other clarification Dr. Metzker offers regarding the meaning of "targeted" massively parallel sequencing is in paragraphs 109-10 of his declaration, where he states "[i]t is my opinion that one of ordinary skill in the art would have understood that the target sequence is known in advance."  Metzker Decl. ¶ 109; *see also id.* ¶ 110 ("In contrast, random sequencing does not involve the use of a known target sequence.  To the contrary, random sequencing involves one or more DNA fragments that contain unknown sequences in advance of performing the method.").  Dr. Metzker does not explain what he means when he states that a "target sequence" is "known in advance."  Furthermore, Dr. Metzker cites nothing whatsoever (including anything from the '017 or '018 patent) to support his opinion that a "target sequence is known in advance."

15.     Regardless, in view of the latter portion of Dr. Metzker's declaration on this limitation in claim 17 of the '017 patent, it is clear that Dr. Metzker contends that attributes of "targeted sequencing" include (1) preselection of DNA sequences or regions prior to the sequencing process and/or (2) sequencing of fragments of DNA for which the "sequence is known in advance."  Reflecting this, I am informed that Sequenom has stated in discovery responses that "[u]nder Sequenom's proposed claim construction of this claim term, step (c) requires targeted sequencing of a specific subset of fragments . . . ."  Exh. 21 [Sequenom's First

1  Supplemental Response to Interrogatory No. 2] at 10.

2      16.      As I discuss below, those of ordinary skill in the art would not understand the

3  claims of the '017 and '018 patents to be limited to Dr. Metzker's "targeted sequencing" concept.

4  Nothing in the claims or specification suggests that the methods as defined by any of the asserted

5  claims should be limited to methods requiring preselection of specific DNA sequences or DNA

6  regions and/or sequencing of particular DNA fragments where the sequence of each such

7  fragment is known in advance.   To the contrary, the evidence teaches away from such a

8  requirement.

9          **b.      The Claims Do Not Support Sequenom's Proposed "Target**
           **Sequence" Construction**
10

11     17.      Claim 17 of the '017 patent explicitly states in steps b) and c):  "b) distributing

12  random fragments from the mixture of fetal and maternal genomic DNA of step a to provide

13  reaction samples containing a single genomic DNA molecule or amplification products of a single

14  genomic molecule; c) conducting massively parallel DNA sequencing of the random fragments of

15  genomic DNA in the reaction samples of step b) to determine the sequence of said random

16  fragments."   Claim 1 of the '018 patent distinctly states in step b: "b. conducting massively

17  parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and

18  maternal genomic DNA of step a) to determine the sequence of said DNA fragments."   As is

19  clearly evident, these claims do not specify some sort of "targeted" or "target specific"

20  sequencing approach in which a specific pre-identified, preselected known region(s) of a nucleic

21  acid is sought in the mixture.

22     18.      Neither claim 17 of the '017 patent nor claim 1 of the '018 patent recites a

23  preselection step or any preamplification (*i.e.*, amplification other than that which may occur on a

24  sequencing platform itself or that is performed purely as a means of increasing signal strength) of

25  any specifically preselected, known "target" nucleotide sequence that is carried out prior to the

26  sequencing process.  Without specifically reciting such a step, it is my opinion that a person of

27  ordinary skill in the art would understand "massively parallel sequencing" to mean just that—

28  "massively parallel sequencing."—that is, any sequencing method that allows for the acquisition

of sequence information from multiple DNA fragments in parallel, such as the Illumina sequencing platform.

19.     Indeed, the claims do not recite "massively parallel sequencing" of "target sequences."  Rather, the claims recite "conducting massively parallel DNA sequencing of the ***random fragments*** of genomic DNA" ('017 patent) or "conducting massively parallel DNA sequencing of DNA fragments ***randomly selected*** from the mixture of fetal and maternal genomic DNA" ('018 patent").[2]  Referring to "random fragments" or "fragments randomly selected," this language alone makes clear that Sequenom's "targeted sequencing" construction should not be adopted.

20.     Furthermore, the claims call for a "mixture of fetal and maternal genomic DNA from said maternal tissue sample."  Those of skill in the art recognize that this sample contains random fragments of maternal and genomic DNA, a point Dr. Metzker agrees with.  Metzker Decl. ¶ 150 ("The fragments of maternal and fetal DNA in the maternal tissue are random fragments of the mother's and fetus' genomic DNA.  That is, the genomic DNA is naturally broken up into ***random fragments***.").  It is this sample of random fragments that is directly subjected to massively parallel sequencing.  For instance, as claim 17 of the '017 patent recites, one "distribute[s] random fragments from the mixture of fetal and maternal genomic DNA . . . to provide reaction samples" and "conduct[s] massively parallel DNA sequencing of the random fragments of genomic DNA in the reaction samples."  Exh.16 ['017 patent] at claim 17; *see also* Exh. 22 ['018 patent] at claim 1 ("conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA").  As such, it makes no sense to limit these independent claims of the '017 or '018 patent to "targeted sequencing."

21.     Finally, claims 17 of the '017 patent and claim 1 of the '018 patent require "identifying the chromosomes to which the sequences obtained . . . belong"  and "identifying chromosomes to which the sequences obtained . . . belong," respectively.  These limitations

_____

[2] Emphasis added unless noted otherwise.

would make little sense if the claims were directed to sequencing preselected, pre-identified fragments for which the sequence information (and hence the chromosomal location) was already known.

22.     Simply put, nothing about the claim language suggests preselection of specific DNA sequences prior to conducting the sequencing process.  In fact, for the reasons listed above, the claim language requires ***exactly the opposite***, that the sequences obtained from the massively parallel sequencing step of claim 17 of the '017 patent are random sequences from the mixture of fetal and maternal cell-free DNA.

23.     The only aspects of the claim language that Dr. Metzker points to in support of Sequenom's proposal to limit claim 17 of the '017 patent to "targeted sequencing" are steps e) and f) of the claim, which refer to "at least one first target chromosome."  Metzker Decl. ¶ 105. However, steps e) and f) deal with ***analyzing the data*** resulting from the sequencing process, not the sequencing process itself.  Accordingly, one of ordinary skill in the art would not understand steps e) and f) of the claim to be relevant to understanding the ***sequencing process***, in particular whether it requires sequencing only fragments that have been preselected or for which the sequence information is already known.  The "massively parallel DNA sequencing of the random fragments of genomic DNA" occurs in step c).  Nowhere in steps a), b), c), or even d)—the steps dealing with massively parallel sequencing—does the word "target" ever appear.[3]

24.     In his declaration, Dr. Metzker compares two claims of the '017 and '018 patents and argues that there are differences in the claim language such that a person of ordinary skill in the art would "expect[] the meaning of this claim element to differ."  Metzker Decl. ¶¶ 148-149.  In particular, as noted above, Dr. Metzker contends that claim 1 of the '018 patent is limited to "random, not targeted massively parallel DNA sequencing," while claim 17 of the '017 patent is "referring to **targeted** sequencing, not random sequencing."  *Id.* ¶¶ 103, 147 (emphasis in original).

---

[3] For the reasons explained below, even if the word "target" did appear in these steps, those of skill in the art would not understand that word to limit the claims in the manner suggested by Dr. Metzker.

