**EXHIBIT 5**

Michael J. Malecek (State Bar No. 171034)
Email address:  michael.malecek@kayescholer.com
Peter E. Root (State Bar No. 142348)
Email address:  peter.root@kayescholer.com
Stephen C. Holmes (State Bar No. 200727)
Email address: stephen.holmes@kayescholer.com
KAYE SCHOLER LLP
Two Palo Square, Suite 400
3000 El Camino Real
Palo Alto, California  94306
Telephone:     (650) 319-4500
Facsimile:      (650) 319-4700

Attorneys for Defendant and
Counterclaim-Plaintiff Sequenom, Inc.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARIA DIAGNOSTICS, INC.<br><br>          Plaintiff,<br><br>     v.<br><br>SEQUENOM, INC.,<br><br>          Defendant/<br>          Counterclaim-Plaintiff,<br><br>     v.<br><br>ARIA DIAGNOSTICS, INC.,<br><br>          Counterclaim-Defendant,<br><br>     and<br><br>ISIS INNOVATION LIMITED,<br><br>          Nominal Counterclaim-<br>          Defendant.<br><br>And Related Cases. | Case No. 3:11-cv-06391-SI<br><br><br><br>**DECLARATION OF DR. MICHAEL L. METZKER REGARDING CLAIM CONSTRUCTION** |

KAYE SCHOLER LLP

**TABLE OF CONTENTS**

I.     BACKGROUND ................................................................................................. 1

II.    SCOPE OF REVIEW ....................................................................................... 3

III.   TECHNOLOGY BACKGROUND ................................................................. 4

       A.    DNA basics ........................................................................................... 4

       B.    Oligonucleotides – primers and probes............................................... 5

       C.    Amplification and enrichment of nucleic acids ................................... 6

       D.    Nucleic acid analysis........................................................................... 11

IV.    THE PATENTS-IN-SUIT ............................................................................ 23

       A.    The '540 Patent .................................................................................. 23

       B.    The '017 and '018 Patents ................................................................ 24

       C.    The '415 Patent .................................................................................. 26

V.     PERSON OF ORDINARY SKILL IN THE ART....................................... 27

       A.    The Person of Ordinary Skill in the Art of the '017 and '018 Patents.................. 27

       B.    The Person of Ordinary Skill in the Art of the '415 Patent ................................. 27

       C.    The Person of Ordinary Skill in the Art of the '540 Patent ................................. 28

VI.    DISPUTED CLAIM TERMS IN THE '540 PATENT ............................... 28

       A.    "Paternally inherited nucleic acid of fetal origin" ............................. 28

       B.    "Amplifying" ...................................................................................... 30

       C.    "Detecting" ......................................................................................... 32

       D.    "foetal DNA enrichment step"............................................................ 33

VII.   DISPUTED CLAIM TERMS IN THE '017 PATENT ............................... 34

       A.    "Aneuploidy" ...................................................................................... 35

       B.    "Reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule"............................... 35

       C.    "Massively parallel DNA sequencing of the random fragments of genomic DNA" (Claim 17 of '017 Patent)........................................................... 37

       D.    "identifying the chromosomes" ........................................................ 42

i

KAYE SCHOLER LLP

E.      "the number of copies [of at least one first target chromosome / of a second target chromosome]" ................................................................................ 43

F.      "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome" ............. 45

G.      "wherein said at least one first target chromosome is presumed to be diploid" ... 46

H.      "wherein said second chromosome is suspected to be aneuploid" ...................... 48

I.      "a statistical analysis that compares the number of copies of said at least one first target chromosome to the number of copies of said second target chromosome" .......................................................................................... 48

J.      "determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f)" .................................................. 49

K.      "solid phase amplification of the attached fragments to create a high density sequencing flow cell" ................................................................ 50

VIII.  DISPUTED CLAIM TERMS IN THE '018 PATENT .................................... 51

A.      "Massively parallel DNA sequencing of DNA fragments randomly selected" .... 51

B.      "identifying the chromosomes" .......................................................... 56

C.      "compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture" ...................................................... 58

D.      "wherein said at least one first chromosome is presumed to be euploid" ............ 59

E.      "wherein said at least one second chromosome is suspected to be aneuploid" .... 60

F.      "solid phase amplification of the attached DNA fragments to create a high density sequencing flow cell " ...................................................... 60

G.      "four-color DNA sequencing by synthesis process" ........................................... 61

IX.    DISPUTED CLAIM TERMS IN THE '415 PATENT ........................................ 62

A.      "the mixed sample" ........................................................................... 62

B.      "determine a differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists" ........ 63

C.      "a first value and a second value" ...................................................... 65

D.      "massively parallel sequencing" ........................................................ 66

E.      "aneuploidy" ....................................................................................... 67

F.      "GC content" ....................................................................................... 67

ii

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION

Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

I, Michael L. Metzker, declare:

**I.      BACKGROUND**

1.      I am currently an Associate Professor in the Department of Molecular & Human Genetics at the Baylor College of Medicine.  I am also a Senior Manager at the Human Genome Sequencing Center (HGSC), Baylor College of Medicine.  I am also an Adjunct Associate Professor in the Cell & Molecular Biology Program at the Baylor College of Medicine. Additionally, I am an Adjunct Associate Professor in the Department of Chemistry at Rice University.  Prior to my current positions at Baylor College of Medicine and Rice University, I held the position of tenure-track Assistant Professor in Molecular and Human Genetics and Senior Manager at the HGSC since November 1999 and the position of Adjunct Assistant Professor in Chemistry at Rice University since July 2001.  I also founded LaserGen, Inc., which provides technology and reagents used in, among other things, nucleic acid sequencing methods.

2.      Since 1988, I have performed scientific research in the field of Molecular Biology. In particular, I have extensive experience with technology development in DNA sequencing methods including genomic DNA isolation, PCR, fragmenting genomic DNA, genomic DNA and cDNA library construction, bacterial cloning, nucleic acids chemistry, DNA modifying enzymes, polymerase engineering, fluorescent dyes, fluorescence imaging, and data analysis of multi-color images.  I have extensive experience in methods used to detect sequence variation, including single nucleotide polymorphisms (SNPs), in all organisms, with particular interest in humans and HIV.   My research has been devoted to developing next-generation sequencing ("NGS") technologies, developing novel methods to study HIV transmission between individuals, and identifying molecular causes of novel forms of diabetes and their treatment.  My colleagues and I have been deeply involved in PCR, DNA fragmentation, library construction, cloning, and the development of sequencing technologies.

3.      From 2000 to the present, I have given lectures to graduate and medical students in the Molecular Methods course at the Baylor College of Medicine.  The lectures are Libraries and Screening, Genomics I, and Genomics II.  From 2001 to 2003 I also gave a lecture entitled

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                          Case No. 3:11-CV-06391-SI

Mammalian Genome Analysis in the Mammalian Genetics course. I have presented lectures at a variety of academic and industry conferences as well. In May 2010, I was an invited speaker at the Next-Generation Sequencing Workshop at Lübeck University in Germany. In April 2011, I was a keynote speaker at the Next-Gen Sequencing Conference in Boston, MA. In February 2012, I gave a presentation related to the development of a novel NGS technology at the Advances in Genome Biology and Technology ("AGBT") meeting. I was also invited to speak at the Copenhagenomics meeting and the American Society of Microbiology conference in June 2012.

4.      I have reviewed manuscripts that present data for many of the techniques described above and have also authored several extensive reviews on sequence technologies and their applications used for the detection of sequence variation, including SNPs and structural variants. I have also received research grants and fellowships both from government and private agencies to fund my investigations of technology development in Sanger sequencing and NGS methods, development of NGS approaches for HIV forensics, and the detection of genomic variation in diabetic cohorts using novel methods.

5.      I have authored 44 peer-reviewed papers, 6 book chapters, and am an inventor of 31 patents and/or patent applications. My most recent review papers discuss the emerging technologies and advances in DNA sequencing. The patents relate to various aspects of molecular biology and DNA sequencing. For example, I co-invented the pulsed-multiline excitation (PME) method in combination with Nobel Laureate Robert F. Curl, Ph.D., which has resulted in U.S. Patent Nos. 6,995,841, 7,511,811, and 8,089,628. By way of collaboration with the scientific team at LaserGen, I have also co-invented novel nucleotide terminations that have resulted in numerous U.S. patents including U.S. Patent Nos. 7,893,227, 7,897,737, 7,964,352, 8,148,503, and 8,198,029, as well as a Notice of Allowance for U.S. Patent Application No. 13/114,270. I have served on review panels for Genome Canada and U.S. Department of Energy as well as various National Institutes of Health (NIH) study sections for the National Cancer

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

Institute, National Institute of Biomedical Imaging and Bioengineering, National Human Genome Research Institute, and National Institute for Allergy and Infectious Diseases.

6.     From 2003 to 2006, I served on the editorial/advisory boards for "Genome Research." From 2006 to 2012, I have served as a scientific organizer for the AGBT Meeting. From 2007 to present, I have served as a scientific advisor for "Milestones in DNA Technologies." Since 2011, I have served on the advisory committee of "Genome Canada: Advancing Technology Innovation Through Discovery."

7.     I belong to the American Association for the Advancement of Science, the American Chemical Society and the American Diabetes Association.

8.     A copy of my curriculum vitae is attached to this declaration, which includes a list of the cases in which during the previous four years I have testified as an expert at trial or by deposition.

9.     I have been retained by Sequenom, Inc. ("Sequenom") to provide my expert opinions as to the meaning of certain terms in the claims of United States Patent Nos. 6,258,540 ("the '540 Patent"), 7,888,017 ("the '017 Patent"), 8,008,018 ("the '018 Patent"), and 8,195,415 ("the '415 Patent") (collectively, "the Patents-in-Suit") to a person of ordinary skill in the art of each of those patents. In particular, I have been asked to explain certain aspects of the science in the Patents-in-Suit and to provide opinions regarding the meaning to a person of ordinary skill in the art of certain terms in the claims of the '540, '017, '018 and '415 Patents, and related matters.

10.    I am being compensated at my usual consulting rate of $600 per hour for my work associated with this case. My compensation is not contingent in any way on the outcome of this litigation.

## II.   SCOPE OF REVIEW

11.    In preparing this declaration, I have considered the claims and specifications of the '540, '017, '018, and '415 Patents, documents referenced therein, the prosecution file histories for the Patents-in-Suit, and also prior art to the Patents-in-Suit. I have also reviewed the parties'

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                          Case No. 3:11-CV-06391-SI

proposed claim constructions, and the deposition testimony of some of the named inventors listed on the Patents-in-Suit.

12.     I have been informed and understand that the words of a claim in a patent are generally given their ordinary and customary meaning from the perspective of a person of ordinary skill in the art of the patent at the time of filing the application for the patent.  I have been further informed and understand that the meaning of a claim term is a matter for the Court in light of the "intrinsic evidence" (including the claims, the patent specification and the prosecution file history of each of the Patents-in-Suit) and "extrinsic evidence" (including expert and inventor testimony, dictionaries, and learned treatises.)

13.     I may supplement this declaration if I become aware of additional pertinent information, or in response to the testimony of others regarding claim construction issues.  I may comment on or testify in response to the testimony of other witnesses in this matter.

## III.     TECHNOLOGY BACKGROUND

### A.     DNA basics

14.     DNA is a double-stranded molecule with two complementary chains running in opposite directions in the form of a double helix.  Each strand of DNA is a chain of molecules ("nucleotides") with three parts:  (1) a phosphate, (2) a sugar, and (3) one of four possible nucleobases (or "bases").  The phosphate and sugar structure of each regular nucleotide is constant and forms the "backbone" of the DNA strands—*i.e.*, the two opposing "legs" of the DNA ladder.  The chemical variance occurs in the "rungs" of the DNA ladder—*i.e.*, the four different bases:  adenine ("A"), cytosine ("C"), guanine ("G"), and thymine ("T")—which form "base-pairs."

15.     The formation of base-pairs between bases on the two opposite strands causes the two strands to coil around each other into the double-helix structure, first described by James Watson and Francis Crick in 1953.  The "A" base binds to the "T" base (and vice versa) while the "C" base binds to the "G" base (and vice versa).  Complementary base-pairs of A:T and G:C between the two DNA strands are called "Watson-Crick base-pairs."  The specific binding of A:T

4

KAYE SCHOLER LLP

and G:C between the two DNA strands are sometimes referred to as "base-pairing rules." Complementary base pairing makes DNA suitable for carrying genetic information, as one strand of DNA can act as a template for direct synthesis of a complementary strand and, by biological process, copy and pass on the "genetic code" to the next generation of cells.

16.     When two single strands of DNA containing complementary base sequences come together, specific pairing of bases takes place between the complementary strands and double-stranded DNA is formed.  This process is referred to as "annealing" or "hybridization."  The double-stranded product may be referred to as a "duplex."  Conversely, when double-stranded nucleic acids separate into two single strands of DNA, this process is called "melting" or "denaturation."

17.     Many nucleic acid identification methods are based on variations of the simple premise of this hybridization reaction.  An oligonucleotide with a known sequence can be introduced to a sample.  If it hybridizes with an unknown target (and that hybridization event can be detected), then one knows that the complement of the known sequence is present.  Because nucleic acids are too small to be detected or identified directly, these hybridization events are typically detected by the use of labels, most commonly, fluorescent molecules attached to the nucleic acids.   An oligonucleotide that contains a label is generally called a probe or oligonucleotide probe.

**B.    Oligonucleotides – primers and probes**

18.     Since the early 1980s, automation of oligonucleotide synthesis has become widely used in molecular biology, *see* Heron, *System for automated DNA synthesis*, Am. Biotechnol. Lab. 2:52-9 (1984) ("Heron").  The investigator could simply type in the desired DNA sequence of interest into the instrument's computer interface to chemically synthesize sufficient quantities of the desired oligonucleotides.  In the 1980s, oligonucleotides were widely used as primers for DNA sequencing and PCR, as probes for screening experiments, and as linkers or adapters for cloning purposes.  Short oligonucleotides in the range of 15 – 25 bases could be used directly without purification (*see* Heron at 53), but because the stepwise yields were less than 100%,

KAYE SCHOLER LLP

longer oligonucleotides required purification by high performance liquid chromatography or HPLC, or by preparative gel electrophoresis to remove failed oligonucleotide fractions, also known as n-1, n-2, etc products.  As a result of the imperfect stepwise yield, the practical length of an oligonucleotide synthesized was roughly 100 bases (*see* Heron, Table 2 and Figure 9).  In 1988, Dr. Lloyd Smith also reviewed the field of oligonucleotide synthesis, including other techniques, stating "[i]t is possible today to routinely synthesize oligonucleotides up to 200 nucleosides in length in commercially available instruments operated by a technician".  *See* Smith at 384A; Smith, *Automated synthesis and sequence analysis of biological molecules*. Anal. Chem., 60:381A-390A (1988) ("Smith").

C.     **Amplification and enrichment of nucleic acids**

19.     Several basic strategies are commonly used in research involving nucleic acids in order to obtain the appropriate amount or concentration of the nucleic acids of interest to the researcher.  Two examples of such strategies are nucleic acid amplification and nucleic acid enrichment.  As illustrated by the Venn diagram below, there is a certain degree of overlap between the concepts of nucleic acid amplification and enrichment.  There are also techniques in which the two concepts are distinct and non-overlapping.



20.     There are instances in which a particular subset of nucleic acids is amplified within the context of a larger pool of nucleic acids.  This form of amplification can be said to enrich for that subset of nucleic acids relative to the larger pool.  There are other instances in which the entire pool of nucleic acids is amplified together.  This form of amplification would not lead to

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

enrichment as all the nucleic acid fragments are increased in the pool.  In addition, there are instances in which enrichment of a specific subset of nucleic acids can be accomplished without the use of amplification methods.  A brief description of some examples of common amplification and enrichment techniques follows.

### a.        Amplification by PCR

21.     A universal technique for amplifying nucleic acids in a laboratory setting is the method of "polymerase chain reaction," commonly abbreviated as "PCR."  PCR is a method invented by Dr. Kary Mullis in the 1980s which is used to amplify (or copy) a single piece of nucleic acid or a few copies of a nucleic acid across many orders of magnitude, generating thousands to millions of copies of that nucleic acid.  *See* Saiki, et al., *Enzymatic amplification of β-globin genomic sequences and restriction site analysis for diagnosis of sickle cell anemia*. Science, 230:1350-1354 (1985) and Saiki, et al., *Primer-Directed Enzymatic Amplification of DNA with a Thermostable DNA Polymerase*, Science, 239:487-491 (1988.)

22.     Generally speaking, PCR involves the serial denaturation and replication of DNA sequences *in vitro* (*i.e.*, outside of an organism).  DNA polymerase, the enzyme that replicates DNA, copies or synthesizes the complementary strand from a single-stranded template. For this enzymatic reaction to occur, a partially double-stranded section of DNA is required and is typically accomplished by hybridizing a primer to a complementary region of a single-stranded template.  Mullis and his co-inventors used short oligonucleotide primers complementary to the 3'-ends of the complementary strands of a sequence of interest.  DNA polymerase synthesizes the nascent strand in a 5'-to-3' direction to create double-stranded DNA.  The general concept of PCR is illustrated by the diagram below.

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

23.     The first step of a PCR reaction is to melt or "denature" double-stranded DNA to yield single-stranded DNA. This typically is done by raising the reaction temperature to melt double-stranded DNA or fragments, but it also can be accomplished chemically or enzymatically.

24.     Next, the primers hybridize to complementary sequences at the 3'-ends of the sequence of interest or template strand or target sequence.  It should be noted that primer sequences need not occur at the very ends of the template DNA fragment.  Rather, they need only be at the 3'-ends of the target sequence that is intended to be amplified.  Additionally, only the 3'-end of the primer sequence needs to anneal to the template sequence to allow the polymerase reaction to continue.  A primer can have a 5'-end sequence that is noncomplementary to the target sequence, called a "5'-end tail," provided there is enough complementarity to keep the primer/template strand complex double-stranded, and the 3'-terminal bases of the primer stably hybridized to permit DNA polymerase to copy the template strand.

25.     Following primer hybridization, the polymerase replicates the template strand from the primer in a 5'-to-3' direction, synthesizing a complementary strand.  Assuming optimal

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

reaction conditions, the quantity of the original target sequence of interest, which is flanked by the two primers, will have been substantially doubled in one PCR cycle.

26.     Next, the PCR cycle is repeated multiple times.  This is accomplished by denaturing the double-stranded template, annealing the primers, and extending the primer with DNA polymerase to synthesize new double-stranded templates.  At each PCR cycle, the target sequence that lies between the primers (including the primer sequences themselves) will be replicated.  Theoretically, a target sequence will be amplified exponentially as described by $2^n$, where n is the number of cycles.  In practice, however, the efficiency of the reaction varies, and decreases in later cycles.  Regardless, PCR is able to create large quantities of DNA within a matter of hours.

27.     One of the key benefits of PCR is the ability to isolate target sequences from a mixture using specific primers that flank the region of interest.  This allows for the selective amplification of only those nucleic acids in which a researcher is interested, while no amplification of other nucleic acids will occur.

28.     One can use PCR to amplify the entire pool of nucleic acids present in the starting mixture. This accomplished by ligating common sequences (called linkers or adaptors) to the end of the fragments, and amplifying the fragments by denaturing the fragments, hybridizing common primers whose sequences are complementary to the common adaptors, and copying the DNA fragment.  This type of PCR is called "universal PCR." (*See* U.S. Pat. No. 6,107,023.)

### b.     Amplification by LCR

29.     Another method for amplifying nucleic acids is "ligase chain reaction," also referred to "LCR."  Like PCR, LCR used specific primers designed to bind to the target nucleic acid.  However, unlike PCR, the primers are not used to amplify the DNA sequence between the primers.  Instead, if the target sequence is present, both primers will hybridize so that one primer will lie directly adjacent to the second primer of the pair.  In the presence of DNA ligase, these two primers are joined to form a single strand and the target sequence will have been effectively duplicated.  A key advantage to LCR is greater specificity as compared to PCR.  Given its

9

KAYE SCHOLER LLP

specificity, LCR can be used to enrich for a subset of nucleic acids relative to the total pool of nucleic acids.

### c.    Enrichment by size selection

30.    Nucleic acids can also be enriched by methods that do not involve amplification. One such method involves selective separation of nucleic acid fragments by size, which can be used to filter out fragments that are bigger or smaller than the fragment size of interest, while retaining those fragments that are properly sized.

31.    A common approach to size selection of nucleic acid fragments involves running the total pool of fragments across a matrix, such as a gel made of agarose or polyacrylamide, and separating the fragments by size using an electric field (called "electrophoresis").  The fragments being sorted are dispensed (also called "pipetted") into a well in the gel material.  The gel is placed in an electrophoresis chamber, which is then connected to a power source.  The DNA fragments are pipetted or "loaded" into individual wells (usually for agarose) or on top in lanes (usually for polyacrylamide) of the gel.  When the electric current is applied, the larger fragments move more slowly through the gel while the smaller molecules move faster.  This process is called "gel electrophoresis."  The differently sized fragments form distinct bands on the gel.  A reference ladder is also loaded in a separate well/lane to serve as a size reference to find the band or bands that contains the fragments of the desired size.  The band or bands can then be cut out of the gel material, and the properly-sized fragments can be extracted from the gel.  The majority of the extracted fragments will be of the desired size.  Thus, this method enriches for the fragments of interest without amplification.

