1   EDWARD R. REINES (Bar No. 135960)
    edward.reines@weil.com
2   DEREK C. WALTER (Bar No. 246322)
    derek.walter@weil.com
3   MICHELE A. GAUGER (Bar No. 281769)
    michele.gauger@weil.com
4   ANANT N. PRADHAN (Bar No. 287227)
    anant.pradhan@weil.com
5   WEIL, GOTSHAL & MANGES LLP
    Silicon Valley Office
6   201 Redwood Shores Parkway
    Redwood Shores, CA  94065
7   Telephone: (650) 802-3000
    Facsimile: (650) 802-3100
8
    Attorneys for Plaintiffs/Counterclaim-Defendants
9   VERINATA HEALTH, INC. and
    THE BOARD OF TRUSTEES OF THE LELAND
10  STANFORD JUNIOR UNIVERSITY

11              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
12                SAN FRANCISCO DIVISION

13  VERINATA HEALTH, INC. and THE BOARD         Case No. 3:12-cv-00865-SI
    OF TRUSTEES OF THE LELAND
14  STANFORD JUNIOR UNIVERSITY,

15                Plaintiffs,                    **VERINATA AND STANFORD'S
                                                RESPONSE TO SEQUENOM, INC.
16        v.                                    AND SEQUENOM CENTER FOR
                                                MOLECULAR MEDICINE LLC'S
17  SEQUENOM, INC., and SEQUENOM                OBJECTION TO THE TESTIMONY
    CENTER FOR MOLECULAR MEDICINE               OF DR. STEPHEN A. BROWN**
18  LLC,
                                                JURY TRIAL DEMANDED
19                Defendants/Counterclaim
                  Plaintiffs,                   Hon. Susan Illston
20
          v.                                    Hearing: August 9, 2013 9:00 a.m.
21
    VERINATA HEALTH, INC. and THE BOARD
22  OF TRUSTEES OF THE LELAND
    STANFORD JUNIOR UNIVERSITY,
23
                  Counterclaim Defendants,
24
          and
25
26  ISIS INNOVATION LIMITED,

27                Nominal Counterclaim-
                  Defendant.
28

1

## TABLE OF CONTENTS

2
**Page**

3   I.    INTRODUCTION ......................................................................................... 1

4   II.   ARGUMENT ............................................................................................... 3

5         A.    Dr. Brown Understands The Operation And Application Of Massively
                Parallel Sequencing ........................................................................... 3

6         B.    Dr. Brown Is Distinctively Qualified To Testify On The Subject Matter Of
                The Verinata/Stanford Patents ......................................................... 9

7         C.    Dr. Brown's Rebuttal Declaration Was Procedurally Proper, Timely, And
                Did Not Prejudice Sequenom ........................................................... 12

8
          D.    It Would Be Prejudicial To Verinata To Exclude Dr. Brown's Rebuttal
9               Declaration ..................................................................................... 14

10        E.    Sequenom Is In No Position To Complain About Dr. Brown's Rebuttal
                Declaration ..................................................................................... 16

11  III.  CONCLUSION ......................................................................................... 18

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Mallinckrodt, Inc. v. Masimo Corp.*,
    254 F.Supp. 2d 1140 (C.D. Cal. 2003)............................................................................ 13

*Two Moms & a Toy, LLC v. Int'l Playthings, LLC*,
    No. 10-CV-02271-PAB-BNB, 2012 WL 5249459 (D. Colo. Oct. 24,
    2012) ............................................................................................................................... 7

**RULES AND STATUTES**

Fed. R. Civ. P. 26 ..................................................................................................................... 13

N.D. Cal Pat. L.R. 4-1(b) ........................................................................................................ 16

N.D. Cal Pat. L.R. 4-1(c) ........................................................................................................ 16

VERINATA'S RESPONSE TO
SEQUENOM'S OBJECTION
    ii
    Case No. 3:12-cv-00865-SI

# I.    INTRODUCTION

Sequenom's Objection to Dr. Brown's testimony is ill-conceived, both on a substantive and procedural level.  It is difficult to understand why Sequenom thought it would be appropriate to burden the Court with its filing.

Substantively, Sequenom's sole complaint is that Dr. Brown does not satisfy his own definition of the person of ordinary skill in the art because he allegedly does not understand the operation and application of massively parallel sequencing platforms.  He is even accused of demonstrating "fundamental ignorance" of massively parallel sequencing.  This allegation is directly contradicted by pages and pages of Dr. Brown's deposition testimony (all of which Sequenom ignores in its papers), which establishes that he is very knowledgeable about DNA sequencing techniques and that he satisfies his definition of the person of ordinary skill in the art.  This testimony alone undercuts Sequenom's only complaint about Dr. Brown's qualifications, and establishes that Sequenom's Objection should be denied.

There can be no legitimate question regarding Dr. Brown's qualifications or the helpfulness of his testimony. Unlike Sequenom's expert, Dr. Brown has published original research on the topic of using cell-free DNA to diagnose aneuploidy, the precise subject matter of the patents-in-suit.  Unlike Sequenom's expert—who has no experience in the field of prenatal diagnosis—Dr. Brown is also a physician who deals with the very prenatal diagnostic tests at issue in the related cases on a daily basis.  Unlike Sequenom's expert, Dr. Brown is an authority that has been quoted three times by The New York Times for his thoughts on developments in the field.  It is difficult to imagine an individual more distinctively qualified to provide helpful testimony on the multi-disciplinary subject matter of the patents-in-suit than Dr. Brown, and it would be a peculiar result to have his opinions excluded.

