# EXHIBIT 1

---

**Page 1**

1  UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF CALIFORNIA

   ------------------------------------------ x

3  VERINATA HEALTH, INC. and THE
   BOARD OF TRUSTEES OF THE LELAND

4  STANFORD JUNIOR UNIVERSITY,

5               Plaintiffs,

6          vs.

7  SEQUENOM, INC., and SEQUENOM
   CENTER FOR MOLECULAR MEDICINE, LLC,

8               Defendants.

9  3:12-cv-00865-SI

10 ------------------------------------------ x

   AND RELATED CROSS-ACTION.

11 ------------------------------------------ x

12

13                    201 Redwood Shores Parkway
                      Redwood Shores, California

14

                      March 19, 2013

15                    9:05 a.m.

16

17        VIDEOTAPED DEPOSITION OF STEPHEN BROWN, M.D.,

18 taken pursuant to Notice, before me, BRANDON D. COMBS,

19 a Certified Shorthand Reporter, called as a witness by

20 the Defendants, being first duly sworn, testified as

21 follows:

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor

24           New York, New York 10022
                  212-750-6434

25              Ref:  103109

---

**Page 2**

1  A P P E A R A N C E S :

2

3  KAYE SCHOLER, LLP

4  Appeared as counsel on behalf of the Defendants

5      1999 Avenue of the Stars

6      Suite 1700

7      Los Angeles, CA 90067-6048

8  by:  HANNA G. COHEN, Attorney at Law

9      Phone: 310-788-1015

10     Email: aton@kayescholer.com

11

12 WEIL, GOTSHAL & MANGES, LLP

13 Appeared as counsel on behalf of the Plaintiffs

14     201 Redwood Shores Parkway

15     Redwood Shores, CA 94065

16 by:  DEREK C. WALTER, Attorney at Law

17     Phone: 650-802-3934

18

19 ALSO PRESENT:

20     Marcus Burch

21     Stephen Holmes

22     Michael Metzker

23     Steve Patapoff, Videographer

24

25

---

**Page 3**

1  ---------------------- I N D E X ---------------------

2  WITNESS                    EXAMINATION BY              PAGE

3  STEPHEN BROWN, M.D.        MS. COHEN                     6

4

5

6  ----------------- E X H I B I T S ------------------

7  BROWN          DESCRIPTION                       FOR I.D.

8  Exhibit 1      Declaration of Stephen A. Brown         9

9  Exhibit 2      Sequence information can be             44

10               obtained from single DNA

11               molecules

12 Exhibit 3      017 Patent                              56

13 Exhibit 4      Patent Application Publication,         64

14               US 2003/0022207 A1

15 Exhibit 5      Rebuttal Declaration of Stephen         88

16               A. Brown

17 Exhibit 6      018 Patent                             108

18 Exhibit 7      PrimerStation: a highly                133

19               specific multiplex genomic

20               PCR primer design server for

21               the human genome

22 Exhibit 8      Provisional Application for            142

23               Patent Cover Sheet

24 Exhibit 9      The Year of Sequencing                 158

25

---

**Page 4**

1  ------------- E X H I B I T S (Cont'd) -------------

2  BROWN          DESCRIPTION                       FOR I.D.

3  Exhibit 10     CBot - fully automated clonal          167

4                 cluster generation for

5                 Illumina sequencing

6

7

8              (EXHIBITS TO BE PRODUCED)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

BROWN

1    BROWN
2  Q.  Did it have anything to do with
3  sequencing?
4  A.  No.  Molecular diagnostics.
5    MS. COHEN: I'm going to mark as Exhibit 1
6  the declaration of Stephen A. Brown, M.D., regarding
7  claim construction of U.S. patent numbers 7,888,0 --
8  sorry, 7,888,017 and 8,008,018.
9    (Whereupon, Exhibit 1 was marked for
10  identification.)
11  MS. COHEN:  Q.  Dr. Brown, do you
12  recognize this document?
13  A.  I do.
14  Q.  Is this your declaration in this case?
15  A.  Appears to be.
16  Q.  In connection for preparing for this
17  deposition, did you review this report?
18  A.  I have, yes.
19  Q.  Do you have any corrections to make on
20  this report?
21  A.  No.
22  Q.  Did you prepare this report?
23  A.  I participated extensively in the
24  preparation of it.
25  Q.  Can you describe your involvement in

Page 10

1    BROWN
2  preparing it.
3    MR. WALTER: I'll caution the witness not
4  to reveal the substance of any communications
5  between attorneys that assisted in the preparation.
6    THE WITNESS: In general terms, there were
7  many -- this declaration is the product of many
8  discussions between myself and attorneys
9  representing me and is the product of those
10  discussions.
11  MS. COHEN:  Q.  Okay.  Did you actually
12  physically type this declaration?
13  A.  I did not physically type this
14  declaration.
15  Q.  Okay.  So the attorneys actually typed it
16  up?
17  A.  Well, or their assistants.
18  Q.  Fair enough.
19    So you reviewed the declarations that they
20  typed up?
21  A.  Yes.
22  Q.  And did you make comments?
23  A.  Absolutely.
24  Q.  And you agree with everything that's said
25  in this declaration?

Page 11

1    BROWN
2  A.  Yes, I agree.
3  Q.  How many drafts of the declaration would
4  you say that you reviewed?
5  A.  I'm going to have to estimate that
6  roughly.  There must have been five, six, seven
7  drafts.
8  Q.  And how did you come to be retained as an
9  expert in this case?
10  A.  I received a phone call one day, I believe
11  it was from Mr. Walter, and he discussed with me
12  whether or not I'd be willing to serve in that
13  capacity.
14  Q.  Do you remember approximately when that
15  was?
16  A.  I'm afraid, actually, that I don't.  I
17  believe it was in the late summer or early autumn of
18  2012, but I'm not certain of that.
19  Q.  If you can please go to paragraph 17 of
20  your declaration.  And in paragraph 17 you define
21  the term massively parallel DNA sequencing as,
22  quote, any sequencing method that allows for the
23  acquisition of sequence information from multiple
24  DNA fragments in parallel, parentheses, e.g., the
25  Illumina sequencing platform, end of parentheses,

Page 12

1    BROWN
2  quotes.
3    Is that correct?
4  A.  Yes.
5  Q.  How did you come up with this definition?
6  A.  Sequencing technology has been an
7  evolution and certainly the idea of sequencing
8  multiple fragments in parallel was an idea that's
9  been around -- is an idea that's been around for
10  many years.  And the expansion of that to include
11  large numbers of fragments in parallel has acquired
12  the name of massive, quote/unquote.
13    I don't think massive has a specific
14  definition, but it's generally understood to be
15  larger than the numbers -- larger numbers that have
16  been possible in the past.
17  Q.  So when you say larger numbers than were
18  possible in the past, how many would that be?  Would
19  that be two, five?
20  A.  No.  I think that massive would -- to
21  qualify for -- understanding that the word massive
22  doesn't have a specific definition.  I think that
23  massive would have to be understood to have been
24  thousands, hundreds of thousands, perhaps millions.
25  Q.  And part of your definition of the

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

---

Page 13

BROWN

1   parallel DNA sequencing is any sequencing method.
2   What would be included in any sequencing method?
3       MR. WALTER: Objection. Vague.
4       THE WITNESS: I think any is an open-ended
5   term that could include methods that have been
6   described and methods that perhaps may yet be
7   described. The term massively parallel sequencing
8   doesn't specify.
9   MS. COHEN:  Q. Would that include Sanger
10  sequencing?
11  A. In my opinion, yes.
12      Q. Does it include Maxim-Gilbert sequencing?
13  A. In principle it could.
14      Q. And why would it include Sanger
15  sequencing?
16  A. Well, Sanger sequencing will allow the
17  acquisition of DNA sequencing. And the only
18  question would be, can it do enough DNA sequencing
19  in parallel to qualify for the term massive. And I
20  think that the history of DNA sequencing includes an
21  era when Sanger sequencing was as parallel and as
22  massive as was available.
23      Q. So Sanger sequencing could be massive as
24  you understand that term?

---

Page 14

BROWN

1   A. In principle.
2       Q. In your report you also discuss massively
3   parallel signature sequencing, is that also included
4   in your definition of any sequencing method?
5   A. Could be.
6       Q. And why is that?
7   A. It's another sequencing method that lends
8   itself to parallelism.
9       Q. Are you familiar with the term next
10  generation sequencing?
11  A. I've certainly heard the term, yes.
12      Q. And what does that term mean to you?
13  A. Again, this is not a word with a very
14  specific definition. But the way I would interpret
15  it is, for a number of years what was commercially
16  available were instruments that were capable of a
17  certain degree of parallelism and production of
18  sequence. And then through various technological
19  developments, there was a very large leap in degree
20  of parallelism that people in the world of genetics
21  and genomics colloquially refer to as next
22  generation because of it basically being a fairly
23  new departure.
24      Q. So in your opinion is next generation

---

Page 15

BROWN

1   sequencing the same thing as massively parallel DNA
2   sequencing?
3       MR. WALTER: Object as vague and object as
4   beyond the scope of his report.
5       THE WITNESS: Are you asking are the two
6   terms interchangeable?
7   MS. COHEN:  Q. Yes.
8       MR. WALTER: Same.
9       THE WITNESS: I'm not sure they're
10  interchangeable but there's overlap between them.
11  MS. COHEN:  Q. Do you mean that there's
12  next generation sequencing that is not massively
13  parallel sequencing?
14      MR. WALTER: Object again as being beyond
15  the scope of his report.
16      THE WITNESS: I guess next generation
17  sequencing is a term that I think is too vague to
18  specifically pin down in that way.
19  MS. COHEN:  Q. When I asked about next
20  generation sequencing, you answered that there's a
21  number of years, I would interpret it for a number
22  of years what was commercially available were
23  instruments that were capable of a certain degree of
24  parallelism and of production of sequence.