25.     However, nothing in the claims supports Dr. Metzker's opinion, and Dr. Metzker's chart includes little, if any, accompanying explanation, as to how the claim language supposedly supports his opinion.

26.     First, Dr. Metzker asserts that "for the '017 Patent, from the point of view of a person of ordinary skill in the art, the sequencing in Claim 17 is target specific sequencing . . . ." Metzker Decl. ¶ 151.  However, as noted above, the only aspect of claim 17 of the '017 patent that Dr. Metzker cites to for support is the phrase "one first target chromosome."  Metzker Decl. ¶ 105.  This language does not support Dr. Metzker's proposed limitation, for the reasons stated above.  Otherwise, Dr. Metzker's opinion that the claims of the '017 patent are limited to "targeted sequencing" is based strictly on passages from the specification (which I address below), not the claim language.  *See id.* ¶¶ 107-09.

27.     Second, Dr. Metzker states that "in Claim 1 of the '018 Patent, the DNA fragments to be sequenced are 'randomly selected' from the genomic DNA mixture."  *Id.* ¶ 152. Offering no further explanation, Dr. Metzker asserts that this is a "contrast" to claim 17 of the '017 patent.  However, Dr. Metzker's own chart highlights claim language from claim 17 of the '017 patent demonstrating that there is no such "contrast."  For instance, Dr. Metzker's chart highlights the language "distributing random fragments" and "random fragments of genomic DNA in the reaction samples."  *Id.* ¶ 149.  More specifically, claim 17 of the '017 patent recites "conducting massively parallel sequencing of the ***random fragments of genomic DNA*** in the reaction samples."  *Id.*  At least this language shows that the claims of the '017 patent are directed to sequencing "random fragments" of the fetal and maternal genomic DNA obtained from the maternal sample, and that they are not requiring a sequencing approach that is "targeted" to only specific fragments, each of whose sequence is known and that have been a priori enriched or preamplified so that they can be specifically identified in the genomic DNA.

28.     Third, Dr. Metzker notes that in step d) of claim 1 of the '018 patent, the word "target" is not used.  *Id.* ¶ 153.  Likewise, Dr. Metzker notes that steps e) and f) of claim 17 of the '017 patent refer to a "target chromosome."  *Id.* ¶ 155.  According to Dr. Metzker, this shows that "Claim 17 of the '017 Patent is expressly directed towards targeted sequencing," while claim 1 of

the '018 patent is not.  *Id.* ¶ 153.  As an initial matter, in view of the claim language discussed in the preceding paragraph, those of skill in the art would not view the claims of the '017 patent as being directed to "targeted sequencing" involving a priori preselection and sequencing of only fragments where the sequence information is already "known in advance" and then conducting sequencing of any such fragments to confirm their existence.  Indeed, none of these requirements is actually recited in the claims, and nothing in the claim language indicates that the term "target chromosome" imposes these requirements.  Consistent with this, step d) of claim 17 of the '017 patent requires "identifying the chromosomes to which the sequences obtained in step c) belong."  This limitation would make little sense if the claims were directed to sequencing preselected, pre-identified fragments for which the sequence information (and hence the chromosomal location) was already known.

29.      Finally, Dr. Metzker states "in step d) of Claim 17, the claim wording is 'identifying the chromosomes,' whereas the corresponding limitation of Claim 1 of the '018 Patent merely refers to 'identifying chromosomes.'  A person of ordinary skill in the art would have understood 'the' chromosomes identified in step d) of Claim 17 to be the target chromosomes referred to in steps e) and f) because no other chromosomes are mentioned in Claim 17.  In contrast, because Claim 1 of the '018 Patent appears to be directed to random sequencing, it makes sense in step c simply to refer to 'identify chromosomes,' that is, *any* chromosomes, rather than 'identifying the chromosomes.'"  *Id.* ¶ 155 (emphasis in original).

30.      Dr. Metzker's opinion makes little sense.  As an initial matter, one of skill in the art would not look at the word "the" in claim 17 of the '017 patent and suggest that it is being used to connote the substantial difference in meaning that Dr. Metzker suggests.  In particular, one of skill in art would not agree that the word "the" in claim 17 of the '017 patent carries the significance Dr. Metzker suggests, because Dr. Metzker's proposed understanding crosses out the word "random" that appears in step c) of the claim immediately prior to step d) where the word "the" appears.  Simply put, one of skill in the art would not agree that the word "the" is being used in claim 17 of the '017 patent for the purpose of negating the claim term "random."

31.      Rather, those of skill in the art would have understood this claim term as

follows.  First, step d) of claim 17 of the '017 patent states, in full, "identifying the chromosomes to which the sequences obtained in step c) belong."  Thus, the "chromosomes" that are being referred to in step d) of the claim are the "chromosomes" to which the fragments sequenced in step c) belong.  As explained above, step c) simply recites "conducting massively parallel DNA sequencing of the random fragments of genomic DNA in the reaction samples" and is not limited to sequencing based on preselection of certain "target" sequences.  Thus, just like the '018 patent, the "chromosomes" in the claims of the '017 patent can be "any" chromosome.  Second, step e) refers to "analyzing the data of step d)" to determine the number of copies of "at least one first target chromosome."  This language simply confirms that one must determine the representation of one or more chromosomes that are of interest for the aneuploidy determination.  In other words, the claim language simply makes clear that the "target chromosome" is one or more chromosomes that are of interest for the aneuploidy determination, not that certain DNA sequences are "known in advance" or that there is prior pre-selection of these sequences.

32.     In short, nothing in Dr. Metzker's chart suggests that the claims require preselecting or enriching certain DNA sequences prior to conducting massively parallel sequencing or that the sequencing process be limited to certain DNA sequences that are "known in advance" by some a priori pre-selection or enrichment step.  Indeed, it appears that Dr. Metzker and Sequenom's construction for "massively parallel DNA sequencing of the random fragments of genomic DNA" as it appears in claim 17 of the '017 patent does nothing more than recite the words present in the claim term, adding additional requirements that are not otherwise present.

c.     **The Specification Does Not Support Sequenom's Proposed "Target Sequence" Construction**

33.     Consistent with the claims, nothing in the specification suggests that the claims are limited to methods that involve preselection of DNA sequences or regions prior to the sequencing process and/or sequencing of fragments of DNA for which the sequence has already been determined (i.e., DNA fragments where the "sequence is known in advance").

34.     While Dr. Metzker cites a number of articles supposedly related to "targeted

1    sequencing" that postdate the '017 and '018 patents, *see* Metzker Decl. ¶¶ 44-45, nowhere in his

2    report does Dr. Metzker point to a disclosure of "targeted sequencing" in the '017 and '018

3    patents.  That is, Dr. Metzker never identifies any teaching in the '017 or '018 patent in which

4    specific sequences are preselected or selectively enriched prior to massively parallel sequencing.

5    Likewise, Dr. Metzker does not point to any teaching in the '017 or '018 patent of how this might

6    be done.  In fact, those of skill in the art would recognize that the '017 or '018 patents do not

7    include any such teaching.   In this regard, Sequenom's proposed "targeted sequencing"

8    construction appears aimed towards limiting the claims to hypothetical embodiments that are not

9    disclosed in the specification.