### d.    Enrichment by sequence selection

32.    Another approach to enriching nucleic acids is enrichment by sequence selection. In this method, the total pool of nucleic acids is passed over a matrix containing immobilized probes specific to the sequence of interest.  The solid-phase matrix may also be magnetic beads which contain specific probe sequences.  Because of base-pairing rules, complementary sequences are designed to selectively hybridize to nucleic acid fragments of interests, *i.e.,*

10

KAYE SCHOLER LLP

targeted fragments.  The probes will capture the targeted nucleic acid fragments of interest and allow all other fragments from the total nucleic acid pool to pass through the matrix by way of a magnet and be removed in the solution phase.  Like enrichment by size selection, this method allows for the enrichment of nucleic acid fragments of interest without amplification.

### D.    Nucleic acid analysis

33.    Once nucleic acids of interest have been isolated, they can be analyzed in a variety of ways.  Some of the methods used for the analysis of nucleic acids include digital PCR and sequencing.  The data derived from these techniques can then be further characterized using bioinformatic analyses.  Several of these techniques are discussed below.

### a.    Digital PCR

34.    Digital PCR ("dPCR") is a laboratory technique which uses the polymerase chain reaction to quantify the number of copies of a particular DNA sequence, or sequences, in a sample.  *See* Vogelstein and Kinzler, *Digital PCR*, Proc. Natl. Acad Sci., 96:9236-9241 (1999) ("Vogelstein".)  Unlike conventional PCR, dPCR utilizes many reaction wells — often several thousand.  The DNA sample is first diluted such that each PCR well, on average, contains less than one copy of the sequence of interest.  Typically, the DNA sample is diluted so that only one out of every three dPCR wells, on average, contains the sequence of interest.  Next, targeted PCR is performed in each of the many wells in a fashion that produces a signal if, and only if, the sequence of interest is present in a well and has been amplified via PCR.  Each well is either positive for the sequence of interest or negative for this sequence.  The technique is referred to as "digital" PCR because each well is read in a binary manner, like the "0s" and "1s" of a computer's hard drive.  Based on the number of positive wells, as well as the dilution factor, one can then calculate the number of copies of the gene of interest present in the original DNA sample.  This technique has become widespread due to its superior accuracy and sensitivity compared to other forms of quantitative PCR.

KAYE SCHOLER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### b.     Nucleic acid sequencing – Maxam-Gilbert and Sanger sequencing

35.     DNA sequencing includes several methods and technologies that are used to determine the order of nucleotide bases (A, C, G and T) in a DNA fragment.  DNA sequencing methods can generally be characterized as "first-generation sequencing," which include the Sanger sequencing discussed immediately below, or "next-generation sequencing," discussed in the next section.  In broad terms, next-generation sequencing technologies are distinguishable from first-generation sequencing in that they produce substantially larger volumes of sequence information cheaply.   I recently reviewed many of the platforms using next-generation sequencing technologies.  *See* Metzker, *Sequencing technologies — the next generation*, Nature Reviews Genet. 11: 31-46 (2010) ("Metzker 2010").  I may rely on figures and information from this article.

36.     Methods to determine the nucleotide sequence of DNA were first developed in the early 1970s, but two sequencing methods developed in 1977.  *See* Maxam and Gilbert, *A new method of sequencing DNA*, Proc. Natl. Acad. Sci. USA, 74:560-564 (1977) ("Maxam-Gilbert") and Sanger et al., *DNA sequencing with chain-terminating inhibitors*, Proc. Natl. Acad. Sci. USA, 74:5463-5467 (1977) ("Sanger.")   Maxam-Gilbert and Sanger were the first widely used techniques to sequence DNA.

37.     Maxam-Gilbert sequencing involves the chemical modification of radiolabeled DNA at specific bases and cleavage, followed by gel electrophoresis to separate the fragments by their size in adjacent lanes to determine the DNA sequence.

38.     Sanger sequencing is a "chain-termination" method that involves a DNA polymerase to create fragments terminated with a base-specific 2',3'-dideoxyribonucleotides or "dideoxys" or "ddNTPs."   The synthesized fragments are then separated by gel electrophoresis to determine the DNA sequence.   Since 1977, the Sanger method has undergone significant technological developments over the ensuing decades so that any reference to the specific techniques used in "Sanger sequencing" must consider the relevant timeframe.   Until the development of cloning vectors that produced single-stranded templates (*e.g.*, M13) (*see*

12

Messing et al., *A system for shotgun sequencing*, Nucleic Acids Res., 9:309-321 (1981)) ("Messing") and automated oligonucleotide synthesizers (*see* Heron and Smith), Maxam-Gilbert sequencing was more commonly used because it could be performed on hybridized, double-stranded DNA.

39.    Sanger sequencing utilizes primer extension of a single-stranded template.  Along with the primer, single-stranded template, DNA polymerase, and the four deoxyribonucleotides ("dNTPs," where "N" is A, C, G or T), the reaction mixture includes one of the four ddNTPs. These ddNTPs lack a 3'-OH group, which is the chemical substrate for the DNA polymerase to add the next incoming dNTP or ddNTP.  Thus, after ddNTPs are incorporated in a growing polynucleotide, the growth of the chain will stop, as no further phosphodiester bonds can be formed.  The ddNTPs are added to the reaction at a concentration such that they are incorporated at random in the growing strand, wherever the complementary base exists in the template strand. The result should be a series of sequences of different lengths, each ending with either ddATP, ddCTP, ddGTP, or ddTTP.

40.    Taking into account all four reactions run with four different ddNTPs, different fragments terminating at each base in the sequence are represented.  Subsequent electrophoresis of the four reaction mixtures in different lanes will separate the fragments by size.  Under the right conditions, the fragments, which differ in length by one base, can be resolved, and the sequence determined simply by reading down the gel.  Before 1986, the primer or one or more of the nucleotides were labeled with a radioactive isotope to detect the bands separated by gel electrophoresis by exposure to film.  Thereafter, two groups described the use of four different fluorescent dyes, each dye or color associated with one of the four ddNTPs, *see* Smith et al., *Fluorescence detection in automated DNA sequence analysis*, Nature, 321:674-679 (1986) and Prober et al., *A system for rapid DNA sequencing with fluorescent chain-terminating dideoxynucleotides*, Science, 238:336-341 (1987).  This four-color Sanger sequencing approach allowed for dideoxy reactions to be run in a single lane and for the automated analysis of DNA sequence determination.  In 1989, the method of cycle sequencing using the radioactive version

13

KAYE SCHOLER LLP

of Sanger sequencing was first described, *see* Murray, *Improved double-stranded DNA sequencing using the linear polymerase chain reaction*, Nucleic Acids Res., 17:8889 (1989) ("Murray").  The cycle sequencing method employed the repeated steps of heat denaturing the double-stranded template, primer annealing to a complementary section of the single-stranded template, and extending the primer with DNA polymerase.  The cycle sequencing method differs from PCR in several ways including the use of modified nucleotides such as ddNTPs and the copied template strand cannot be used as a template in subsequent round of temperature cycling.  The standard protocol for Sanger sequencing is summarized in the following diagram:

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                   Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24

c. **Nucleic acid sequencing - next-generation sequencing**

25      41.     Next-generation sequencing technologies include a number of methods that are

26  grouped broadly as template preparation, sequencing and imaging, and data analysis.  Next-

27  generation sequencing extends this process across millions of reactions in a massively parallel

28

15

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

fashion, rather than being limited to one or a few nucleic acid fragments.  Since their introduction, next-generation DNA sequencing platforms have allowed for high-throughput sequencing of nucleic acids.

42.     The first next-generation sequencing platform to achieve widespread commercial use was 454 Life Sciences Corporation's sequencer, also known as Genome Sequencer 20 ("GS20").  *See* Margulies et al., *Genome sequencing in microfabricated high-density picolitre reactors*. Nature 437:376-380 (2005.)  The GS20 sequencer first became commercially available in 2005.  The G20 sequencer uses a technology known as pyrosequencing, which is a method for detecting a single nucleotide incorporation event by a DNA polymerase as a bioluminescence signal.  Specifically, nucleotide incorporation causes the release of a small molecule called "pyrophosphate," which initiates a series of enzymatic reactions that produce the bioluminescence signal.  Use of this technique typically requires shearing of the double-stranded genomic DNA into smaller pieces of DNA that can be sequenced.  The GS20 then uses a bead-based immobilization strategy for DNA preparation.  After the genomic DNA is sheared into fragments of 300-800 base pairs, two short pieces of DNA (called adaptors A and B), are attached to the ends of the DNA.  The A and B adaptors each consist of a known DNA sequence and provide priming sites for universal PCR amplification and subsequently sequencing of the DNA fragments.  Adaptors A and B are attached to the opposite ends of the genomic DNA fragment. Adaptor B contains a tag that permits the DNA fragments to be immobilized to the beads. Immobilization is carried out under conditions that allow for only one DNA fragment to attach to one bead.  Thus, each bead carries one unique fragment of DNA.  The next step involves PCR amplification of each bead-DNA complex in an isolated microenvironment called "emulsion PCR."  *See* Dressman et al., *Transforming single DNA molecules into fluorescent magnetic particles for detection and enumeration of genetic variations*. Proc. Natl. Acad. Sci. USA 100: 8817-8822 (2003).  An oil and water mixture is created to encapsulate individual bead-DNA complexes into single aqueous droplets.  Ideally, one droplet will contain only one bead with one piece of DNA attached and the necessary reagents for PCR amplification.  After successful

16

amplification, each bead will have attached millions of new copies of a single DNA fragment. Millions of beads attached to individual DNA fragments are processed per experiment, which allows for millions of fragments to be amplified and sequenced individually.  Following emulsion PCR, each DNA-attached bead is prepared for the DNA sequencing step.  Those beads are deposited onto a plate that accommodates only one individual DNA-attached bead per well. Additional beads coated with enzymes (called enzyme beads) are also added to the wells. Sequencing reagents (buffers, DNA polymerase, and nucleotides) are then flowed across the wells of the plate.  Nucleotides are sequentially added one at a time during a sequencing cycle. Nucleotide insertion by the DNA polymerase causes release of pyrophosphate, which reacts with the enzyme beads and produces the bioluminescence signal.  With the sequential flow of individual nucleotides, the timing of the bioluminescence signal indicates the order in which nucleotides are inserted, which ultimately translates into the sequence of the genomic DNA template.  The sequential addition of the four different nucleotides is repeated for 42 cycles resulting in an average read length per well of 100 base pairs.  During this process, each of the millions of beads containing millions of copies of DNA is sequenced in parallel.  A typical GS20 run yields at least 200,000 sequences, which can result in a single instrument run of over 20 million bases.

43.     The Genome Analyzer, which was developed by Illumina/Solexa and released in late 2006, was the second massively parallel sequencing platform to achieve widespread commercial use.  The Genome Analyzer utilizes a strategy called sequencing by synthesis, otherwise known as cyclic reversible termination, which was developed as an alternative to the Sanger sequencing method.  *See* Metzker 2010.  Use of this technique requires shearing of genomic DNA into smaller DNA fragments to form the DNA to be sequenced (the template). Short pieces of DNA (adaptors) are attached to both ends of the DNA template.  Solid-phase amplification is then used to make numerous copies of the DNA template.  *See* Adessi et al., *Solid phase DNA amplification: characterisation of primer attachment and amplification mechanisms*. Nucleic Acids Res., 28: e87 (2000) and Fedurco et al., *BTA, a novel reagent for DNA attachment*

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

*on glass and efficient generation of solid-phase amplified DNA colonies*. Nucleic Acids Res., 34: e22 (2006).  First, the DNA samples are added to a glass flow cell that is coated with two different pieces of short DNA (primers) that can bind to the adaptors.  The goal of this procedure is to capture one DNA molecule per location.  Next, reaction reagents are pumped into the flow cell allowing for the single DNA template to be copied onto the solid support.  The original DNA template is then washed away.  In the second phase, the individual copied DNA fragments are then copied by forming bridge structures.  This occurs because the DNA fragments bend over and the adaptor sequence on the free end of the DNA fragment binds to an adjacent primer attached to the flow cell.  In this way, both ends of the DNA are now immobilized to the flow cell.  Following continuous solid-phase amplification, clusters are formed on the flow cell that contain copies (also called "clones") of the single original DNA template fragment.  Because each DNA molecule is separated from neighboring molecules, solid-phase amplification results in a clonal amplification of the same sequence (also called "clusters") that is visually resolvable on the flow cell from other DNA fragment clusters.  The result is that millions of different template clusters are formed.  Following solid-phase amplification, the flow cells are prepared for the cyclic reversible terminator sequencing approach.  In this approach all four nucleotides contain a unique fluorescent label; however, each nucleotide also contains a reversible terminator, which is an important feature of the technique.  *See* Bentley et al., *Accurate whole human genome sequencing using reversible terminator chemistry*. Nature, 456:53-59 (2008) ("Bentley").  In the first step, all four nucleotides are added simultaneously to the flow channels along with DNA polymerase.  The DNA polymerase adds a single fluorescent nucleotide that corresponds to the template base.  The terminator on the incorporated nucleotide blocks any other nucleotides from subsequently being incorporated.  Following incorporation the remaining bases are washed away.  Imaging is then performed to determine the identity of the incorporated nucleotide based on the fluorescent signal.  This is followed by a cleavage step, which removes the inhibiting group and the fluorescent dye on the incorporated nucleotide.  The cycle is repeated and the fluorescent identity for each cluster is read using sequential images.

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                        Case No. 3:11-CV-06391-SI

#### d.      Nucleic acid sequencing - targeted sequencing

44.      Despite significant cost reductions with next-generation sequencing technologies, whole genome sequencing is still an expensive endeavor.  Targeting regions of interest may be an interim solution by applying NGS platforms to hundreds, if not thousands, of samples.  This strategy can be employed to examine all of the exons in the genome (called "exome" sequencing), or megabase-size regions (called "regional" sequencing) implicated in disease or pharmacogenetics effects through genome-wide association studies.  The concept of targeting specific regions of the genome is well established, with PCR being the most widely used method, albeit on a small scale.  PCR coupled with Sanger sequencing is suitably matched for analyzing a handful of candidate genes, but not so for high-throughput NGS platforms, as sample preparation would require handling tens of thousands of primers individually or in large multiplex groups to meet the needs of a single instrument run.  A recent article, however, reported the simultaneous amplification of 3,976 products using the microdroplet PCR technology.  Here, a microfluidic device creates aqueous picoliter volume droplets of targeting forward and reverse primers in an oil solution.  Primer droplets targeting different regions merge with separate picoliter droplets containing fragmented genomic DNA and associated PCR reagents, which are then thermal cycled in a single tube.  The authors reported an 84% capture efficiency with 90% of the targeted bases showing uniform coverage using the microdroplet PCR method sequenced with either Roche/454 or Illumina/Solexa platform.  *See* Tewhey et al., *Microdroplet-based PCR enrichment for large-scale targeted sequencing*. Nature Biotechnol. 27:1025-1031 (2009.)

45.      Custom-designed oligonucleotide microarrays and solution-based hybridization strategies have also been employed for targeting regions of interest.    For example, Roche/NimbleGen oligonucleotide microarrays have been designed to provide complementary sequences for solid-phase hybridization for exome sequencing or regional sequencing.  *See* Albert et al., *Direct selection of human genomic loci by microarray hybridization*. Nature Methods 4:903-905 (2007);  Hodges et al., *Genome-wide in situ exon capture for selective resequencing*. Nature Genet. 39:1522-1527 (2007);  Okou et al., *Microarray-based genomic selection for high-throughput resequencing*. Nature Methods 4:907-909 (2007.)  Alternatively, other groups have

19

employed solution-based hybridization methods to capture specific genomic regions including molecular inversion probes (MIPs) and biotinylated RNA capture sequences. *See* Porreca et al., *Multiplex amplification of large sets of human exons*. Nature Methods, 4:931-936 (2007); Krishnakumar et al., *A comprehensive assay for targeted multiplex amplification of human DNA sequences*. Proc. Natl. Acad. Sci. USA, 105:9296-9301 (2008);  Turner et al.,. *Massively parallel exon capture and library-free resequencing across 16 genomes*. Nature Methods 6:315-316 (2009);  Gnirke et al., *Solution hybrid selection with ultra-long oligonucleotides for massively parallel targeted sequencin*g. Nature Biotechnol. 27:182-189 (2009).  Several big science projects including the 1,000 Genomes Project and the Exome Project have employed these microarray-based or solution-based strategies using multiple NGS platforms to target regions of interests.

### e.  Bioinformatic analyses

46.    Data obtained from techniques such as next-generation sequencing need to be pre-processed before subsequent data analysis can result in meaningful and useful information.  Raw data generated by methods such as next-generation sequencing may contain observation errors, such as non-uniform distributions or missing values, which must be taken into account before the data can be analyzed without producing misleading results.  Some common techniques used for pre-processing data relating to work with nucleic acid sequencing include data binning and GC bias correction.  Both of these concepts are briefly described below.

### i.  Alignment

47.    Once next-generation sequencing reads have been generated, they are then aligned to a known reference sequence or assembled *de novo*.  *See* Pop & Salzberg, *Bioinformatics challenges of new sequencing technology*. Trends Genet. 24:142-149 (2008);   Trapnell & Salzberg, *How to map billions of short reads onto genomes*. Nature Biotechnol. 27:455-457 (2009);  Chaisson et al., *De novo fragment assembly with short mate-paired reads: Does the read length matter*? Genome Res. 19:336-346 (2009).  The decision to employ either strategy is based upon the intended biological application as well as cost, effort, and time considerations.  For example, identifying and cataloguing genetic variation in humans can be accomplished by

20

aligning NGS reads to the human reference genome.  *See* Wheeler et al., *The complete genome of an individual by massively parallel DNA sequencing*. Nature 452:872-876 (2008);   Bentley; Wang et al., *The diploid genome sequence of an Asian individual*. Nature 456:60-65 (2008); McKernan, et al., *Sequence and structural variation in a human genome uncovered by short-read, massively parallel ligation sequencing using two-base encoding*. Genome Res. 19:1527-1541 (2009);  Pushkarev et al., *Single-molecule sequencing of an individual human genome*. Nature Biotechnol. 27:847-850 (2009.)  This approach is significantly cheaper and faster than Sanger sequencing.

48.     There are limitations to the alignment approach, such as placing reads within repetitive regions within the reference genome or in corresponding regions that may not exist in the reference genome.  *See* Frazer et al., *Human genetic variation and its contribution to complex traits*. Nature Reviews Genet. 10:241-251 (2009).  The latter situation may come from gaps in the reference genome or the presence of structural variants (SVs) in the genome being analyzed.  The proper alignment of NGS reads that fall within these regions can be addressed by using templates called "mate-pairs".  For mate-pair templates, the size of the fragments is generally known with both ends being sequenced providing "mate-pair reads."  Mate-pair reads can resolve the correct genome assignment for some repetitive regions as long as one read in the pair is unique to the genome.  One study demonstrated that Roche/454 read data (averaging 258 bases), derived from 3-kb sized mate-pair genomic libraries, could capture a larger fraction of SVs in the human genome.  *See* Korbel et al., *Paired-end mapping reveals extensive structural variation in the human genome*. Science 318:420-426 (2007).  This study, however, reveals that NGS reads using mate-pair templates is still incomplete when compared with that of traditional fosmid-end sequencing approaches.  *See* Kidd et al., *Mapping and sequencing of structural variation from eight human genomes*. Nature 453:56-64 (2008).  These examples provide clear evidence of the challenges associated with aligning NGS reads to a reference genome even still in the 2008 and 2009 time period, with many of these impediments still in existence today.

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

KAYE SCHOLER LLP

### ii.      Binning

49.      In statistical analysis, the concept of data binning or histograms is attributed to Karl Pearson, who introduced this idea around 1895.  In data binning, original data values which fall in a small discrete interval, often called a "bin" or alternatively a "window," are replaced by a value that is representative of that interval (often the "central value" of the original data values). The concept of using bins is particularly appropriate in the analysis of nucleic acid sequences that are aligned along a chromosome because a chromosome is easily divisible into discrete units or bins.  In fact, many researchers analyzing nucleic acid sequences that align along chromosomes have used the binning approach.

### iii.      GC bias correction

50.      Generally speaking, "GC content," or "guanine-cytosine content," refers to the percentage of nucleobases on a nucleic acid molecule that are either guanine or cytosine (and therefore not adenine or thymine).  Certain molecular biology and genetics techniques can be influenced by either higher or lower GC content of nucleic acids and produce data that over- or under-represents the true GC content.  This phenomenon is known as "GC bias."  GC bias is a well-known artifact of the Illumina/Solexa next-generation sequencing system. *See* Dohm et al., *Substantial biases in ultra-short read data sets from high-throughput DNA sequencing*. Nucleic Acids Res. 36:e105 (2008).

51.      In short, there are several steps in the Illumina sequencing process that results in GC bias.  In the template preparation step, the way in which clusters are generated for sequencing on the Illumina platform is dependent on the relative proportion of the GC content for a given region of the genome.  In the sequencing chemistry step, the way in which the read data are produced is dependent on the relative proportion of the GC content for a given region of the genome.  In the data analysis step, the way in which the read data are aligned to the reference genome is dependent on the relative proportion of the GC content for a given region of the genome.  Collectively, these steps result in GC bias.  For example, windows with a GC content of 40% will generally produce more sequencing reads than windows with a GC content of 30%.