Procedurally, Sequenom complains that Dr. Brown was not entitled to prepare a rebuttal declaration and, even if he was, that his rebuttal was served too late.  However, from the outset, Sequenom and its expert explicitly reserved their rights to prepare rebuttal testimony.  Thus, although they ultimately chose not to serve rebuttal opinion, they cannot possibly contend that it was forbidden for Dr. Brown and Verinata to do so.  As to the timing of Dr. Brown's rebuttal

declaration, Sequenom fails to mention that mere days after the parties served their opening expert witness declarations, the case schedule in this matter was extended by months (at Sequenom's request) to allow additional time for the Federal Circuit to rule on Sequenom's preliminary injunction motion against Ariosa.  Dr. Brown's March 1, 2013 rebuttal declaration was served on a time frame completely consistent with the new schedule—18 days in advance of his deposition, three months before the close of claim construction discovery, and months before Sequenom served its responsive claim construction brief.  There was no prejudice to Sequenom. In fact, Sequenom marked Dr. Brown's rebuttal declaration as an exhibit during his deposition and questioned him extensively on it.  Sequenom even cites and relies upon Dr. Brown's testimony regarding his rebuttal report in its responsive claim construction brief.

Sequenom's Objection is all the more curious in view of its own improper use of expert testimony in this litigation.  While Sequenom complains that Dr. Brown's declaration was tardy when it was served 18 days in advance of his deposition and months before opening claim construction briefs, Sequenom's responsive claim construction brief relies upon the 51 page declaration of Dr. Stacy Gabriel from Patent Office proceedings, which Sequenom did not cite in the Joint Claim Construction Statement and did not serve in November 2012 when it was undisputedly due.  In fact, Sequenom never served her declaration at all or signaled any intention to rely upon it in claim construction (that is, until it filed its responsive claim construction brief). Sequenom's claim construction expert testified unequivocally during his March deposition that his opinions "stand on their own" and that he was *not* relying on Dr. Gabriel's Patent Office expert opinions in any way.    In short, while Verinata identified the testimony it planned to rely upon and gave Sequenom ample opportunity to test it at deposition, Sequenom did not reciprocate.  Instead, it informed Verinata that it was ***not*** relying on certain expert opinion, only to then rely upon it anyway after it was too late for Verinata to test that opinion at deposition.

Sequenom is in no position to make any objection to Dr. Brown's rebuttal declaration, and its Objection should be denied in full.

## II.   ARGUMENT

### A.   Dr. Brown Understands The Operation And Application Of Massively Parallel Sequencing

The thrust of Sequenom's Objection is that Dr. Brown is unfit to testify because he does not understand the operation of massively parallel sequencing.[1]  Indeed, Sequenom contends that Dr. Brown "lacks a basic understanding of fundamental concepts underlying massively parallel sequencing technology" and that "[n]othing in Dr. Brown's education, training or experience gives him an understanding of either the operation or application of massively parallel DNA sequencing platforms."  Objection at 1, 4.  Sequenom goes so far as to accuse Dr. Brown of demonstrating "fundamental ignorance" of the topic.  *Id.* at 5.  Sequenom's hyperbole is unwarranted and unsupported by the record.   As Dr. Brown explained at deposition:

> I'm a human geneticist. And the knowledge of human and other genomes and how they function, how genes are encoded, how information is conveyed from generation to generation is a general topic for me in my life, both as physician and scientist.
>
> And obtaining sequence information is central to the whole subject and general knowledge of how sequence information is obtained and what are the parameters around which the technologies work and depend is something that -- something of necessity that I know about.

Exh. 1 [Brown Dep. Tr.] 75:9-19.[2]

Consistent with this testimony, at deposition, Dr. Brown confirmed that he understood the operation of numerous massively parallel sequencing platforms, repeatedly answering Sequenom's vague open-ended questions regarding the operation of a range of such platforms.

---

[1] Indeed, the sole substantive basis for Sequenom's Objection is Dr. Brown's alleged lack of knowledge regarding massively parallel DNA sequencing.  However, Sequenom's Objection asks that Dr. Brown's testimony be excluded ***in its entirety***—even as it pertains to issues unrelated to massively parallel DNA sequencing.  Other than with regard to procedural grounds, Sequenom's Objection does not present a basis for such a request.  For the reasons stated herein, Sequenom's Objection should be denied outright.  However, to the extent the Court considers granting Sequenom's Objection (it should not), any order should be targeted only to the specific substantive issues identified in Sequenom's brief (*i.e.*, Dr. Brown's alleged lack of knowledge regarding massively parallel signature sequencing).

[2] All exhibit cites are to exhibits attached to the accompanying declaration of Michele A. Gauger.

For instance, with regard to pyrosequencing, Dr. Brown first testified as follows:

> Q.   Can you tell me a little bit about the 454 sequencer and its operation?
>
> A.   Not sure how to answer that.  It seems open-ended.
>
> Q.   How does it work, what kind of chemistry does it have? Can you tell me anything about its operation?
>
> A.   My understanding of the 454 device is that it makes use of something called pyrosequencing and that it achieves parallelism by isolating reactions in smaller droplets of liquid that contain the necessary chemistry.
>
> Q.   And what is pyrosequencing?
>
> A.   Pyrosequencing is a sequencing technology that instead of using chain terminators to signify addition of a base to an elongated chain, the polymerase when it incorporates the next base emits light, and then a device records the output of light.

*Id.* at 21:22-22:20.   Then, Dr. Brown explained the SOLiD® massively parallel sequencing platform to Sequenom:

> Q.   Can you generally tell me about the operation of a solid sequencing platform?
>
> A.   Yeah, I -- in preparation for today's deposition, I did not deeply review how the -- the details of the solid sequencing platform.
>
> Q.   Is the solid sequencing platform a massively parallel DNA sequencing platform?
>
> A.   My understanding is yes.
>
> Q.   But you're not familiar with the operation of a solid sequencing platform?
>
> A.   I have a general knowledge of the solid device.
>
> Q.   Okay. And what is your general knowledge of the solid sequencing platform?
>
> A.   It achieves sequencing through -- instead of polymerase activity, through DNA ligation.
>
> Q.   And what is DNA ligation?
>
> A.   Well, in general terms, a DNA molecule has a phosphate backbone, and on several -- a strand of DNA has both a beginning and an end, and one can take two strands of DNA and ligate them together to form a longer strand. And that step of attaching the two strands together through their phosphate backbone is called ligation.
>
> Q.   And how do you use the ligation to massively sequence?
>
> A.   Well, the fundamental idea is in order to achieve ligation, two strands have to be juxtaposed by a complementary strand and that juxtaposition has to be precise so that the ligation only occurs when there's a precise [annealing] of two strands to a complementary strand, and that allows you to interrogate the bases that are at the point of ligation.