---

Page 16

BROWN

1   What time period are you talking about
2   when you say that?
3       MR. WALTER: Object again as vague.
4       THE WITNESS: I haven't -- in preparation
5   for this deposition, I didn't review the whole
6   history of automated DNA sequencing, but there's a
7   clear evolution with first instruments that were not
8   parallel at all to instruments that had a small
9   degree of parallelism and subsequently larger
10  degrees of parallelism. And this all occurred,
11  roughly speaking, in the 1990s.
12  MS. COHEN:  Q. So the switch from
13  nonparallelism to parallelism was around the 1990s?
14      MR. WALTER: Objection. Vague. And I'll
15  object to the extent that the question
16  mischaracterizes the testimony.
17      THE WITNESS: I guess I'll say again there
18  was an evolution and I'm not -- I haven't reviewed
19  the dates of all aspects of that evolution.
20  MS. COHEN:  Q. Do you know if companies
21  have in the past produced massively parallel DNA
22  sequencing platforms?
23      MR. WALTER: Objection. Vague.
24      THE WITNESS: Certainly I know some of the

---

Page 17

```
 1      BROWN
 2  companies.
 3  MS. COHEN:  Q.  But you're not familiar
 4  with all of them?
 5  A.  I wouldn't claim to be familiar with all
 6  of them.
 7      Q.  Which ones are you familiar with?
 8  A.  I had some familiarity with, certainly,
 9  Illumina, Applied Biosystems.  I have some knowledge
10  of 454, some knowledge of Helicos.
11      Q.  Can you tell me about the evolution of the
12  Solexa sequencer?
13      MR. WALTER: Objection.  Vague.
14      THE WITNESS: What aspect of the
15  evolution?
16  MS. COHEN:  Q.  Anything that you know
17  about it from the beginning until its current
18  incarnation.
19      MR. WALTER: Objection.  Vague.  And I'll
20  object to the extent that the question calls for a
21  narrative.
22      Can you break that down?
23  MS. COHEN:  Q.  When did Solexa begin
24  making massively parallel DNA sequencing platforms?
25  A.  Well, I think my report has dates about
```

Page 18

```
 1      BROWN
 2  that in it.  This is the initial declaration, and I
 3  think the specific dates are in the rebuttal
 4  declaration.
 5      Q.  Do you recall any of those dates without
 6  looking at your declaration?
 7      MR. WALTER: Objection.  Vague.  And I
 8  would caution the witness not to speculate.
 9      THE WITNESS: I have all of those dates
10  lined out in a document.  I would hesitate to come
11  up with a date by memory that was wrong.
12  MS. COHEN:  Q.  Can you tell me anything
13  about how the first Solexa massively parallel DNA
14  sequencing platform came about?
15      MR. WALTER: Objection.  Vague, beyond the
16  scope.
17      THE WITNESS: I'm sorry.  Do you mean, for
18  instance, who invented it?
19  MS. COHEN:  Q.  Sure.  Who invented it,
20  what its features were, anything about it?
21  A.  Yeah.  I don't have a detailed knowledge
22  of the specifics of the evolution of that instrument
23  platform.
24      Q.  Would you say that you have a knowledge of
25  the operation and application of massively parallel
```

Page 19

```
 1      BROWN
 2  DNA sequencing platforms?
 3  A.  Yes.
 4      Q.  Which platforms?
 5  A.  I know most about Illumina.
 6      Q.  And which platform of Illumina do you know
 7  most about?
 8  A.  I would say I have a general knowledge of
 9  their sequencing products.
10      Q.  And what are their sequencing products?
11  A.  I hesitate to use specific product names
12  because I don't have necessarily memorized them.
13      Q.  Approximately how many products,
14  sequencing products, does Illumina have?
15      MR. WALTER: Objection.  Vague, beyond the
16  scope.
17      THE WITNESS: I believe there's at least
18  three instruments.
19  MS. COHEN:  Q.  Okay.  And you believe
20  that you don't recall the actual names of three
21  instruments?
22  A.  No.
23      Q.  Can you tell me about the operation and
24  application of Sanger sequencing?
25      MR. WALTER: Objection.  Vague.
```

Page 20

```
 1      BROWN
 2  Go ahead and answer.
 3      THE WITNESS: Are you asking me to go
 4  through all the steps of how one does
 5  Sanger sequencing?
 6  MS. COHEN:  Q.  Sure, yes.  How would you
 7  do Sanger sequencing?
 8      MR. WALTER: Objection.  Vague, calls for
 9  a narrative.
10      Go ahead and answer.
11      THE WITNESS: I'll run through the steps.
12  The fundamental idea is you have a fragment of DNA
13  which you wish to sequence, and you have a primer
14  that you can allele to that single-stranded
15  sequence.  And you have a polymerase that allows
16  extension of a complementary copy of the strand that
17  you wish to sequence beginning with the primer that
18  you've alleled.
19      And you have nucleotide triphosphates that
20  the polymerase is capable of using as substrate to
21  continue the extension of the complementary copy.
22      But you've also got in the mixture of
23  nucleotide triphosphates ones that are colloquially
24  referred to as chain terminators or
25  dideoxynucleotides that cannot be extended, so that
```

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

---

Page 21

1    BROWN
2  what you end up with at the end of the series or
3  even at the end of one extension of a large number
4  of molecules, what you end up with is chain
5  terminated fragments corresponding to all of the
6  different possible extension products.
7        And then all you need is a way to resolve
8  those, and you'll know the DNA sequence.  Methods of
9  resolving those have been several over the years.
10 MS. COHEN:  Q.  And what are some
11 applications in which Sanger sequencing is useful?
12    **MR. WALTER:** Objection.  Vague.
13    Go ahead and answer.
14    **THE WITNESS:** I can think of an infinite
15 number of situations in which Sanger sequencing
16 could be useful.
17 MS. COHEN:  Q.  Could you just give me one
18 or two examples.
19 **A.  You want to know if a given patient's DNA**
20 **sample harbors a mutation, a gene mutation, so you**
21 **can use Sanger sequencing to determine that.**
22 **Q.  Can you tell me a little bit about the 454**
23 **sequencer and its operation?**
24    **MR. WALTER:** Objection.  Vague.
25    **THE WITNESS:** Not sure how to answer that.

---

Page 22

1    BROWN
2  It seems open-ended.
3  MS. COHEN:  Q.  How does it work, what
4  kind of chemistry does it have?  Can you tell me
5  anything about its operation?
6    **MR. WALTER:** Objection.  Vague.
7    Go ahead and answer.
8    **THE WITNESS:** My understanding of the 454
9  device is that it makes use of something called
10 pyrosequencing and that it achieves parallelism by
11 isolating reactions in smaller droplets of liquid
12 that contain the necessary chemistry.
13 MS. COHEN:  Q.  And what is
14 pyrosequencing?
15 **A.  Pyrosequencing is a sequencing technology**
16 **that instead of using chain terminators to signify**
17 **addition of a base to an elongated chain, the**
18 **polymerase when it incorporates the next base emits**
19 **light, and then a device records the output of**
20 **light.**
21 **Q.  Can you generally tell me about the**
22 **operation of a solid sequencing platform?**
23    **MR. WALTER:** Same objection.  Vague.
24    **THE WITNESS:** Yeah, I -- in preparation
25 for today's deposition, I did not deeply review how

---

Page 23

1    BROWN
2  the -- the details of the solid sequencing platform.
3  MS. COHEN:  Q.  Is the solid sequencing
4  platform a massively parallel DNA sequencing
5  platform?
6  **A.  My understanding is yes.**
7  **Q.  But you're not familiar with the operation**
8  **of a solid sequencing platform?**
9    **MR. WALTER:** I'll object to the extent
10 that the question mischaracterizes the testimony.
11    Go ahead and answer.
12    **THE WITNESS:** I have a general knowledge
13 of the solid device.
14 MS. COHEN:  Q.  Okay.  And what is your
15 general knowledge of the solid sequencing platform?
16    **MR. WALTER:** Objection.  Vague.
17    **THE WITNESS:** It achieves sequencing
18 through -- instead of polymerase activity, through
19 DNA ligation.
20 MS. COHEN:  Q.  And what is DNA ligation?
21    **MR. WALTER:** Objection.  Vague.
22    Go ahead and answer.  Take as much time as
23 you need to answer that kind of a question.
24    **THE WITNESS:** Well, in general terms, a
25 DNA molecule has a phosphate backbone, and on

---

Page 24

1    BROWN
2  several -- a strand of DNA has both a beginning and
3  an end, and one can take two strands of DNA and
4  ligate them together to form a longer strand.  And
5  that step of attaching the two strands together
6  through their phosphate backbone is called ligation.
7  MS. COHEN:  Q.  And how do you use the
8  ligation to massively sequence?
9    **MR. WALTER:** Objection.  Vague, calls for
10 a narrative.
11    Go ahead and answer.
12    **THE WITNESS:** Well, the fundamental idea
13 is in order to achieve ligation, two strands have to
14 be juxtaposed by a complementary strand and that
15 juxtaposition has to be precise so that the ligation
16 only occurs when there's a precise alleling of two
17 strands to a complementary strand, and that allows
18 you to interrogate the bases that are at the point
19 of ligation.
20 MS. COHEN:  Q.  The definition that you
21 provide for massively parallel DNA sequencing in
22 paragraph 17 of your declaration, is that the
23 definition that a person of ordinary skill in the
24 art in February of 2006 would have for that term?
25 **A.  I believe so, yes.**

---

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 25

BROWN

1    BROWN
2    Q.  So in February of 2006 a person looking at
3    your definition of massively parallel DNA sequencing
4    would have known what the Illumina sequencing
5    platform is?
6    A.  They would have known of a sequencing
7    platform of that kind, yeah.
8    MS.  COHEN:  Q.  Would they have understood
9    what the Illumina sequencing platform is, though?
10   A.  I guess your question is specific to date.
11   Could you state the date again.
12   Q.  Sure.  As of February of 2006.
13   A.  Again, I have the dates of events in 2006
14   in my rebuttal declaration.  But at that time there
15   was a period of transition between what people would
16   have referred to as the Solexa platform, which was
17   then acquired by Illumina, at least temporarily
18   around the time that you're referring to people
19   referred to it as Illumina/Solexa.
20   Q.  So you believe that in February of 2006
21   somebody would have understood that when you say
22   Illumina you actually mean Solexa?
23   MR.  WALTER:  Objection.  Vague.
24   THE WITNESS:  It's a period of transition
25   of the naming of the instrumentation.