10           35.      To the extent the specification uses the phrase "target sequence," those of skill

11   in the art would understand that the specification uses this term in a broad non-limiting fashion to

12   refer to any sequence that is of interest because it can be enumerated and used in the aneuploidy

13   analysis.  Simply because a DNA sequence is of interest for the aneuploidy analysis does not

14   mean it has been physically preselected in advance of the sequencing process, and nothing in the

15   specification suggests otherwise.   Indeed, numerous sections of the specification—including

16   portions that pertain to both digital PCR and sequencing—illustrate that the use of the terms

17   "target," "target molecule," and "target sequence" broadly pertain to any sequence that is of

18   interest:

19      i.   For instance, in describing one embodiment, the specification states that "the
             number of reaction samples is selected to give a statistically significant result
20           for the number of copies of *a target* in the DNA molecules." Exh. 16 ['017
             patent] at 8:47-51.  Clarifying further, the specification goes on to explain in
21           the very same passage that "[t]he amount of DNA molecule per reaction
             sample is preferably on the order of one copy of the chromosome *of interest*
22           equivalent per reaction sample." *Id.* at 8:54-56.  Thus, in the specification, the
             "target" DNA may simply be the chromosome "of interest."   Nothing about
23           this description requires that the sequence of the chromosome "of interest" be
             preselected or determined in advance.
24
25      ii.  As another example, the specification states, "[a]gain, a sample is diluted to
             contain less than a nominal single genome equivalent of DNA, and the
26           presence of the *target of interest* (i.e., chromosome 21 trisomy) can be
             determined in a large number of samples." *Id.* at 11:67-12:4.   Thus, the
27           specification again makes clear that the "target" is one or more sequences "of
             interest."
28      iii. As yet another example, in describing exemplary detection and quantification

STEPHEN BROWN REBUTTAL DECLARATION                    13                    ATTORNEY'S EYES ONLY
REGARDING CLAIM CONSTRUCTION                                                C 12-00865(SI)

steps, the specification states, "[h]aving isolated the sample DNA into a nominal genome equivalent, the presence of the DNA sequence or chromosome *of interest* must be quantified." *Id.* at 12:17-19. In concluding this passage, the specification states, "[a]lso, while detection may be conveniently be carried out by a sequence specific probe, detection may also be carried out by directly sequencing a region of interest to determine *if* it is the *target sequence of interest.*" *Id.* at 12:30-33. Thus, the specification again characterizes the "target sequence" as nothing more than a sequence that is "of interest" for the analysis.

36.     Furthermore, Dr. Metzker's interpretation of "massively parallel DNA sequencing of the random fragments of genomic DNA" in claim 17 of the '017 patent requires that DNA sequencing is performed only on the sequence of the "target" (*i.e.*, the sequence of interest, as is clear from the specification). *See supra* ¶¶ 12-15. However, the specification makes clear that no such limitation is present.

i.     For instance, the specification states that "detection may also be carried out by directly sequencing a region of interest to determine *if* it is the *target sequence of interest.*" Exh. 16 ['017 patent] at 12:30-33. The specification explains that regions can be sequenced to determine "*if*" they are in fact the sequences "of interest." In other words, directly contrary to Dr. Metzker's interpretation, the specification contemplates sequencing of fragments other than those that are "of interest" for the analysis—the nucleic acid that was sequenced may not belong to the target sequence of interest.

ii.     As another example, a passage of the specification cited by Dr. Metzker as support for his interpretation of the claim language, states that "[t]his approach is termed here '*digital analysis*,' and involves the separation of the extracted genomic material into discrete units so that the *detection of a target sequence* (*e.g.*, chromosome 21) may be simply quantified as binary (0, 1) or simple multiples, 2, 3, etc." Exh. 16 ['017 patent] at 1:45-50 (cited in Metzker Decl. ¶ 107). In another passage also cited by Dr. Metzker, the specification states "[e]ach sample mixture has a possibility of having distributed in it less than 1 *target* (i.e., 0 target) or more than one target." *Id.* at 7:47-48 (quoted in Metzker Decl. ¶ 107). These passages, in fact, suggest that sequencing may be performed on a sample that has "0" copies of the sequence of interest (*e.g.*, 0 nucleic acids corresponding to chromosome 21 when chromosome 21 is the sequence being targeted). In other words, the patent does not teach performing sequencing only on samples containing the "target sequence" as Dr. Metzker states—rather, sequencing is performed on all DNA fragments, even those not containing the "target sequence," and only after sequencing is performed is it determined whether or not the "target sequence" is present.

37.     In fact, the concept of assigning a nucleic acid, by its sequence, to a chromosome of interest is already present in step (d) of claim 17 of the '017 patent: "d) identifying the chromosomes to which the sequences obtained in step c) belong." Exh. 16 ['017 patent] at claim 17. Dr. Metzker and Sequenom's notion of "targeted sequencing" would

incorporate the element of step (d) into step (c), rendering step (d) both unnecessary and redundant.  The presence of step (d) in claim 17 contradicts Dr. Metzker and Sequenom.

38.      In paragraphs 107-109 and 120 of his declaration, Dr. Metzker cites to a number of passages that allegedly support limiting the claims to the use of "targeted sequencing." Dr. Metzker's report simply lists these passages in bullet-point fashion and includes little, if any, analysis.  Instead, he merely states in conclusory fashion that "one of ordinary skill in the art would have understood that the target sequence is known in advance."  Metzker Decl. ¶ 109. However, as set forth below, none of the passages that Dr. Metzker points to support limiting the claims of either the '017 or '018 patent to "targeted sequencing," nor do they support Dr. Metzker's understanding of the terms "targeted sequencing" or "target sequence."

    i.    First, Dr. Metzker points to a passage of the '017 patent at 1:43-50 referring to "digital analysis."  Nowhere does this section state that a target sequence is known in advance or is the product of a preselection process conducted in advance of the sequencing process.  At most, the passage provides that a target sequence may be detected through the use of digital analysis.  Notably, the passage characterizes a "target sequence" as an entire chromosome.  *Id.* at 1:48-49 ("…the detection of a target sequence (e.g., chromosome 21)…"). This confirms that the specification uses the term "target sequence" broadly to describe a sequence of interest, not a particular sequence fragment that is "known in advance," as Dr. Metzker contends.  Indeed, the sequence for the entire chromosome of an individual is not "known in advance."  Insofar as Dr. Metzker and Sequenom contend that the sequence of an entire chromosome of an individual is actually "known in advance," the human chromosome sequences of the entire genome of an individual would also be theoretically "known in advance," putting aside  individual variation.  This is an absurd result that confirms that Dr. Metzker's definition of the term "target sequence" cannot be correct.

    ii.    Second, Dr. Metzker points to a passage of the '017 patent at 4:61-5:3 from the Brief Summary of the Invention.  Notably, this section explicitly disclaims limiting the invention, stating "[t]he following brief summary is not intended to include all features and aspects of the present invention, nor does it imply that the invention must include all features and aspects discussed in this summary." *Id.* at 4:34-39.  Regardless, this section again does not state that a "target sequence" must be known in advance or the product of a preselection or prior specific enrichment step that is carried out prior to sequencing.  Likewise, although the passage states that the "target sequences are chosen," this does not require determining a sequence in advance or any preselection.  Indeed, one may choose the sequences of interest for aneuploidy determination without any a priori knowledge of the sequence data.