22

The precise influence of GC content on the number of sequencing reads, however, varies in degree from experiment to experiment.  The GC bias created by each sequencing run should therefore be characterized independently if it is to be properly corrected.  Correction for GC bias is particularly important when one is attempting to infer copy number from sequencing data.

## IV.   THE PATENTS-IN-SUIT

### A.   The '540 Patent

52.     The '540 Patent is entitled "Non-invasive prenatal diagnosis," with named inventors Yuk-Ming Dennis Lo and James Stephen Wainscoat.  The front page of the '540 Patent identifies "Foreign Application Priority Data" as "Mar. 4 1997 (GB) . . . 9704444," which I am informed and understand is the priority date asserted by Sequenom for the '540 Patent.

53.     I am informed and understand that Sequenom is asserting infringement of Claims 1, 2, 4, 5, 8, 19-22, and 24-25 by Ariosa, Claims 1, 2, 5, 8, 13, 18, 21-22, and 24-25 by Natera, and DDC, and Claims 1, 2, 5-8, 12-13, 15, 18-22, and 24-25 by Verinata.

54.     Claim 1 of the '540 Patent is an independent claim, and Claims 2, 4, 5, 8, 18-22 are dependent claims of Claim 1.  Claim 1 of the '540 Patent is:

> A method for detecting a paternally inherited nucleic acid of fetal origin performed on a maternal serum or plasma sample from a pregnant female, which method comprises
>
> amplifying a paternally inherited nucleic acid from the serum or plasma sample and
>
> detecting the presence of a paternally inherited nucleic acid of fetal origin in the sample.

55.     Claim 24 of the '540 Patent is an independent claim, and Claim 25 is a dependent claim of Claim 25.  Claim 24 of the '540 Patent is:

> A method for detecting a paternally inherited nucleic acid on a maternal blood sample, which method comprises:
>
> removing all or substantially all nucleated and anucleated cell populations from the blood sample,
>
> amplifying a paternally inherited nucleic acid from the remaining fluid and subjecting the amplified nucleic acid to a test for the Paternally inherited fetal nucleic acid.

23

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

B.     **The '017 and '018 Patents**

56.     The '017 Patent is entitled "Non-invasive fetal genetic screening by digital analysis" with named inventors Stephen R. Quake and Hei-Mun Christina Fan.  The front page of the '017 Patent identifies "Related U.S. Application Data" as Provisional Application No. 60/764,420, filed on February 2, 2006.  The '018 Patent is entitled "Determination of fetal aneuploidies by massively parallel DNA sequencing" with named inventors Stephen R. Quake and Hei-Mun Christina Fan.  The front page of the '018 Patent identifies "Related U.S. Application Data" as Continuation of Application No. 11/701,686, filed on February 2, 2007, now Patent No. 7,888,017 and Provisional Application No. 60/764,420, filed on February 2, 2006.  The '017 and '018 Patents share substantially identical specifications.  However, the Claims of the '017 and '018 Patents being asserted by Stanford and Verinata are significantly different, as explained in detail below.

57.     Claim 17 of the '017 Patent is an independent claim, and Claims 18 to 21 are dependent claims of Claim 17.  The Claims of the '017 and '018 Patents appear to be directed to different types of "massively parallel DNA sequencing."  In contrast, the shared specification of the '017 and '018 Patents is focused on the method of nucleic acid analysis called "digital PCR," not really sequencing at all.

58.     As the '017 and '018 Patent specifications state:

> It has now been found that these problems [associated with conventional PCR] can be solved by quantitative examination of large numbers of chromosome samples through the use of highly scalable techniques.  This approach is termed here "digital analysis," and involves the separation of the extracted genomic material into discrete units so that the detection of a target sequence (e.g., chromosome 21) may be simply quantified as binary (0, 1) or simple multiples, 2, 3, etc.  ('017 Patent at 1:43-50; '018 Patent at 1:46-53.)

59.     I am informed and understand that Stanford/Verinata is asserting that Sequenom infringes Claims 17 to 21 of the '017 Patent, and Claims 1 to 4 of the '018 Patent.

60.     Claim 17 of the '017 Patent is an independent claim, and Claims 18 to 21 are dependent claims of Claim 17.  Claim 17 of the '017 Patent is:

24

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

A method for determination of the presence or absence of a fetal aneuploidy in a maternal tissue sample comprising fetal and maternal genomic DNA, wherein the method comprises:

a)   obtaining a mixture of fetal and maternal genomic DNA from said maternal tissue sample;

b)   distributing random fragments from the mixture of fetal and maternal genomic DNA of step a to provide reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule;

c)   conducting massively parallel DNA sequencing of the random fragments of genomic DNA in the reaction samples of step b) to determine the sequence of said random fragments;

d)   identifying the chromosomes to which the sequences obtained in step c) belong;

e)   analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA, wherein said at least one first target chromosome is presumed to be diploid in both the mother and the fetus, and ii) the number of copies of a second target chromosome in said mixture of fetal and maternal genomic DNA, wherein said second chromosome is suspected to be aneuploid in the fetus;

f)   conducting a statistical analysis that compares the number of copies of said at least one first target chromosome to the number of copies of said second target chromosome; and

g)   determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f).

61.   Claim 1 of the '018 Patent is an independent claim, and Claims 2 to 4 are dependent claims of Claim 1.  Claim 1 of the '018 Patent is:

A method for determining presence or absence of fetal aneuploidy in a maternal tissue sample comprising fetal and maternal genomic DNA, wherein the method comprises:

a.   obtaining a mixture of fetal and maternal genomic DNA from said maternal tissue sample;

b.   conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA of step a) to determine the sequence of said DNA fragments;

c.   identifying chromosomes to which the sequences obtained in step b) belong;

25

KAYE SCHOLER LLP

d.    using the data of step c) to compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture of maternal and fetal genomic DNA, wherein said at least one first chromosome is presumed to be euploid in the fetus, wherein said at least one second chromosome is suspected to be aneuploid in the fetus, thereby determining the presence or absence of said fetal aneuploidy.

**C.    The '415 Patent**

62.    The '415 Patent is entitled "Noninvasive diagnosis of fetal aneuploidy by sequencing," with named inventors Hei-Mun Christina Fan and Stephen R. Quake.  The front page of the '415 Patent, in the section titled "Related U.S. Application Data," states that it is a Divisional of Application No. 12/560,708, filed September 16, 2009, and that it claims priority to Provisional Application No. 61/098,758, filed September 20, 2008.

63.    I am informed and understand that Stanford/Verinata is asserting that Sequenom infringes Claims 1, 3, 5-10 and 14 of the '415 Patent.

64.    Claim 1 of the '415 Patent is:

A method of testing for an abnormal distribution of a specified chromosome portion in a mixed sample of normally and abnormally distributed chromosome portions obtained from a subject, comprising:

a)    sequencing DNA from the mixed sample to obtain sequences from multiple chromosome portions, wherein said sequences comprise a number of sequence tags of sufficient length of determined sequence to be assigned to a chromosome location within a genome;

b)    assigning the sequence tags to corresponding chromosome portions including at least the specified chromosome by comparing the determined sequence of the sequence tags to a reference genomic sequence;

c)    determining values for numbers of sequence tags mapping to chromosome portions by using a number of windows of defined length within normally and abnormally distributed chromosome portions to obtain a first value and a second value therefrom; and

d)    using the values from step (c) to determine a differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists.

65.    Claim 3 of the '415 Patent is:

The method of claim **1** wherein the mixed sample is comprises a mixture of maternal and fetal DNA and wherein the abnormal distribution results from a fetal aneuploidy.

26

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

66.     Claim 5 of the '415 Patent is:

The method of claim **3** wherein the sequencing is massively parallel sequencing.

67.     Claim 14 of the '415 Patent is:

The method of claim **3** further comprising the step of calculating a relationship between numbers of sequence tags and GC content associated with sequence tags in a given window and correcting for a higher or lower number of reads resulting from a change in GC content.

## V.     PERSON OF ORDINARY SKILL IN THE ART

68.     I am informed and understand that a "person of ordinary skill in the art" of a patent at the relevant time (which I understand is the priority date for the patent) depends on several factors including:  the levels of education and experience of persons working in the field; the types of problems encountered in the field; and prior art solutions to those problems.

### A.     A person of ordinary skill in the art of the '540 Patent

69.     I am informed and understand that March 4, 1997 (which is the filing date of G.B. Patent Application No. 9704444) is being asserted by Isis/Sequenom as the priority date for the '540 Patent.  I have also read the Declaration of Dr. Mark Evans dated March 8, 2012, and in particular Section VII entitled "The Level of Ordinary Skill in the Art."  I agree with Dr. Evans' opinion that a person having ordinary skill in the art of the '540 Patent as of March 1997 would have been a person with a degree in medicine (or an advanced degree in a related field) with knowledge of genetics, molecular biology and biochemistry, including two years of practical experience in prenatal diagnosis, although I am of the opinion that as an alternative to two years of practical experience in prenatal diagnosis, the person of ordinary skill in the art could have two years of experience with nucleic acid chemistry and DNA sequencing.

### B.     A person of ordinary skill in the art of the '017 and '018 Patents

70.     I am informed and understand that February 2, 2006 (which is the filing date of U.S. Provisional Patent Application No. 60/764,420) is the priority date being asserted by Stanford and Verinata as the priority date for the '017 and '018 Patents.  In my opinion, a person having ordinary skill in the art as of February 2006 would have been a person with graduate level

27

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                   Case No. 3:11-CV-06391-SI

1   training in genetics, molecular biology or biochemistry, or related disciplines, and two years of
2   experience with nucleic acid chemistry and DNA sequencing technologies.

3         **C.**    **A person of ordinary skill in the art of the '415 Patent**

4        71.    I am informed and understand that September 20, 2008 (which is the filing date of

5   U.S. Provisional Patent Application No. 61/098,758) is being asserted by Stanford and Verinata

6   as the priority date for Claims 1, 3, and 5-10 of the '415 patent, while September 16, 2009 is

7   being asserted for Claim 14.   In my opinion, a person having ordinary skill in the art as of

8   September 2008 would have been a person with graduate level training in genetics, molecular

9   biology, or biochemistry or related disciplines and two years of experience with nucleic acid

10   chemistry and DNA sequencing technologies.

11   **VI.**    **DISPUTED CLAIM TERMS IN THE '540 PATENT**

12        72.    In this section, I set out my opinions regarding the meaning of certain terms in the

13   claims of the '540 Patent.   I have reviewed the '540 Patent, its prosecution file history, the

14   prosecution file history of the continuation application, U.S. Patent Application No. 09/872,063,

15   and also the declaration of Dr. Mark Evans dated March 8, 2012.

16        73.    I have also reviewed the Court's Preliminary Injunction Order dated July 5, 2012

17   which sets out the Court's constructions of certain terms in the '540 Patent "for the purposes of

18   [the preliminary injunction] motion only and based on the current record."

19        74.    I am informed and understand that the Court's Order is being appealed to the

20   Court of Appeals for the Federal Circuit and that claim construction of certain terms in the '540

21   Patent may or may not be decided by the Court of Appeals.

22         **A.**    **"Paternally inherited nucleic acid of fetal origin"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata/Ariosa/ Natera's Proposed Construction |
|---|---|---|
| Paternally inherited nucleic acid of fetal origin | "a nucleic acid that originates from the fetus and is inherited from the father" | Ariosa Construction:<br><br>DNA sequence known to be |

28

KAYE SCHOLER LLP

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata/Ariosa/ Natera's Proposed Construction |
|---|---|---|
| | | received only from the father which is not possessed by the mother<br><br>Verinata Construction:<br><br>Known DNA sequence known to be received only from the father which is not possessed by the mother<br><br>Natera/DDC Construction: DNA sequence from a locus known to be possessed by the father but not possessed by the mother |

75.    A person of ordinary skill in the art would have understood that "paternally inherited" means inherited from the father.  It is my opinion that is the ordinary and customary meaning of those words in the field of genetics.  A person of ordinary skill in the art would also have understood that "of fetal origin" refers to something that "originates from the fetus."  Thus, the plain language of this claim term supports Sequenom's first proposed construction.  This proposed construction is consistent with the specification of the '540 Patent and its file history.

76.    I disagree with the District Court's construction of the phrase "paternally inherited nucleic acid" to mean "DNA sequence known to be received only from the father which is not possessed by the mother."  I agree with the reasons set forth in Sequenom's opening and reply appellate briefs as to why the District Court's construction is incorrect.  In particular, the District Court imposed a requirement that the DNA sequence be "known in advance."  I agree with Sequenom that a person of ordinary skill in the art would not have understood the phrase "paternally inherited nucleic acid" as used in the Claims of the '540 Patent to mean that the fetal nucleic acid sequence must be known in advance.  This requirement is not set forth in the language of Claim 1, described in the specification of the '540 Patent, nor required by the

KAYE SCHOLER LLP

prosecution file history of the '540 Patent or that of the continuation application. I note that Example 3 in the specification, relating to the detection of the Rhesus D gene, the sequence of the fetal nucleic acid was not known in advance of the test.

77. I also disagree with the constructions proposed by Ariosa, Ventana and Natera because they adopt the "known in advance" requirement from the District Court's construction.

78. For the reasons set out above, I agree with Sequenom's proposed construction.

**B.** **"Amplifying"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata/Ariosa/ Natera's Proposed Construction |
|---|---|---|
| Amplifying | increasing the amount of the nucleic acid by making copies of it | |
| Amplifying a paternally inherited nucleic acid from the serum or plasma sample / amplifying a paternally inherited nucleic acid from the remaining fluid / amplifying a paternally inherited nucleic acid from the non-cellular fraction | See proposed construction above. | Ariosa's and Verinata's construction: increasing the concentration of a paternally inherited nucleic acid relative to the other DNA in the sample |
| amplifying a paternally inherited nucleic acid | See proposed construction above. | Natera/DDC's construction: increasing the concentration of a paternally inherited nucleic acid relative to all of the other DNA in the sample |

79. A person of ordinary skill in the art would have understood that "amplifying" in the '540 Patent means "increasing the amount of the nucleic acid by making copies of it."

80. The language of Claim 1 of the '540 Patent simply says "amplifying a paternally inherited nucleic acid from the serum or plasma sample." This phrase contains no limiting text that requires there to be an increase in concentration of the paternally inherited nucleic acid

30

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

"relative to the other DNA in the sample."  While "amplification" can sometimes result in an increase the concentration of certain nucleic acids over others, that is not the normal meaning of the word "amplification" in the context of the subject matter of the '540 Patent.  In fact, the terminology normally used when the concentration of a substance is increased is "enrichment," and indeed that is how "enrichment" is used in the '540 Patent.

81.    The District Court construed the phrase "amplifying a paternally inherited nucleic acid" to mean "increasing the concentration of a paternally inherited nucleic acid relative to the other DNA in the sample."  This is also Ariosa's and Verinata's proposed construction and very similar to Natera/DDC's proposed construction.  I disagree with this construction for the reasons set out herein.  I also agree with the reasons set forth in Sequenom's opening and reply appellate briefs as to why the District Court's construction of "amplifying a paternally inherited nucleic acid" is incorrect.

82.    As I explained above in the technology background section (Section III.C), enrichment can be done in several ways, some of which do not involve any amplification.

83.    It is clear that the '540 Patent specification uses the words "amplifying" and "enrichment" in different ways in both the Claims and in the specification.  For example, the '540 Patent states: "A sequence-based enrichment method could also be used on the maternal serum or plasma to specifically **enrich** for foetal nucleic acid sequences." ('540 Patent at 2:38-41.)  The very next paragraph in the specification then says:  "An **amplification** of foetal DNA sequences in the sample is normally carried out.  **Standard nucleic acid amplification systems can be used, including PCR,** the ligase chain reaction, nucleic acid sequence based amplification (NASBA), branched DNA methods, and so on.  Preferred amplification methods involve PCR."  Thus, the '540 Patent itself does not use "amplify" and "enrich" in the same manner, and in my opinion the District Court incorrectly equated them in arriving at its construction.

84.    In addition, I have practiced in the field of nucleic acid analysis for more than 20 years.  Throughout my career, I have been closely involved with and directly used methods for amplifying nucleic acids.  In my opinion, it is clear that a person of ordinary skill in the art would

31

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                                Case No. 3:11-CV-06391-SI

have understood that the term "amplifying" in the '540 Patent means "increasing the amount of the nucleic acid by making copies of it."

C.    "Detecting"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata/Ariosa/ Natera's Proposed Construction |
|---|---|---|
| Detecting | discovering or determining the existence, presence, or fact of | |
| "detecting a paternally inherited nucleic acid" / "detecting the presence of a paternally inherited nucleic acid of fetal origin in the sample" / "to detect paternally inherited nucleic acid" / "subjecting the amplified nucleic acid to a test for the paternally inherited nucleic acid" | See proposed construction above. | Ariosa's construction:<br><br>discovering (the presence of) a DNA sequence known to be received only from the father which is not possessed by the mother; the discovering is not based on differences between maternal and fetal DNA |
| detecting; detected; detection; detect | See proposed construction above. | Natera/DDC's construction:<br><br>discovering (the presence of) a DNA sequence from a locus known to be possessed by the father but not possessed by the mother; the discovering is not based on differences between maternal and fetal DNA |
| "detecting a paternally inherited nucleic acid" / "detecting the presence of a paternally inherited nucleic acid of fetal origin in the sample" / "to detect paternally inherited nucleic acid" / "subjecting the amplified nucleic acid to a test for the paternally | See proposed construction above. | Verinata's construction:<br><br>Discovering (the presence of) a known DNA sequence known to be received only from the father which is not possessed by the mother; the discovering is not based on differences between maternal and fetal DNA |

32

KAYE SCHOLER LLP

KAYE SCHOLER LLP

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata/Ariosa/ Natera's Proposed Construction |
|---|---|---|
| inherited nucleic acid" | | |

85.     A person of ordinary skill in the art would have understood that "detecting" in the '540 Patent means "discovering or determining the existence, presence, or fact of." Detecting is a straightforward word that has no special meaning in the field of nucleic acid analysis. The claim language and the specification of the '540 Patent support this ordinary and customary meaning of "detecting."

86.     In contrast, the constructions proposed by Ariosa, Verinata and Natera/DDC include their proposed constructions for "paternally inherited nucleic acid" which I disagree with for reasons I have already explained above.

87.     However, stripping out the "paternally inherited" language, it appears that Ariosa, Verinata and Natera/DDC all propose that "detecting" by itself means "discovering (the presence of)." This is one possible meaning of "detecting," though I prefer Sequenom's proposed construction as it is not only limited to "discovering."

**D.     "foetal DNA enrichment step"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata/Ariosa/ Natera's Proposed Construction |
|---|---|---|
| foetal DNA enrichment step | increasing the concentration of fetal DNA relative to the maternal DNA in the sample | Natera's position:<br><br>Natera contends that because claim 19 is not asserted in [the Natera case], it is not appropriate to construe this term |
| without subjecting it to a foetal DNA enrichment step | See proposed construction above. | Ariosa's and Verinata's construction:<br><br>prior to the amplification step of claim1 |

33

88.     A person of ordinary skill in the art would have understood that "foetal DNA enrichment step" in the '540 Patent means "increasing the concentration of fetal DNA relative to the maternal DNA in the sample."

89.     As I explained above in relation to "amplifying," the '540 Patent uses "amplifying" and "enrichment" to mean different things.  It is clear from the specification of the '540 Patent that "enrichment" is used to mean increasing the concentration of the fetal nucleic acid relative to other DNA. (*See* '540 Patent at 2:34-47.)

90.     In addition, in my opinion, a person of ordinary skill in the art would have understood that there is a difference between "amplifying" and "enrichment" based on the differences between Claim 1 and Claim 19 of the '540 Patent.

91.     I disagree with Ariosa's and Verinata's proposed construction, which is "prior to the amplification step of claim 1."  First, this proposed construction does not actually address the meaning of "a foetal DNA enrichment step."  Instead, the proposed construction is directed to when the "foetal DNA enrichment step" occurs.  There does not appear to be any requirement in the claim language itself or the '540 Patent specification that would dictate when a foetal DNA enrichment step must occur.  Indeed, the plain language of Claim 19 is that there is no fetal DNA enrichment step.  In my opinion, a person of ordinary skill in the art would have read Claim 19 to require the method of Claim 1 (*i.e.,* requiring an amplification step), in which the concentration of foetal DNA is above the specified level, without there being a separate enrichment step of the foetal DNA.

## VII.    DISPUTED CLAIM TERMS IN THE '017 PATENT

92.     In this section, I address the meaning of certain terms in the claims of the '017 Patent on which I understand the parties disagree and point out a few claim term constructions on which the parties have reached an agreement.

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

**A.      "Aneuploidy"**

| Terms to be Construed | Agreed Construction |
|---|---|
| Aneuploidy | the occurrence of one or more extra or missing chromosomes |

93.    The parties agree that a person of ordinary skill in the art would have understood that the term "aneuploidy" used in the '017 Patent means "the occurrence of one or more extra or missing chromosomes."   ('017 Patent at 6:26-27.)   This definition is cited directly from the specification of the '017 Patent.   It is my understanding that if the specification describes a definition of a claim term that would otherwise be used differently, the inventor's lexicography governs.