*Id.* at 22:21-24:19.   Testing Dr. Brown further, Sequenom demanded that he give a narrative

description of the Illumina platform:

> Q.    Are you familiar with the Illumina sequencing platform called the HiSeq 2000?
>
> A.    I know the name, I've heard the name.
>
> Q.    Are you familiar with that platform to the extent that you can tell me how it works?
>
> A.    I know in general terms how it works.
>
> Q.    Do you know specifically how it works?
>
> . . .
>
> A:    Well, Illumina sequencing, in general, relies on the idea of taking fragments of DNA and placing them on a solid support in such a dilution that only one fragment is located in any given geographical area of the solid support not surrounded, in general, by others, and then performs an amplification step that is on the solid support so that each individual fragment results in a physical clustering of copies of that fragment.
>
> And those physical clusters of copy are then used in a subsequent step for sequencing that proceeds by sequencing by synthesis where a polymerase adds a nucleotide that has a fluorophore attached to it that corresponds to the complementary nucleotide on the strand that one is sequencing.
>
> A scanner then obtains fluorescence output from that physical cluster and records it. And then after a photo bleaching step to get rid of the fluorochrome color, another round of addition of the next base occurs, and so forth, resulting in sequence information from a very large number of such physically constrained clusters of DNA on the cell.
>
> Q.    And why does the platform make physical clusters of the fragments?
>
> A.    Why does it or how does it?
>
> Q.    Why does it?
>
> A.    Because if they weren't contained in space, then there would not -- there would be a general amplification of all of the DNA, and thereby, be not useful for obtaining sequence of individual strands.
>
> Q.    Why are you using clusters as opposed to just using the individual strands?
>
> A.    In other words, no amplification step?
>
> Q.    Correct.
>
> A.    Not enough signal.

*Id.* at 40:3-42:25.   Dr. Brown even gave Sequenom a tutorial on "all the steps" of Sanger sequencing:

> Q.    Can you tell me about the operation and application of Sanger sequencing?
>
> A.    Are you asking me to go through all the steps of how one does Sanger sequencing?
>
> Q.    Sure, yes. How would you do Sanger sequencing?
>
> A.    I'll run through the steps.  The fundamental idea is you have a fragment of

1    DNA which you wish to sequence, and you have a primer that you can
2    allele to that single-stranded sequence. And you have a polymerase that
     allows extension of a complementary copy of the strand that you wish to
3    sequence beginning with the primer that you've [annealed].

4    And you have nucleotide triphosphates that the polymerase is capable of
     using as substrate to continue the extension of the complementary copy.

5    But you've also got in the mixture of nucleotide triphosphates ones that are
6    colloquially referred to as chain terminators or dideoxynucleotides that
     cannot be extended, so that what you end up with at the end of the series or
7    even at the end of one extension of a large number of molecules, what you
     end up with is chain terminated fragments corresponding to all of the
     different possible extension products.

8    And then all you need is a way to resolve those, and you'll know the DNA
9    sequence. Methods of resolving those have been several over the years.

     Q.    And what are some applications in which Sanger sequencing is useful?
10
     A.    I can think of an infinite number of situations in which Sanger sequencing
11         could be useful.

12   *Id.* at 19:23-21:16.  Dr. Brown further explained that he has personal research experience with

13   DNA sequencing and that he has published his work utilizing DNA sequencing.  *See id.* at 75:25-

14   76:12 ("I used to do experiments that involved sequencing of DNA using conventional Sanger

15   sequencing with polyacrylamide gels and labeled primers . . . . And then later as the technology

16   changed, I made extensive use of Sanger sequencing with fluorochrome labeled terminators."); *id.*

17   at 76:13-15 (Q. And did you publish on any of your experiments with sequencing? A. I have.).

18        Thus, at deposition, Sequenom tested Dr. Brown thoroughly regarding his knowledge of

19   massively parallel sequencing, including a pop quiz on irrelevant details of particular commercial

20   devices through history.  He passed the test, explaining off the top of his head the operation of at

21   least four different sequencing platforms, including three that Sequenom will not dispute are

22   massively parallel sequencing platforms.   In view of this testimony—almost all of which

23   Sequenom ignores in its brief—it is puzzling that Sequenom even filed its objection to Dr.

24   Brown's testimony.  Dr. Brown's testimony epitomizes the type of helpful testimony that is called

25   for under the Federal Rules, and Sequenom's Objection must be denied.

26        Sequenom spends much of its brief criticizing Dr. Brown for allegedly not knowing

27   irrelevant details of a technique called "massively parallel signature sequencing."   Sequenom

28   cites no authority standing for the proposition that this could call for the wholesale exclusion of

Dr. Brown's testimony on all topics, as Sequenom requests.[3]  More importantly, Dr. Brown never purports to rely on the details of how this technique works.  He cites papers that use the technique in his declaration only to show the timeframe over which massively parallel sequencing platforms first became available and when they were used for sequencing random fragments without *a priori* knowledge of sequence information.  *See, e.g.*, Dkt. No. 87, Exh. 1 [Brown Decl.] ¶¶ 39-40.  In fact, it is unreasonable to demand that Dr. Brown know the details of this technique—Sequenom's own expert acknowledged that the technique is not still being used, was never popular, and ultimately died because it "was a very complicated method."  *See* Exh. 2 [Metzker 3/21/13 Dep. Tr.] at 77:2-78:2.  To wit, Dr. Metzker does not bother teaching the technique to his students because "it's not a technology that's used."  *Id.* at 78:3-13.  As Dr. Metzker explained at deposition, the only reason he knows the details of this technique is because he came across it "in a previous case" where it "was used as prior art."  *Id.* at 78:14-24.  In other words, Sequenom's expert knows the details of massively parallel signature sequencing only through one of his many litigation engagements,[4] not because this is something those of skill in the art of the '017 and '018 patents generally know.