Page 26

1    BROWN
2    MS.  COHEN:  Q.  But you don't recall the
3    specific dates of when the transition actually
4    occurred?
5    A.  Well, there's the dates of the transition
6    in terms of acquisition of Solexa by Illumina, and
7    then there's also the more vague occurrence of the
8    use of the common use of language.
9    My other document, that rebuttal, includes
10   the dates of the acquisition.
11   Q.  If there was no Illumina sequencing
12   platform in February of 2006, how would a person of
13   ordinary skill in the art know what you mean by,
14   e.g., the Illumina sequencing platform?
15   MR.  WALTER:  Objection.  Vague.
16   THE WITNESS:  I'm sorry, your question
17   was?
18   MS.  COHEN:  Q.  If there was no Illumina
19   sequencing platform in February of 2006, how would a
20   person of ordinary skill in the art know what you
21   mean by, e.g., Illumina sequencing platform?
22   A.  I'm sorry.  That's a hypothetical.  If
23   there were no -- there was such a sequencing
24   platform at that time, so I'm --
25   Q.  There was a sequencing platform in 2006

Page 27

1    BROWN
2    that was known as the Illumina sequencing platform?
3    A.  Illumina perhaps or Illumina/Solexa.
4    Q.  In February of 2006, there was an Illumina
5    sequencing platform?
6    A.  Again, I'd have to refer to my declaration
7    to have the exact dates.
8    Q.  If you assume -- I would like you to
9    assume that in February of 2006 there was no product
10   known as the Illumina sequencing platform, how would
11   you know in February of 2006 what you mean then when
12   you say the Illumina sequencing platform in your
13   definition?
14   MR.  WALTER:  Objection.  Vague, incomplete
15   hypothetical.
16   THE WITNESS:  I'm going to try to restate
17   the question to make sure I understand it.  In
18   February 2006, if there was no specific product
19   known as the Illumina sequencing platform, how would
20   one have known?  Is that --
21   MS.  COHEN:  Q.  How would one have
22   understood your definition which includes the
23   phrase, e.g., the Illumina sequencing platform?
24   A.  Well, I guess if I accept the
25   hypothetical, then -- I'm sorry.  I'm tied up in

Page 28

1    BROWN
2    hypotheticals here.  You're saying if there was no
3    such thing.
4    Q.  Right.  So in your declaration you state,
5    as of February of 2006, a person of skill in the art
6    would have had an understanding of the term
7    massively parallel DNA sequencing to include the
8    phrase, e.g., the Illumina sequencing platform.  I
9    will represent to you that there was no product
10   known as the Illumina sequencing platform.
11   What would a person of skill in the art in
12   February of 2006 have understood that phrase as
13   then?
14   A.  They would have understood it as a
15   massively parallel DNA sequencing platform that they
16   had -- that would be, if not imminently, then had
17   already been offered as a commercial product by
18   Illumina.
19   Q.  Was Illumina selling commercial sequencing
20   products in February of 2006?
21   A.  Again, I would have to go to my
22   documentation of that time period.  It is well
23   documented in my report.
24   Q.  Without looking at your report, you have
25   no recollection of the dates of when Illumina

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 37

1　　　BROWN
2　　　MR. WALTER: Counsel, he cites a document
3　regarding massively parallel sequencing in his
4　report. If you would like to show him the document
5　and ask him questions about it, that's fine, but
6　we've done enough memory tests.
7　　　MS. COHEN: It's not a memory test to ask
8　him what that platform uses.
9　　　MR. WALTER: You've done it for an hour
10　now. If you want to ask him with that, fine. You
11　want to ask him about the document he cites
12　regarding this and ask him questions about it, give
13　him a chance to review it, that's fine.
14　　　MS. COHEN: I assume he has reviewed it
15　since it's included in his report.
16　　　Q. Can you please answer my question.
17　A. I guess I have to rephrase it to make sure
18　that I have it.
19　　　You're saying is -- whether or not the
20　massively parallel signature sequencing platform
21　uses a polymerase or not, is that a general aspect
22　of its -- no, that's a specific aspect of its
23　technical character.
24　　　Q. So a person of ordinary skill in the art
25　who understands the operation of a massively

Page 38

1　　　BROWN
2　parallel DNA sequencing platform would not know
3　whether massive parallel signature sequencing uses
4　DNA polymerase?
5　　　MR. WALTER: Objection. Vague, incomplete
6　hypothetical.
7　　　THE WITNESS: One certainly might not
8　know.
9　MS. COHEN:　Q. One of ordinary skill in
10　the art?
11　A. One of ordinary skill in the art, yes.
12　　　MR. WALTER: We've been going for an hour,
13　can we take a break now?
14　　　MS. COHEN: Yes.
15　　　THE VIDEOGRAPHER: We're now off the
16　record. The time is 10:05 a.m.
17　　　(Recess taken.)
18　　　THE VIDEOGRAPHER: We're now back on the
19　record at 10:21 a.m.
20　MS. COHEN:　Q. Dr. Brown, which DNA --
21　which massively parallel DNA sequencing platforms do
22　you know the operation of?
23　　　MR. WALTER: Objection. Vague, asked and
24　answered, calls for a narrative.
25　　　MS. COHEN: I'm just asking for a list of

Page 39

1　　　BROWN
2　the platforms.
3　　　MR. WALTER: Asked and answered, he's
4　already provided that.
5　　　Go ahead and answer.
6　　　THE WITNESS: I guess know the operations
7　of is a term I don't quite understand, and I'd like
8　clarification.
9　MS. COHEN:　Q. Which massively parallel
10　sequencing platforms do you know the operation of to
11　the extent that you could tell me how those
12　platforms work?
13　　　MR. WALTER: Objection. Asked and
14　answered.
15　　　THE WITNESS: I think what my report
16　focuses on is my preparation. It's mostly geared
17　towards the Illumina platform.
18　MS. COHEN:　Q. Which Illumina platform?
19　A. Illumina platforms in general.
20　　　Q. And can you name a specific Illumina
21　platforms?
22　　　MR. WALTER: Objection. Asked and
23　answered.
24　　　THE WITNESS: You already asked me that
25　some time ago and I answered that I don't have the

Page 40

1　　　BROWN
2　names memorized.
3　MS. COHEN:　Q. Are you familiar with the
4　Illumina sequencing platform called the HiSeq 2000?
5　A. I know the name, I've heard the name.
6　　　Q. Are you familiar with that platform to the
7　extent that you can tell me how it works?
8　A. I know in general terms how it works.
9　　　Q. Do you know specifically how it works?
10　　　MR. WALTER: Objection. Vague.
11　　　What do you mean by specifically? Are you
12　asking him to tell you every detail about how the
13　Illumina sequencing platform works or do you want to
14　give him a general description, like you already
15　did, of 454, is that what you'd like?
16　　　MS. COHEN: I would like his knowledge
17　about how the Illumina HiSeq 2000 works.
18　　　MR. WALTER: You would like a core dump of
19　how the HiSeq 2000 works, everything in his head on
20　how HiSeq works.
21　　　MS. COHEN: I would like you to stop
22　making speaking objections.
23　　　MR. WALTER: Well, he needs -- objection.
24　Vague.
25　　　THE WITNESS: My preparation for this

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

---

Page 41

1    BROWN
2 deposition I don't think includes a detailed
3 description of how the Illumina HiSeq 2000 operation
4 goes, step-by-step.
5    MR. WALTER: Go ahead and provide your
6 general understanding, what you know.  Please
7 provide the description.
8    THE WITNESS: Well, Illumina sequencing --
9    MR. WALTER: Tell her everything you know
10 about the Illumina sequencing platform.  Everything
11 you can think of, tell her.
12    THE WITNESS: Well, Illumina sequencing,
13 in general, relies on the idea of taking fragments
14 of DNA and placing them on a solid support in such a
15 dilution that only one fragment is located in any
16 given geographical area of the solid support not
17 surrounded, in general, by others, and then performs
18 an amplification step that is on the solid support
19 so that each individual fragment results in a
20 physical clustering of copies of that fragment.
21    And those physical clusters of copy are
22 then used in a subsequent step for sequencing that
23 proceeds by sequencing by synthesis where a
24 polymerase adds a nucleotide that has a fluorophore
25 attached to it that corresponds to the complementary

---

Page 42

1    BROWN
2 nucleotide on the strand that one is sequencing.
3    A scanner then obtains fluorescence output
4 from that physical cluster and records it.  And then
5 after a photo bleaching step to get rid of the
6 fluorochrome color, another round of addition of the
7 next base occurs, and so forth, resulting in
8 sequence information from a very large number of
9 such physically constrained clusters of DNA on the
10 cell.
11 MS. COHEN:  Q. And why does the platform
12 make physical clusters of the fragments?
13    MR. WALTER: Objection.  Vague.
14    THE WITNESS: Why does it or how does it?
15 MS. COHEN:  Q. Why does it?
16 A.  Because if they weren't contained in
17 space, then there would not -- there would be a
18 general amplification of all of the DNA, and
19 thereby, be not useful for obtaining sequence of
20 individual strands.
21 Q.  Why are you using clusters as opposed to
22 just using the individual strands?
23 A.  In other words, no amplification step?
24 Q.  Correct.
25 A.  Not enough signal.

---

Page 43

1    BROWN
2 Q.  Do you have any knowledge of the Helicos
3 massively parallel DNA sequencing platform?
4 A.  Again, general terms, yes.
5 Q.  What is your understanding of that
6 platform?
7    MR. WALTER: Objection.  Vague.
8    Again, just go ahead and tell her
9 everything you know of Helicos.
10    THE WITNESS: Helicos is described in
11 detail in exhibits attached to my report.
12 MS. COHEN:  Q. Do you know which
13 exhibits?
14 A.  The number, I don't recall, but the name
15 of the first author of a significant paper is -- I'm
16 not good at pronouncing it, it's Polish -- was
17 Braslavsky.
18 Q.  Braslavsky.
19    Braslavsky describes the Helicos massively
20 parallel DNA sequencing platform?
21 A.  Well, it describes the general underlying
22 principle.
23 Q.  Are there differences between the Helicos
24 platform and the Illumina platform?
25 A.  Certainly.