    iii.    Third, Dr. Metzker points to a passage of the '017 patent at 7:36-59 from the Overview of the invention.  Here, Dr. Metzker does little more than emphasize the word "target" repeatedly, again providing no explanation as to why this passage supports his interpretation.  The section does not say anything about a

sequence being known in advance. To the contrary, the passage refers to an "abnormal increase in the *target sequence, e.g., a trisomy*." Of course, a trisomy is an abnormal increase in an entire chromosome, and therefore, the passage again refers to a "target sequence" as possibly being an entire chromosome, a description inconsistent with Dr. Metzker's "known in advance" description of the term "target sequence." *See also id.* at 7:58-59 ("where the target sequence in the offspring will be different from that of the mother, e.g. in trisomy").

iv.   Fourth, Dr. Metzker points to a passage of the '017 patent at 11:38-45 which uses the word "target." This passage again supports a broad understanding of the word as the passage explicitly states "a single template molecule (haplotype), two target molecules (diploid) or three target molecules (trisomy)." As before, here, the specification demonstrates that a target can be an entire chromosome. And, as with each of these sections, nothing in this passage suggests the target must be known in advance or the subject of a preselection step before sequencing. Furthermore, this particular passage appears to focus on the digital PCR embodiments of the patent, not the sequencing embodiment covered by the claims. *See id.* at 11:53-56 ("The reaction sample is preferably holds about 10-100 µL of a PCR reaction sample . . . .").

v.    Fifth, Dr. Metzker points to a passage of the '017 patent at 11:66-12:9 discussing the distribution of DNA molecules. Critically, this section makes explicitly clear that the use of the word "target" is merely meant to mean target of interest. Indeed, the passage recites "the presence of the target of interest (i.e., chromosome 21 trisomy) can be determined in a large number of samples." Again, the section refers to an entire chromosome as being "of interest" and, as stated before, the sequence of an entire chromosome cannot be known in advance—at least, not any more than the entire human genome is known in advance. Thus, this passage cuts against Dr. Metzker's interpretation.

vi.   Sixth, Dr. Metzker points to a passage of the '017 patent at 8:31-9:6 which describes analysis of information. Nothing in this section suggests that a "target sequence" must be known in advance or the subject of a preselection step prior to sequencing. And, in any event, this particular passage appears to be exemplifying the digital PCR embodiments, not the sequencing embodiments that the claims cover. *See, e.g., id.* at 9:3-4 (referring to "probes to a target on a chromosome").

vii.  Seventh, Dr. Metzker points to a passage of the '017 patent at 12:30-33 which discusses the detection and quantification of DNA molecules. This passage again does not provide any indication of when the identity of the sequence is known, and instead, as discussed above, explicitly states that detection may be carried out "by directly sequencing a region of interest to determine if it is the target sequence of interest." As noted above, this language simply confirms that Dr. Metzker's understanding of the term "target sequence" is incorrect.

viii. Eighth, Dr. Metzker points to a passage of the '017 patent at 19:6-11 which discusses analyzing multiple samples and the fact that different types of containers can hold the samples. This passage merely states the phrase "target sequences." As before, it does not indicate that a "target sequence" is "known in advance" or the product of any preselection step.

ix.   Ninth, Dr. Metzker, points to a passage of the '017 patent at 19:12-20 which

discusses sequencing methods as methods of molecular counting. Again, there is no mention that a "target sequence" is "known in advance" and nothing in the passage lends itself to the suggestion that a target sequence is anything other than a sequence of interest.

x.  Tenth, Dr. Metzker points to a passage of the '017 patent at 19:57-20:1 which details exemplary methods of molecular counting. Once again, the passage provides no indication that a "target sequence" must be "known in advance" or is the result of any preselection process. To the contrary, the passage goes on to state that a sequencing method that is "useful in the present invention" is "based on massively parallel sequencing of millions of fragments using attachment of *randomly fragmented genomic DNA* to a planar, optically transparent surface . . . ." The passage then cites to "products offered by Illumina, Inc." The passage goes on to explain that "[o]nly about 30 bp of *random sequence* information are needed to identify a sequence as belonging to a specific human chromosome." *Id.* at 20:1-18. Thus, if anything, the portion of the specification that Dr. Metzker points to confirms that a "target sequence" is not "known in advance."

39.    Given the foregoing, one of ordinary skill in the art would not agree that the claims of the '017 patent should be limited to "targeted sequencing," as Dr. Metzker proposes.

**B.    "identifying the chromosomes"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "identifying the chromosomes" ('017 patent claim 17) | No construction necessary | "determining the identity of the unique regions of the target chromosomes from the corresponding target sequences"[4] |
| "identifying chromosomes" ('018 patent claim 1) | No construction necessary | "Aligning sequences obtained from random massively parallel DNA sequencing to a reference genome." |

40.    With regard to this claim term, Dr. Metzker again offers different interpretations for the same phrase in the patent claims based on a common specification. To the extent that Dr. Metzker bases his position on the fact that this term appears as "identifying the chromosomes" in claim 17 of the '017 patent, and appears as "identifying chromosomes" in claim

---

[4] As Sequenom's proposed construction for "identifying the chromosomes" in Claim 17 of the '017 patent refers to "target sequence," my analysis of Dr. Metzker's contentions regarding "targeted sequencing" and "target sequence" in ¶¶ 11-39 applies.

1 of the '018 patent, I find this position to have no support whatsoever either in the '017 and '018 patents themselves or in basic common sense. Indeed, in the context of steps (c) and (d) of claim 17 of the '017 patent and steps (b) and (c) of claim 1 of the '018 patent, a person of ordinary skill in the art would interpret those steps, respectively, as conveying exactly the same concept, regardless of the lack of the word "the" within the phrase "identifying chromosomes" in step (c) of claim 1 of the '018 patent. Thus, for the reasons set forth below, it is my opinion that an ordinary person of skill in the pertinent art would understand "identifying the chromosomes" and "identifying chromosomes" to have the same meaning in both claim 17 of the '017 patent and claim 1 of the '018 patent, respectively.

**1. Dr. Metzker Provides No Support For Sequenom's Construction Of "Identifying The Chromosomes" In The '017 Patent**

41.     With regard to the '017 patent, Dr. Metzker states in his report that "[a] person of ordinary skill in the art would have understood that, based on the language of Claim 17 and the disclosure of the specification, 'identifying the chromosomes' means 'determining the identity of the target chromosomes from the corresponding target sequences.'" Metzker Decl. ¶ 117. However, Dr. Metzker provides almost no support for his interpretation. Likewise, none of Dr. Metzker's arguments provides support for or even addresses why the two identical claim terms in the '017 and '018 patents should be afforded different interpretations.