**B.      "Reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| Reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule | discrete reaction samples where the target sequence can be analyzed and where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules | Reaction sample containing a single DNA fragment or the amplification products of a single DNA fragment |

94.    A person of ordinary skill in the art would have understood that the "reaction samples" of the claims are discrete samples where the target sequences can be analyzed.  ('017 Patent at 5:29-30.)  Moreover, the person of ordinary skill in the art would also have understood that there must be sufficient discrete reaction samples such that the "digital analysis" method gives a statistically significant result.

95.    Sequenom's proposed construction comes directly from the specification.   The specification states that the "present method comprises generally the following steps,":

   1.  Obtaining a tissue containing DNA from a pregnant subject, which DNA is known to have about 3% fetal DNA. This material is preferably drawn blood, and the circulating DNA is found in the blood plasma, rather than in cells. The blood or plasma may optionally be enriched for fetal DNA by known methods, such as

35

KAYE SCHOLER LLP

size fractionation to select for DNA fragments less than about 300 bp. Alternatively, maternal DNA, which tends to be larger than about 500 bp may be excluded. Another enrichment step may be to treat the blood sample with formaldehyde, as described in Dhallan et al. "Methods to Increase the Percentage of Free Fetal DNA Recovered From the Maternal Circulation," J. Am. Med. Soc. 291(9): 1114-1119 (March 2004). 2. Distributing single DNA molecules from this sample to *a number of discrete reaction samples, <u>where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules</u>*. Further, the reaction sample is confined to a small volume to bring the reaction molecules into close approximation. The amount of DNA molecule per reaction sample is preferably on the order of one copy of the chromosome of interest equivalent per reaction sample. ('017 Patent at 8:34-55 (emphasis added).)

96.    The specification specifically describes the reaction samples as "discrete reaction samples" in several sections of the '017 Patent:

- Thus, the present method comprises generally the following steps:

  … 2. Distributing single DNA molecules from this sample to a number of discrete reaction samples, where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules. ('017 Patent at 8:47-51 (emphasis added).)

- It should be appreciated that methods involving PCR or other amplification are not the only way to detect or enumerate the molecules *in a given discrete reaction sample*. ('017 Patent at 19:13-15 (emphasis added).)

97.    The specification also refers extensively to "discrete samples":

- The genetic material thus obtained is distributed into *discrete samples*, where each sample will contain, on average not more than about one target sequence per sample. The average of one target sequence means that, for practical reasons, the sample will contain, preferably 0.1 to 0.8 genome equivalents per *discrete sample*, ideally 0.5 genome equivalent per sample. . . The presence or absence of different target sequences *in the discrete samples* is detected; *and the results are analyzed whereby the number of results from the discrete samples will provide data sufficient to obtain results distinguishing different target sequences*. ('017 Patent at 5:4-23 (emphasis added).)

  *<u>The discrete samples are in reaction samples where the target sequences can be analyzed</u>*. The reaction samples may be, for example, wells in a microtiter plate, aqueous phases in an emulsion, areas in an array surface, or reaction chambers in a microfluidic device. ('017 Patent at 5:29-38 (emphasis added).)

- *The labeling and detection in the present method* is used to distinguish the presence or absence of a single target sequence, referred to as "digital analysis," although it may be performed with sensitive nucleic acid detection methods which distinguish between one and more than one *target sequence in a discrete sample*. ('017 Patent at 4:61-66 (emphasis added).)

*See also* references to, or descriptions of, discrete samples at '017 Patent col. 6, ll. 28-37 (emphasis added.)

36

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

98.     The specification also explains that the genomic material to be analyzed is separated into "discrete units":

> It has now been found that these problems [associated with conventional PCR] can be solved by quantitative examination of large numbers of chromosome samples through the use of highly scalable techniques.  ***This approach is termed here "digital analysis,"*** and involves ***the separation of the extracted genomic material into discrete units*** so that the detection of a target sequence (e.g., chromosome 21) may be simply quantified as binary (0, 1) or simple multiples, 2, 3, etc.  ('017 Patent at 1:43-50 (emphasis added).)

99.     As described in more detail below, the "digital analysis" method described in the '017 Patent is a target specific approach.  A person of ordinary skill in the art would interpret the meaning of the "reaction sample" phrase in this context.

100.    In sum, in light of the claim language, the specification, and the prosecution history of the '017 and '018 patents and the prosecution histories of continuing applications that share substantially the same specification as the '017 and '018 Patents, it is my opinion that the person of ordinary skill in the art would have construed the "reaction sample" phrase as involving the analysis of target specific sequences.

101.    I disagree with the Stanford/Verinata proposed construction because it has simply replaced the phrase "single genomic DNA molecule" with the phrase "single DNA fragment."  I note that the phrase "single DNA fragment" does not appear once in the '017 Patent.  The Stanford/Verinata proposed construction also fails to capture the target specific analysis that is an essential feature of Claim 17.

102.    In my opinion, Sequenom's proposed construction is properly based on the claim language and the disclosure of the specification as set out above, and in my opinion is how a person of ordinary skill in the art would have understood the "reaction samples" element.

C.      **"Massively parallel DNA sequencing of the random fragments of genomic DNA"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| Massively parallel DNA sequencing of the random | Massively parallel DNA sequencing of the random | no construction necessary |

KAYE SCHOLER LLP

| fragments of genomic DNA | fragments of genomic DNA in each discrete reaction sample to detect the presence of the target sequence | |
|---|---|---|
| massively parallel DNA sequencing | See construction above. | Any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments n parallel (*e.g.*, the Illumina sequencing platform). |

103.   It is my opinion that a person of ordinary skill in the art would have understood that the "massively parallel DNA sequencing" as used in the Claims of the '017 Patent is referring to **targeted** sequencing, not random sequencing.

104.   Also in my opinion, Sequenom's proposed construction is how a person of ordinary skill in the art would have understood the "massively parallel DNA sequencing" element.  I disagree with Stanford/Verinata's proposed construction.

105.   First, the language of Claim 17 itself would have demonstrated to a person of ordinary skill in the art that the sequencing is targeted, not random.  For example, steps e) and f) of Claim 17 refer to "one first **target** chromosome," which shows that there is a target for the sequencing step.

106.   Second, the specification also demonstrates the construction that the sequencing claimed in Claim 17 is targeted sequencing in discrete reaction samples, not random sequencing.

107.   As noted above, the title of the '017 Patent is "Non-invasive fetal genetic screening by digital analysis."  Based upon my review of the specification, it is clear that the method of sequencing is described to identify known target sequences, not random sequencing of unknown sequences.  Indeed, the specification states explicitly that the alleged invention is based on the use of a technique called "digital analysis," which is described in the specification by reference to "target sequences," as shown in the following quotations from the specification:

- It has now been found that these problems [associated with conventional PCR] can be solved by quantitative examination of large numbers of chromosome samples through the use of highly scalable techniques. ***This approach is termed here "digital analysis,"*** and involves the separation of the extracted genomic

38

material into discrete units so that the **detection of a target sequence** (e.g., chromosome 21) may be simply quantified as binary (0, 1) or simple multiples, 2, 3, etc. ('017 Patent at 1:43-50 (emphasis added.).)

- **The labeling and detection in the present method** is used to distinguish the presence or absence of **a single target sequence, referred to as "digital analysis,"** although it may be performed with sensitive nucleic acid detection methods which distinguish between one and more than one **target sequence** in a discrete sample. Many fluorescent techniques have this sensitivity. **The target sequences are chosen** so that a maternal sequence and a fetal sequence are distinguishable, such as two **copies** of a maternal sequence versus two **copies** of a fetal sequence. ('017 Patent at 4:61-5:3 (emphasis added).)

- **The present invention** involves the analysis of maternal blood for a genetic condition, wherein the mixed fetal and maternal DNA in the maternal blood is analyzed to distinguish a fetal mutation or genetic abnormality from the background of the maternal DNA . . . **The method employs "digital analysis," in which the DNA in the sample is isolated to a nominal single target molecule in a small reaction volume.** Each sample mixture has a possibility of having distributed in it less than 1 **target** (i.e., 0 target) or more than one **target**. Next, **the target molecules are detected in each reaction well, preferably as target sequences** which are amplified, which may include a quantization of starting copy number of the **target sequence**, that is, 0, 1, 2, 3, etc. A control sequence is used to distinguish an abnormal increase in the **target sequence**, e.g., a trisomy. **Thus there is a differential detection of target sequences**, one of which is chosen to represent a normal genotype present in both mother and offspring, and one of which is chosen for detection of an abnormal genotype in the offspring, where the **target sequence** in the offspring will be different from that of the mother, e.g. in trisomy. ('017 Patent at 7:36-59 (emphasis added).)

- Thus, when the individual discrete samples are analyzed for the presence of the genetic abnormality to be tested, the DNA (chromosome) to be analyzed will, on average, either be present or absent, permitting so-called **"digital analysis."** A reaction sample in general will contain a single **template** molecule (haplotype), two **target** molecules (diploid) or three **target** molecules (trisomy). ('017 Patent at 11:38-45 (emphasis added).)

- Another form of parallel analysis useful **in the present invention** is single molecule analysis. Again, a sample is diluted to contain less than a nominal single genome equivalent of DNA, and **the presence of the target of interest** (i.e., chromosome 21 trisomy) can be determined in a large number of samples. By analyzing a large number of samples, the fetal DNA can be distinguished from the maternal DNA. **This is termed a "digital analysis,"** because each well will have, on average, one genome equivalent per well, and furthermore, the dilution may be read as a binary "yes-no" result as to the presence of the chromosome or other sequence to be counted. ('017 Patent at 11:66-12:9 (emphasis added).)

108.  Moreover, in addition to the above citations, the specification contains numerous other references to detecting target sequences. *See*, for example:

- Thus, **the present method** comprises generally the following steps: . . . 4. Quantitative analysis of the detection of the maternal and fetal **target sequences**. In some cases this may include **targets** to different regions, such as probes to a

39

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

- ***target on a chromosome*** suspected of being present in an abnormal copy number (trisonomy) [sic] compared to a normal diploid chromosome, which is used as a control.  ('017 Patent at 8:31-9:6 (emphasis added).)

- Also, while detection may be conveniently be carried out by a ***sequence specific probe***, detection may also be carried out by directly sequencing a region of interest to determine if it is ***the target sequence of interest***.  ('017 Patent at 12:30-33 (emphasis added).)

- The detailed description of multiple sample analysis being carried out in wells does not mean that ***the target sequences*** need to be physically separated into wells, as the sequences may be in samples which are isolated simply by being on different beads (as described above) or by adherence to different areas of a substrate (as described below). ('017 Patent at 19:6-11 (emphasis added).)

- 4. Single Molecule Detection/Sequencing Methods.  It should be appreciated that methods involving PCR or other amplification are not the only way to detect or enumerate the molecules in a given discrete reaction sample. It is possible to use single molecule flow cytometry to count single molecules that have been labeled with a ***sequence-specific fluorescent probe***. It is also possible to ***sequence the target sequence in the reaction sample directly***, either after amplification or at the single molecule level.   ('017 Patent at 19:12-20 (emphasis added).)

- The genomic DNA from the tissue taken from the mother, i.e. the mixture of fetal and maternal genetic material, may be distributed into discrete samples which are anchored to a surface and ***sequenced or monitored by labeled probes to detect a target specific sequence, e.g., a unique region of chromosome 21, e.g., AML1***. Further guidance for the ***preparation of chromosome 21-unique sequences*** may be found, for example, in Fuscoe et al., "An Efficient Method for Selecting Unique-Sequence Clones from DNA Libraries and Its Application To Fluorescent Staining of Human Chromosome 21 Using in Situ Hybridization," Genomics, vol. 5, 1989, pp. 100-109. ('017 Patent at 19:12-20 (emphasis added).)

109.    In all of these passages, the specification refers to a "target sequence" or the synonymous phrase "target specific sequence."  It is my opinion that one of ordinary skill in the art would have understood that the target sequence is known in advance.  This represents a design choice to know the target in advance so that the presence or absence of the target sequence can be detected using the method of "digital analysis."  As the specification states:  "The labeling and detection in the present method is used to distinguish the presence or absence of a single target sequence, referred to as 'digital analysis, . . .'"('017 Patent at 4:61-63.)  And the specification further states that "[t]he target sequences are **chosen** . . ."('017 Patent at 4:67 (emphasis added).)

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

110.    In contrast, random sequencing does not involve the use of a known target sequence.  To the contrary, random sequencing involves one or more DNA fragments that contain unknown sequences in advance of performing the method.

111.    I am informed and understand that it is necessary to consider the specification as a whole to determine what the claimed invention is, as set out in the claims.  When the person of ordinary skill in the art has reviewed and considered the specification as a whole, it is apparent that the disclosed method of the '017 Patent is that of **targeted** sequencing, not random sequencing.

112.    The United States Patent and Trademark Office ("USPTO") also considered that the specification of the '017 Patent "does not appear to contemplate or support the claimed limitation directed to 'randomly sequencing.'"  *See* October 22, 2012 Advisory Action Before the Filing of an Appeal Brief in U.S. Patent Appl. No. 12/393,833.  Rather, the USPTO stated that the specification "does NOT support randomly sequencing these randomly distributed fragments, but actually only performing target specific sequence sequencing and probing." *Id.; see also, e.g.*, June 5, 2012 Non-Final Office Action and September 14, 2012 Final Office Action in U.S. Patent Appl. No. 12/393,833.

113.    There also exist examples of DNA analysis techniques that target nucleic acids before sequencing, *see* paragraphs 44-45.  One such example is exome sequencing.  Once captured, these fragments are sequenced to provide the desired sequencing data.

114.    I disagree with the Stanford/Verinata proposed construction because it covers all types of sequencing.  It is my opinion that a person of ordinary skill in the art would not have considered all types of sequencing as "massively parallel DNA sequencing."  For example, Stanford/Verinata's proposed construction would include PCR-based Sanger sequencing and shotgun Sanger sequencing using capillary instruments.  One of the biggest advantages of massively parallel sequencing is the elimination of gel electrophoresis used by capillary instruments.  It is my opinion that a person of ordinary skill in the art in February 2006 would

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

KAYE SCHOLER LLP

have understood these differences and would not have considered Sanger sequencing as a form of "massively parallel" sequencing.

115.    In addition, the Stanford/Verinata proposed construction refers vaguely to the phrase "*e.g.*, the Illumina sequencing platform."  It is my opinion that it would be unclear to a person of ordinary skill in the art in February 2006 what this phrase meant.  For example, it is my understanding that Solexa announced shipping its first sequencing systems on July 11, 2006.  *See* Solexa 2006 GenomeWeb Article.  Moreover, Illumina announced signing a definitive agreement to acquire Solexa on November 13, 2006.  *See* Illumina 2006 Press Release.  It is therefore completely unimaginable how a person of ordinary skill in the art would have understood the term "Illumina sequencing platform" when one did not exist in February 2006.  It is not surprising that "the Illumina sequencing platform" is not described anywhere in the '017 specification.  Perhaps Verinata/Stanford are referring to the phrase "[s]ee, products offered by Illumina, Inc., San Diego" at col. 20, l. 9 in the '017 Patent specification.  But in February of 2006, Illumina offered several products for genotyping and gene expression assays.  The Solexa or Illumina sequencing platform was *not* one of those products offered by Illumina in February 2006.  Even in February 2007, the meaning of this phrase would not have been clear.

116.    Accordingly, in my opinion Sequenom's proposed construction is correct and Stanford/Verinata's construction should be dismissed as being chronologically inaccurate.

**D.    "identifying the chromosomes"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| identifying the chromosomes | determining the identity of the unique regions of the target chromosomes from the corresponding target sequences | no construction necessary |

117.    A person of ordinary skill in the art would have understood that, based on the language of Claim 17 and the disclosure of the specification, "identifying the chromosomes"

42

means "determining the identity of the target chromosomes from the corresponding target sequences."

118.   First, Claim 17 itself refers to the chromosomes as first and second "target chromosomes."

119.   Second, the specification is replete with references to detecting the "target sequence" as I have explained above.

120.   Additionally, another section of the specification provides:

> The genomic DNA from the tissue taken from the mother, i.e. the mixture of fetal and maternal genetic material, may be distributed into discrete samples which are anchored to a surface and sequenced or monitored by labeled probes to detect a target specific sequence, e.g., a unique region of chromosome 21, e.g., AML1.  Further guidance for the preparation of chromosome 21-unique sequences may be found, for example, in Fuscoe et al., "An Efficient Method for Selecting Unique-Sequence Clones from DNA Libraries and Its Application To Fluorescent Staining of Human Chromosome 21 Using in Situ Hybridization," Genomics, vol. 5, 1989, pp. 100-109. ('017 Patent at 19:56-20:1.)

**E.    "the number of copies [of at least one first target chromosome / of a second target chromosome]"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| the number of copies [of at least one first target chromosome / of a second target chromosome] | an integer number of copies [of at least one first target chromosome / of a second target chromosome] | See proposed construction [of 'analyzing' step] |

121.   A person of ordinary skill in the art would have understood that, based on the claim language and the disclosure of the specification, "the number of copies" means "an integer number of copies."

122.   First, a person of ordinary skill in the art would have understood that the concept of "copies" of a chromosome suggests an integer number of copies, 0, 1, 2 etc.  It does not suggest a fraction of a copy of chromosome, such as 1.37 copies of a chromosome.

123.   Further, the specification itself expressly refers to integer, not fractional, number of copies of a chromosome.  *See*, for example:

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                          Case No. 3:11-CV-06391-SI

- ***The method may be performed*** with dilutions whereby more target sequences are detected in samples containing a trisomic or increased copy number of target sequence. That is, if one is analyzing chromosome 21, the mixture may be diluted such that, on average, one may detect ***two chromosomes*** present in a maternal DNA, and ***three chromosomes*** in a Down Syndrome fetal DNA. ('017 Patent at 5:10-16 (emphasis added).)

- It has now been found that these problems [associated with conventional PCR] can be solved by quantitative examination of large numbers of chromosome samples through the use of highly scalable techniques. ***This approach is termed here "digital analysis,"*** and involves the separation of the extracted genomic material into discrete units so that the ***detection of a target sequence (e.g., chromosome 21) may be simply quantified as binary (0, 1) or simple multiples, 2, 3, etc.*** ('017 Patent at 1:43-50 (emphasis added).)

- Brief Summary of the Invention … The target sequences are chosen so that a maternal sequence and a fetal sequence are distinguishable, such as ***two copies*** of a maternal sequence versus ***two copies*** of a fetal sequence. ('017 Patent at 4:67-5:3 (emphasis added).)

- Next, the target molecules are detected in each reaction well, preferably as target sequences which are amplified, which may include a quantization of starting ***copy number of the target sequence, that is, 0, 1, 2, 3, etc.*** ('017 Patent at 7:49-52 (emphasis added).)

- The sum of the positive wells in each section will be consistent with the gene/chromosome copies that were measured in the sample. ('017 Patent at 24:66-25:1 (emphasis added).)

- In this protocol, the number of positive reaction samples is used, disregarding increased intensity from ***three versus two chromosomes in a reaction sample***. That is, as described above, trisomy can be detected either by looking for an increased signal from a single well having multiple chromosomal DNA copies, or by diluting a sample and counting the frequency of responses of the trisomic marker versus a control diploid marker. ('017 Patent at 23:8-15 (emphasis added).)

124.   As each well is an integer number, it is my opinion that a person of ordinary skill in the art would have understood that there is no such thing as a fraction of a chromosome in the digital analysis of the '017 Patent.

125.   Based on these excerpts from the specification and the claim language, it is my opinion that a person of skill in the art would have understood that "number of copies of" the first or second target chromosome in Claim 17 must refer to an **integer** number of copies, as Sequenom's proposed construction states.

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                         Case No. 3:11-CV-06391-SI

126.    I disagree with Stanford/Verinata's proposed construction because it does not make clear that the number of copies must be an integer number of copies.  I also disagree for the reasons set forth below under the "analyzing" step.

**F.    "analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| analyzing the data of step d) to determine i) the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome | determining the integer number of copies of the target chromosomes in said mixture of fetal and maternal genomic DNA from the identities of the target chromosomes determined in step d) | Determining the number of copies of at least one first target chromosome in said mixture of fetal and maternal genomic DNA . . . and ii) the number of copies of a second target chromosome, as represented by the results of the identifying step d) |

127.    For the reasons set out above, a person of ordinary skill in the art would have understood that "number of copies" means "integer number of copies."  Step d) in Claim 17 says: "d) identifying the chromosomes to which the sequences obtained in step c) belong."  Thus, from this language, the "data of step d)" which is analyzed in step e) must be the identities of the target chromosomes which were determined in step d).  Thus, this step e) requires the identities of the chromosomes determined in step d) to be used in determining the number of copies of the first and second target chromosomes, which is reflected in Sequenom's proposed construction.

128.    I disagree with Stanford/Verinata's proposed construction because it does not make clear that the number of copies must be an integer number of copies.  I also disagree with the Stanford/Verinata construction because the phrase "as represented by the results of the identifying step d)" is vague and does not help to explain what is meant by this claim element.