Next, Sequenom contends that Dr. Brown is unreliable because he testified that those of skill in the art would still understand the specification even if they did not understand certain references cited in the specification.  Objection at 4.  Sequenom's argument is nonsense.  Dr. Brown's testimony simply reflects his opinion that the specification stands on its own as a fully enabled instrument that could be understood without review of the references cited therein.  This is true.  While Sequenom may disagree with this, its disagreement is not a basis to exclude Dr. Brown's testimony.  Likewise, while Sequenom may disagree with Dr. Brown's testimony that

---

[3] This consideration would, at most, go to the weight of Dr. Brown's testimony.  *See, e.g.*, *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, No. 10-CV-02271-PAB-BNB, 2012 WL 5249459, at *5 (D. Colo. Oct. 24, 2012) ("Two Moms' argument does not challenge the reliability of the methodology applied by Mr. Milner. Instead, it argues only that Mr. Milner was mistaken with respect to certain facts at issue. However, such a challenge does not limit the admissibility of Mr. Milner's opinions, but rather goes to the weight of the testimony").

[4] Unlike Dr. Brown, Dr. Metzker has made a career of litigation consulting, having been deposed so many times it has become a task for him to count the exact number.  *See* Exh. 2 [Metzker 3/21/13 Dep. Tr.] at 12:3-6.

Sanger sequencing could "in principle" be massively parallel, this is not a basis for excluding his testimony wholesale.  Dr. Brown's testimony—which Sequenom does not cite—was simply as follows:

> A.   Well, Sanger sequencing will allow the acquisition of DNA sequencing. And the only question would be, can it do enough DNA sequencing in parallel to qualify for the term massive. And I think that the history of DNA sequencing includes an era when Sanger sequencing was as parallel and as massive as was available.
>
> Q.   So Sanger sequencing could be massive as you understand that term?
>
> A.   In principle.

Exh. 1 [Brown Dep. Tr.] at 13:17-14:1.  While Sequenom cites literature in footnote 3 of its brief showing that current massively parallel sequencing approaches are improved over Sanger sequencing, nothing about Dr. Brown's testimony is "completely at odds" with Sequenom's literature references.  Nor does it remotely suggest that Dr. Brown is a man of "fundamental ignorance" whose testimony on all topics should be excluded wholesale, as Sequenom requests.

Finally, Sequenom discounts—indeed, belittles—Dr. Brown's testimony that he has "used massively parallel sequencing in the context of ordering clinical tests on patients."  Objection at 4 (citing Brown Dep. Tr. at 75:22-24).  Sequenom's criticism is off base.  While Sequenom's own expert, Dr. Metzker, has absolutely no experience with prenatal diagnosis or the tests at issue in this case, *see* Exh. 3 [Metzker 5/31/13 Dep. Tr.] at 212:5-213:14, Dr. Brown actually deals with them on a daily basis.  Indeed, in addition to conducting original research (discussed further below) Dr. Brown sees actual patients—real pregnant women carrying real babies that might be suffering from life altering chromosomal abnormalities.  *See* Exh. 4 [The Quandary Posed by a New Down Syndrome Test, Oct. 18, 2011, N.Y. Times] (quoting Dr. Brown, "This is an absolutely every-day occurrence for me that I talk to someone who is 37 years old and doesn't want a Down syndrome baby but doesn't want to go through an invasive procedure").  When one of the cell-free DNA diagnostic tests he orders for a patient comes back positive, it is Dr. Brown's job to inform the patient, answer her family's questions about the test, and explain what the results mean.  With that responsibility, Dr. Brown must understand the operation and application of the massively parallel sequencing techniques involved in carrying out the diagnostic tests at

issue here, completely consistent with Dr. Brown's testimony regarding his roles "both as physician and scientist." *See* Exh. 1 [Brown Dep. Tr.] 75:9-19.

### B. Dr. Brown Is Distinctively Qualified To Testify On The Subject Matter Of The Verinata/Stanford Patents

Sequenom's Objection reads as if the Verinata/Stanford patents pertain solely to new sequencing technology, and that one cannot opine on how the claims of these patents should be understood unless one is an expert in the minutiae of such technologies.  Indeed, Sequenom contends that Dr. Brown is unfit to testify because he has "never used, researched, or written on massively parallel DNA sequencing . . . ."  Objection at 4.   Sequenom's Objection is based on an erroneous and myopic view of the patents-in-suit.  The patents-in-suit do not, as Sequenom seems to imply, claim a new massively parallel sequencing instrument, a new piece of sequencing hardware, new sequencing chemistry, or a new sequencing platform.

In fact, the fetal diagnostic inventions claimed in the Verinata/Stanford patents represent an ***application*** of existing and future massively parallel DNA sequencing techniques.   The Verinata/Stanford patents are multi-disciplinary in nature, and one must have broad knowledge in a range of fields, including genetics, statistics, molecular biology, DNA sequencing technologies, and DNA alignment techniques.     This is reflected in Dr. Brown's definition for the level of ordinary skill in the art:

> One of ordinary skill in the art relevant to the '017 and '018 . . . would have a multi-disciplinary background. That person would have at least a bachelor's degree in a life sciences area (e.g., biology, cell biology, genetics, molecular biology) and at least a master's degree or Ph.D. in computational biology, mathematics, or statistics, or equivalent training, for instance as acquired by earning a medical degree and carrying out relevant research activities. One of ordinary skill in the art should understand both the operation and application of massively parallel DNA sequencing platforms.  Further, one of ordinary skill in the art should understand and have experience with techniques for aligning sequence reads to a reference genome.