---

Page 44

1    BROWN
2 Q.  Can you give me some of those differences.
3 A.  Well, in Helicos platform, a polymerase is
4 physically constrained in a small cell and DNA
5 synthesis occurs.
6    You know, I -- in thinking this through,
7 I'm not sure that -- I may be actually confusing two
8 different technologies here.  I would have to refer
9 back to documents to be certain.
10 Q.  Does -- do you know if the Helicos
11 platform uses photo bleaching?
12 A.  Uses?
13 Q.  Uses photo bleaching.
14 A.  I believe that -- I'm not certain.  I
15 would have to refer to documents and to review that
16 in detail before I could answer.
17    MS. COHEN: I'm going to mark as Exhibit 2
18 one of the exhibits to your declaration.  This is
19 the article by -- that's your copy -- Ito
20 Braslavsky, titled Sequence Information can be
21 Obtained from Single DNA Molecules.  It's Bates
22 number VRNTA0006219 through 6223.
23    (Whereupon, Exhibit 2 was marked for
24    identification.)
25 MS. COHEN:  Q. Is this the Braslavsky

---

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

---

Page 73

BROWN

1 read?
2
3    MR. WALTER: Objection. Mischaracterizes
4 the testimony.
5    THE WITNESS: I guess I would say it would
6 describe a sufficiently long read for
7 identification.
8 MS. COHEN:  Q. The discussion of
9 alignment in column 20 aligns sequences uniquely.
10 A.  I'm sorry. There was -- I didn't hear a
11 question there.
12 Q.  Does the discussion of alignment in column
13 20 align sequences uniquely?
14 A.  What it says is only about 30 base pairs
15 of random sequence information are needed to
16 identify a sequence as belonging to a specific human
17 chromosome.
18 Q.  So unique location of the genome?
19 A.  It doesn't use that terminology.
20 Q.  Is that your understanding of what it
21 says?
22 A.  Well, to me identification -- or rather,
23 identify a sequence as belonging to a specific human
24 chromosome, the word specific implies that that
25 sequences only occurred on that chromosome.

---

Page 74

BROWN

1
2 Q.  And then if you continue reading, it says,
3 longer sequences can uniquely identify more
4 particular targets. What does that mean?
5 A.  The whole explanation, okay, one can
6 imagine a sequence of 30 bases that aligns to
7 several parts of a human genome or another genome,
8 but then the 31st base distinguishes it from -- so
9 that it aligns perfectly to one location but not to
10 another, and so forth beyond 31.
11 Q.  Does column 20 of the '017 patent tell you
12 anything about aligning sequences that have
13 mismatches?
14    MR. WALTER: Again, what does that have to
15 do with claim construction?
16    MS. COHEN: Alignment is part of massively
17 parallel DNA sequencing. If we're getting his
18 understanding of what massively parallel DNA
19 sequencing is, I want to know his understanding of
20 alignment.
21    MR. WALTER: No, that's a written
22 description and enablement question and you're
23 beyond the scope of his report and I'm going to
24 instruct the witness not to answer.
25 MS.  COHEN:  Q. Are you going to follow

---

Page 75

BROWN

1
2 your attorney's instructions?
3 A.  Well, I'll just say that the details of
4 alignment and how much mismatch and how much isn't
5 is not what I prepared to discuss today.
6 Q.  Can you tell me a little bit about your
7 background in massively parallel DNA sequencing,
8 your specific training and any use of it.
9 A.  I'm a human geneticist. And the knowledge
10 of human and other genomes and how they function,
11 how genes are encoded, how information is conveyed
12 from generation to generation is a general topic for
13 me in my life, both as physician and scientist.
14    And obtaining sequence information is
15 central to the whole subject and general knowledge
16 of how sequence information is obtained and what are
17 the parameters around which the technologies work
18 and depend is something that -- something of
19 necessity that I know about.
20 Q.  Have you done experiments using massively
21 parallel DNA sequencing?
22 A.  Not -- no research experiments. I've used
23 massively parallel sequencing in the context of
24 ordering clinical tests on patients.
25 Q.  Do you have personal research experience

---

Page 76

BROWN

1
2 with any type of sequencing?
3 A.  Yes.
4 Q.  What would that be?
5 A.  Well, if one turns back the clock to the
6 early 1990s, I used to do experiments that involved
7 sequencing of DNA using conventional Sanger
8 sequencing with polyacrylamide gels and labeled
9 primers. Radio labeled primers.
10    And then later as the technology changed,
11 I made extensive use of Sanger sequencing with
12 fluorochrome labeled terminators.
13 Q.  And did you publish on any of your
14 experiments with sequencing?
15 A.  I have.
16 Q.  Do you have any relationships with any of
17 the parties to this litigation? Do you know the
18 parties to this litigation, first of all?
19 A.  That's not that easy to figure out. No, I
20 don't. If I have any relationship to any of the
21 parties in this litigation, I'm unaware of it.
22    MR. WALTER: You should identify the
23 parties for completeness.
24    MS. COHEN: Yes, I'm getting there.
25 Q.  One of the parties in this litigation is

---

---

Page 77

BROWN

1    BROWN
2    Verinata.
3  A.  That much I am aware of.
4  Q.  Verinata Health, Inc., do you have any
5    relationship with that party?
6  A.  None whatsoever.
7  Q.  Another party --
8  A.  Well, I'm sorry, that's not fair.  They've
9    retained me in this capacity.
10  Q.  Aside from your consulting in this case,
11    do you have any relationship with Verinata?
12  A.  None.
13  Q.  Do you have -- aside from your consulting
14    in this case, do you have any relationship with the
15    board of trustees of the Leland Stanford Junior
16    University?
17  A.  None whatsoever.
18  Q.  Do you have any relationships with
19    Illumina?
20  A.  None whatsoever.
21  Q.  Do you have any relationships with
22    Sequenom, Inc. or Sequenom Center for Molecular
23    Medicine?
24  A.  None whatsoever.
25  Q.  And do you have any relationships with

---

Page 78

1    BROWN
2    Isis Innovation Limited?
3  A.  Not at all.
4  Q.  Have you ever given any talks sponsored by
5    any of the parties to this litigation?
6  A.  Actually, yes.  I once gave a talk
7    sponsored by Sequenom.  It wasn't about this topic
8    at all, but it was sponsored by Sequenom.
9  Q.  Do you remember when that was?
10  A.  No.  I'm sure that if that date is
11    important, I could obtain it from some records that
12    I have, but --
13  Q.  And do you remember the substance of the
14    talk that you gave?
15  A.  It was about noninvasive detection of
16    fetal Rh genotype.
17  Q.  Is that something that you've personally
18    worked on?
19  A.  Yes, it is.
20  Q.  And you were paid by Sequenom?
21  A.  Not a cent.
22  Q.  How much are you getting paid for your
23    consulting services in this litigation?
24  A.  I believe that's in my report here at the
25    end, and I believe it says my compensation for

---

Page 79

1    BROWN
2    consulting on this matter is $500 per hour.
3  Q.  What did you do to prepare for this
4    deposition?
5  A.  Well, I've had numerous discussions with
6    attorneys involved in the case.
7  Q.  Did you review any documents?
8  A.  And I've reviewed relevant documents.
9  Q.  Do you remember which documents you
10    reviewed?
11  A.  Certainly my report.  I've reviewed the
12    reports of other experts.  I've reviewed the '017
13    and '018 patents.
14  Q.  And which reports of other experts did you
15    review?
16  A.  I've reviewed the report of Dr. Michael
17    Metzker.
18  Q.  Anyone else?
19  A.  At some point, not recently, I reviewed
20    the report of Dr. Gabriel.  Was that her name?
21  Q.  Stacy Gabriel.
22  A.  Yes.
23  Q.  Anyone else?
24  A.  No, not that I recall.
25  Q.  Okay.  If you turn to paragraph 22 --

---

Page 80

1    BROWN
2    actually, it starts before that on page 9, section
3    2.
4  A.  Of?
5  Q.  Of your declaration, which relates to the
6    claim terms, massively parallel DNA sequencing of
7    the random fragments of genomic DNA and massively
8    parallel DNA sequencing of DNA fragments randomly
9    selected.
10    Do you see that section?
11  A.  You're referring to the claim terms from
12    '017 and '018?
13  Q.  Correct.
14  A.  Yes.
15  Q.  And in your opinion, do these two claim
16    terms mean the same thing?
17  A.  Yes.
18  Q.  Do they have the same wording?
19  A.  Almost exactly the same.
20  Q.  Is it identical?
21  A.  Well, no, of course it's not.  You can see
22    that.
23  Q.  So you believe there's no meaningful way
24    in which the difference in the wording of the claim
25    terms influences what is meant by those claim terms?

---

Page 85

BROWN

2   Q.  Yes.
3   A.  Yes, I do.  But if I understand the line
4   of questioning, the patent, '017 application, claim
5   language does not specify that the DNA that one
6   obtains from the maternal whatever is randomly
7   fragmented or not.  I don't think and I don't
8   believe that one of ordinary skill in the art would
9   have understood that it did mean that, because it
10  doesn't say that.
11  Q.  Is the DNA that is being tested in using
12  the claims -- claim 17 of the '017 patent, randomly
13  fragmented?
14  A.  Is it randomly fragmented, I don't think
15  we know.  I don't know.
16  Q.  So when you have a mom, and you're testing
17  her for aneuploidy, and you draw her blood and
18  you're using the circulating cell free fetal DNA or
19  cell free DNA for this purpose, is that DNA randomly
20  fragmented?
21  A.  I don't know, and I don't think that
22  that's discussed in '017 or in my report.
23  Q.  What is your understanding of the term
24  targeted sequencing?
25  A.  I'm not certain what that term means.

Page 86

BROWN

2   Q.  It doesn't have a meaning to you at all?
3   A.  No, it doesn't.  I could -- well, that
4   would be speculating.
5   Q.  When you're sequencing something -- when
6   you're sequencing a sample DNA fragment, do you have
7   to sequence everything in that sample, or can you
8   select things from that sample to be sequenced?
9   A.  There are methods for sequencing.
10  Q.  So you can first select for certain
11  sequences, and then sequence those sequences?
12  A.  At least to some extent.
13  Q.  And what would you call those methods if
14  you had to generally put them into a category, what
15  would you call them?
16  A.  Perhaps enrichment methods.
17  Q.  Why would you call them enrichment
18  methods?
19  A.  I would point out that there is a whole
20  discussion of such methodology in my part of my
21  report that I don't have.  But your question is why
22  would one refer to them as enrichment methods as
23  opposed to --
24  Q.  Why would you call them enrichment
25  methods?  You said that you would call them

Page 87

BROWN

2   generally enrichment methods, I just wanted to know
3   why.
4   A.  The idea is, one, that's a selection of
5   DNA fragments, and one would like to separate out
6   from that -- I think what you're asking is one would
7   like to separate out from that the ones that one
8   particularly wants to sequence, I can imagine.  And
9   that -- and then there are methods that would at
10  least enrich the ones that perhaps you might want to
11  sequence.  But this is not -- has nothing to do with
12  '017.
13  Q.  Do you understand Dr. Metzker's opinion on
14  the definition of the claim terms we were
15  discussing, the massively parallel DNA sequencing of
16  the random fragments of genomic DNA and massively
17  parallel DNA sequencing of DNA fragments randomly
18  selected?
19  A.  There's, again, an entire discussion of
20  that topic in my report that I don't have.
21  MS. COHEN:  Okay.  And I will give you
22  that report.  Marking as the next exhibit the
23  Rebuttal Declaration of Stephen A. Brown, M.D.
24  Regarding Claim Construction of US Patent Nos.
25  7,888,017 and 8,008,018.