42.     Dr. Metzker's proposed construction does not even match Sequenom's proposed construction, which is "determining the identity of the ***unique regions*** of the target chromosomes from the corresponding target sequences." Thus, Dr. Metzker's report includes absolutely no opinion regarding why this claim term should be construed to require identifying "unique regions." Dr. Metzker does not even explain what Sequenom's "unique regions" language purportedly means. I am informed that Sequenom altered its construction for this claim term very shortly before my original declaration was submitted to include the "unique regions" language. Therefore, I address this language for the first time below.

43.     Furthermore, to the extent Dr. Metzker provides any opinion as to why this claim term should require identifying "unique regions" of "target chromosomes," I reserve the

18

1    right to provide further rebuttal opinion.   What little opinion Dr. Metzker presents on the

2    construction of this claim term in the context of the '017 patent I address below.

3         44.       First, Dr. Metzker states that "Claim 17 itself refers to chromosomes as first

4    and second 'target chromosomes.'"   Metzker Decl. ¶ 118.   Claim 17 of the '017 patent does

5    include such language, but it is in a step related to data analysis, not identification.  Dr. Metzker

6    does not explain why this is relevant or supportive of Sequenom's proposed construction.  Next,

7    Dr. Metzker argues that the specification is "replete with references to detecting the 'target

8    sequence.'"   *Id.* ¶ 119.   Again, Dr. Metzker does not explain why this is relevant or supportive of

9    Sequenom's proposed construction.  In any event, for the reasons stated above, to the extent the

10   specification uses the word "target sequence" or some variation thereof, it does not do so in a way

11   that supports Sequenom's understanding of the term "target sequence" or "targeted sequencing."

12        45.       Otherwise, Dr. Metzker simply references another section of the '017

13   specification at 19:56-20:1.   *Id.* ¶ 120.   Dr. Metzker's bare citation to the specification provides

14   no explanation as to why this section, which doesn't even use the word "identify," is relevant or

15   supports Sequenom's interpretation.   To the extent Dr. Metzker offers any explanation for why

16   the material in paragraphs 118-120 of his declaration supports his interpretation of the claim term

17   "identifying the chromosomes," I will provide a rebuttal opinion.

18        46.       As to Sequenom's contention that this claim term should be construed to

19   require determining the identity of "unique regions" of the chromosome, those of skill in the art

20   would not adopt this aspect of Sequenom's construction, for at least the following reasons.

21        47.       First, as noted above, the claim language recites "sequencing of the random

22   fragments of genomic DNA."  Exh.16 ['017 patent] at claim 17.  Calling for "random fragments"

23   to be sequenced, this claim language is inconsistent with a requirement that the sequences be

24   limited to only those that are "unique."  Second, in describing the sequencing embodiments of the

25   claimed invention, the specification explains that "[o]nly about 30 bp of ***random sequence***

26   information are needed to identify a sequence as belonging to a specific human chromosome."

27   *Id.* at 20:1-18.  Thus, consistent with the claim language, the specification makes clear that the

28   sequencing embodiments may be based on sequencing "random" fragments of genomic DNA, not

just those that are "unique." Third, to the extent Sequenom's proposed "unique regions" construction is another incarnation of its "targeted sequencing" constructions discussed above, all of the reasoning confirming that Sequenom's "targeted sequencing" constructions should not be adopted applies equally here.

### 2. Dr. Metzker Confirms That "Identifying The Chromosomes" Should Be Construed The Same In The '017 And '018 Patents

48.     With regard to the '018 patent, Dr. Metzker provides a different interpretation for "identifying the chromosomes" than he does for the same term in the '017 patent. Dr. Metzker explains that "aligning sequences or sequence reads to a reference genome is how a random massively parallel sequencing process would 'identify[] chromosomes' based on the sequencing data." Metzker Decl. ¶ 163. Based on this logic, it would seem that the claim term "identifying the chromosomes" in the '017 patent should be given the same construction as in the '018 patent. Indeed, just like claim 1 of the '018 patent, claim 17 of the '017 patent recites "identifying the chromosomes" to which sequences obtained in the "massively parallel sequencing" step belong.

### 3. Those of Skill In The Art Were Well Aware of Techniques For Aligning Sequence Information To A Reference

49.     In his report, Dr. Metzker states that "the disclosure of the '018 Patent, would not have led a person of ordinary skill in the art to believe that the named inventors of the '018 Patent, Drs. Quake and Fan, were in possession of a method of identifying chromosomes by aligning sequences to a reference genome." *Id.* ¶ 164. I understand that this is an argument concerning enablement and/or written description, rather than claim construction, and as such I reserve the right to further address these arguments at the appropriate time.

50.     Regardless, given the specific details set forth in the specification and the state of the art at the time of filing, it is difficult to understand Dr. Metzker's argument that Drs. Quake and Fan were not in possession of a method of identifying chromosomes by aligning sequences to a reference genome.

51.     First, the specification discusses "massively parallel sequencing of millions of

fragments" using technology such as those offered by Illumina/Solexa.  Exh.16 ['017 patent] at 20:1-12.  It was well known that one way the Illumina/Solexa massively parallel sequencing platform could function was to generate millions of sequence reads and align those reads to a reference genome.  Indeed, in his 2010 publication describing next generation sequencers, Metzker makes clear that "[a]fter NGS reads have been generated, they are aligned to a known reference sequence or assembled *de novo*."  Exh. 23 [Metzker 2010] at 40.

52.  Methods of aligning nucleic acid sequences to references have been around and in practice in the field of molecular biology and related fields for many years, including for years before the effective filing dates of the '017 and '018 patents.  For instance, the Basic Local Alignment Search Tool ("BLAST") algorithm, which has been widely used for sequence alignment through the National Center for Biotechnology Information, was published in 1990 and was itself a variation of an earlier alignment algorithm.  Exh. 24 [Altschul].  The tool is still in use.  As an example, in 2007, the NCBI BLAST tool was used in conjunction with massively parallel sequencing for alignment of nucleic acid sequences by Porreca and colleagues.  Exh. 25 [Porreca].

53.  As another example, Wheeler and colleagues utilized the 454/Roche massively parallel sequencer to map the complete genome of an individual.  Exh. 26 [Wheeler].  Wheeler's group mapped the generated sequence reads to the human reference genome using BLAT, an alignment tool available since at least 2002.  *See, e.g.,* Exh. 27 [Kent].

54.  In addition, the '017 patent also cites to a US patent application, US Pat. Pub. 2003/0022207 ("Balasubramanian"), which I discussed in my opening declaration.  *See* Brown Decl. ¶¶ 19, 30-34, 47, 57.  The '017 patent cites Balasubramanian in reference to massively parallel sequencing of randomly fragmented genomic DNA.  *See* Exh. 16 ['017 patent] at 20:10-12.  The patent makes clear that "[a]ny patents or publications mentioned in this specification are indicative of levels of those skilled in the art to which the patent pertains and are intended to convey details of the invention which may not be explicitly set out but would be understood by workers in the field."  *Id.* at 28:41-46.  Balasubramanian describes obtaining sequence reads of approximately 30 base pairs and aligning them to a reference genome.  *See* Exh. 28

[Balasubramanian] at [0069-72].

55.     In yet another article cited by Dr. Metzker, Gnirke and colleagues generated sequencing reads on the Illumina sequencing platform which were then "aligned to the human genome using the ImperfectLookupTable (ILT) of the ARACHNE genome assembly suite . . . ." Exh. 29 [Gnirke].  This software has been available since at least 2003. *See, e.g.,* Exh. 30 [Jaffe].