---

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                          Case No. 3:11-CV-06391-SI

**G.    "wherein said at least one first target chromosome is presumed to be diploid"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| wherein said at least one first target chromosome is presumed to be diploid | wherein an affirmative presumption is made that the at least one first target chromosome, which cannot include the second chromosome suspected to be aneuploid, is of normal copy number | Wherein said at least one first target chromosome is presumed to be of normal copy number. |

129.    A person of ordinary skill in the art would have understood that the phrase "wherein said at least one first target chromosome is presumed to be diploid" means that a presumption must be made that the first target chromosome is diploid, which means it has the normal number of copies, *i.e.*, two.  It is my opinion that a person of ordinary skill in the art would have understood the presumption of being diploid from the language of the claim term itself: "presumed to be diploid."

130.    The descriptions in the specification of the '017 Patent support Sequenom's proposed construction.  For example, the specification states:

- In another aspect, ***the present invention*** comprises materials selected and combined for carrying out the present methods. Thus is provided a kit for differential detection of target sequences in maternal and fetal DNA in a mixed DNA sample, comprising ***primers specific for a genetically abnormal sequence and a control sequence, such as two chromosomes, one of which is possibly aneuploid and one of which is presumed diploid*** . . . . ('017 Patent at 6:38-45 (emphasis added).)

131.    The '017 Patent specification makes clear that the "control sequence" is a "chromosome . . . which is presumed to be diploid."

132.    The '017 specification further makes clear that the "control" used is always a diploid or euploid chromosome of normal copy number, which is compared to the suspected aneuploid chromosome:  For example the specification states that:

- Thus, the present method comprises generally the following steps . . . 4. Quantitative analysis of the detection of the maternal and fetal target sequences. In some cases this may include targets to different regions, such as probes to a target on a chromosome suspected of being present in an abnormal copy number

46

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

(trisomy) [sic] *compared to a normal diploid chromosome, which is used as a control*. ('017 Patent at 8:31-9:6 (emphasis added).)

- If chromosome A is *euploid and represents an internal control*, and chromosome B is *aneuploid and is the target to be measured*, then one can amplify representative segments from both chromosomes via digital PCR. ('017 Patent at 21:18-22 (emphasis added).)

- In this protocol, the number of positive reaction samples is used, disregarding increased intensity from three versus two chromosomes in a reaction sample. That is, as described above, trisomy can be detected either by looking for an increased signal from a single well having multiple chromosomal DNA copies, or by diluting a sample and *counting the frequency of responses of the trisomic marker versus a control diploid marker*. ('017 Patent at 23:8-15 (emphasis added).)

133.    The "control" is *only* made up of "a normal diploid chromosome" – not the "chromosome suspected of being present in an abnormal copy number."

134.    This is explicitly stated in an example in the specification concerning the detection of chromosome 21, where the control is "chromosome 12 or any other chromosomes **except** Chromosome 21":

- An additional set of primers and probes can be designed to increase signal from *the control (these primers can be for chromosome 12 or any other chromosomes except Chromosome 21)* ('017 Patent at 24:46-49 (emphasis added).)

135.    In my opinion, a person of ordinary skill in the art would have understood that in the context of the '017 Patent, a chromosome that is "presumed to be diploid" cannot at the same time be a chromosome that is "suspected to be aneuploid."  In my opinion, the '017 Patent makes clear that these are mutually exclusive terms because something cannot be both "presumed to be diploid" and "suspected to be aneuploid" at the same time.

136.    This means, for example, that if the method of Claim 17 is being used, say, to detect trisomy 21 in which the fetus has an extra copy of chromosome 21, then chromosome 21 is "suspected to be aneuploid" and cannot be "presumed to be diploid."

137.    This claim limitation is important because it describes a particular way that the analysis step is conducted in the claimed method.

138.    It is my opinion that Sequenom's proposed construction accurately captures the meaning of this claim term, and that Stanford/Verinata's construction does not.

47

KAYE SCHOLER LLP

KAYE SCHOLER LLP

### H. "wherein said second chromosome is suspected to be aneuploid"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| wherein said second chromosome is suspected to be aneuploid | wherein there is an affirmative suspicion that the second target chromosome is of abnormal copy number | Wherein said second chromosome is suspected to be of abnormal copy number. |

139.    A person of ordinary skill in the art would have understood that "wherein said second chromosome is suspected to be aneuploid" is referring to the chromosome to be tested for abnormal copy number.  The language of the claim element is "suspected to be aneuploid" which a person of ordinary skill in the art would have read to mean there must be an "affirmative suspicion" that the second chromosome is aneuploid.  For example, conducting a test for, say, chromosome 21, means that there is an affirmative suspicion that the "said second chromosome" – which in this example is chromosome 21 – is aneuploid.  The sections of the specification cited above under the discussion of "presumed to diploid" also support Sequenom's proposed construction of "suspected to be aneuploid."

140.    In my opinion, although the Sequenom and Stanford/Verinata proposed constructions are similar, Sequenom's is preferable because it properly reflects the understanding of a person of ordinary skill in the art that there must have been an affirmative suspicion of a chromosome with abnormal copy number.

### I. "a statistical analysis that compares the number of copies of said at least one first target chromosome to the number of copies of said second target chromosome"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| a statistical analysis that compares the number of copies of said at least one first target chromosome to the number of copies of said second target chromosome | statistical analysis which compares the integer number of copies of at least one first target chromosome to the integer number of copies of said second target chromosome | Statistical analysis that compares the number of copies of at least one first chromosome to the number of copies of a second chromosome, as represented by the results of the |

48

| | | identifying step d) |
|---|---|---|

141.    Sequenom's proposed construction here simply makes clear that the "number of copies" that is compared in the statistical analysis is the integer number of copies of the first and second target chromosomes.  A person of ordinary skill in the art would have understood that this proposed construction follows directly from the claim language, and is also based on the support cited in the discussion on "number of copies" above.  I disagree with Stanford/Verinata's proposed claim construction because it does not specify the requirement for an "integer" number of copies, and also because it includes the wording "as represented by the results of the identifying step d)," which is vague and does not clarify or explain the meaning of this claim element.

**J.    "determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f)"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f) | making an affirmative determination that the fetus does or does not have a fetal aneuploidy from the comparison of the integer number of copies of the first target chromosome with the integer number of copies of the second target chromosome in step f) | no construction necessary |

142.    A person of ordinary skill in the art would have understood that based on the claim language and the description in the specification, "determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f)" requires an affirmative determination that the fetus does or does not have aneuploidy.  Moreover, as explained above under the statistical analysis element, the analysis – and hence the determination of the presence

49

KAYE SCHOLER LLP

or absence of a fetal aneuploidy – must be based on the comparison of the integer numbers of copies of the first and second target chromosomes.

**K.** **"solid phase amplification of the attached fragments to create a high density sequencing flow cell"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| solid phase amplification of the attached fragments to create a high density sequencing flow cell | solid phase polymerase-based amplification of the attached fragments to create a high density sequencing flow cell | Amplification (e.g., by polymerase chain reaction) of DNA fragments attached to the surface of a container through or over which reagents can be flowed (e.g., as in the Illumina sequencing platform). |

143.    A person of ordinary skill in the art would understand that the amplification discussed would be polymerase-based amplification.  Apart from this clarification, I do not believe the phrase separately needs to be construed by the Court because a person of ordinary skill in the art would have understood what this phrase means.

144.    I disagree with Stanford/Verinata's proposed construction because it specifically references the "Illumina sequencing platform."   However, this is not described in the '017 specification.  In addition, in February 2006, the priority date claimed by Stanford/Verinata, there was no "Illumina sequencing platform," and the Solexa sequencing platform was not then commercially available, as I have already described above in paragraphs 43 and 115.

145.    It is also my opinion that the '017 Patent specification does not reasonably convey to a person of ordinary skill in the art that the named inventors, Drs. Quake and Fan, were in possession of a method of determining a fetal aneuploidy as claimed in Claim 17 using "solid phase amplification of the attached fragments to create a high density sequencing flow cell."  It is also my opinion that the '017 Patent specification would not have enabled a person of ordinary skill in the art to practice a method of determining a fetal aneuploidy as claimed in Claim 17

50

KAYE SCHOLER LLP

using "solid phase amplification of the attached fragments to create a high density sequencing flow cell."

## VIII.   DISPUTED CLAIM TERMS IN THE '018 PATENT

146.   In this section, I set out my opinions of how a person of ordinary skill in the art would have understood the disputed terms in the claims of the '018 Patent.

### A.   "Massively parallel DNA sequencing of DNA fragments randomly selected"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| Massively parallel DNA sequencing of DNA fragments randomly selected | random, not targeted massively parallel DNA sequencing | no construction necessary |
| massively parallel DNA sequencing | random, not targeted, massively parallel DNA sequencing | Any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments n parallel (*e.g.*, the Illumina sequencing platform). |

147.   A person of ordinary skill in the art would have understood that "massively parallel DNA sequencing of DNA fragments randomly selected" in the '018 Patent means "random, not targeted, massively parallel DNA sequencing."

148.   In particular, the wording of this claim and this particular claim element differ from Claim 17 and the corresponding element in the '017 Patent, and, therefore, a person of ordinary skill in the art of the '017 and '018 Patents would have expected the meaning of this claim element to differ.

149.   The contrasting wording of  Claim 17 of the '017 Patent and Claim 1 of the '018 patent is shown in the following comparison:

| Claim 17 of '017 Patent | Claim 1 of '018 Patent |
|---|---|
| 17. A method for determination of the presence or absence of a fetal | 1.  A method for determining presence or absence of fetal aneuploidy in a |

51

| Claim 17 of '017 Patent | Claim 1 of '018 Patent |
|---|---|
| aneuploidy in a maternal tissue sample comprising fetal and maternal genomic DNA, wherein the method comprises: | maternal tissue sample comprising fetal and maternal genomic DNA, wherein the method comprises: |
| a) obtaining a mixture of fetal and maternal genomic DNA from said maternal tissue sample; | a.  obtaining a mixture of fetal and maternal genomic DNA from said maternal tissue sample; |
| b) **distributing random fragments** from the mixture of fetal and maternal genomic DNA of step a **to provide reaction samples containing a single genomic DNA molecule or amplification products of a single genomic DNA molecule**; | |
| c) conducting massively parallel DNA sequencing of **the random fragments of genomic DNA in the reaction samples** of step b) to determine the sequence of said random fragments | b.  conducting massively parallel DNA sequencing of **DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA** of step a) to determine the sequence of said DNA fragments |
| d) identifying **the chromosomes** to which the sequences obtained in step c) belong; | c.  identifying **chromosomes** to which the sequences obtained in step b) belong; |
| e) analyzing the data of step d) to determine i) the number of copies of **at least one first target chromosome** in said mixture of fetal and maternal genomic DNA, wherein said at least one first target chromosome is presumed to be diploid in both the mother and the fetus, and ii) the number of copies of **a second target chromosome** in said mixture of fetal and maternal genomic DNA, wherein said second chromosome is suspected to be aneuploid in the fetus; | d. using the data of step c) to compare an amount of **at least one first chromosome** in said mixture of maternal and fetal genomic DNA to an amount of **at least one second chromosome** in said mixture of maternal and fetal genomic DNA, wherein said at least one first chromosome is presumed to be euploid in the fetus, wherein said at least one second chromosome is suspected to be aneuploid in the fetus, thereby determining the presence or absence of said fetal aneuploidy. |
| f) conducting a statistical analysis that compares the number of copies of said **at least one first target chromosome** | |

52

KAYE SCHOLER LLP

| Claim 17 of '017 Patent | Claim 1 of '018 Patent |
|---|---|
| to the number of copies of said **second target chromosome**; and | |
| g) determining the presence or absence of a fetal aneuploidy from the results of the statistical analysis of step f). | |

150.    The fragments of maternal and fetal DNA in the maternal tissue sample are random fragments of the mother's and fetus' genomic DNA.  That is, the genomic DNA is naturally broken up into random fragments.

151.    As discussed above for the '017 Patent, from the point of view of a person of ordinary skill in the art, the sequencing in Claim 17 is target specific sequencing, that looks for the target sequence of the random fragments of genomic DNA in the reaction samples.

152.    In contrast, in Claim 1 of the '018 Patent, the DNA fragments to be sequenced are "randomly selected" from the genomic DNA mixture.

153.    In addition, step d. of Claim 1 of the '018 Patent refers to "at least one first chromosome" and "at least one second chromosome," in contrast to the wording of step e) of Claim 17 of the '017 patent which refers to "at least one first **target** chromosome" and "a second **target** chromosome."  Thus, in my opinion, Claim 17 of the '017 Patent is expressly directed towards targeted sequencing, in contrast to Claim 1 of the '018 Patent which is directed to random sequencing.

154.    The statistical analysis of step f) of the '017 Patent refers to comparing "the number of copies of said at least one **first target chromosome** to the number of copies of said second **target chromosome**," again referring to **target** chromosomes.

155.    I also note that in step d) of Claim 17, the claim wording is "identifying **the** chromosomes," whereas the corresponding limitation of Claim 1 of the '018 Patent merely refers to "identifying chromosomes."  A person of ordinary skill in the art would have understood "**the**" chromosomes identified in step d) of Claim 17 to be the target chromosomes referred to in steps e) and f) because no other chromosomes are mentioned in Claim 17.  In contrast, because Claim 1

53

KAYE SCHOLER LLP

of the '018 Patent appears to be directed to random sequencing, it makes sense in step c simply to refer to "identify chromosomes," that is, *any* chromosomes, rather than "identifying the chromosomes."

156.    I further note that the titles of the '017 and the '018 Patents differ.  The '017 Patent is entitled "Non-invasive fetal genetic screening by digital analysis."  In contrast, the '018 Patent is entitled "Determination of fetal aneuploidies by massively parallel DNA sequencing." The specification describes "digital analysis" as follows: "the method employs digital analysis in which the DNA in the sample is isolated to a nominal single ***target*** molecule in a small reaction volume." (*See* '017 Patent at 7:36-59.)

157.    For at least these reasons, based principally on the differences in claim language, it is my opinion that a person of ordinary skill in the art would have understood the sequencing method being claimed in Claim 17 of the '017 Patent to be target specific sequencing, and the sequencing method being claimed in Claim 1 of the '018 Patent to be random sequencing respectively.

158.    As explained above, in my opinion, the Claims of the '018 Patent are directed to the method of random sequencing.  However, the disclosure of the '018 Patent, would not have led a person of ordinary skill in the art to believe that the named inventors of the '018 Patent, Drs. Quake and Fan, were in possession of a method of random sequencing as claimed in Claims 1-4 of the '018 Patent.  In other words, although the claims themselves are directed to random sequencing, the disclosure of the specification of the '018 Patent completely fails to describe a method of random sequencing for aneuploidy detection and how to perform such an approach.  I am informed and understand that legally this means that the '018 Patent lacks written description support and is not enabled for the full scope of the claims.

159.    I have also read and considered the Declaration of Stacy Bolt Gabriel, Ph.D., submitted in the prosecution of U.S. Patent Application No. 13/070,275 which addresses the disclosure of the '018 Patent.  I agree with the opinions of Dr. Gabriel and her reasons set forth in her declaration.

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

160.    As with the corresponding limitation in Claim 17 of the '017 Patent, I disagree with Stanford/Verinata's proposed claim construction in Claim 1 of the '018 Patent for several reasons.  First, their proposed construction expressly covers "any sequencing method that allows for the acquisition of sequence information from multiple DNA fragments in parallel."  This is a very broad definition of "sequencing."  As I discussed above, this is a very broad definition of "sequencing."  Even Sanger sequencing with gel electrophoresis "allows for the acquisition of sequence information from multiple DNA fragments in parallel."  *See*, for example, Metzker, Emerging technologies in DNA sequencing. Genome Res., 15:1767-1776 (2005) (Metzker 2005) showing the acquisition of sequence information from multiple DNA fragments in parallel.  But the claim expressly calls for "**massively** parallel DNA sequencing."  The Stanford/Verinata proposed construction ignores the word "massively," which is a descriptive word well understood in the field to mean a non-Sanger method.

161.    Second, Stanford/Verinata's proposed claim construction contains the phrase "e.g., the Illumina sequencing platform."  However, this proposed construction is vague.  It is not clear what "Illumina sequencing platform" is being referred to, and importantly, as I described above, Illumina did not sell or make available any sequencing platform in February 2006, which is the asserted priority date of the '018 Patent.

162.    I also note that the '018 specification refers to "See, products offered by Illumina, Inc., San Diego Calif." ('018 Patent at 19:67.)  But in February 2006, the asserted priority date of the '018 patent, the Solexa sequencing technology and products were not available from Illumina.  For example, it is my understanding that Solexa announced shipping its first sequencing systems on July 11, 2006.  *See* Solexa 2006 GenomeWeb Article.  Moreover, Illumina announced signing a definitive agreement to acquire Solexa on November 13, 2006.  *See* Illumina 2006 Press Release.  It is therefore completely unimaginable how a person of ordinary skill in the art would have understood the term "Illumina sequencing platform" when one did not exist in February 2006.  It would also not have been entirely clear to the person of sill in the art what this term meant in February 2007.

B.    "identifying chromosomes"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| identifying chromosomes | aligning sequences obtained from random massively parallel DNA sequencing to a reference genome | no construction necessary |

163.    A person of ordinary skill in the art would have understood that, based on the language of Claim 1 and the disclosure of the specification, "identifying chromosomes" means "aligning sequences obtained from random massively parallel DNA sequencing to a reference genome."  In my opinion, the Sequenom construction is correct because aligning sequences or sequence reads to a reference genome is how a random massively parallel sequencing process would "identify[] chromosomes" based on the sequencing data.

164.    As explained above, in my opinion, the Claims of the '018 Patent are directed to the method of random sequencing.  However, the disclosure of the '018 Patent, would not have led a person of ordinary skill in the art to believe that the named inventors of the '018 Patent, Drs. Quake and Fan, were in possession of a method of identifying chromosomes by aligning sequences to a reference genome.  The disclosure of the specification of the '018 Patent completely fails to describe a method of alignment to the reference human genome.  All that the specification discloses is that:

> Sequencing may be combined with amplification-based methods in a microfluidic chip having reaction chambers for both PCR and microscopic template-based sequencing. Only about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome. Longer sequences can uniquely identify more particular **targets**. An algorithm for designing unique sequences is described in Yamada, et al. "PrimerStation: a highly specific multiplex genomic PCR primer design server for the human genome," Nucleic Acids Res., Jul. 1, 2006; 34 (Web Server issue): W665-W669, illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence. See, also Zhu et al., "Single molecule profiling of alternative pre-mRNA splicing," Science. 2003 Aug. 8; 301(5634):836-838, describing a single-molecule-based technology for studying mRNA. ('018 Patent at 20: 4-20, emphasis added.)

165.    This paragraph in the '018 Patent briefly discusses sequencing in the context of combining sequencing with amplification-based methods, which again conveys the use of

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

sequencing to detect the presence or absence of a **target** sequence.  The statement "only about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome" in my opinion would not have taught a person of ordinary skill in the art how to align random reads to a reference genome.  Rather, in light of the rest of the disclosure of the '018 Patent, one of ordinary skill in the art would have understood this statement to refer to the minimum base-pair (*i.e.*, bp) size of a unique target sequence against an entire genome of a given size.

166.    The cited Yamada reference, Yamada et al., *PrimerStation: a highly multiplex genomic PCR primer design serve for the human genome*. Nucleic Acids Res 34 (Web Server issue):W665 (2006) ("Yamada"), is not related to massively parallel sequencing at all.  Instead, Yamada discloses PrimerStation, a "web service that calculates primer sets guaranteeing high specificity against the entire human genome" (Yamada, Abstract).  PrimerStation is a resource for scientists wishing to generate specific primers for target sequences in the human genome.  PrimerStation is designed for situations where one has specific target sequences in mind.  In my opinion, the ability to generate highly specific primer sequence sets would be of no use where one is using sequence reads from a set of random DNA fragments to identify the chromosomes to which the random DNA fragments belong.  Further, Yamada is directed to developing multiplex primers for a PCR reaction.  In massively parallel sequencing, amplification is generally carried out by ligating on common adaptors to the ends of randomly fragmented genomic DNA or cDNA which is derived from mRNA, and therefore does not require the use of specific multiplex primer sets.  Thus, Yamada is consistent with the focus of the disclosure of the '018 Patent (but not the language of Claim 1 of the '018 Patent) for detecting specific target sequences.  It is my opinion that Yamada provides a means for determining whether a specific target sequence is present or absent in a nucleic acid sample.  However, Yamada does not support the use of a massively parallel sequencing of random DNA fragments to generate sequence reads for alignment to a reference genome.

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

167.    The cited Zhu reference, Zhu et al., *Single molecule profiling of alternative pre-mRNA splicing*. Science 301:836-838 (2003) ("Zhu"), similarly fails to provide support for massively parallel DNA sequencing of random DNA fragments.  Zhu describes a single-molecule-based technology for studying mRNA.  Zhu is directed to the use of polony technology where single molecules are amplified, and addresses alternative splicing in transcripts and using fluorescent probes to explore the combination of different exons.  Zhu does not discuss performing massively parallel DNA sequencing on random DNA fragments to generate sequence reads.  Therefore, the paragraph of the '018 Patent cited above is insufficient to convey to one of ordinary skill in the art that Quake and Fan had possession of the sequencing step of Claims 1-4 of the '018 Patent.