Dkt. No. 87, Exh. 1 [Brown Decl.] ¶ 15.  Notably, Sequenom and its expert require far less specificity in their definition of the level of ordinary skill in the art.  Indeed, they do not demand ***any*** knowledge of massively parallel DNA sequencing, mentioning only "DNA sequencing technologies" generally:

> In my opinion, a person having ordinary skill in the art as of February 2006 would have been a person with graduate level training in genetics, molecular biology or biochemistry, or related disciplines, and two years of experience with nucleic acid chemistry and DNA sequencing technologies.

Dkt. No. 87, Exh. 7 ¶ 70.[5]   Amazingly, while Sequenom moves to exclude Dr. Brown's testimony, it makes no contention that Dr. Brown fails to meet its own definition of the person of ordinary skill in the art.

In fact, if there is anyone with the background necessary to opine on the specific subject matter of the Verinata/Stanford patents, it is Dr. Brown, a point Sequenom cannot legitimately challenge.  Unlike Dr. Metzker, Dr. Brown's experience is right on point, specifically including work directed to developing techniques for diagnosing aneuploidy using cell free fetal DNA.  For instance, Dr. Brown's article "Aneuploidy Detection in Mixed DNA Samples by Methylation-Sensitive Amplification and Microarray Analysis," describes some of his research in this area.[6] A perusal of this article reveals that Dr. Brown is broadly steeped in the technical subject matter of the patents-in-suit, including relevant molecular biology techniques and the specific mathematical analyses that are relevant.  *See, e.g.*, Exh. 5 [Brown et al. Clin. Chem.] at 807 ("For

---

[5] While Sequenom contends that Dr. Brown does not satisfy his definition of the person of ordinary skill, Dr. Metzker did not even know what his own definition was when was asked about it at deposition.  At deposition, Dr. Metzker first took the position one of skill in the art would not need to even understand the operation and application of massively parallel DNA sequencing. Exh. 2 [Metzker 3/21/13 Dep. Tr.] at 143:18-25 ("Q. And that person of ordinary skill in the art would understand both the operation and application of massively parallel DNA sequencing platforms, correct? A.  Well, that's not my definition. I believe that definition came from Dr. Brown.").  However, Dr. Metzker was then shown the declaration of Stacy Gabriel, which Sequenom submitted in support of interference proceedings and that Dr. Metzker stated he reviewed and agreed with in preparing his opinions.  *See id.* at 45:12-49:18; Dkt. No. 87, Exh. 7 ¶ 159.  When Dr. Metzker realized that his definition of the level of ordinary skill in the art was different from Dr. Gabriel's, he just changed it to state that one would need to have an understanding of the operation and application of massively parallel DNA sequencing.  *See* Exh. 2 [Metzker 3/21/13 Dep. Tr.] at 148:18-151:1 ("And you agree that one of ordinary skill in the art of the '017 and '018 patent at the relevant time, which you've emphasized is important, would have understood both the operation and application of massively parallel DNA sequencing platforms; is that correct? A. Yep.  That's correct.").  As set forth more fully below, Sequenom (not Verinata) is playing fast and loose with expert witnesses in this litigation.

[6] *See* Exh. 5 [Brown et al. Clin. Chem.] at 805-06 ("We present data showing that . . . methylation-sensitive amplification followed by microarray analysis can be used to confidently detect whole-chromosome aneuploidy in first-trimester TB DNA samples that have been mixed with 90% chromosomally normal DNA from peripheral blood (PB) leukocytes."); *id.* at 812 ("We used this method of methylation analysis to detect whole-chromosome aneuploidy, despite the presence of a high proportion of chromosomally normal DNA.").

detection of aneuploidy, the ratio obtained from the chromosome with aneuploidy (18 or 21) was compared with the distribution of ratios obtained from all other chromosomes (except the X chromosome) by computing a T score with 20 degrees of freedom.").  In his article, Dr. Brown even discusses the research by Drs. Quake and Lo regarding the use of massively parallel DNA sequencing for aneuploidy detection, explaining that he regards his work as being of the same ilk. *See id.* at 812 ("Two studies have used next-generation sequencing for detecting fetal aneuploidy in maternal plasma DNA samples (11, 12). The method we report is similar in that we detect aneuploidy by simply measuring the overall amount of signal for each chromosome and then comparing it with an unaffected control.").[7]  In addition to publishing his work, Dr. Brown has applied for patents in the field.  *See* Exh. 6 [U.S. 2009/0203002] at Abstract ("The invention also provides methods of using the amplified fetal DNA sequences for aneuploidy detection.").

Despite the foregoing, Sequenom seeks to exclude ***all*** Dr. Brown's testimony on every single claim term he opined on—even the claim terms that do not relate to DNA sequencing.  For instance, Sequenom would have the Court exclude all of Dr. Brown's testimony regarding the data analysis to assess aneuploidy, the meaning of the terms "suspected" and "presumed," whether the claims require identifying an "integer" number of chromosomes, etc.  In other words, Sequenom would have the Court exclude Dr. Brown's testimony even as it pertains to aspects of the claims related to the mechanics of the prenatal diagnosis, where Sequenom does not even attempt to challenge Dr. Brown's qualifications.  Of course, with Dr. Brown's direct experience on these issues through his research and role as a physician, Sequenom could never make such a challenge.