Page 88

BROWN

2   (Whereupon, Exhibit 5 was marked for
3   identification.)
4   MS. COHEN:  Q.  So having that report in
5   front of you, your rebuttal declaration, do you
6   understand Dr. Metzker's definition on the two claim
7   terms that we were discussing?
8   A.  No, I don't.
9   Q.  You do not understand Dr. Metzker's
10  definition?
11  A.  Dr. Metzker, you asked Dr. Metzker's
12  opinion before.
13  Q.  I'm sorry, I'm reading from here, and it
14  says, definition --
15  A.  Definition, I'm sorry.  So which
16  definition are you asking me about, then?
17  Q.  The definitions that he provides for the
18  two claim terms that we're discussing.  So we're
19  talking about massively parallel DNA sequencing of
20  the random fragments of genomic DNA as that's used
21  in the '017 patent and massively parallel DNA
22  sequencing of DNA fragments randomly selected as
23  used in the '018 patent.
24  A.  No, I don't understand his definition.
25  Q.  What is his definition of the first term,

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 89

BROWN

1 the one of the '017 patent?
2 A.  Do you have Dr. Metzker's declaration
3 there available?
4 Q.  If you want to take a look at your -- I
5 do, but I don't know if it's necessary to pull it
6 out quite yet.  If you look at your original
7 declaration on page 9.
8 A.  Yeah.
9 Q.  Do you see Dr. Metzker's definition of
10 massively parallel DNA sequencing of the random
11 fragments of genomic DNA?
12 A.  Are you taking that to be the same as
13 Sequenom's proposed construction?
14 Q.  Yes.  Dr. Metzker provided his declaration
15 on behalf of Sequenom.
16 A.  So it says, massively parallel DNA
17 sequencing of the random fragments of genomic DNA in
18 each discrete reaction samples to detect the
19 presence of the target sequence.  And the terms
20 there that I don't understand would be discrete
21 reaction samples and target samples.
22 Q.  So target sequence does not have a meaning
23 to you?
24 A.  No.

Page 90

BROWN

1 Q.  And a discrete reaction sample does not
2 have a meaning to you?
3 A.  In a general sense, I could imagine a
4 discrete reaction sample, but I don't see any way to
5 understand how it comes up in the context of the
6 claim 17 of '017.
7 Q.  Does the '017 patent specification discuss
8 discrete reaction samples?
9 A.  In the entire specification?
10 Q.  Yes.
11 A.  There are places where it discusses such
12 discrete reaction samples.
13 Q.  And given that the '017 patent discusses
14 discrete reaction samples, you still do not
15 understand what Dr. Metzker means by discrete
16 reaction samples in his proposed definition of his
17 review of the '017 patent?
18 A.  No, I don't understand.
19 Q.  In paragraph 24 of your original
20 declaration --
21 A.  Yes.
22 Q.  -- the second sentence says, to the extent
23 Sequenom's construction reflects an effort to draw a
24 distinction between sequencing of a subset of

Page 91

BROWN

1 preselected DNA fragments in a mixture and the
2 random fragments of DNA fragments in a mixture, I
3 believe that Sequenom's proposed construction are
4 incorrect and inconsistent with how one of ordinary
5 skill in the art would have interpreted the patents.
6 What do you mean by subset of preselected
7 DNA fragments?
8 A.  As we discussed previously, there are
9 methods in general that would allow one to preselect
10 or enrich for, if you prefer that language, DNA
11 fragments before sequencing.
12 Q.  Are such methods described in the
13 specification of the '017 patent?
14 A.  No.
15 Q.  So the specification does not describe
16 sequencing as a subset of preselected DNA fragments?
17 A.  I don't believe so, no.
18 Q.  So if you read the next sentence of
19 paragraph 24 where we stopped, it says, indeed, as
20 set forth below, those with ordinary skill in the
21 art would have understood that both of the claim
22 terms addressed in this section of my declaration
23 cover massively parallel sequencing of random DNA
24 fragments, as is possible using the Illumina

Page 92

BROWN

1 sequencing platform, in addition to massively
2 parallel sequencing methods that sequence
3 preselected fragments.
4 Are you not saying there that the
5 specification describes massively parallel
6 sequencing that sequence preselected fragments?
7 A.  I'm sorry.  I have to get you to rephrase.
8 There were several negatives in that question.
9 Q.  So you previously answered that the
10 specification does not describe sequencing of a
11 substantive preselected DNA fragments.
12 A.  Correct.
13 Q.  I'm asking you if that is consistent with
14 what you wrote in this last sentence of paragraph 24
15 of your original declaration.
16 A.  Well, claim terms describe massively
17 parallel sequencing of random DNA fragments.
18 Massively parallel sequencing itself could pertain
19 to preselected fragments, but claim terms are clear
20 to massive parallel sequencing of random DNA
21 fragments.
22 And I guess if you continue reading
23 paragraph 25, 26, 27, so forth, it goes on to
24 elaborate on this.

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 129

1  BROWN
2  A.  The specification of the '017 patent does
3  discuss, for instance, discrete reaction samples,
4  and does discuss statistical significance but not in
5  the same context as the claim term in question.
6  Q.  Will the method of claim 17 of the '017
7  patent work without a statistically significant
8  number of samples?
9      MR. WALTER: Objection. Vague.  Vague as
10  to statistically significant.
11     THE WITNESS: I think that the concept of
12  statistical significance in claim 17 of '017 is
13  implicit.
14 MS. COHEN:  Q.  So it's implicit that the
15  number of reaction samples has to be statistically
16  significant?
17     MR. WALTER: Objection.  Mischaracterizes
18  the testimony.
19     THE WITNESS: I think that at the end to
20  make a diagnosis of euploid or aneuploidy one needs
21  to have a statistical analysis that would require
22  significance.
23 MS. COHEN:  Q.  And what does statistical
24  significance mean to you?
25     MR. WALTER: Objection.  Beyond the scope

Page 130

1      BROWN
2  of the report, vague.
3      THE WITNESS: Yeah, I could discuss
4  statistical significance in broad general terms, but
5  I didn't certainly come prepared today to -- to do a
6  review of statistical methods.
7  MS. COHEN:  Q.  Is there a difference
8  between a high degree of statistical significance
9  and a statistically significant result?
10     MR. WALTER: Objection.  Vague.
11     THE WITNESS: Well, clearly statistical
12  significance is a vague term.  And it means what
13  it's specifically stated to mean in any given
14  circumstance.
15 MS. COHEN:  Q.  Can you turn to
16  paragraph 63 of your rebuttal report.  And if you
17  look at the last sentence of that paragraph it says
18  in this passage, specification specifically states
19  that a high degree of statistical significance,
20  i.e., a statistically significant result, is
21  preferred.
22     Here are you saying that a high degree of
23  statistical significance is the same thing as a
24  statistically significant result?
25  A.  I guess my understanding of this is the

Page 131

1      BROWN
2  statistically significant result would be sort of a
3  subset of a high degree of statistical significance.
4  They're not necessarily identical concepts, but
5  they're pointed in the same direction.
6  Q.  So statistically significant is a subset
7  of a high degree of statistical significance?
8  A.  Yeah, for illustration.
9  Q.  And is that what the i.e. in that
10  parentheses means?
11  A.  That is a statistically significant
12  result, yes.
13  Q.  So that signifies an example and/or that
14  signifies that it is equivalent?
15  A.  I would look at it as that would imply a
16  substantial equivalent.  For instance, if someone
17  tells you that your fetus is 99 percent chanced to
18  have trisome 21, for you that would be statistically
19  significant.  If they told you that it was
20  99.9 percent, it would perhaps be highly
21  statistically significant, but the two statements
22  would have substantially the same meaning.
23  Q.  Do those two phrases always have the same
24  meaning?
25     MR. WALTER: Objection.  Vague.

Page 132

1      BROWN
2      THE WITNESS: Not necessarily always the
3  same meaning.
4      MS. COHEN: Can we take a short break?
5      MR. WALTER: Yeah.
6      THE VIDEOGRAPHER: Time is 2:47.  We're
7  off the record.
8      (Recess taken.)
9      THE VIDEOGRAPHER: Back on the record at
10  3:11.
11 MS. COHEN:  Q.  Dr. Brown, are you
12  familiar with an article by an author named Yamada?
13  A.  Yes, I am.
14  Q.  And in what context do you know that
15  article?
16  A.  Well, it appears in the specification of
17  '017.
18  Q.  Does it appear in the specification of the
19  '018 patent?
20  A.  I believe they're basically identical, so
21  that would be -- should be column 21.  No, I'm
22  sorry, column 20.
23  Q.  And have you reviewed the Yamada
24  reference?
25  A.  Along the way of this whole case, I have

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 133

BROWN

1    BROWN
2    had a reasonable look at it, yeah.
3    Q.  Did you read the whole thing?
4    A.  Probably not.  I usually don't read any
5    scientific publication from beginning to end.
6    Q.  Do you understand the Yamada article?
7    A.  I understand the goal of what they set out
8    to do and essentially how they achieved it in terms
9    of the details of computer code.  I'm not an expert
10   in that, and it's also only discussed generally in
11   the text of the paper.
12       MS. COHEN: Going to mark as the next
13   exhibit an article by Yamada entitled PrimerStation,
14   A Highly Specific Multiplex Genomic PCR Primer
15   Design Server for the Human Genome.  Bates number
16   VRNTA00046684 through 46688.
17       (Whereupon, Exhibit 7 was marked for
18       identification.)
19   MS.  COHEN:  Q.  Do you believe a person of
20   ordinary skill in the art would need to understand
21   Yamada to understand the claims of the '017 and '018
22   patents?
23   A.  They would need to understand the concept
24   of the existence of algorithms for performing
25   sequence analysis to determine uniqueness of a given