56.     Given Dr. Metzker's extensive citations to publications of studies utilizing algorithms available well before 2006 to align sequence reads from massively parallel sequencers, it is unclear how Dr. Metzker could argue that Drs. Quake and Fan were not in possession of techniques for alignment of nucleic acid sequences to a reference sequence or genome.  At the time of filing, a person of ordinary skill in the art would have understand that random sequences can be identified through the use of alignment to a reference sequence or genome without any further discussion given the wide acceptance of alignment in the field.

57.     In this regard, the '017 and '018 patents provide further discussion regarding the use of alignment to identify random sequences.  For instance, in column 20 of the '017 patent, the specification states that "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome."  Exh. 16 ['017 patent] at 20:15-18.  Those of skill in the art would recognize that this statement is referring to the use of alignment techniques (numerous of which were known in the art by 2006) to identify the chromosomes to which the sequence reads belong.

58.     However, Dr. Metzker argues that the paragraph from which this statement is drawn "discusses sequencing in the context of combining sequencing with amplification-based methods, which again conveys the use of sequencing to detect the presence or absence of a **target** sequence."  Metzker Decl. ¶ 165 (emphasis in original).  Dr. Metzker appears to be referring to the statement in the specification that "[s]equencing may be combined with amplification-based methods in a microfluidic chip having reaction chambers for both PCR and microscopic template-based sequencing."  Exh. 16 ['017 patent] at 20:13-15.  Dr. Metzker offers no explanation as to why he holds this opinion, and it is simply incorrect to conclude that a reference to "amplification" in the context of sequencing "conveys" "targeted sequencing."   Indeed, Dr.

Metzker's opinion ignores the full context of this paragraph, which is an antecedent discussion of the Illumina sequencing platform appearing at 20:1-12, which explains that, in the Illumina platform, solid phase amplification in a flow cell precedes a sequencing procedure. However, those of skill in the art would certainly recognize that this sequencing process need not be "targeted" in any way and that solid phase amplification is used to increase signal strength. In other words, those of skill in the art would not understand the material at 20:13-15 as setting forth any requirement for a "targeted sequencing" procedure but simply as describing an alternative amplification substrate.

59.    Dr. Metzker further argues that the statement "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome" refers simply to "the minimum base-pair (*i.e.*, bp) size of a unique target sequence against an entire genome of a given size." Metzker Decl. ¶ 165. Again, Dr. Metzker fails to acknowledge the full context and scope of the material at 19:57-20:28 of the specification. Indeed, this paragraph of the specification, in citing to an article by Yamada, unambiguously states that the methods described therein are "illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence." Thus, the specification is clear that it is not simply referring to "the minimum base-pair (*i.e.*, bp) size of a unique target sequence against an entire genome of a given size," but is instead referring to methods of alignment (*i.e.*, "identify[ing] a sequence in comparison to the known genome sequence" using "[o]nly about 30 bp of random sequence information"). In this regard, the specification leaves no doubt and one of ordinary skill in the art would clearly understand that the inventors were in possession of a method for aligning sequence data to a reference genome.

60.    Dr. Metzker contends that the Yamada reference cited in the '017 specification "is not related to massively parallel sequencing at all." Metzker Decl. ¶ 166. However, as the '017 specification makes clear, Yamada is "illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence." Exh. 16 ['017 patent] at 20:19-25. The software described by Yamada, PrimerStation, was developed using such techniques. PrimerStation was designed to "calculate[] primer sets guaranteeing high specificity

against the entire human genome." Exh. 31 [Yamada] at W665.  Notably, the design of the software included an 80-day pre-processing procedure during which 25-base pair candidate substrings in gene coding regions were aligned to a reference genome to identify "off-target candidates" to which the substring might erroneously anneal.  To the extent any such "off-target candidates" were identified having four or fewer mismatches, a thermodynamic calculation was carried out to assess whether that particular "off-target" candidate would present a problem.  This alignment process was carried out using an "efficient text-matching algorithm" that is cited to in Yamada.  *See id.* at W666-67.  Simply put, while the ultimate goal of the Yamada paper was primer selection, the process by which those primers were generated directly involved alignment of sequence data to a reference genome.  In this regard, the Yamada work is indeed "illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence," just as the specification states.  Exh. 16 ['017 patent] at 20:19-25.

**C.** **"reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule" ('017 patent claim 17) | "Reaction samples containing a single DNA fragment or the amplification products of a single DNA fragment." | "Discrete reaction samples where the target sequence can be analyzed and where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules." |

61.      With regard to the term "reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule," Dr. Metzker contends that "Sequenom's proposed construction comes directly from the specification."  Metzker Decl. ¶ 95.  Dr. Metzker points to the following excerpt from the '017 patent specification as the source of Sequenom's proposed construction:

1. Obtaining a tissue containing DNA from a pregnant subject, which DNA is known to have about 3% fetal DNA.  This material is preferably drawn blood, and the circulating DNA is found in the blood plasma, rather than in cells.  The blood or plasma may optionally be enriched for fetal DNA by known methods, such as size fractionation to select for DNA fragments less than about 300 bp.

Alternatively, maternal DNA, which tends to be larger than about 500 bp may be excluded.   Another enrichment step may be to treat the blood sample with formaldehyde, as described in Dhallan et al. "Methods to Increase the Percentage of Free Fetal DNA Recovered From the Maternal Circulation," J. Am. Med. Soc. 291(9): 1114-1119 (March 2004).

2.  Distributing single DNA molecules from this sample to a number of discrete reaction samples, where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules.  Further, the reaction sample is confined to a small volume to bring the reaction molecules into close approximation.  The amount of DNA molecule per reaction sample is preferably on the order of one copy of the chromosome of interest equivalent per reaction sample.

*Id.* (quoting Exh. 16 ['017 patent] at 8:34-55).

62.      However, those of skill in the art would not view the quoted language as a definition for the term "reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule."  Nowhere does the specification identify the text quoted by Dr. Metzker as providing a definition for this or any other claim term.  Indeed, Dr. Metzker himself acknowledges this fact in his declaration:  "The specification states that the 'present method comprises ***generally*** the following steps.'"  *Id.* ¶ 95.  As Dr. Metzker concedes, the quoted passage from the specification merely describes steps that "generally" work in the claimed methods.

63.      Other passages from the specification make this abundantly clear.   For example, the specification states the following:

The ***number of discrete samples is chosen according to the results desired***.  ***In one aspect***, it is preferred that a high degree of statistical significance is obtained, and the number of samples is at least about 10,000. . . . ***However, as shown below, results can be obtained with less, e.g. on the order of about 500 samples***, placed in separate reaction samples.

Exh. 16 ['017 patent] at 5:54-6:3.  In this passage, the specification explicitly states that "a high degree of statistical significance" (*i.e.*, a statistically significant result) is preferred "in one aspect," but that such an aspect is not a required limitation to the invention, as the number of samples is "chosen according to the results desired."