C.    **"compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture | compare an amount of at least one first chromosome to an amount of at least one second chromosome, all chromosomes being within one maternal tissue sample | no construction necessary |

168.    A person of ordinary skill in the art would have understood, based on the language of Claim 1, that comparing "an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture" is done within one maternal tissue sample.

169.    This is because, as the claim states, the comparison is of the amounts of the first chromosome and the second chromosome "in said mixture."  The "mixture" referred to is the "mixture of fetal and maternal genomic DNA from said maternal tissue sample" obtained in step a.  There is no suggestion in Claim 1 that there is any more than **one** mixture per maternal

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                        Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

tissue sample.  Hence, in my opinion, the person of skill in the art would have understood the claim requires comparing the amounts of chromosomes within one maternal tissue sample.

**D.** **"wherein said at least one first chromosome is presumed to be euploid"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| wherein said at least one first chromosome is presumed to be euploid | wherein an affirmative presumption is made that at least one first chromosome, which cannot include the at least one second chromosome suspected to be aneuploid, is of normal copy number | Wherein said first chromosome is presumed to be of normal copy number |

170.    A person of ordinary skill in the art would have understood that "wherein said at least one first chromosome is presumed to be euploid" means "wherein an affirmative presumption is made that at least one first chromosome, which cannot include the at least one second chromosome suspected to be aneuploid, is of normal copy number."

171.    The reasons why it is my opinion that this is the appropriate construction are essentially the same as for the phrase "presumed to be diploid" in Claim 17 of the '017 Patent. Therefore, I rely upon the corresponding sections of the '018 Patent as previously identified in the '017 Patent relating to this element.

172.    In the context of the '018 Patent, the focus of which is detecting fetal aneuploidy, a person of ordinary skill in the art would have understood that a chromosome that is "presumed to be euploid," *i.e.*, have a normal copy number, cannot at the same time be a chromosome that is "suspected to be aneuploid," *i.e.*, have an abnormal copy number.

173.    I note that Verinata agrees that the phrase means "wherein said first chromosome is presumed to be of **normal copy number**."

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### E.   "wherein said at least one second chromosome is suspected to be aneuploid"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| wherein said at least one second chromosome is suspected to be aneuploid | wherein there is an affirmative suspicion that at least one second chromosome is of abnormal copy number | Wherein said second chromosome is suspected to be of abnormal copy number |

174.    A person of ordinary skill in the art would have understood that "wherein said at least one second chromosome is suspected to be aneuploid" means "wherein there is an affirmative suspicion that at least one second chromosome is of abnormal copy number."

175.    Sequenom's and Stanford/Verinata's proposed constructions are similar but not identical.  In my opinion, Sequenom's proposed construction is correct because a person of ordinary skill in the art would have understood the meaning of "suspected" to require an affirmative suspicion, that is, an actual suspicion, which is reflected in Sequenom's proposed construction, but not Stanford/Verinata's proposed construction.

### F.   "solid phase amplification of the attached DNA fragments to create a high density sequencing flow cell "

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| solid phase amplification of the attached DNA fragments to create a high density sequencing flow cell | No construction needed - ordinary and customary meaning<br><br>or alternatively<br><br>solid phase polymerase-based amplification of the attached fragments to create a high density sequencing flow cell | Amplification (e.g., by polymerase chain reaction) of DNA fragments attached to the surface of a container through or over which reagents can be flowed (e.g., as in the Illumina sequencing platform). |

176.    A person of ordinary skill in the art would have understood that "solid phase amplification of the attached DNA fragments to create a high density sequencing flow cell"

60

means "solid phase polymerase-based amplification of the attached fragments to create a high density sequencing flow cell."

177.    I incorporate here my comments from paragraphs 143-145 above addressing this wording in the context of the '017 Patent.   For the same reasons, I disagree with Stanford/Verinata's proposed construction and, in my opinion, Sequenom's proposed construction is correct.

### G.    "four-color DNA sequencing by synthesis process"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| four-color DNA sequencing by synthesis process | No construction needed - ordinary and customary meaning<br><br>or alternatively<br><br>DNA sequencing by synthesis process using four different dye-labeled dNTPs with photocleavable linkers in which all four dNTPs can be assayed simultaneously | Any DNA sequencing process in which sequence information is ascertained by detecting incorporation of four differently labeled nucleotides into a DNA strand during synthesis (e.g., as in the Illumina sequencing platform.) |

178.    A person of ordinary skill in the art would have understood that "four-color DNA sequencing by synthesis process" does not need construction, or, if it is to be construed, means "DNA sequencing by synthesis process using four different dye-labeled dNTPs with photocleavable linkers in which all four dNTPs can be assayed simultaneously."

179.    I disagree with Stanford/Verinata's proposed construction because it specifically refers to "e.g., as in the Illumina sequencing platform," but this is not described or disclosed in the '018 Patent, and it was not available in February 2006, as I have explained above in paragraphs 43 and 115.

KAYE SCHOLER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IX.   DISPUTED CLAIM TERMS IN THE '415 PATENT

180.    In this section, I address the meaning of certain claim terms in the Claims of the '415 Patent on which I understand the parties disagree.

### A.   "the mixed sample"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| the mixed sample | the mixed sample of normally and abnormally distributed chromosome portions obtained from a subject | a sample of DNA extracted from the plasma of a pregnant woman, consisting of a mixture of maternal and fetal DNA |

181.    A person of ordinary skill in the art would have understood that the term "the mixed sample" as used in the '415 Patent claims means "the mixed sample of normally and abnormally distributed chromosome portions obtained from a subject."  Sequenom's proposed construction comes straight out of the preamble of Claim 1, to which the term "the mixed sample" is unambiguously referring.  The preamble explicitly identifies the mixed sample as "a mixed sample of normally and abnormally distributed chromosome portions obtained from a subject."

182.    Sequenom's construction is also consistent with the use of the term "the mixed sample" in the specification.  For example, the specification states:

> Thus, the present invention comprises, in certain aspects, a method of testing for an abnormal distribution of a specified chromosome portion in *a mixed sample of normally and abnormally distributed chromosome portions obtained from a single subject, such as a mixture of fetal and maternal DNA in a maternal plasma sample*. One carries out sequence determinations on the DNA fragments in the sample, obtaining sequences from multiple chromosome portions of the mixed sample to obtain a number of sequence tags of sufficient length of determined sequence to be assigned to a chromosome location within a genome and of sufficient number to reflect abnormal distribution.  Using a reference sequence, one assigns the sequence tags to their corresponding chromosomes including at least the specified chromosome by comparing the sequence to reference genomic sequence.  Often there will be on the order of millions of short sequence tags that are assigned to certain chromosomes, and importantly, certain positions along the chromosomes.  One then may determine a first number of sequence tags mapped to at least one normally distributed chromosome portion and a second number of sequence tags mapped to the specified chromosome portion, *both chromosomes being in one mixed sample*. ('415 Patent at 4:29-52(emphasis added).)

62

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                    Case No. 3:11-CV-06391-SI

183.    The specification also provides, "that one would prefer to use as *a reference chromosome in the mixed sample* with a mid level of G/C content, as it can be seen that the data there are more tightly grouped." ('415 Patent at 5:53-56 (emphasis added).)

184.    Verinata's proposed construction neglects a significant limitation required by the claim as a whole, namely that the mixed sample must contain normally and abnormally distributed chromosome portions.

**B.     "determine a differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| determine a differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists | determine the difference between the first value and the second value, both values determined from chromosome portions of one sample/subject | determine a value showing or relating to a difference between the first and second value, which is used to determine whether or not the abnormal distribution exists |

185.    A person of ordinary skill in the art would have understood the term "determine a differential, between the first value and the second value, which is determinative of whether or not the abnormal distribution exists" in the '415 Patent to mean "determine the difference between the first value and the second value, both values determined from chromosome portions of one sample/subject."  Sequenom's construction is consistent with the specification.  As set forth above, the specification states:

> Thus, the present invention comprises, in certain aspects, a method of testing for an abnormal distribution of a specified chromosome portion in *a mixed sample of normally and abnormally distributed chromosome portions obtained from a single subject, such as a mixture of fetal and maternal DNA in a maternal plasma sample*. One carries out sequence determinations on the DNA fragments in the sample, obtaining sequences from multiple chromosome portions of the mixed sample to obtain a number of sequence tags of sufficient length of determined sequence to be assigned to a chromosome location within a genome and of sufficient number to reflect abnormal distribution.  Using a reference sequence, one assigns the sequence tags to their corresponding chromosomes including at least the specified chromosome by comparing the sequence to reference genomic sequence.  Often there will be on the order of millions of short sequence tags that are assigned to certain chromosomes, and importantly, certain

63

positions along the chromosomes. ***One then may determine a first number of sequence tags mapped to at least one normally distributed chromosome portion and a second number of sequence tags mapped to the specified chromosome portion, both chromosomes being in one mixed sample***. ('415 Patent at 4:29-52 (emphasis added).)

186.   Another portion of the specification states:

The present method also involves ***calculating a differential between the first number and the second number*** which is determinative of whether or not the abnormal distribution exists. ('415 Patent at 4:64-67.)

187.   The specification also provides, "***that one would prefer to use as a reference chromosome in the mixed sample*** with a mid level of G/C content, as it can be seen that the data there are more tightly grouped." ('415 Patent at 5:53-56 (emphasis added).)

188.   Additionally, the specification states:

This can be done by counting the number of tags falling within each window on a chromosome; obtaining a median value of the total sequence tag count for each chromosome; obtaining a median value of all of the autosomal values, using this value as a normalization constant to account for differences in total number of sequence tags obtained from different samples.  A sequence tag density as calculated in this way would ideally be about 1 for a disomic chromosome.  As further described below, sequence tag densities can vary according to sequencing artifacts, most notably G/C bias; this is corrected as described. ***This method does not require the use of an external standard, but rather, provides an internal reference, derived from al [sic] of the sequence tags (genomic sequences)***, which may be, for example, a single chromosome or a calculated value from all autosomes. ('415 patent at 8:63-9:10 (emphasis added).)

189.   Moreover, Sequenom's proposed construction of "differential" as used in this term is consistent with dictionary definitions for this word.  For example, Merriam-Webster On-line Dictionary defines "differential" as follows:

noun: a difference between comparable individuals or classes <a price *differential*>; *also* **:** the amount of such a difference

190.   Additionally, The Oxford On-line Dictionary defines "differential" as:

noun: a difference between amounts of things: ***the differential between*** gasoline and diesel price

191.   Verinata's proposed construction in inaccurate for failing to link the values of sequence tags mapping to chromosome portions to chromosomes from within the same sample.

64

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                          Case No. 3:11-CV-06391-SI

C.    "a first value and a second value"

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| a first value and a second value | a first value and a second value for mapping to different chromosome portions, all chromosome portions being from one sample/subject | a first value and a second value for numbers of sequence tags mapping to chromosome portions |

192.    A person of ordinary skill in the art would have understood that "a first value and a second value" in the '415 Patent means "a first value and a second value for mapping to different chromosome portions, all chromosome portions being from one sample/subject." Sequenom's construction is consistent with the specification. As set forth above, the specification states:

> Thus, the present invention comprises, in certain aspects, a method of testing for an abnormal distribution of a specified chromosome portion in *a mixed sample of normally and abnormally distributed chromosome portions obtained from a single subject, such as a mixture of fetal and maternal DNA in a maternal plasma sample*. One carries out sequence determinations on the DNA fragments in the sample, obtaining sequences from multiple chromosome portions of the mixed sample to obtain a number of sequence tags of sufficient length of determined sequence to be assigned to a chromosome location within a genome and of sufficient number to reflect abnormal distribution. Using a reference sequence, one assigns the sequence tags to their corresponding chromosomes including at least the specified chromosome by comparing the sequence to reference genomic sequence. Often there will be on the order of millions of short sequence tags that are assigned to certain chromosomes, and importantly, certain positions along the chromosomes. *One then may determine a first number of sequence tags mapped to at least one normally distributed chromosome portion and a second number of sequence tags mapped to the specified chromosome portion, both chromosomes being in one mixed sample*. ('415 Patent at 4:29-52 (emphasis added).)

193.    The specification also provides, "that one would prefer to use as *a reference chromosome in the mixed sample* with a mid level of G/C content, as it can be seen that the data there are more tightly grouped." ('415 Patent at 5:53-56 (emphasis added).)

194.    In addition, the specification states:

> This can be done by counting the number of tags falling within each window on a chromosome; obtaining a median value of the total sequence tag count for each chromosome; obtaining a median value of all of the autosomal values, using this value as a normalization constant to account for differences in total number of sequence tags obtained from different samples. A sequence tag density as

65

KAYE SCHOLER LLP

calculated in this way would ideally be about 1 for a disomic chromosome.  As further described below, sequence tag densities can vary according to sequencing artifacts, most notably G/C bias; this is corrected as described. ***This method does not require the use of an external standard, but rather, provides an internal reference, derived from al [sic] of the sequence tags (genomic sequences)***, which may be, for example, a single chromosome or a calculated value from all autosomes. ('415 patent at 8:63-9:10 (emphasis added).)

195.    Verinata's proposed construction in inaccurate for failing to link the values of sequence tags mapping to chromosome portions to chromosomes from within the same sample.

**D.    "massively parallel sequencing"**

| Terms to be Construed | Agreed Construction |
|---|---|
| massively parallel sequencing | techniques for sequencing millions of fragments of nucleic acids, e.g., using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~ 1,000 copies of template per sq. cm. |

196.    The parties agree that a person of ordinary skill in the art would have understood that the term "massively parallel sequencing" as used in the '415 Patent does not require construction because the definition for this claim term is explicitly provided by the specification. As discussed above, it is my understanding that if the specification describes a definition of a claim term that would otherwise be used differently, the inventor's lexicography governs.  In the "Definitions" section of the '415 Patent, the specification provides:

"Massively parallel sequencing" means techniques for sequencing millions of fragments of nucleic acids, e.g., using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~ 1,000 copies of template per sq. cm. These templates are sequenced using four-color DNA sequencing-by-synthesis technology.  See, products offered by Illumina, Inc., San Diego, Calif.  In the present work, sequences were obtained, as described below with an Illumina/Solexa 1G Genome Analyzer.  The Solexa/Illumina method referred to below relies on the attachment of randomly fragmented genomic DNA to a planar, optically transparent surface.  In the present case, the plasma DNA does not need to be sheared.  Attached DNA fragments are extended and bridge amplified to create an ultra-high density sequencing flow cell with ≥ 50 million clusters, each containing 1,000 copies of the same template.  These templates are sequenced using a robust four-color sequencing-by-synthesis technology that employs reversible terminators with removable fluorescent dyes.  This novel approach ensures high accuracy and true base-by-base sequencing, eliminating sequence-context specific

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                        Case No. 3:11-CV-06391-SI

1    errors and enabling sequencing through homopolymers and repetitive sequences. ('415 patent at 9:19-42.)

2    197.    Other portions of the specification which discuss "massively parallel sequencing"

3    are consistent with the definition provided by the '415 Patent.  For example, the "Background of

4    the Invention" section states that "Recent advances in DNA sequencing technology allow

5    massively parallel sequencing (20), producing tens of millions of short sequence tags in a single

6    run and enabling a deeper sampling than can be achieved by digital PCR." ('415 Patent at 2:16-

7    19.)

8    198.    Another section of the specification provides:

9    Further description of a massively parallel sequencing method, which employed the below
10   referenced 454 is found in Rogers and Ventner, [sic] "Genomics: Massively parallel
     sequencing," Nature, 437, 326-327 (15 Sep. 2005).  As described there, Rothberg and
11   colleagues (Margulies. M. et al. Nature 437, 376-380 (2005)), have developed a highly
     parallel system capable of sequencing 25 million bases in a four-hour period - about 100
12   times faster than the current state-of-the-art Sanger sequencing and capillary-based
     electrophoresis platform.  The method could potentially allow individual to prepare and
13   sequence an entire genome in a few days.  ('415 Patent at 10:6-17.)

14   **E.    "aneuploidy"**

| Terms to be Construed | Agreed Construction |
|---|---|
| Aneuploidy | presence or absence of an entire chromosome, as well as the presence of partial duplications or deletions |

18   199.    The parties agree that a person of ordinary skill in the art would have understood

19   that the term "aneuploidy" as used in the '415 patent is defined by the specification and should be

20   construed to have the meaning provided by the specification.  In the "Definitions" section of the

21   patent, the specification states:

22   "Aneuploidy" is used in a general sense to mean the presence or absence of an entire
     chromosome, as well as the presence of partial chromosome duplications or deletions or
23   kilobase or greater size, as opposed to genetic mutations or polymorphisms where
     sequence differences exist.  ('415 Patent at 9:14-18.)

24   **F.    "GC content"**

| Terms to be Construed | Sequenom's Proposed Construction | Stanford/Verinata's Proposed Construction |
|---|---|---|
| GC content | GC content associated with | any measure of the amount of |

67

DECLARATION OF DR. MICHAEL L. METZKER
REGARDING CLAIM CONSTRUCTION                                   Case No. 3:11-CV-06391-SI

KAYE SCHOLER LLP

| | the sequence tags | a DNA molecule that is either guanine or cytosine. |
|---|---|---|

200.   A person of ordinary skill in the art would have understood that the term "GC content" as used in Claim 14 of the '415 Patent means "GC content associated with the sequence tags." This term does not require construction because its meaning is made clear by the language of Claim 14 alone, which unambiguously associates GC content with sequence tags. (*See* '415 Patent at Claim 14.)

201.   Additionally, Table 2 of the specification, which sets forth results for clinical samples sequenced by applicants in the course of the experimental work relating to the '415 Patent, also associates GC content with the sequence tags. (*See* '415 Patent, cols. 15-16.) The last column of the table, labeled "Overall G/C content of sequence tags (%)" makes clear that applicants were evaluating the GC content associated with the sequence tags generated in the course of their experimental work. (*Id.*) This is further supported by the description of Table 2, which states:

> The G/C content of sequenced tags of all samples (including genomic DNA control) was on average 10% higher than the value of the sequenced human genome (41%) (21) (Table 2), suggesting that there is a strong G/C bias stemming from the sequencing process. ('415 Patent at 17:31-35.)

Thus, given that applicants were evaluating the GC content of the sequence tags, it is reasonable to associate the "GC content" of Claim 14 with the sequence tags as well.

KAYE SCHOLER LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAYE SCHOLER LLP

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on November 21, 2012 in Houston, Texas.

_____*/s/ Michael L. Metzker*_____

Dr. Michael L. Metzker

69

# Michael L. Metzker

## I. *General Biographical Information*

### a. Personal:

| | |
|---|---|
| *Home address:* | 1511 McDuffie Street, Houston, TX 77019 |
| *Date of birth:* | September 20, 1962 |
| *Citizenship:* | United States |

### b. Education:

| | |
|---|---|
| 1984 | University of California — Davis, Davis, CA |
| | B.S. — Biochemistry & Biophysics |
| 1996 | Baylor College of Medicine, Houston, TX |
| | Ph.D. — Molecular & Human Genetics |

### c. Academic Appointments:

| | |
|---|---|
| 2009-to-Present | Associate Professor, Department of Molecular & Human Genetics & Human Genome Sequencing Center, |
| | Baylor College of Medicine, Houston, TX |
| 2009-to-Present | Adjunct Associate Professor, Cell & Molecular Biology, |
| | Baylor College of Medicine, Houston, TX |
| 2009-to-Present | Adjunct Associate Professor, Department of Chemistry, |
| | Rice University, Houston, TX |
| 1999-to-2008 | Assistant Professor, Department of Molecular & Human Genetics & Human Genome Sequencing Center, |
| | Baylor College of Medicine, Houston, TX |
| 2000-to-2008 | Adjunct Assistant Professor, Cell & Molecular Biology, |
| | Baylor College of Medicine, Houston, TX |
| 2001-to-2008 | Adjunct Assistant Professor, Department of Chemistry, |
| | Rice University, Houston, TX |

### d. Other Information:

| | |
|---|---|
| 1983-1984 | Laboratory Technician, Aerojet-General Corporation; Sacramento, CA |
| 1984-1987 | Research Chemist, Bio-Rad Laboratories; Richmond, CA |
| 1987-1991 | Associate Scientist, Applied Biosystems, Inc. (ABI), Foster City, CA |
| 1996-1999 | Senior Research Biologist, Merck Research Laboratories, West Point, PA |
| 1997-1999 | Expert witness for HIV criminal case, Lafayette, LA |
| 2002-to-2012 | Founder, President & CEO, LaserGen, Inc. |
| 2003 | Appeared on *truTV*'s series *Forensics Files* in episode #152, "Shot of Vengeance" |
| 2004 | Expert witness for HIV criminal case, Thurston Co., WA |
| 2007-to-2009 | Expert witness for HIV criminal case, Collins Co., TX |
| 2009 | Appeared on ABC's *20/20* profiling Collin Co. HIV criminal case |
| 2012 | Founder, CTO, LaserGen, Inc. |

**e. Prior Expert Experience**

In the past four years, I have provided expert testimony at trial or deposition in the following cases:

- Applera Corp. - Applied Biosystems Group v. Illumina, Inc., Civil Action No. 07-2845-WHA (N.D. Cal., filed 2007) (on behalf of Applied Biosystems)

- Gene Codes Corp. v. Thomson, C.A. No. 09-14687-RHC-DAS (E.D. Mich., filed 2009) (on behalf of Naomi Thomson)

- Hardin et al. (U.S. 7,329,492) v. Williams (U.S. Patent Application 11/459,182), Patent Interference No. 105,677, (on behalf of Life Technologies)

- State of Texas v. Philippe Padieu, C.A. Nos. 219-82276-07, 219-82277-07, 219-82278-07, 219-82279-07, 219-82280-07, and 219-82705-07 (219th Judicial District Court, Collin County, TX, 2009) (on behalf of the District Attorney's Office, Collin County)

- Ladatech, LLC v. Illumina, Inc. and Solexa, Inc., C.A. No. 09-627 (SLR) (D. Del., filed 2009) (on behalf of Ladatech)

- Illumina, Inc. v. Complete Genomics, Inc., C.A. No. 3:10-cv-05542 EDL (on behalf of Complete Genomics)

- Life Technologies, Inc. v. Illumina, Inc., C.A. No. 11-cv-00703-CAB (on behalf of Life Technologies)

*Research Information*

**a. Research Support**

**1 — Current research support**

| | | |
|---|---|---|
| 2 U54 HG003273-09 (Gibbs) calendar | 11/01/2011 –10/31/2015 | 1.20 |
| NIH/NHGRI | $20,119,270 | |

The Human Genome Sequencing Center

The major goals of this project are to support sequencing and technology development in the areas of human genetics, cancer, the microbiome and comparative genomics.

| | | |
|---|---|---|
| 2U19GM061388-12 (Weinshilboum) calendar | 07/01/10 to 06/30/15 | 1.20 |
| NIH | $425,709 | |

Pharmacogenetics of Phase II Drug Metabolizing Enzymes

This proposal represents a request for continued funding of the Mayo Clinic Pharmacogenomics Research Network (PGRN) grant, "Pharmacogenetics of Phase II Drug Metabolizing Enzymes." The Mayo PGRN is an integrated, multidisciplinary, pharmacogenomic research effort that is based on a decades-long focus at Mayo on the pharmacogenetics of phase II (conjugating) drug metabolizing enzymes. Role: Co-Investigator

| | | |
|---|---|---|
| 2011-DN-BX-K534 (Metzker) calendar | 01/01/12 to 03/31/13 | 3.00 |
| NIJ (National Institute of Justice) | $341,017 | |

Extending the Microbial Forensic Toolkit Through Whole Genome Sequencing and Statistical Phylogenomics

This proposal seeks to expand our existing scientific work on HIV forensic studies by developing a robust 'pathogen toolkit' for source identification across a range of biological agents

*DoD SBIR Program – OSD11-H16*          02/01/11 to 08/31/12          0.90
calendar
(Hertzog and Metzker)                            $40,780
*Office of the Secretary of Defense, Defense Health Program*
Feasibility Study to Explore NGS Technologies in Pathogen Identification
This Phase I SBIR grant application proposes three aims: (*i*) identify the most efficient NGS platform by sequencing *E. coli* MG1655 using six platforms, (*ii*), conduct mixing experiments using purified gram negative and gram positive bacteria using the platform selected in aim (*i*), and (*iii*) conduct mixing experiments described in aim (*ii*) in the presence of human blood to simulate animal wound models.