Simply put, Dr. Brown is an authority in the field of the patents-in-suit.  Indeed, The New York Times has reached out to and quoted Dr. Brown at least three times regarding his opinions on developments in the field.  *See* Exh. 7 [DNA Blueprint for Fetus Built Using, June 6, 2012, N.Y. Times]; Exh. 4 [The Quandary Posed by a New Down Syndrome Test, Oct. 18, 2011, N.Y.

---

[7] Sequenom's expert, Dr. Metzker, has no comparable publications, agreeing at deposition that he has absolutely no experience with prenatal diagnostics.  Exh. 3 [Metzker 5/31/12 Dep. Tr.] at 212:5-213:14.

Times]; Exh. 8 [A Less Risky Down Syndrome Test Is Developed, Oct. 17, 2011, N.Y. Times]. On these facts, it would be a peculiar result indeed if the Court were to exclude any portion of Dr. Brown's testimony based on his alleged lack of qualifications.

### C. Dr. Brown's Rebuttal Declaration Was Procedurally Proper, Timely, And Did Not Prejudice Sequenom

As stated above, Sequenom does not have a legitimate substantive objection to Dr. Brown's testimony.  It does not have a legitimate procedural complaint either.[8]

First, Sequenom claims that Dr. Brown was simply not allowed to prepare a rebuttal declaration.  According to Sequenom, "[t]he parties' stipulation made no provision for introducing 'rebuttal' expert declarations beyond [November 21, 2012] and accordingly Dr. Metzker did not respond to Dr. Brown's declaration.  Dr. Brown's two declarations to Dr. Metzker's one significantly prejudice Sequenom."  Objection at 7.  Sequenom's argument cannot be taken seriously.  Indeed, in the declaration that Dr. Metzker submitted on behalf of Sequenom, Dr. Metzker specifically reserved the right to prepare sundry rebuttal testimony.  As Dr. Metzker stated:

> I may supplement this declaration if I become aware of additional pertinent information, or in response to the testimony of others regarding claim construction issues.  I may comment on or testify in response to the testimony of other witnesses in this matter.

Dkt. No. 87, Exh. 7 ¶ 13.  Sequenom's recent revelation that it was improper for Dr. Brown to submit a rebuttal declaration cannot be credited in view of Sequenom's earlier position that such testimony was allowed and that their expert might submit rebuttal in response to a range of new evidence.  Moreover, it is improper for Sequenom to put Verinata and Stanford in a catch-22 by reserving for itself the right to prepare rebuttal testimony and then cry foul when Verinata and Stanford do exactly that.

Second, Sequenom complains that Dr. Brown's rebuttal declaration was untimely under

---

[8] For avoidance of doubt, Sequenom makes no complaint about the timeliness of Dr. Brown's initial declaration.  Sequenom complains only that Dr. Brown's rebuttal declaration was procedurally improper.  Therefore, to the extent the Court considers granting Sequenom's Objection (it should not), any order should be targeted to only Dr. Brown's rebuttal declaration.

Rule 26, citing the time that passed between Dr. Brown's opening and rebuttal declaration. Objection at 8.  However, Sequenom fails to mention that mere days after the parties submitted their November 21 initial expert witness declarations, the case schedule in this matter was completely reshaped.  Indeed, at a November 30 CMC—in response to *Sequenom's request* to extend the case schedule—the Court moved the claim construction hearings from February 2013 all the way out to late June 2013.[9]  *See* Dkt. No. 59 at 4; Dkt. No. 62.  Verinata and Stanford served their rebuttal declaration on March 1, 2013 a time frame completely consistent with the revised schedule and, as Sequenom acknowledges, well in advance of Dr. Brown's deposition and months before opening claim construction briefs were due.  In fact, Dr. Brown's declaration was served three months in advance of the stipulated deadline for the close of claim construction discovery.  *See* Dkt. No. 82 at 2.

In any event, Sequenom cites no authority establishing that the scheduling aspects of Rule 26 apply in the context of claim construction extrinsic evidence, particularly where, as here, the parties have agreed that there will be no live expert witness testimony at the claim construction hearing.  The only case Sequenom cites is entirely inapplicable, as it involved a party that submitted a rebuttal declaration (including 800 pages of new supporting evidence) *with* its opening claim construction brief.  *See Mallinckrodt, Inc. v. Masimo Corp.*, 254 F. Supp. 2d 1140, 1156 (C.D. Cal. 2003).  Here, by contrast, Verinata and Stanford submitted their rebuttal declaration more than two months before their opening brief, more than three months before Sequenom's responsive brief, and 18 days in advance of Dr. Brown's deposition.

Finally Sequenom complains that it was somehow prejudiced by Dr. Brown's rebuttal declaration.  Sequenom cannot complain of prejudice because Dr. Brown submitted a rebuttal while Dr. Metzker did not.  As noted above, Dr. Metzker and Sequenom reserved the right to submit rebuttal testimony, but ultimately chose not to.  That was their decision, and any prejudice is thus of their own making.  Likewise, Sequenom was not prejudiced by the timing of Dr. Brown's rebuttal declaration.  As Sequenom acknowledges, the rebuttal declaration—which was

---

[9] The claim construction hearing was ultimately re-scheduled again to early August 2013.

only 30 pages in length—was served well in advance of Dr. Brown's deposition and months in advance of opening claim construction briefs precisely to ensure that it would not be prejudicial to Sequenom.  Although there was ample time in the schedule, Sequenom did not request that Dr. Brown's deposition be rescheduled.  To the contrary, Sequenom marked Dr. Brown's rebuttal declaration as an exhibit during his deposition and questioned him at length about it.  *See* Exh. 1 [Brown Dep. Tr.] at 87:21-88:8; 130:15-131:5, 157:21-158:13, 170:20-171:2, 174:22-176:3, 181:13-22.  Where it suits it, Sequenom even relies upon Dr. Brown's testimony in its responsive claim construction brief, including even the testimony specifically around his rebuttal report.  *See* Sequenom Responsive Claim Construction Brief (citing the portion of Dr. Brown's transcript at 130:15-23 regarding his rebuttal report).  Sequenom cannot possibly cry prejudice where, as here, it has chosen to use Dr. Brown's testimony regarding his rebuttal report in its own briefing.  If anything, it appears Sequenom perceived that it has received some benefits from the rebuttal report.[10]