Page 134

BROWN

1    BROWN
2    stretch of sequence.
3    Q.  Does the Yamada paper actually describe
4    inputting sequence data and aligning that sequence
5    data to the reference?
6        MR. WALTER: Again, take your time to
7    review the article.
8        THE WITNESS: So I think the term align is
9    a bit -- what they describe doing in this
10   modification is defining 25 base substrings of
11   sequence that are unique to the human genome.
12   Essentially, the same concept as taking one stretch
13   of sequence and asking is it unique to the genome
14   and from whence does it arise.
15   MS. COHEN:  Q.  But does the paper itself
16   actually input sequence data and try to align it to
17   something?
18       MR. WALTER: Take your time to review the
19   paper.
20       THE WITNESS: So they describe inputting
21   sequence to which you want to define PCR
22   primers and getting an output of PCR primers.
23   MS. COHEN:  Q.  Where does it describe
24   that?
25   A.  So to evaluate the completeness of the

Page 135

BROWN

1    BROWN
2    design using primer station, we attempted to process
3    28,516 human ref sequence genes.
4    Q.  Where are you reading from?
5    A.  The discussion at the last -- at the end
6    of the page.
7        And figure 3 also describes input of
8    sequence data.
9    Q.  Do you know what it means to design a
10   primer?
11   A.  Yeah, I would say that I do.
12   Q.  What does it mean?
13   A.  Well, a primer is generally defined as a
14   short segment of DNA single stranded that can be
15   used to anneal to another single stranded DNA
16   molecule, and that after annealing, one could do
17   various things.
18       But the typical example of what one might
19   do would be to initiate synthesis of a complementary
20   strand beginning at the primer.
21       And so one designs a primer to be
22   complementary to the sequence that it needs to be
23   complementary to and to meet other criteria that
24   would make it a good functional primer.
25   Q.  Is designing a primer the same thing as

Page 136

BROWN

1    BROWN
2    aligning the sequencing read?
3        MR. WALTER: Objection.  Vague.
4        THE WITNESS: I wouldn't say that aligning
5    a sequence read is exactly the same thing as
6    designing a primer or a pair of PCR primers, but
7    certainly they're very closely related activities.
8    MS. COHEN:  Q.  Is a sequence read data?
9    A.  Is a sequence read data?
10       MR. WALTER: Objection.  Vague, beyond the
11   scope of his report.
12       THE WITNESS: I'm sorry, data is just a
13   very general term for any piece of information that
14   happens to be the one you're interested in at the
15   moment.
16   MS. COHEN:  Q.  So it could be?
17       MR. WALTER: Objection.  Mischaracterizes
18   the testimony, vague, beyond the scope of his
19   report.
20       THE WITNESS: Certainly one could have
21   sequence data.
22   MS. COHEN:  Q.  So do you think that
23   Yamada tells you everything you need to know about
24   aligning sequences to understand the claim term
25   identifying the chromosomes to which the sequences

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 153

BROWN

1    BROWN
2    one could make the inference that is most likely the
3    concept of an underlying aneuploid trisome 21, but
4    it would be an inference and would not be a definite
5    conclusion, and would never be a definite
6    conclusion.
7        MS. COHEN: Okay. I think we're running
8    out of tape, so we'll have to take a break.
9        THE VIDEOGRAPHER: We're now off the
10   record. The time is 4:05.
11       (Recess taken.)
12       MS. COHEN: This is Tape Number 4 of the
13   deposition of Stephen Brown. We're now on the
14   record at 4:32.
15   MS. COHEN: Q. Okay. Dr. Brown, how did
16   you arrive at your definition of one of ordinary
17   skill in the art?
18   A.  First, I'm going to go back and read what
19   it says.
20   Q.  Okay. Let me point you to that. It's in
21   your original declaration. It's paragraph 15.
22   A.  Right. Well, I looked through the '017
23   patent carefully, and I asked myself what are all
24   the areas of knowledge and information that one
25   would need to have familiarity with to evaluate this

Page 154

1    BROWN
2    patent, and this is the list of things that I came
3    up with.
4    Q.  And under is the definition that you
5    provide in paragraph 15 of your declaration, do you
6    believe that you are one of ordinary skill in the
7    art?
8    A.  I do.
9    Q.  Do you consider yourself an expert on the
10   operation of next generation sequencing platforms?
11       MR. WALTER: Objection. Asked and
12   answered.
13       THE WITNESS: I guess two responses, one
14   is the way that this reads is one of ordinary skill
15   in the art should understand operation and
16   application of platforms as opposed to being an
17   expert, quote/unquote.
18       And the other is that, as I've said
19   earlier at the beginning of the day today, it's my
20   understanding the application of massively parallel
21   sequencing is most critical, in that arena that I
22   would think of myself as one of ordinary skill in
23   the art.
24   MS. COHEN: Q. Okay. But would you
25   consider yourself an expert in the operation of next

Page 155

1    BROWN
2    generation sequencing, just a yes or no?
3        MR. WALTER: Objection. Vague, and I
4    think it's been asked and answered as well.
5        THE WITNESS: I would think of myself as
6    having expertise in the application of massively
7    parallel DNA sequencing.
8    MS. COHEN: Q. But would you think of
9    yourself as having expertise in the operation of
10   massively parallel DNA sequencing?
11       MR. WALTER: Same objections?
12       THE WITNESS: Operation is a word that is
13   so hard for me to understand here. If you're asking
14   the technical steps of actually running an
15   instrument, then the answer would be no, I don't
16   have expertise in the technical aspect of running
17   the instrument.
18   MS. COHEN: Q. How would you define the
19   word operation?
20   A.  Understanding the basic underlying
21   principles of how the methodology works, its
22   limitations and its possibilities as opposed to the
23   technical expertise of running an instrument.
24   Q.  So would you say that you have expertise
25   in the operation of massively parallel DNA

Page 156

1    BROWN
2    sequencing under your definition of operation?
3    A.  I would say that I have an understanding
4    as written here.
5    Q.  What about expertise?
6        MR. WALTER: Objection. Vague.
7        THE WITNESS: Expertise. No, I would say
8    that expertise would be a -- I would say that I have
9    understanding as opposed to, quote/unquote,
10   expertise.
11   MS. COHEN: Q. Do you have an
12   understanding of the chemistry of next generation
13   sequencing platforms?
14       MR. WALTER: Objection. Vague.
15       THE WITNESS: I have a general
16   understanding of some aspects of the chemistry, but
17   the details of the chemistry, I would think of as
18   not even relevant to the patents in discussion.
19   MS. COHEN: Q. So you're not an expert on
20   the chemistry of next generation sequencing
21   platforms?
22   A.  I would say not.
23   Q.  Would you consider yourself an expert in
24   bioinformatics?
25   A.  I am not a bioinformatician.

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

---

Page 157

1      BROWN
2   Q.  Would you consider yourself an expert in
3   analyzing sequence data?
4      MR. WALTER: Objection.  Vague.
5      THE WITNESS: I have a lot of experience
6   in analyzing sequence data.  I'm not sure where the
7   line is crossed to say that one is an expert.
8   MS. COHEN:  Q. Would you consider
9   yourself an expert?
10      MR. WALTER: Objection.  Vague.
11      THE WITNESS: I would consider myself as
12   one generally knowledgeable about DNA sequencing
13   analysis.
14   MS. COHEN:  Q.  But not an expert?
15      MR. WALTER: Same objection.
16      THE WITNESS: No.  An expert would be
17   somebody whose whole profession and career is
18   devoted to that one thing, DNA sequence analysis.
19   Certainly, there are such people and I am not one
20   who devotes my whole career to that.
21   MS. COHEN:  Q.  Can you turn to
22   paragraph 8 of your rebuttal report.  If you read,
23   the first sentence says, in October of 2005, Solexa
24   had sequenced an 180,000-base-pair chromosome.  And
25   by June 2006 the Solexa platform was commercialized.

---

Page 158

1      BROWN
2   Do you see that sentence?
3   A.  I do.
4   Q.  Can you tell me about the chromosome that
5   was sequenced by Solexa on October 2005?
6      MR. WALTER: Objection.  Vague.
7      THE WITNESS: No, I don't know
8   specifically what chromosome that is.
9   MS. COHEN:  Q.  Well, would the reference
10   cited after that sentence, Exhibit 18, the Chi
11   article, tell you what that chromosome is?
12   A.  Yes.  That would have that information in
13   it.
14      MS. COHEN: Okay.  I'll mark as the next
15   exhibit an article by Chi, titled, The Year of
16   Sequencing.  Bates number BRNTA00047378 through
17   47381.
18      (Whereupon, Exhibit 9 was marked for
19   identification.)
20   MS. COHEN:  Q.  And can you look through
21   that reference and tell me what that chromosome was.
22      MR. WALTER: Take your time to carefully
23   review the article.
24      THE WITNESS: So this report here mentions
25   that in October 2005 sequenced 180,000-base-pair

---

Page 159

1      BROWN
2   bacterial artificial chromosome.
3   MS. COHEN:  Q.  And what is a bacterial
4   artificial chromosome?
5   A.  It was one of a series, or still is, of
6   cloning vector for cloning large insert fragments of
7   DNA.
8   Q.  Is that an actual chromosome?
9   A.  That would require one to have a specific
10   definition of chromosome.  Chromosome is originally
11   defined cytologically as a colored body that you
12   could see through a microscope in the nucleus of a
13   cell.
14      So if you're going to follow that strict
15   definition, then I don't think you could call the
16   bacterial artificial chromosome a chromosome, and
17   yet, it's well understood in the human genetics
18   world what a bacterial artificial chromosome is.
19   Q.  Did you consider the prosecution history
20   of the '017 patents in forming the opinions that you
21   set forth in your declaration?
22   A.  In part.
23   Q.  How much time do you think you spent
24   reviewing the prosecution history of the '017
25   patent?