64.      Furthermore, even if the quoted language from the '017 specification were a definition for this term (which, in my opinion, it is not), Dr. Metzker and Sequenom do not treat it

as such.  Rather, Sequenom's proposed construction cherry-picks certain phrases from the quoted text, while leaving others out—with no explanation for choosing some phrases while ignoring others.  There is no distinction in the text between the phrases Sequenom has chosen to use in its proposed construction and those Sequenom has chosen to leave out.  For instance, the phrase "reaction sample is confined to a small volume to bring the reaction molecules into close approximation" appears in the quoted text to which Sequenom and Dr. Metzker point to as support for Sequenom's proposed construction.  However, this phrase and others in the passage Sequenom cites do not appear anywhere in Sequenom's proposed construction.  Simply put, Dr. Metzker and Sequenom simultaneously (1) contend that the quoted passage provides a definition for this term and (2) selectively omit parts of the supposed "definition" with no explanation for the omission.  Neither is supported by the claims or the specification, in my opinion.

65.     The same can be said for Sequenom's inclusion of the word "discrete" in its proposed construction.  To support the proposed construction, Dr. Metzker points to various passages in the specification in which the phrase "discrete reaction samples," "discrete samples" or "discrete units" appears.  Metzker Decl. ¶¶ 96-98.  However, Dr. Metzker gives no actual explanation of why the passages he cites lend any support to the inclusion of "discrete" in Sequenom's proposed construction, instead including bare citations to the specification.

66.     Furthermore, the mere presence of the phrases "discrete reaction samples," "discrete samples" and "discrete units" does not, in my opinion, support the inclusion of "discrete" in Sequenom's proposed claim construction.  Indeed, the phrase "reaction samples" appears numerous times in the specification without being preceded by "discrete," a fact Dr. Metzker omits from his declaration.  *See, e.g.*, Exh. 16 ['017 patent] at 5:16-18 ("Alternatively, the method may be performed with dilutions whereby more ***reaction samples*** are positive in this situation."); 5:30-33 ("The ***reaction samples*** may be, for example, wells in a microtiter plate, aqueous phases in an emulsion, areas in an array surface, or reaction chambers in a microfluidic device."); 6:1-3 ("However, as shown below, results can be obtained with less, e.g. on the order of about 500 samples, placed in separate ***reaction samples***."); 6:41-50 ("Thus is provided a kit for differential detection of target sequences in maternal and fetal DNA in a mixed DNA sample,

comprising . . . a PCR reaction buffer for forming a PCR reaction sample with the primers in a device having separate *reaction samples*. . . ."); 8:57-61 ("3. Detecting the presence of the target in the DNA in a large number of *reaction samples*, preferably with a sequence specific technique . . . ."); 11:35-38 ("In the illustrated method, the genomic DNA obtained from a maternal tissue as described above is diluted into multiple *reaction samples*, e.g. in multiwell plates, so that there is, on average, less than one genome equivalent per well."); 23:8-10 ("In this protocol, the number of positive *reaction samples* is used, disregarding increased intensity from three versus two chromosomes in a *reaction sample*."). Moreover, the word "discrete" is absent from any of the claims in the '017 patent. At best, the word "discrete" is a modifier used in some instances in the specification with relation to the term "reaction samples," but in my opinion that does not support Sequenom's proposed construction or Dr. Metzker's opinion.

67.        Notably, there are instances in the specification in which "discrete samples" and "reaction samples" (not preceded by "discrete") are used *in the same sentence*. *See, e.g.*, Exh. 16 ['017 patent] at 5:29-30 ("The discrete samples are in reaction samples where the target sequences can be analyzed."); 5:33-34 ("The reaction samples may be used for PCR analysis of the discrete samples."); 6:53-55 ("The kit may further comprise the device having separate reaction samples for discrete samples."). In my opinion, these instances reinforce the fact that "discrete" is indeed only a modifier with regard to "reaction samples," rather than a required aspect of this term; otherwise the quoted sentences above would have simply made no sense. Thus, Dr. Metzker and Sequenom are incorrect in inserting "discrete" into their proposed construction, as doing so finds no support in the patent.

**D.      "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome"**

| Claim Term | Verinata's Proposed Construction | Sequenom's Proposed Construction |
|---|---|---|
| "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a | "Determining the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and  ii) the number of copies of a second target chromosome, | "Determining the integer number of copies of  the target chromosomes in said mixture of fetal and maternal genomic DNA from the identities of the target chromosomes determined in step |

| second target chromosome" ('017 patent claim 17) | as represented by the results of the identifying step d)." | d)." |
|---|---|---|

68.    With regard to the term "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome," Dr. Metzker and Sequenom argue for the inclusion of a word (and accompanying concept) that, notably, *does not appear anywhere in the specification or claims of the '017 patent.*  There is no support for this in the patents, and Dr. Metzker is simply incorrect in contending that a person of skill in the art would have understood the term in this way.[5]

### 1.    Sequenom's Proposed Construction Makes No Sense In The Context Of The '017 Patent

69.    Dr. Metzker presents his argument as creating a distinction between "an *integer* number of copies, 0, 1, 2 etc." and "a fraction of a copy of chromosome, such as 1.37 copies of a chromosome."  Metzker Decl. ¶ 122.  Dr. Metzker states that "a person of ordinary skill in the art would have understood that the concept of 'copies' of a chromosome suggests an integer number of copies, 0, 1, 2, etc."  *Id.*  He further states that one of ordinary skill in the art would not understand the concept of "copies" of a chromosome to "suggest a fraction of a copy of chromosome, such as 1.37 copies of a chromosome," *id.*, and that "a person of ordinary skill in the art would have understood that there is no such thing as a fraction of a chromosome in the digital analysis of the '017 Patent."  *Id.* ¶ 124.  Notably, Dr. Metzker cites no support whatsoever for these statements.  *Id.* ¶¶ 122, 124.

70.    In fact, a person of ordinary skill in the art would have understood that there *is* such a thing as "a fraction of a chromosome in the digital analysis of the '017 Patent."  In fact, one of ordinary skill in the art would have understood that this is the *only* thing in the "digital

---

[5] As stated in my opening declaration, I understand that Sequenom has included the word "integer" in a number of its proposed constructions.  I do not believe that any of Sequenom's proposed constructions that add this term to the claim language are appropriate.  The opinions and reasoning set forth in this section apply equally to the other claim terms that Sequenom proposed to construe in terms of the word "integer," including at least the terms on which Dr. Metzker opines in his declaration at paragraphs 121-128.

analysis of the '017 Patent" because the maternal plasma or serum samples that are being analyzed include nothing but fractions of chromosomes.  No whole chromosomes are present in such samples; it is and was well known that cell-free DNA in maternal plasma or serum is fragmented.  Dr. Metzker himself admits this, acknowledging that "the genomic DNA is naturally broken up into **random fragments**."  *Id.* ¶ 150.

71.     The '017 patent's suggestion that "the presently known PCR methods may be multiplexed, that is, run with multiple primers to multiple targets" further establishes this, by suggesting a method in which multiple primers to a particular chromosome are run in a single reaction.  Exh. 16 ['017 patent] at 12:36-39; *see also* Brown Decl. ¶ 59.