## 2 — Completed research support:

*Technical description*: The goal is to evaluate the feasibility of our next-generation, cyclic reversible termination (CRT) sequencing approach by targeting 1,000 candidate genes on high-density oligonucleotide chips.
*Funding agency:* NIH: NHGRI
*Investigator relationship:* Michael L. Metzker, PI
*Date of funding:*  08/01/08 to 05/31/11
*Annual costs:*  $230,250            *Total costs:* $422,125
*Grant*:  1R21 HG004757, entitled "Targeted CRT Sequencing of 1000 Genes in KPD Patients"

*Technical description*: The goal is to develop ultrafast sequencing-by-synthesis (SBS) technology that is practical on a genomic scale.
*Funding agency:* NIH: NHGRI
*Investigator relationship:* Michael L. Metzker, PI
*Date of funding:*  10/01/04 to 09/30/08
*Annual costs:*  $468,575            *Total costs:* $2,933,762
*Grant*: 1 R01 HG003573-01 entitled, "Ultrafast SBS Method for large-Scale Human Resequencing"

*Technical description:* Development of a novel portable DNA sequencer for rapid identification of single nucleotide polymorphisms (SNPs) in common disease.
*Funding agency:* NIH: NHGRI
*Investigator relationship:* Michael L. Metzker, PI
*Date of funding:*  06/07/04 to 02/28/06
*Annual costs:*  $421,914            *Total costs:* $532,761
*Grant*: 1 R41 HG003265-01 entitled, "Development of a Portable PME DNA Sequencer"

*Technical description*: Development of novel FluoroBase dyes and associated nucleotide triphosphates, which have the potential to create sets of spectrally resolvable dye-terminators.
*Special note:* Originally awarded to Michael L. Metzker as STTR application:  Grant converted in SBIR

3

*Funding agency:* NIH:NHGRI
*Investigator relationship:* Vladislav A. Litosh, PI; Michael L. Metzker, co-PI
*Date of funding:* 07/11/03 to 12/31/05
*Annual costs:* $213,064          *Total direct costs:* $289,689
*Grant:* 1 R43 HG002632-01A1 entitled, "Synthesis of FluoroBase Nucleotides for DNA Sequencing"

*Technical description:* The major goal of this project is to produce a draft sequence of the rhesus macaque and bovine genomes and extract maximal biological information from these data.
*Funding agency:* NIH: NHGRI
*Investigator relationship:* Richard A. Gibbs; PI, Michael L. Metzker, co-PI
*Date of funding:* 11/10/03 to 10/31/06
*Annual direct costs:* $21,028,110          *Total direct costs:* $89,072,698
*Grant:* 1 U01 HG02051 entitled, "Large Scale Sequencing at BCM-HGSC"

*Technical description:* The goal of this project is to generate a draft sequence of the genome of *Bos Taurus.*
*Funding agency:* USDA
*Investigator relationship:* Richard A. Gibbs, PI; Michael L. Metzker, co-PI
*Date of funding:* 12/01/03 to 11/31/05
*Annual direct costs:* $3,879,953          *Total direct costs:* $7,853,612
*Grant:* TEXR-2003-05478 entitled, "Bovine Genome Sequencing Project (BGSP)"

*Technical description:* Development of a novel multi-color fluorescent detection apparatus with potential application for direct detection of targeted regions from genomic DNA materials.
*Funding agency:* NIH: NHGRI
*Investigator relationship:* Michael L. Metzker, PI
*Date of funding:* 04/01/03 to 03/31/05
*Annual costs:* $150,000          *Total costs:* $250,000
*Grant:* 1 R21 HG002443-01A2, entitled "Development of Fluorescent Detector for DNA Sequencing"

*Technical description:* Development of a novel DNA sequencing strategy by synthesis for application in high-throughput single nucleotide polymorphism (SNP) analysis.
*Funding agency:* NIH: NHGRI
*Investigator relationship:* Michael L. Metzker, PI
*Date of funding:* 09/30/03 to 03/31/05
*Annual costs:* $310,504          *Total costs:* $436,400
*Grant:* 1 R41 HG003072-01 entitled, "Screening *Taq* Pol I Variants using 3'-*O*-Modified-dNTPs"

*Technical description:* Pilot project to synthesize and characterize modified nucleoside for potential activity against HIV-1.
*Funding agency:* Robert A. Welch Foundation
*Investigator relationship:* Michael L. Metzker, PI
*Date of funding:* 06/01/01 to 07/31/04
*Annual costs:* $50,000          *Total costs:* $158,000
*Grant:* Q-1518 entitled, "Characterization of HIV-1 drug resistance using 3'-saturated nucleotides"

*Technical description:* Development of sixteen spectrally-resolved dyes for high-throughput nucleic acid detection such as DNA sequencing.

*Special note:* Originally awarded to Michael L. Metzker as STTR application:  Grant converted in SBIR

*Funding agency:* NIH: NHGRI

*Investigator relationship:* Mathew Mahindaratne; PI; Michael L. Metzker, co-PI

*Date of funding:*  07/21/03 to 06/30/05

*Annual direct costs:*  $214,000          *Total direct costs:* $214,000

*Grant:* 1 R43 HG002567-01A2 entitled, "Development of Novel Fluorescent Dyes for DNA Sequencing"

*Technical description*: The major goal of this project is to determine the genome sequence of the rat.

*Funding agency:* NIH: NHGRI/NHLBI

*Investigator relationship:* Richard A. Gibbs, PI; Michael L. Metzker, co-PI

*Date of funding:*  02/27/01 to 02/26/04

*Annual direct costs:*  $10,976,914          *Total direct costs:* $25,950,547

*Grant:* 1 U54 HG02345-02 entitled, "Draft sequence of the rat genome"

*Technical description*: The major goal of this project is to prepare two types of extremely sensitive fluorescent label "cassettes" for DNA sequencing that may be used with both dye primer and dye terminator strategies.

*Funding agency:* NIH: NHGRI

*Investigator relationship:* Kevin Burgess, PI; Michael L. Metzker, co-PI

*Date of funding:*  09/06/01 to 07/31/05

*Annual direct costs:*  $38,296          *Total direct costs:* $114,923

*Grant:* Competing Renewal FDN-S80093 entitled, "Unnatural nucleotides for DNA sequencing"

*Technical description*: To develop and validate novel pooling-based methods for the rapid physical mapping of BAC libraries.

*Funding agency:* NIH: NCRR

*Investigator relationship:* Aleksandar Milosavljevic, PI; Michael L. Metzker, co-PI

*Date of funding:*  09/30/02 to 08/31/05

*Annual direct costs:*  $206,693          *Total direct costs:* $612,721

*Grant:* 1 U01 RR18464-01 entitled, "Clone pooling methods for physical mapping"

*Technical description*: The major goals of this project are extensive mapping and sequencing of the mouse genome.

*Funding agency:* NIH: NHGRI

*Investigator relationship:* Richard A. Gibbs, PI; Michael L. Metzker, co-PI

*Date of funding:*  09/30/99 to 09/30/03

*Annual direct costs:*  $5,316,551          *Total direct costs:* $20,851,198

*Grant:* 1 U54 HG02139 entitled, "Network for large-scale sequencing of the mouse genome"

*Technical description*: To produce a draft sequence of *D. pseudoobscura* with annotation and finishing of selected full-length cDNA and gene-rich regions.

*Funding agency:* NIH: NHGRI

*Investigator relationship:* Richard A. Gibbs, PI; Michael L. Metzker, co-PI

*Date of funding:*  05/10/02 to 04/30/03

*Annual direct costs:*  $3,336,210          *Total direct costs:* $3,336,210

*Grant:* 1 U01HG02570 entitled, "Sequencing, annotation and assembly of a second Drosophila"

**b. National Scientific Participation**

**1 — Editorial/Advisory Boards:**

| | |
|---|---|
| 2003-2006 | *Genome Research*, Cold Spring Harbor Laboratory Press |
| 2006-to-2012 | *Advances in Genome Biology & Technology Meeting*, Scientific advisor |
| 2007-to-present | *Milestones in DNA Technologies*, Nature, Scientific advisor |
| 2011-to-present | Genome Canada: Advancing Technology Innovation through Discovery (ATID) Advisory Committee |

**2 — Review panels:**

| | |
|---|---|
| Aug 2012 | Chair: Team Grant: CEEHRC - LOI committee. |
| Feb 2012 | Chair: Epigenomics platform peer review committee, Canadian Institutes of Health research (CIHR) |
| Feb 2012 | Chair: Epigenetics catalyst peer review committee, CIHR |
| Sep 2011 | Ad hoc member of NIH Instrumentation and Systems Development (ISD) study section |
| Feb 2011 | Science &Technology Innovation Center Competition Review: Genome Canada |
| Nov 2010 | ATID Review: Genome Canada |
| Mar 2010 | IDDRC P30 REVIEW, ZHD1-MRG-C (ID) |
| Oct 2009 | Genomics, Computational Biology and technology study section, NIH |
| Jul 2009 | DP3 Review, ZDK1 GRB-N(01), NIDDK |
| Jan 2009 | Applied Genomics Research in Bioproducts or Crops (ABC), Genome Canada |
| Sep 2008 | NCI Structural Biophysics Laboratory Site Visit, NCI |
| Nov 2007 | Technology Development Competition, Genome Canada |
| 2005-2007 | Permanent member of NIH ISD study section |
| Apr 2007 | Applied Emerging Technologies for Cancer Research, ZCA1 SRRB-4 (M1), NCI |
| Oct 2006 | Applied Emerging Technologies for Cancer Research, ZCA1 SRRB-K (J1), NCI |
| Jun 2006 | Innovative Technologies for the Molecular Analysis of Cancer, ZCA1 SRRB-K (O1), NCI |
| Mar 2006 | Applied Emerging Technologies for Cancer Research, ZCA1 SRRB-9 (M1), NCI |
| Oct 2005 | ISD study section [ZRG1 ISD (01)], NIBIB |
| Oct 2005 | Emerging Technologies for Cancer Research, ZCA1 SRRB-4 (J1), NCI |
| Jul 2005 | ISD study section [ZRG1 ISD (01)], NIBIB |
| Jun 2005 | Innovative Technologies for Cancer Research, ZCA1 SRRB-3 (O1), NCI |
| Mar 2005 | ISD study section [ZRG1 ISD (01)], NIBIB |
| Mar 2005 | Innovative Molecular Analysis Technology, ZCA1 SRRB-C (M2), NCI |
| Nov 2004 | ISD study section, ZRG1 ISD (01), NIBIB |
| Jul 2004 | Innovative Molecular Analysis Technology, ZCA1 SRRB-C (01), NCI |
| Jul 2004 | ISD study section, ZRG1 ISD (01), NIBIB |
| Jun 2004 | Subcommittee E – Cancer Epidemiology, Prevention & Control study section, NCI-E RPRB (X1), NCI |
| Mar 2004 | ISD study section, ZRG1 ISD (01), NIBIB |

| | |
|---|---|
| Dec 2003 | Genome Technology & Cytogenetics (GT&C) study section, ZRG1 GNM (90), NHGRI |
| Oct 2003 | Atopic Dermatitis & Vaccinia Network; Clinical Studies Consortium study section [ZAI1 CL-1 (C1), NIAID |
| Jul 2003 | GT&C study section, ZRG1 GNM (90), NHGRI |
| Nov 2001 | Genome study section, CSR-GNM, NHGRI |
| Jul 2001 | Center for Scientific Review – Special Emphasis Panel (CSR-SEP) study section [ZRG1 SSS-Y], NHGRI |
| Jul 2001 | Bioengineering Research Partnership study section [ZRG1 SSS-Y (02)], NHGRI |
| Apr 2001 | CSR-SEP study section [ZRG1 SSS-Y (11) B], NHGRI |
| Mar 2001 | Microbial Genome Project – study section, DOE |
| Nov 2000 | CSR-SEP SBIR/STTR study section [ZRG1 SSS-Y (10)], NHGRI |
| Mar 2000 | CSR-SEP SBIR/STTR study section [ZRG1 SSS-Y (01)], NHGRI |
| Nov 1999 | CSR-SEP SBIR/STTR study section [ZRG1 SSS-Y (01)], NHGRI |
| Jul 1999 | Technologies for Generation of Full-Length Mammalian cDNA study section [CA99-005], NCI |
| Jul 1999 | CSR-SEP SBIR/STTR study section [ZRG1 SSS-Y (01)], NHGRI |
| Mar 1999 | CSR-SEP SBIR/STTR study section [ZRG1 SSS-Y (01)], NHGRI |
| Mar 1998 | SBIR/STTR Molecular Genetics study section [ZRG2 GNM O2B], NHGRI |
| Mar 1997 | Biological & Physiological SEP study section [ZRG2 SSS-Y (15)], NHGRI |

## 3 — Professional societies:

| | |
|---|---|
| 1996-to-present | American Association for the Advancement of Science |
| 2000-to-present | American Chemical Society |
| 2001-to-present | American Diabetes Association |

## 4 — Invited lectures, presentations, research seminars:

| | |
|---|---|
| Mar 2013 | ABRF- Satellite workshop, Palm Springs, CA; Invited Speaker |
| Jun 2012 | American Society of Microbiology, San Francisco, CA; Invited Speaker |
| Jun 2012 | Copenhagenomics, Copenhagen, Denmark, Invited Speaker |
| Feb 2012 | Advances in Genome Biology & Technology, Marco Island, FL; Speaker |
| Apr 2011 | Next-Gen Sequencing Conference, Boston, MA; Keynote Speaker |
| Apr 2011 | Texas Association for Clinical Laboratory Science (TACLS), Austin, TX; Invited Speaker |
| Oct 2010 | Centre de Regulació Genòmica (CRG) Symposium, Barcelona Spain, Invited Speaker |
| Jun 2010 | ACS Meeting, San Diego, CA; Invited Speaker |
| May 2010 | Next Generation Sequencing Workshop, Lübeck University, Germany; Invited Speaker |
| May 2010 | Genomics Automation Conference, Boston, MA; Invited Speaker |
| Feb 2009 | Advances in Genome Biology & Technology, Marco Island, FL Invited Speaker |
| Jun 2008 | Workshop on Genotyping-Tissue Expression (GTEx) Resource, NIH Invited Participant |
| Oct 2007 | International Conference on Genomics, Shenzhen, China; |

|          | Invited Speaker |
|----------|-----------------|
| Sep 2007 | IBC's Discovery-2-Diagnostics Conference, Philadelphia, PA |
|          | Invited Chair & Speaker |
| Feb 2007 | Advances in Genome Biology & Technology, Marco Island, FL |
|          | Invited Speaker |
| Oct 2006 | International Conference on Genomics, Hangzhou, China |
|          | Invited Speaker |
| Sep 2006 | Genomics of Hyperglycaemia, Elsinore, Denmark |
|          | Invited Speaker |
| Feb 2006 | Advances in Genome Biology & Technology, Marco Island, FL |
|          | Invited Speaker |
| May 2005 | 5th Annual RECOMB Satellite meeting on DNA Sequencing Technologies and Computation, Stanford University; Invited Speaker |
| Feb 2005 | Advances in Genome Biology & Technology, Marco Island, FL |
|          | Invited Speaker |
| Feb 2004 | Advances in Genome Biology & Technology, Marco Island, FL |
|          | Invited Speaker |
| Jun 2003 | BECON 2003 Symposium on Catalyzing Team Science, NIH |
|          | Invited Speaker |
| Jan 2002 | Agriculture Program Research General Session, Texas A&M University |
|          | Invited Speaker |
| Oct 2001 | Genome sequencing and Analysis Conference XIII, San Diego, CA |
|          | Invited Speaker |
| Feb 2001 | Advances in Genome Biology & Technology, Marco Island, FL |
|          | Invited Speaker |
| May 2000 | Second Follow-Up Workshop on Priority Setting for Mouse Genomics and Genetics Resources, NIH; Invited Participant |
| Mar 1998 | Full-Length cDNA Cloning: A Workshop on Problems and Solutions, The Banbury Center, Cold Spring Harbor; Invited Participant |
| May 1997 | Workshop on Complete cDNA Sequencing, NIH; Invited Participant |

## c. Publications
### 1 — Full papers:

1. Burgess, K, Gibbs, RA, **Metzker, ML**, and Raghavachari, R (1994) Synthesis of an Oxyamide Linked Nucleotide Dimer and Incorporation into Antisense Oligonucleotide Sequences, *J. Chem. Soc., Chem Commun.*, 915-916.

2. **Metzker, ML**, Raghavachari, R, Richards, S, Civitello, A, Burgess, K, and Gibbs, RA (1994) Termination of DNA synthesis by novel 3'-modified-deoxyribonucleoside 5'-triphosphates, *Nucleic Acids Res.* 22, 4259-4267.

3. **Metzker, ML**, Allain, KM, and Gibbs, RA (1995) Accurate determination of DNA in agarose gels using the novel algorithm *GelScann(1.0)*, *Comput. Applic. Biosci.* 11, 187-194.

4. **Metzker, ML**, Lu, J and Gibbs, RA (1996) Electrophoretically Uniform Fluorescent Dyes for Automated DNA Sequencing, *Science* 271: 1420-1422.

5. Ansari-Lari, MA, Liu, XM, **Metzker, ML**, Rut, AR and Gibbs, RA (1997) The extent of genetic variation in the CCR5 gene. *Nature Genetics* 16: 221-222.

6. Petrukhin, K, Koisti, MJ, Bakall, B, Li, W, Xie, G, Marknell, T, Sandgren, O, Forsman, K, Holmgren, G, Andreasson, S, Vujic, M, Bergen, AAB, McGarty-Dugan, V, Figueroa, D, Austin,

8

CP, **Metzker, ML,** Caskey, CT, and Wadelius, C (1998) Identification of the gene responsible for Best macular dystrophy. ***Nature Genetics*** 19:241-247.

7. **Metzker, ML,** Ansari-Lari, MA, Liu, XL, Holder, DJ, and Gibbs, RA (1998) Quantitation of Mixed-Base Populations of HIV-1 Variants by Automated DNA Sequencing with BODIPY Dye-Labeled Primers. ***BioTechniques*** 25:446-462.

8. Hey, PJ, Twells, RCJ, Phillips, MS, Nakagawa, Y, Brown, SD, Kawaguchi, Y, Cox, R, Xie, G, Dugan, V, Hammond, H, **Metzker, ML,** Todd, JA, and Hess, JF (1998) Cloning of a novel member of the low-density lipoprotein receptor family. ***Gene*** 216:103-111.