### D.    It Would Be Prejudicial To Verinata To Exclude Dr. Brown's Rebuttal Declaration

As Sequenom acknowledges, it has been in possession of Dr. Brown's rebuttal report since March 1, 2013—over four months ago.  Yet, rather than move to strike the report when it was submitted, Sequenom stood by and did nothing.  Three weeks later, when Sequenom took Dr. Brown's deposition, Sequenom even marked the rebuttal report as an exhibit and questioned Dr. Brown at length on his rebuttal opinions, no doubt hoping to get helpful admissions.  In the months-long time frame between Dr. Brown's deposition and the submission of opening claim construction briefs, Sequenom again took no action.  Only now—after Sequenom has questioned Dr. Brown on his rebuttal opinions and after Verinata relied upon his opinions in its opening claim construction briefs—does Sequenom file a formal objection complaining about the timing and substance of Dr. Brown's testimony.

---

[10] In fact, Dr. Brown's rebuttal declaration served to give Sequenom a months-long preview of Verinata's rebuttal claim construction positions in advance of its responsive claim construction brief.

While Sequenom erroneously complains that it was prejudiced by Dr. Brown's rebuttal declaration, it would, of course, be highly prejudicial to Verinata for Sequenom to be permitted to take a swing at Dr. Brown and his rebuttal opinions at deposition and then, months after Verinata relies upon them, be permitted to move to exclude.  In fact, Sequenom's delayed reactions are not those of a party that truly feels prejudiced.  Rather, the tardiness of Sequenom's motion, coupled with its submission as part of Sequenom's responsive claim construction brief, shows that Sequenom's objection is merely a staged effort timed to attack the credibility of a witness that Sequenom knows full well has submitted damaging testimony it cannot rebut on substance.

More important, it was absolutely necessary for Verinata to submit a rebuttal declaration in view of Sequenom's puzzling claim construction positions.  As Verinata notes in its opening claim construction brief, Sequenom propounds antiparallel constructions for nearly identical claim terms,[11] redefines plain and ordinary claim terms using redundant surplusage,[12] and introduces concepts into the claims that are nowhere found in the specification.[13]   As such, Sequenom dedicates much of its construction brief to construing its own constructions and explaining to the Court what they actually mean.

---

[11] As Sequenom acknowledges in its responsive claim construction brief when describing its own claim construction positions, "it may be unusual to construe similar claim language from nearly identical specifications differently."  Sequenom Responsive Claim Construction Brief at 5.  It is very unusual.  As Verinata noted in its opening claim construction brief, Sequenom construes the claim term "massively parallel DNA sequencing" to encompass only "random" sequencing in the '018 patent and only "targeted" sequencing in the '017 patent.  *See* Dkt. No. 87 at 4-5.  Likewise, it offers completely different constructions for "identifying the chromosomes" in the '017 patent and "identifying chromosomes" in the '018 patent, contending that the word "the" in the '017 patent calls for radically different interpretations that otherwise clash with the claim language. *See id.* at 14-17.

[12] For instance, as Verinata explained its opening claim construction brief, Sequenom seeks to change the claim terms "presume" and "suspect" to "affirmative presumption" and "affirmative suspicion," respectively.  *See* Dkt. No. 87 at 21-23.  Likewise, it bizarrely seeks to change the claim term "determining" to "affirmative determination."  *Id.* at 29.  In the '415 patent, Sequenom proposes "constructions" for the claim terms "the mixed sample" and "GC content" that do not actually define anything but just add extra content.  *Id.* at 30-33. Sequenom's responsive claim construction brief offers no meaningful explanation for its numerous efforts to rewrite the claim language with such surplusage.

[13] For instance, in addition to seeking to introduce an "enrichment" step in to the claims of the '017 patent, Sequenom's constructions also seek to introduce the word "integer" (which does not appear anywhere in the patents-in-suit) into at least three different claim terms in the '017 patent. *See* Dkt. No. 87 at 7-8, 17-18, 29.

Thus, when Verinata first learned of Sequenom's proposed claim constructions in October 2012, Verinata promptly requested a meet and confer pursuant to the Patent Local Rules, in hopes of better understanding Sequenom's positions and narrowing disputes.  *See* N.D. Cal Pat. L.R. 4-1(b), 4-1(c).  But Sequenom refused to participate in good faith, instead playing hide-the-ball and refusing to offer any insight into its positions.  *See* Exh. 9 [Walter 11/7/12 email to Estrin].  Faced with Sequenom's refusal to engage in productive meet and confer and narrow disputes and left perplexed as to Sequenom's positions, Verinata and its expert explicitly reserved their rights to prepare supplemental testimony to specifically address the possibility of Sequenom explaining itself.  *See, e.g.*, Dkt. No. 87, Exh. 1 [Brown Decl.] ¶ 3 ("In particular, I understand that Sequenom has not yet offered any explanation of the rationale underlying its proposed claim constructions, and may provide further discovery on this issue. To the extent Sequenom provides such discovery, I will provide supplemental or rebuttal opinions as appropriate."); *see also id.* ¶¶ 23, 42, 61, 66.  While Sequenom complains that it was prejudiced by Dr. Brown's rebuttal,[14] the only party that has been prejudiced in the claim construction process is Verinata, and granting Sequenom's Objection would only work further prejudice.

### E.     Sequenom Is In No Position To Complain About Dr. Brown's Rebuttal Declaration

Sequenom's Objection is startling not just because it is substantively and procedurally without merit, but because it is incongruent with Sequenom's improper utilization of expert witness testimony in the related cases.