---

Page 160

1      BROWN
2   A.  Several hours.  Three, four, five hours at
3   most.
4   Q.  Did you review the prosecution history of
5   the '018 patent?
6   A.  It's a very long -- more than you're
7   aware -- more than a thousand-page document that
8   I've -- I have looked through cursorily, I have not
9   attempted to tear it apart.
10   Q.  And how much time would you say that you
11   spent looking through the '018 patent file history?
12   A.  Perhaps an hour, two at the most.
13   Q.  Did you look at any portions of the file
14   histories of any other patents which are related to
15   the '017 and '018 patents?
16   A.  Not that I recall.
17   Q.  Do you know if Dr. Metzker cites to any
18   prosecution histories of any of the related patents
19   in the '017 and '018 patents in his declaration?
20   A.  I don't specifically know.
21   Q.  Do you recall Dr. Metzker citing to the
22   prosecution history of the related patent to the
23   '017 and '018 patents to state that the PTO has
24   stated that the specification does not support
25   randomly sequencing -- randomly distributed

---

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 165

1    BROWN
2  and Quake in 2008, that was published after the
3  filing date of the '017 and '018 applications; is
4  that correct?
5  A.   Filing date of '017, filed February 2,
6  2007.
7     And I'd have to look at the PNAS paper to
8  see when it was submitted for review.  But it was
9  published in spring -- I believe -- April 2008.
10 Q.   I don't believe it was published in
11 April 2008.  My recollection is that it was
12 published in July of 2008.
13 A.   I don't know exactly when it was submitted
14 for review.  And this is speculation, but my guess
15 is it was after February 2, 2007.
16 Q.   It was actually published October 21,
17 2008, and submitted for review on July 13, 2008.
18 A.   So, yes, the submission of the filing date
19 of 2007 precedes that.
20 Q.   And so how does that paper, the 2008 Fan
21 and Quake paper, tell you anything about the '017
22 and '018 patents?
23    MR. WALTER: Objection.  Mischaracterizes
24 the testimony.
25    THE WITNESS: How does it tell me anything

Page 166

1    BROWN
2  about the patents?
3  MS. COHEN:  Q.  Yes.
4  A.   I don't think it does tell me anything
5  about the patents.
6  Q.   So how is it relevant, why is it in your
7  report?
8  A.   Well, as it says here, it's characterized
9  -- it's in my report in the sense that it's
10 characterized by another publication from Dennis Lo
11 and his group as an illustration of the power of the
12 random sequencing approach, used, et cetera, the
13 part that you just got through reading.
14    So that it's relevant in the sense that it
15 recognizes the power of random sequencing, and
16 random sequencing is what is described in the '017
17 patent.
18 Q.   How does an article from 2008 help you
19 understand claim terms as they were
20 written -- strike that.
21    How does an article from 2008 help you
22 understand claim terms of a patent that was filed in
23 2006 or 2007?
24 A.  I don't think it does help.
25 Q.   And if you turn to paragraph 46 of your

Page 167

1    BROWN
2  declaration, and you'll see that at the end of that
3  paragraph you cite Exhibit 14, which is the Illumina
4  specification sheet, colon, sequencing, do you
5  recall the date of that publication?
6  A.   Of the Illumina specification sheet?
7  Q.   Yes.
8  A.   No, I don't specifically recall the date
9  of that, but it's certainly --
10    MS. COHEN: I'll mark --
11    THE WITNESS: -- certainly more recent.
12    MS. COHEN: -- as the next exhibit, the
13 Illumina Specification Sheet, colon, Sequencing.
14 Bates numbers VRNTA00005986 through 5989.
15    (Whereupon, Exhibit 10 was marked for
16 identification.)
17    MR. WALTER: Can I have my copy?
18    MS. COHEN: Oh, I'm sorry.
19    THE WITNESS: Did I steal yours?  I'm
20 sorry, I stole your copy.
21 MS.  COHEN:  Q.  And can you tell me the
22 date of this publication?
23 A.   I was looking for the date here.  I don't
24 actually see one.  It's hard to believe that they
25 wouldn't date it.

Page 168

1    BROWN
2  Q.   If you look at the last page, Bates
3  number 5989, and you look at the very bottom.
4  A.   Right, it's quite recent.
5  Q.   And what is the date that it says there?
6  A.   Copyright 2011, Illumina.
7  Q.   And then it says current as far as 27th of
8  April, 2011?
9  A.   I believe you, but I don't see that.
10 Q.   All the way at the end of that section,
11 the last thing that you see.
12 A.   Oh, current.  Yes, okay.  Uh-huh.
13 Q.   And so how is this publication from 2011
14 going to help someone of skill in the art in
15 February of 2006 or February of 2007 understand the
16 meaning of the plain terms of the '017 or '018
17 patents?
18 A.   Well, illustration in this recent document
19 from Illumina is still pertinent to sequencing
20 methods.
21 Q.   Which illustration?
22 A.   I mean, the whole illustration, set of
23 illustrations.  The whole document is pertinent to
24 the sequencing methods that were available back at
25 the time of the '017 application.

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 169

BROWN

1   BROWN
2   Q.  So why not point to references from that
3   time period?
4      MR. WALTER: Objection.  Mischaracterizes
5   the report, mischaracterizes his testimony, vague.
6      THE WITNESS: I'm sorry.  The question is,
7   why not have a document from Solexa or from Illumina
8   from the specific time period?
9   MS. COHEN:  Q.  Yes.
10  A.  My guess --
11     MR. WALTER: Object, again, that
12  mischaracterizes the report.
13     Go ahead and answer.
14     THE WITNESS: It's speculation, but my
15  guess is that finding such a document would be
16  either impossible or extremely difficult to do.
17  MS. COHEN:  Q.  Would there have been such
18  a document from Illumina in February of 2006?
19     MR. WALTER: Objection.  Vague.  Calls for
20  speculation.
21     THE WITNESS: I would have to speculate
22  about that.  I don't know.
23  MS. COHEN:  Q.  Was Illumina
24  commercializing massively parallel sequencing
25  platforms in February of 2006?

Page 170

1      BROWN
2      MR. WALTER: Objection.  Asked and
3   answered.
4      THE WITNESS: The dates of all of that --
5   I'll just read for you from the rebuttal report,
6   paragraph 8.
7      At the time Solexa issued a press release
8   noting shipping of Solexa genome analysis systems in
9   the second quarter of 2006.  And then in the next
10  paragraph, a few months after, let's see, the
11  acquisition date of -- so clearly after Illumina
12  acquired Solexa, it would have been in the process
13  of commercializing the instrument or commercializing
14  massively parallel sequencing.
15  MS. COHEN:  Q.  And when did Illumina
16  acquire Solexa?
17  A.  I'm looking for the entry there that has
18  the specific date.  I believe it was in the autumn
19  of 2005, but...
20  Q.  If you look at paragraph 6 of your
21  rebuttal report, the second sentence says, as
22  Dr. Metzker notes --
23  A.  In autumn of 2006.  Excuse me, yes.  So
24  the purpose of Illumina acquiring Solexa presumably
25  would be to help commercialize and sell the

Page 171

1   BROWN
2   instrument platform.
3   Q.  But as of February of 2006, Illumina had
4   not yet acquired the Solexa platform?
5   A.  That's my understanding.
6   Q.  So how would one of ordinary skill in the
7   art in February of 2006 understand the term Illumina
8   sequencing platform?
9      MR. WALTER: Objection.  Asked and
10  answered.
11     THE WITNESS: That's discussed here in
12  paragraphs 6, 7, 8, the Solexa platform was
13  well-known prior to that time period, and was
14  clearly in the transition phase of being referred to
15  at that time as Illumina/Solexa.
16  MS. COHEN:  Q.  Would it have been called
17  the Illumina platform in February of 2006?
18  A.  I can only answer that by saying that it
19  was called that in the '017 application which was
20  dated February 2008 -- filed February 2007, excuse
21  me.
22     Yeah, I'm not certain what arrangement
23  there was at that time if there was a relationship
24  between Illumina and Solexa, I don't know for sure.
25  Q.  I'm just trying to understand your

Page 172

1      BROWN
2   definition of massively parallel sequencing of
3   random fragments of genomic DNA, which includes the
4   phrase, e.g., the Illumina sequencing platform.  And
5   as we just discussed Illumina did not acquire Solexa
6   until November or the fall of 2006.
7   A.  But I guess the question is, would one of
8   skill in the art have understood what that was
9   talking about, and the answer is yes.
10  Q.  How could they understand what an Illumina
11  sequencing platform is if no such thing existed?
12     MR. WALTER: Objection.  Mischaracterizes
13  the testimony.
14     THE WITNESS: It did exist.  It was just a
15  Solexa instrument, and then during the transition
16  was a Solexa/Illumina instrument, and then
17  ultimately it became colloquially known as Illumina.
18  MS. COHEN:  Q.  Right.  But in February of
19  2006, would anybody know it as the Illumina
20  platform?
21     MR. WALTER: Asked and answered.
22     THE WITNESS: I don't know for sure if
23  they would have or not at that time.
24  MS. COHEN:  Q.  Can you go to paragraph 58
25  of your original declaration, please.  And if you go

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

---

Page 173

1    BROWN
2  halfway down that paragraph, it says, for instance,
3  with regard to a digital PCR embodiment the
4  specification states, digital PCR allows the
5  detection of aneuploidy merely by counting
6  transcripts.
7    What does it mean to say merely by
8  counting transcripts?
9  A.  My understanding of that statement is it
10 means digital PCR allows the detection of aneuploidy
11 by merely counting, in this case the word is
12 transcripts, but one could substitute molecules.
13 Q.  What does transcripts mean?
14 A.  You know, that word is used in various
15 contexts and various ways.  In this case, it's
16 referring to PCR products.
17 Q.  Why are they being referred to as
18 transcripts?
19 A.  I'm not sure that there is any meaning or
20 reason behind the use of that term as part of this
21 patent.
22 Q.  If you go to the next paragraph,
23 paragraph 59, the second sentence reads, indeed, the
24 specification confirms that digital PCR embodiments
25 may be carried out in the multiplexed manner in

---

Page 174

1    BROWN
2  which there are multiple primers to multiple
3  targets.
4    Do you see that?
5  A.  Yes.
6  Q.  Do the multiple targets have to be on the
7  same chromosome?
8  A.  No, I don't think there's any requirement
9  for that.
10 Q.  Could the targets be from the same
11 chromosome?
12   MR. WALTER: Objection.  Incomplete
13 hypothetical, vague.
14   THE WITNESS: You're referring to
15 multiplex and PCR?
16 MS. COHEN:  Q.  Yes.
17 A.  On which there are multiple primers to
18 multiple targets?
19 Q.  Uh-huh, yes.
20 A.  One could envision having multiple primer
21 sets for a given chromosome, yes.
22 Q.  Could you please go to your rebuttal
23 report, paragraph 37.  It says, in fact, the concept
24 of assigning nucleic acid by its sequence to a
25 chromosome of interest is already present in step D