72.     As I explained in detail in my opening declaration, the number of sequence reads that align to the at least first chromosome is used as a proxy for the amount of or number of copies of the chromosome itself.  *See* Brown Decl. ¶¶ 54, 56-58.  This would have been clear to one of ordinary skill in the art, because such a person would know that massively parallel DNA sequencing generates sequence reads from nucleic acid **fragments** that can then be aligned to a reference genome.  *See id.*

## 2.     Dr. Metzker's Citations To The '017 Specification Do Not Require "Integer" Numbers Of Chromosomes

73.     Dr. Metzker claims that "the specification itself expressly refers to integer, not fractional, number of copies of a chromosome."  Metzker Decl. ¶ 123.  He then cites six passages from the '017 patent specification as examples, with no explanation or analysis (or even any informative context) of the cited language.  *Id.*   As I explain below, these citations are inapt. Ultimately, Dr. Metzker arrives at his proposed "integer" construction simply by extrapolating that if the individual counts of reaction samples are an integer number, then the chromosomes must be an integer number as well.  There is no support for that leap, particularly in view of the fact that the claimed methods are conducted using samples that do not even contain whole chromosomes in the first place.  *See supra* ¶ 71.

74.     Regardless, Dr. Metzker mischaracterizes the meaning of the '017 specification and the passages he cites:

i.   First, Dr. Metzker relies on a portion of the specification at 5:10-16.  As is clear from the quoted language ("The method **may** be performed with dilutions whereby . . . . one **may** detect two chromosomes present in a maternal DNA, and three chromosomes in a Down Syndrome fetal DNA."), this passage merely explains an example of the techniques described in the '017 patent, and is not intended to include all aspects of the claimed methods, a point that is made clear in the beginning of the section from which the material Dr. Metzker cites is drawn.  Furthermore, this passage, which refers to "dilutions" is focused on embodiments of the digital PCR methods described in the '017 patent, rather than on embodiments of the sequencing methods that are claimed in the '017 patent and at issue in this case.

ii.   Second, Dr. Metzker relies upon a portion of the specification appearing at 1:43-50.  Again, as is clear from the quoted language (". . . [S]o that the detection of a target sequence (e.g., chromosome 21) **may** be simply quantified as binary (0, 1) or simple multiples, 2, 3, etc."), this passage merely explains an example of the techniques described in the '017 patent, and is not intended to include all aspects of the claimed methods.  Furthermore, this passage is clearly referring not to detecting the number of a particular chromosome but rather detecting the number of nucleic acid fragments belonging to a particular chromosome, which is exactly the technique contemplated in the sequencing embodiments of the '017 patent.

iii.   Third, Dr. Metzker relies upon a portion of the specification appearing at 4:67-5:3.  Again, as is clear from the quoted language (" . . . *[s]uch as* two copies of a maternal sequence versus two copies of a fetal sequence"), this passage merely explains an example of the techniques described in the '017 patent, and is not intended to include all aspects of the claimed methods.  Furthermore, the passage merely re-states the principle behind the utility of the claimed methods to determine a fetal aneuploidy; *i.e.*, the method provides a way to distinguish between the mother's DNA and the fetus's DNA in order to determine whether an aneuploidy is present in the fetus.

iv.   Fourth, Dr. Metzker points to three lines of the specification appearing at 7:49-52. Again, as is clear from the quoted language ("Next, the target molecules are detected in each reaction well . . . which **may** include a quantization of starting copy number of the target sequence, that is, 0, 1, 2, 3, etc."), this passage merely explains an example of the techniques described in the '017 patent, and is not intended to include all aspects of the claimed methods.  Furthermore, it is clear that the passage is discussing not the number of a particular entire chromosome in a maternal blood sample, but rather the number of fragments that belong to a particular chromosome.

v.   Fifth, Dr Metzker points to a portion of the specification appearing at 24:66-25:1.  The language preceding the cited passage ("In the Examples below . . . .") makes clear that the cited passage is merely describing an example of the claimed methods.  Furthermore, the described example is an embodiment of the digital PCR methods described in the '017 patent, rather than the embodiments of the sequencing methods that are claimed in the '017 patent and at issue in this case.

vi.   Finally, Dr. Metzker points to a portion of the specification appearing at 23:8-15.  Again, this passage describes an embodiment of the digital PCR methods claimed in the '017 patent, rather than the embodiments of the sequencing methods that are claimed in the '017 patent and at issue in this case.

75.     For the reasons described above, the passages cited by Dr. Metzker do not whatsoever support his contention that the concept of an "integer" number of copies of chromosomes reflects how one of ordinary skill in the art would have understood the claims of the '017 patent.  Dr. Metzker is further flatly incorrect in arguing that the specification "***expressly*** refers to integer, not fractional, number of copies of a chromosome".  Metzker Decl. ¶ 123.  The specification does no such thing, which is especially clear given that the term "integer" appears nowhere in the specification.  In fact, all that can be said about the passages cited by Dr. Metzker is that they refer simply to ***numbers***, and there is no indication or support in the specification that these numbers must be integers.  As explained in my opening declaration, the specification actually contains reference to the concept of a non-integer number of amplicons.  *See, e.g.*, Exh. 16 ['017 patent] at 21:10-55 (" . . . [O]ne expects 2.03 amplicons from chromosome B."); *see also* Brown Decl. ¶ 58.

## II.

## MATERIALS REVIEWED

76.     A list of the materials that I reviewed in preparing this declaration is attached as Appendix C.

## III.

## COMPENSATION

77.     My compensation for consulting on this matter is $500 per hour. My compensation does not depend on the outcome of this dispute.

1    Dated:  March 1, 2013

2

3

4                                         Stephen A. Brown

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE

I am a citizen of the United States, more than 18 years old, and not a party to this

action.  My place of employment and business address is 201 Redwood Shores Parkway,

Redwood Shores, California 94065.  On March 1, 2013, I caused a copy of:

**REBUTTAL DECLARATION OF STEPHEN A. BROWN, M.D, REGARDING CLAIM
CONSTRUCTION OF U.S. PATENT NOS. 7,888,017 AND 8,008,018**

to be served as follows:

[ **XX** ] **BY ELECTRONIC SERVICE**   I am readily familiar with the business
practice at my place of business for electronically mailing a true and correct copy through Weil,
Gotshal & Manges, LLP's electronic mail system to the e-mail address(es) set forth below, or as
stated on the attached service list per agreement in accordance with Code of Civil Procedure
section 1010.6.

Michael J. Malecek
michael.malecek@kayescholer.com
Peter E. Root
peter.root@kayescholer.com
Stephen C. Holmes
stephen.holmes@kayescholer.com
Sean M. Boyle
sean.boyle@kayescholar.com
**KAYE SCHOLER LLP**
Two Palo Alto Square Suite 400
3000 El Camino Real, Palo Alto, CA 94306
Telephone: (650) 319-4500
Facsimile: (650) 319-4700
Attorneys for Defendant SEQUENOM, INC.


Executed on March 1, 2013 at Redwood Shores, California.  I declare under

penalty of perjury under the laws of the United States of America that the foregoing is true and

correct.

_____*/s/ Joanna Lahtinen*_____
Joanna Lahtinen