9. Brown, SD, Twells, RCJ, Hey, PJ, Cox, RD, Levy, ER, Soderman, AR, **Metzker, ML,** Caskey, CT, Todd, JA, and Hess, JF (1998) Isolation and characterization of *LRP6*, a novel member of the low density lipoprotein receptor gene family. ***Biochem. Biophys. Res. Commun.*** 248:879-888.

10. **Metzker, ML**, Raghavachari, R, Burgess, K, and Gibbs, RA (1998) Elimination of residual natural nucleotides from 3'-*O*-modified-dNTP syntheses by enzymatic Mop-Up. ***BioTechniques*** 25:814-817.

11. Muzny, DM, **Metzker, ML,** Bouck, J, Gorrell, JH, Ding, Y, Maxim, E, and Gibbs, RA (1998) Using BODIPY Dye-Primer Chemistry in Large-Scale Sequencing. ***IEEE Engineering in Medicine and Biology*** 88-93.

12. Allikmets, R, Seddon, JM, Bernstein, PS, Hutchinson, A, Sharma, S, Gerrard, B, Li, W, **Metzker, ML**, Wadelius, C, Caskey, CT, Dean M, and Petrukhin K (1999) Rare variants of the best disease gene in patients with age-related macular degeneration and other maculopathies. ***Hum. Genet.*** 104: 449-453.

13. Bai, C, Connolly, B, Liu, X, Hilliard, CA, Galloway, SM, Sandig, V, Liu, Q, **Metzker, ML**, Austin, CP, and Caskey, CT (2000). Overexpression of a new secreted member of tumor necrosis factor receptor family in gastrointestinal tract tumors. ***Proc. Natl. Acad. Sci. USA*** 97:1230-1235.

14. Sandig V, Youil R, Bett AJ, Franlin LL, Oshima M, Maione D, Wang F, **Metzker** ML, Savino R, Caskey CT (2000) Optimization of the helper-dependent adenovirus system for production and potency *in vivo*. ***Proc. Natl. Acad. Sci. USA.*** 97:1002-1007.

15. Bouck JB, **Metzker** ML, and Gibbs RA (2000) Shotgun sample sequence comparisons between mouse and human genomes. ***Nat Genet.*** 25:31-3.

16. Zhang K, Kniazeva M, Han M, Li W, Yu Z, Yang Z, Li Y, **Metzker ML**, Allikmets R, Zack DJ, Kakuk LE, Lagali PS, Wong PW, MacDonald IM, Sieving PA, Figueroa DJ, Austin CP, Gould RJ, Ayyagari R, and Petrukhin K (2001) A 5-bp deletion in ELOVL4 is associated with two related forms of autosomal dominant macular dystrophy. ***Nat Genet.*** 27:89-93.

17. International Human Genome Sequencing Consortium: Baylor College of Medicine Human Genome Sequencing Center: Gibbs, RA, Muzny, DM Scherer, SE, Bouck, JB, Sodergren, EJ, Worley, KC, Rives, CM, Gorrell, JH, **Metzker, ML,** Naylor, SL, Kucherlapati, RS, Nelson, DL, and Weinstock, GM (2001) Initial sequencing and analysis of the human genome. ***Nature*** 409:860-921.

18. Twells RC, **Metzker** ML, Brown SD, Cox R, Garey C, Hammond H, Hey PJ, Levy E, Nakagawa Y, Philips MS, Todd JA, and Hess JF.  (2001) The sequence and gene characterization of a 400-kb candidate region for *IDDM4* on chromosome 11q13. ***Genomics*** **72:**231-242.

19. Dederich DA, Okwuonu G, Garner T, Denn A, Sutton A, Escotto M, Martindale A, Delgado O, Muzny DM, Gibbs RA and **Metzker** ML (2002) Glass Bead Purification of Plasmid Template DNA for High-Throughput Sequencing of Mammalian Genomes. ***Nucleic Acids Res.*** 30:e32

20. **Metzker** ML, Mindell DP, Ptak RG, Gibbs RA, and Hillis DM (2002) Molecular Evidence of HIV-1 Transmission in a Louisiana Criminal Case. ***Proc. Natl. Acad. Sci. USA*** 99:14292-14297.

21. Ueda H *et al.* (2003) Association of the T-cell regulatory gene CTLA4 with susceptibility to autoimmune disease. *Nature* 423:506-511.

22. Thoresen LH, Jiao GS, Haaland WC, **Metzker ML**, and Burgess K (2003) Rigid, Conjugated, Fluoresceinated Thymidine Triphosphates: Syntheses and Polymerase Mediated Incorporation Into DNA. *Chem. Eur. J.* 9:4603-4610.

23. Twells RCJ, Mein CA, Phillips MS, Hess JF, Veijola R, Gilbey M, Bright M, **Metzker ML**, Lie BA, Kingsnorth A, Gregory E, Nakagawa Y, Snook H, Wang WYS, Masters J, Johnson G, Eaves I, Howson JMM, Clayton D, Cordell HJ, Nutland S, Rance H, Carr P and Todd JA (2003) Haplotype Structure, LD Blocks, and Uneven Recombination Within the *LRP5* Gene. *Genome Research* 13:845-855.

24. Gibbs RA, Weinstock GM, **Metzker ML** *et al.* (2004) Genome sequence of the Brown Norway rat yields insights into mammalian evolution. *Nature* **428:**493-521.

25. Richards S *et al.* (2005) Comparative genome sequencing of Drosophila pseudoobscura: chromosomal, gene, and cis-element evolution. *Genome Research* 15:1-18.

26. Ross MT *et al.* (2005) The DNA sequence of the human X chromosome. *Nature* 434:325-337.

27. Lewis EK, Haaland WC, Nguyen F, Heller DA, Allen MJ, Macgregor RR, Berger CS, Willingham B, Burns LA, Scott GB, Kittrell C, Johnson BR, Curl RF, **Metzker ML** (2005) Color-blind fluorescence detection for four-color DNA sequencing *Proc. Natl. Acad. Sci. USA* 102:5346-5351.

28. Fernandez R, Zhang Y, Pai S, **Metzker ML**, Schumacher A (2005) *l7Rn6* encodes a novel protein required for Clara cell function in mouse lung development. *Genetics* **172:**389-399.

29. **Metzker ML** (2005) Emerging Technologies in DNA Sequencing. *Genome Res.* **15:**1767-1776.

30. Scherer S *et al.* (2006) The Finished DNA Sequence of Human Chromosome 12. *Nature* 440 346-351.

31. Muzny D *et al.* (2006) The DNA sequence, annotation and analysis of human chromosome 3. *Nature* 440:1194-1198

32. Jiao G-S, Thoresen LH, Kim TG, Haaland WC, Topp MR,> Hochstrasser RM, **Metzker ML**, Burgess K (2006) Syntheses, photophysical properties, and applications of through-bond energy transfer cassettes for multiplexing in biotechnology. *Eur. J. Chem.* 12:7816-7826.

33. Wu W, Stupi BP, Litosh VA, Mansouri D, Farley D, Morris S, Metzker S, **Metzker ML** (2007) Termination of DNA synthesis by $N^6$-alkylated, not 3'-O-alkylated, photocleavable 2'-deoxyadenosine triphosphates. *Nucleic Acids Research* 35:6339-49.

34. **Metzker, ML** (2009) Sequencing in real time. *Nature Biotechnol.* 27:150-151.

35. Haaland WC, Scaduto DI, Maldonado, MR, Mansouri DL, Nalini R, Iyer D, Patel S, Guthikonda A, Hampe CS, Balasubramanyam A, **Metzker ML**. (2009) The "A-β-" subtype of Ketosis-Prone Diabetes (KPD) is not predominantly a monogenic diabetic syndrome. *Diabetes Care* 32:873-877.

36. Church DM et al. (2009) Lineage-specific biology revealed by a finished genome assembly of the mouse. *PLoS Biol.* 5:e1000112

37. Metzker ML (2010) Sequencing technologies — the next generation. *Nature Rev. Genet.* 11:31-46

38. The 1000 Genomes Project Consortium. (2010) A map of human genome variation from population-scale sequencing. *Nature* 467:1061-73.

39. Scaduto DI, Brown JM, Haaland WC, Zwickl DJ, Hillis DM, **Metzker ML**. (2010) Source identification in two criminal cases using phylogenetic analysis of HIV-1 DNA sequences. *Proc Natl Acad Sci USA* 107:21242-21247.

40. Litosh VA, Wu W, Stupi BP, Wang J, Morris, SE, Hersh MN, **Metzker ML**. (2011) Improved nucleotide selectivity and termination of 3'-OH unblocked reversible terminators by

molecular tuning of 2-nitrobenzyl alkylated HOMedU triphosphates. *Nucleic Acids Res*. 39:e39.

41. Leitner, T. **Metzker ML**, et al., (2011) Guideline for HIV in court. *Nature* 473:284

42. Hertzog D, Hersh MN, **Metzker ML**. (2011) A high-performance, low-cost approach to next-generation sequencing. *BioOptics World*, Nov-Dec Issue.

43. Stupi BP, Li H, Wang J, Wu W, Morris SE, Litosh VA, Muniz J, Hersh MN, Metzker ML. (2012) Stereochemistry of benzylic carbon substitution coupled with ring modification of 2-nitrobenzyl groups as key determinants for fast-cleaving reversible terminators. *Angew. Chem. Int. Ed.*, 51: 1724-1727.

44. Gardner AF, Wang J, Wu W, Karouby J, Li H, Stupi BS, Jack WE, Hersh MN, Metzker ML (2012) Improved fidelity and rapid incorporation kinetics of 3'-OH unblocked reversible terminators by Therminator DNA polymerase. *Nucleic Acids Res*., 40:7404-7415.

## 2 — Other full papers:

1. Hersh MN et al. (2012) *Manuscript In preparation.*

## 3 — Abstracts:

N/A

## 4 — Book Chapters:

1. Caskey CT, Liu O, **Metzker ML**, Gerhold D, and Austin CP (1998) Functional Analysis of Human Genes. GENOMICS, Commercial Opportunities from a Scientific Revolution, p. 55-68. *In* GK Dixon, LG Copping, and D Livingstone (Eds.). Bios Scientific Publishers Ltd., Oxford.

2. **Metzker ML** and Caskey CT (2001) Polymerase chain reaction. In *Encyclopedia of Life Sciences*. Macmillan References Ltd., London.

3. **Metzker ML** and Caskey CT (2005) Polymerase chain reaction. In *Medical Devices and Instrumentation* by JG Webster (Ed.), John Wiley & Sons, Inc., Hoboken, New Jersey.

4. **Metzker ML** (2006) Emerging Technologies in DNA Sequencing. In *Genomes, Cold Spring Harbor Monograph Series* by HE Sussman and MA Smit (Eds.), Cold Spring Harbor Laboratory Press, Cold Spring Harbor,NY.

5. **Metzker ML** (2007) Advances in next-generation DNA sequencing technologies. In *Comparative Genomics: Basic and Applied Research* by JR Brown (Ed.), Taylor & Francis, Boca Raton, FL.

6. **Metzker ML** and Caskey CT (2009) Polymerase chain reaction. In *Encyclopedia of Life Sciences*. Macmillan References Ltd., London.

## 5— Poster:

1. **Metzker ML** (2008) Sequencing technologies — the next generation. *Nature Reviews Genetics* and *Nature Genetics*, Invited Project — http://www.nature.com/nrg/posters/sequencing/index.html

## d. Patents

1. Cathcart GR, Breena-Marquez T, Bridgham JA, Golda G, Guiremand HA, Hane M, Hoff LB, Lachenmeier E, Kronick MN, Keith DH, Mayrand PE, **Metzker ML**, Mordan WJ, McBride LJ, Shigeura J, Ting CH, and Whiteley NM (1995) US Patent 5,443,791. Automated molecular biology laboratory.

2. **Metzker ML** and Gibbs RA (1997) US Patent 5,614,386. Alternative dye-labeled primers for automated DNA sequencing.

3. **Metzker ML** and Gibbs RA (1998) US Patent 5,728,529. Alternative dye-labeled ribonucleotides, deoxyribonucleotides and dideoxyribonucleotides for automated DNA analysis.

4. **Metzker ML** and Gibbs RA (1999) US Patent 5,861,287. Alternative dye-labeled primers for automated DNA sequencing.

5. **Metzker ML** and Gibbs RA (1999) US Patent 5,994,063. Substituted 4,4 difluoro-4-bora-3A,4A-diaza-s-indacene compounds for homogeneous amplification/ detection assays.

6. Todd JA, Hess JW, Caskey CT, Cox RD, Gerhold D, Hammond H, Hey P, Kawaguchi Y, Merriman TR, **Metzker ML**, Nakagawa Y, Phillips MS, Twells, RCJ (2003) US Patent 6,545,137. Receptor.

7. Todd JA, Hess JW, Caskey CT, Cox RD, Gerhold D, Hammond H, Hey P, Kawaguchi Y, Merriman TR, **Metzker ML**, Nakagawa Y, Phillips MS, Twells, RCJ (2003) US Patent 6,555,654. LDL-receptor.

8. Liu XL, Bai C and **Metzker ML** (2004) US Patent 6,762,042.  DNA molecules encoding human NHL a DNA helicase.

9. **Metzker ML** and Gibbs RA Docket No. WO 97/00967 Alternative dye-labeled primers, ribonucleotides, deoxyribonucleotides and dideoxyribonucleotides dideoxyribonucleotides for automated DNA analysis and homogeneous amplification/ detection assays. Filed June 21, 1996.

10. Scott GBI, Kittrell C, Curl RF, and **Metzker ML** (2006) US Patent 6,995,841.  Pulsed-Multiline Excitation for Color-Blind Fluorescence Detection.

11. Petrukhin, K, caskey, CT, **Metzker, ML**, Wadelius, C (2006) US Patent 7,005,290. Best's Macular Dystrophy gene.

12. Todd, JA, Hess, JW, Caskey, CT, Cox, RD, Gerhold, D, Hammond, H, Hey, P, Kawaguchi, Y, Merriman, TR, **Metzker, ML**, Nakagawa, Y, Phillips, MS, Twells, RCJ (2007) US Patent 7,244,577. Method of screening for modulator of LRP5 activity.

13. Liu XL, Bai C and **Metzker ML** (2008) US Patent 7,361,491.  DNA molecules encoding human NHL a DNA helicase.

14. Scott GBI, Kittrell C, Curl RF, and **Metzker ML** (2008) Australian Patent 2002/323452. Pulsed-Multiline Excitation for Color-Blind Fluorescence Detection.

15. **Metzker ML** Substituted 4,4-difluoro-4-bora-3A,4A-diaza-s-indacene compounds for 8-Color DNA Sequencing. *Filed:* February 5, 2002.

16. Wu W, Litosh V, Stupi B, **Metzker ML**.  PCT Application No. US2007/086559.  Photocleavable labeled nucleotides and nucleosides and methods for their use in DNA sequencing. *Filed*: Dec 5, 2007.

17. Scott GBI, Kittrell C, Curl RF, and **Metzker ML** (2009) US Patent 7,511,811. Pulsed-Multiline Excitation for Color-Blind Fluorescence Detection.

18. Litosh V, Stupi B, Hersh M, Wu W, **Metzker ML**.  PCT Application No. US2009/047071. Nucleotides and nucleosides and methods for their use in DNA sequencing. *Filed*: Jun 11, 2009.

19. Wu W, Litosh V, Stupi B, **Metzker ML**. (2010) South African Patent 2009/03888. Photocleavable labeled nucleotides and nucleosides and labeled nucleotides and methods for their use in DNA sequencing.

20. Wu W, Litosh V, Stupi B, **Metzker ML**. (2011) US Patent 7,893,227.  3'OH unblocked nucleotides and nucleosides, base modified with non-cleavable, terminating groups and methods for their use in DNA sequencing.

21. Wu W, Litosh V, Stupi B, **Metzker ML**. (2011) US Patent 7,897,737.  3'OH unblocked nucleotides and nucleosides, base modified with photocleavable, terminating groups and methods for their use in DNA sequencing.
22. Wu W, Litosh V, Stupi B, **Metzker ML**. (2011) US Patent 7,964,352.  3'OH unblocked nucleotides and nucleosides, base modified with photocleavable, terminating groups and methods for their use in DNA sequencing.
23. Wu W, Litosh V, Stupi B, **Metzker ML**.  Application No. 12/986,810.  Labeled nucleotides and nucleosides and methods for their use in DNA sequencing. *Filed*: Dec 5, 2006.  Claims allowed November 21, 2011
24. Wu W, Litosh V, Stupi B, **Metzker ML**. (2010) South Africa Patent 2009/03888. Photocleavable labeled nucleotides and nucleosides and labeled nucleotides and methods for their use in DNA sequencing.
25. Litosh V, Stupi B, Hersh M, Wu W, **Metzker ML**. (2012) US Patent 8,148,503.  Labeled nucleotides and nucleosides and methods for their use in DNA sequencing. *Filed*: Jun 11, 2009.
26. Wu W, Litosh V, Stupi B, **Metzker ML**.  Application No. 13/114,270, continuation of Appl. 11/567,189, now US Patent 7,897,737.  Labeled nucleotides and nucleosides and methods for their use in DNA sequencing. *Filed*: May 24, 2011
27. Wu W, Litosh V, Stupi B, **Metzker ML**. (2011) Mexico Patent 2009/005936.  Photocleavable labeled nucleotides and nucleosides and labeled nucleotides and methods for their use in DNA sequencing.
28. Wu W, Litosh V, Stupi B, **Metzker ML**. (2011) New Zealand Patent 577303.  Photocleavable labeled nucleotides and nucleosides and labeled nucleotides and methods for their use in DNA sequencing
29. Scott GBI, Kittrell C, Curl RF, and **Metzker ML** (2012) US Patent 8,089,628.  Pulsed-Multiline Excitation for Color-Blind Fluorescence Detection.
30. Scott GBI, Kittrell C, Curl RF, and **Metzker ML** (2012) US Application 12/388,358.  Pulsed-Multiline Excitation for Color-Blind Fluorescence Detection. *Filed*: Jan 3, 2012.
31. Litosh V, Stupi B, Hersh M, Wu W, **Metzker ML**.  US Application No. 13/406,934.  Labeled nucleotides and nucleosides and methods for their use in DNA sequencing. *Filed*: Feb 28, 2012.

## II. *Teaching Information:*

### a. **Courses taught at BCM:**

| | |
|---|---|
| 2000-to-present | *Molecular Methods*:  All first-year graduate students are required to take this course.  Three lectures taught: *Libraries and screening*, *Genomics I* and *Genomics II*. |
| 2001-2003 | *Mammalian Genetics:*  All first-year genetics student are required to take this class.  One lecture taught: *Mammalian Genome Analysis*. |

### b. **Graduate student training:**

| | |
|---|---|
| 2008-to-2011 | Major advisor for Diane Scaduto, graduated with PhD from CMB program |
| 2007-to-2010 | Thesis committee member for Rocio Benabentos, CMB program |
| 2004-to-2006 | Major advisor for Michele Sexton, graduated with MS degree from CMB program |

| 2001-to-2007 | Major advisor for Wade C. Haaland, graduated with PhD from CMB program |
| 2001-to-2005 | Thesis committee member for Teresa Venezia, graduated with PhD from CMB program |
| 2001-to-present | Qualifying examination reviewer for 1-2 Genetics & CMB students |
| 2000-to-present | First year student rotations (1-2 per year) |

**c.  Post-doctoral training:**

| 2001-2003 | Mathew Mahindaratne, Ph.D., now at UT San Antonio |
| 2003-2004 | Ernest Lewis, Ph.D., now at Rice University |
| 2003-2006 | Ming Fa, Ph.D., now at Visigen Biotechnology |

**d.  Minority undergraduate student internships:**

| 2010-to-present | Jesse Muniz, University of Texas at Brownsville graduate, B.S. Biology |
| 2006-to-2007 | Demetra Farley, now in graduate school at Southwestern Medical Center, Division of Basic Science Program- Cancer Biology training track (began 2007) |
| Summer 2004 | Lamin Bangura, now at Ross University Medical School in Dominica(Caribbean) |
| Summer 2005 | Rosalie Bangura, now at BCM |
| Summer 2006 | Mindy Smith, now at Chicago Medical School of Rosalind Franklin University of Medicine and Science |
| Summer 2006 | Quincy Johnson, now at Texas A&M University Graduate School of Engineering (began 2007) |
| Summer 2007 | Dionne Watson, student at Prairie View A&M University |
| Summer 2008 | Nicholas Chambers, student at Prairie View A&M University |
| Summer 2009 | Ogechi Nwaobia, student at University of Texas, Austin |
| Summer 2010 | Brian Tenner, Southern Methodist University and Crist Cuffee, Virginia Polytechnic Institute and State University |

**e.  Local lectures**

| Jun 2008 | Repeat of DNA Day Celebration Lecture for high school students, organized by the Office of Diversity and Community Outreach's Office of Diversity and Community Outreach at BCM |
| Apr 2008 | DNA Day Celebration Lecture for high school students, organized by the Office of Diversity and Community Outreach at BCM |

## III.  *Service information:*

**Administrative assignment:**

| 2002-to-present | Member: BCM Patent and Copyright Committee |
| 2007-to-present | Member: HGSC New Faculty Search Committee |