Sequenom complains because Dr. Brown submitted a rebuttal declaration well in advance of his deposition and months before Sequenom's responsive claim construction brief was due. Yet, in its responsive claim construction brief, Sequenom submits and relies upon for the first time the declaration of Dr. Stacy Gabriel, who has provided opinion testimony on Sequenom's behalf in support of interference proceedings but never in this case.  *See* Sequenom Responsive

---

[14] As set forth more fully below, Verinata and Stanford have also been prejudiced by Sequenom's last-minute decision to submit additional expert testimony **with its responsive claim construction brief** that it never before signaled an intention to rely upon.

Claim Construction Brief at 7-8 (Sequenom states that "Dr. Gabriel has authored over 90 peer-reviewed publications relating to various aspects of genome sequencing.  She repeatedly shows how the specification for the '018 does not describe random sequencing. Ex. 27 (Gabriel Decl.) ¶¶ 25-89.").  There has been no chance for Verinata and Stanford to depose Dr. Gabriel on her opinions, as Sequenom has never signaled that it would rely upon her testimony in claim construction.  To wit, although Sequenom stated in the Joint Claim Construction Statement ("JCCS") that it would be relying upon the declaration of Dr. Metzker, it made no mention of Dr. Gabriel in its portion of the JCCS.  *See* Dkt. No. 58, Exhs. A-C.  Likewise, Sequenom never mentioned Dr. Gabriel in any previous claim construction disclosures either.  On November 21, 2012, when the parties were to exchange initial claim construction declarations, Sequenom served only Dr. Metzker's declaration, not a declaration from Dr. Gabriel.

To be sure, Dr. Metzker states in his November 21 declaration that he "agrees" with Dr. Gabriel's opinions, but at deposition Dr. Metzker made absolutely clear that there would be no reason to pursue her deposition because he was not relying upon her opinions and because his opinions "stand on their own:"

> Q.   Okay. Let me maybe -- let me handle it this way: Is part of the reasoning and basis for your claim construction opinions in this case the opinions of Dr. Gabriel?
> A.   ***No. My opinions stand on their own.***
> Q.   Okay. So you're not – you're not relying on the Gabriel declaration; is that correct?
> A.   All I said in my declaration is I agree with her opinions.
> Q.   Yeah.
> A.   But I -- ***my opinions stand on their own***.
> Q.   Right. So let me just ask this: ***You're not relying on the Gabriel reasoning for – to support your claim constructions; is that correct?***
> A.   ***That's correct.*** I just agree with her opinions.

Exh. 2 [Metzker 3/21/13 Dep. Tr.] at 46:14-24; *see generally id.* at 45:18-49:18 (Dr. Metzker repeatedly confirms that he does not rely on Dr. Gabriel's opinions).  In other words, Dr. Metzker and Sequenom informed Verinata that Dr. Gabriel's opinions were not being relied upon in this case.  Yet, they now submit her testimony in their ***responsive claim construction brief***—long after the close of claim construction discovery and at a time when Verinata and Stanford cannot meaningfully respond.  Against this backdrop, Sequenom gets a chutzpah award for complaining

1   about the timeliness of Dr. Brown's rebuttal declaration.

2   Similarly, Sequenom's complaints about Dr. Brown's alleged lack of expertise cannot be

3   credited in view of the shortcomings in its own expert's testimony.  For instance, while

4   Sequenom complains that Dr. Brown does not satisfy his own definition of a person of ordinary

5   skill, Dr. Metzker did not even fully understand what his definition was, altering it wholesale to

6   conform to Dr. Gabriel's definition at deposition.  *See supra* n.5.  In fact, Sequenom's confusion

7   about the level of ordinary skill in the art has been an ongoing issue in the related cases.  In its

8   litigation with Ariosa, Sequenom criticized Ariosa's expert, Dr. Eric Fearon, as being unqualified

9   to give an opinion about the '540 patent because he had "no expertise in prenatal diagnosis."  *See*

10  Dkt. No. 116 in 11-cv-063191, Exh. 1 at 3.  Having leveled this criticism, it is perplexing to see

11  Sequenom now contend that Dr. Metzker is an expert in the field of not just the Verinata/Stanford

12  patents, but also Sequenom's '540 patent.  Indeed, at deposition, Dr. Metzker confirmed that he

13  has no expertise in prenatal diagnosis.  *See* Exh. 3 [Metzker 5/31/13 Dep. Tr.] at 212:5-213:14.

14  Recognizing this, Sequenom altered its definition of the level of ordinary skill in the art

15  midstream in litigation so that it could use Dr. Metzker, a professional expert who has testified 10

16  times in the past and is a favorite of Sequenom's counsel at Kaye Scholer.  *See* Exh. 2 [Metzker

17  3/21/13 Dep. Tr.] at 12:3-6.  Simply put, while Sequenom has a penchant for making baseless

18  criticisms of the qualifications of its opponent's experts, it is Sequenom that has been reckless in

19  its use of expert witness testimony in this litigation.

20  ### III.   CONCLUSION

21  For the foregoing reasons, Sequenom's Objection should be denied in full.  No portion of

22  Dr. Brown's testimony should be excluded.  However, to the extent the Court considers granting

23  any aspect of Sequenom's Objection (it should not), any Court order should be targeted to (1)

24  only the specific substantive issues identified in Sequenom's Objection (*i.e.*, Dr. Brown's alleged

25  lack of knowledge regarding massively parallel signature sequencing) and (2) Dr. Brown's

26  rebuttal declaration.

27

28

1

Dated: July 17, 2013                    WEIL, GOTSHAL & MANGES LLP

2

By:  _____/s/ *Derek C. Walter*_____

3                                              Derek C. Walter
                                      Attorney for Verinata and Stanford

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28