---

Page 175

1    BROWN
2  of claim 17 of the '017 patent:  D, identifying the
3  chromosomes to which the sequences obtained in step
4  C belong, Exhibit 16, the '017 patent at claim 17.
5  Dr. Metzker and Sequenom's notion of targeted
6  sequencing would incorporate the element of step D
7  into step C rendering step D both unnecessary and
8  redundant.
9    What do you mean by that?
10 A.  Well, if one goes to the prior paragraph,
11 36, furthermore, Dr. Metzker's interpretation of,
12 quote, massively parallel sequencing of the random
13 fragments of DNA in claim 17 of '017 requires that
14 DNA sequencing is performed only in the sequence of
15 the target, i.e., sequences of interest.  However,
16 the specification makes clear that no such
17 limitation is present.
18   And then in 37, this points out that step
19 D of the claim is identifying chromosomes to which
20 sequences belong.
21   And if one already knew the chromosome to
22 which the sequences belong, one would not have to
23 bother identifying and that would make, as it says,
24 step D unnecessary and redundant.
25   So the fact that step D is there makes it

---

Page 176

1    BROWN
2  clear that one does not know the origin of the
3  sequence until one discovers it.
4  Q.  What if you had multiple targets, would
5  you necessarily know the identity of those targets?
6    MR. WALTER: Objection.  Vague.
7    THE WITNESS: You're saying in a digital
8  PCR embodiment if one had multiple targets.  One
9  would have to have a scheme for knowing which was
10 the target, either by one method or one could
11 envision several methods.
12 MS. COHEN:  Q.  What about in the
13 massively parallel DNA sequencing embodiment?
14   MR. WALTER: Objection.  Vague.
15   THE WITNESS: I'm not sure I understand
16 the question.  What you're saying -- I don't
17 understand.
18 MS. COHEN:  Q.  If you had multiple
19 targets which you wanted to sequence --
20 A.  But targets don't come up with massively
21 parallel sequencing.  There are no targets.
22 Q.  Okay.  But you're responding to
23 Dr. Metzker, and Dr. Metzker's opinion is that this
24 is actually talking about targeted sequencing.
25 A.  I understand that that's his opinion.

---

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 177

BROWN

1    BROWN
2    Q.  So if, as Dr. Metzker believes, this is
3    talking about targeted sequencing, if you have
4    multiple targets, wouldn't you still need to
5    sequence them to figure out what they are?
6        MR. WALTER: Objection.  Incomplete
7    hypothetical, vague.
8        THE WITNESS: I don't understand that
9    question.
10   MS. COHEN:  Q.  Okay.  So say you're
11   targeting sequences from chromosomes 21 and 12...
12   A.  Targeting how?
13   Q.  How could you target a sequence?
14       MR. WALTER: Objection.  Vague, incomplete
15   hypothetical, beyond the scope of his report.
16       THE WITNESS: So the question is, how
17   could I target sequences, or how could I target
18   sequencing.  I could think of various ways, but
19   they're not relevant to this patent discussion
20   because there is no targeted sequencing.
21   MS. COHEN:  Q.  Okay.  That's fine.  But
22   you're still responding to Dr. Metzker's point, so I
23   want you to assume that this is talking about
24   targeted sequencing, and you're targeting sequences
25   from two different chromosomes.

Page 178

1    BROWN
2    A.  How can I assume that when it's not there?
3    Q.  You could assume it hypothetically.
4        MR. WALTER: I'm going to object to it as
5    an incomplete hypothetical, vague and being beyond
6    the scope of his report.
7    MS. COHEN:  Q.  What are your targeting
8    methods that you are aware of?
9    A.  Targeting methods.  I'm unaware of any, I
10   don't know what that means.
11   Q.  If you want to target specific sequences,
12   how would you go about doing it?
13       MR. WALTER: Objection.  Vague.
14       THE WITNESS: I can't answer that, I don't
15   know what you mean.
16   MS. COHEN:  Q.  If you want to pull out
17   specific sequences out of all of the sequences in
18   your sample, how could you go about doing that?
19       MR. WALTER: Same objection.
20       THE WITNESS: Should I answer?
21       MR. WALTER: Yeah, go ahead.
22       THE WITNESS: Well, I think that, in
23   general, the only way that one can tell one nucleic
24   acid molecule from another is either by sequencing
25   it or by hybridizing it to a known sequence through

Page 179

1    BROWN
2    melting and re-annealing.  I don't know of other
3    methods that one would be able to tell a sequence.
4    Or to be able to select a given fragment of DNA.
5    MS. COHEN:  Q.  Could you select fragments
6    out of a sample by flow sorting?
7        MR. WALTER: Objection.  Vague, beyond the
8    scope of his report.
9        THE WITNESS: According to their sequence
10   by flow sorting, is that what you're asking?
11   MS. COHEN:  Q.  Can you select for
12   samples -- for sequences out of a sample by flow
13   sorting?
14       MR. WALTER: Objection.  Vague, beyond the
15   scope of his report, incomplete hypothetical.
16       THE WITNESS: The answer to the question
17   is no.  There are flow sorting techniques for
18   separating DNA molecules, but they start with
19   hybridization to a known sequence.  So the flow
20   sorting is really not the critical step that
21   distinguishes one from another.
22   MS. COHEN:  Q.  So if you were able to
23   pull out specific sequences out of a sample by
24   hybridizing, for example, and there were multiple
25   sequences that you were pulling out, how would you

Page 180

1    BROWN
2    be able to differentiate between what they are?
3        MR. WALTER: Objection.  Vague, incomplete
4    hypothetical, and also beyond the scope of his
5    report.
6        THE WITNESS: Yeah, I mean, I would have
7    to be speculating at this point, or I would have to
8    speculate at this point.
9    MS. COHEN:  Q.  Could you sequence to
10   differentiate between those different sequences?
11       MR. WALTER: Same objections.
12       THE WITNESS: I suppose one could, but I
13   don't understand the relevance of that to this
14   discussion.
15   MS. COHEN:  Q.  Well, you're saying that
16   you do not agree with Dr. Metzker's opinion
17   regarding targeted sequencing, and you say that Dr.
18   Metzker's and Sequenom's notion of targeted
19   sequencing would incorporate the element of step D
20   into step C, rendering step D both unnecessary and
21   redundant.
22   A.  Right.
23   Q.  So if you have multiple sequences that
24   you're pulling out, and you don't know what each one
25   of those is, wouldn't you need to determine what

Ellen Grauer Court Reporting Co. LLC

VERINATA HEALTH, INC. VS.
SEQUENOM, INC.

STEPHEN BROWN, M.D.
March 19, 2013

Page 181

BROWN

1    each one of those is?
2
3        MR. WALTER: Objection. Vague, incomplete
4    hypothetical, beyond the scope of his report.
5        THE WITNESS: Yeah, I'm not sure I really
6    understand what you're talking about.
7    MS. COHEN:   Q. What is the sequence of
8    interest as you use it in your declarations?
9        MR. WALTER: Object as asked and answered.
10        THE WITNESS: I'm not sure exactly where
11    you're referring to in my declaration, which would
12    be helpful in answering the question.
13    MS. COHEN:   Q. For example, in your
14    rebuttal report, rebuttal declaration, at
15    paragraph 35, the last sentence before the block
16    citations.
17    A. Indeed numerous sections, that...
18    Q. Yeah, the last part of that says, broadly
19    pertains to any sequence that is of interest.
20    A. Right. Target -- target molecule, target
21    sequence broadly pertain to any sequence that is of
22    interest.
23    Q. So what is the sequence of interest?
24    A. One that uniquely maps to a chromosome and
25    can be used in the ultimate analysis for detection

Page 182

BROWN

1
2    of aneuploidy.
3    Q. Do you have to know your sequence of
4    interest ahead of time?
5    A. In the sense that one has to know the
6    human genome sequence in general ahead of time, yes.
7    This method won't work without knowing the human
8    genome sequence ahead of time.
9        Or putting it differently, if you tried to
10    get this method to work in a different organism,
11    like a chimpanzee, you would have to know that
12    sequence too.
13    Q. So if your sequence of interest is
14    chromosome 21, for example, then you know ahead of
15    time that you're looking for sequences on chromosome
16    21; is that correct?
17    A. I'm sorry. If you know ahead of time that
18    you're interested in detecting chromosome 21?
19    Q. Yes, if your sequence of interest is
20    chromosome 21, then you would know ahead of time
21    that you're looking for sequences on chromosome 21;
22    is that correct?
23    A. Well, in order to detect aneuploidy,
24    you're going to need counts of molecules mapping to
25    more than one chromosome, so sequence of interest is

Page 183

BROWN

1
2    going to be much more broad than those that map to
3    chromosome 21.
4    Q. What else will they include?
5    A. Potentially the entire rest of the genome.
6    Q. Is a target sequence the same thing as a
7    sequence of interest?
8        MR. WALTER: Objection. Asked and
9    answered.
10        THE WITNESS: A target sequence, as it
11    says here in this report, the use of the word target
12    in the specification of the '017 patent is used in
13    multiple places in different ways, but they're all
14    broad general ways that pertain to what -- to mean
15    what is interesting or what is of interest.  As
16    opposed to referring to, for instance, a specific
17    sequence or a specific DNA fragment.
18    MS. COHEN:   Q. When you're doing digital
19    PCR, do you have to know your sequences of interest
20    ahead of time?
21        MR. WALTER: Objection. Vague.
22        THE WITNESS: Well, to perform PCR you
23    need to define primers, and so that portion of the
24    sequence that is the primer sequence itself you have
25    to know.

Page 184

BROWN

1
2        MS. COHEN: All right. Can we take a
3    10-minute break to make sure that I covered
4    everything I need to?
5        MR. WALTER: Okay. But I expect this to
6    be a short break and I expect that we'll be close to
7    being finished when we're done, because we've
8    retreaded things that we've done two or three times
9    this morning.
10        THE VIDEOGRAPHER: We're off the record at
11    5:43.
12        (Recess taken.)
13        THE VIDEOGRAPHER: We're on the record at
14    5:54.
15    MS. COHEN:   Q. Dr. Brown, you have done
16    any digital PCR yourself?
17    A. No, I have not.
18    Q. Have you done any digital analysis of
19    nucleic acids yourself?
20    A. Depending on how one construes the word,
21    yeah, I have.
22    Q. And can you tell me about that.
23    A. Well, if one takes digital to mean
24    molecular counting, then there may be several ways
25    that I might have done things of that kind over the