# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--o0o--

| | |
|---|---|
| VERINATA HEALTH, INC., AND THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) NO. C12-00865-SI ) |
| SEQUENOM, INC. AND SEQUENOM CENTER FOR MOLECULAR MEDICINE, LLC, | ) ) ) ) |
| Defendants. _____ | ) ) |
| AND RELATED CROSS-ACTIONS. _____ | ) ) |

VIDEOTAPED DEPOSITION OF

DR. MICHAEL E. METZKER

-------------------------------------

THURSDAY, MARCH 21, 2013

Volume I

(Pages 1 - 306)

REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR 12470

(2001-450182)

**Page 10**

08:15:03   1   consulting work.
08:15:05   2     A.  Understood.
08:16:01   3     Q.  So if you could just characterize, however
08:16:03   4   you're comfortable, the relative time commitment you
08:16:06   5   make to your activities.  And let's just describe
08:16:08   6   them as being a professor at Baylor as one category,
08:16:16   7   being a professor at Rice another, being a manager
08:16:18   8   at the genome center as a third, and then litigation
08:16:20   9   consulting as the fourth.
08:16:20  10       Can you just, in whatever way you're
08:16:23  11   comfortable, describe a relative distribution of
08:16:25  12   time?
08:16:28  13     A.  Sure.  Sure.  Be happy to.
08:16:30  14       It's hard to separate my role at the Human
08:16:33  15   Genome Sequencing Center at Baylor College of
08:16:35  16   Medicine from my associate professor position in the
08:16:37  17   department of genetics.  They're -- I consider them
08:16:40  18   related, and I spend the majority of my time in
08:16:42  19   those activities.  It could be as much as 80 percent
08:16:47  20   of my time doing that.
08:16:49  21       With respect to my adjunct position at
08:16:54  22   Rice University, it's very little participation.  An
08:16:56  23   adjunct position receives no salary.  I sometimes
08:17:00  24   attend seminars.  I might talk with students.  But
08:17:03  25   it's very little commitment.  But there's enough

**Page 11**

08:17:06   1   interaction to justify me holding an adjunct
08:17:08   2   position.
08:17:09   3       And then the rest of my time is spent
08:17:10   4   doing consulting work.
08:17:40   5     Q.  And so are you comfortable saying that
08:17:42   6   consulting work is about 20 percent of your time?
08:17:43   7     A.  That's a fair assessment.
08:17:45   8     Q.  Can you describe whether you do any
08:17:50   9   consulting work other than litigation consulting?
08:17:53  10     A.  I do not do any other consulting work.
08:18:03  11     Q.  And do you charge a rate other than $600
08:18:06  12   an hour to anybody?
08:18:03  13     A.  Sometimes I do charge a different rate.
08:18:26  14     Q.  Please describe your rate schedule.
08:18:28  15     A.  For example, I've been involved in several
08:18:16  16   criminal cases involving HIV transmission.  And in
08:18:20  17   those cases, I've been contacted by the district
08:18:26  18   attorney's office.  And because it's, you know, a
08:18:29  19   public service that's doing something for the
08:18:30  20   community, I will discount that rate to $300 an
08:18:35  21   hour.
08:18:34  22       And in one case, I've taken on a pro bono
08:18:36  23   case in -- in a -- an employee dispute for a person.
08:18:48  24     Q.  For your patent-related litigation
08:18:50  25   consulting in the last four years, have you charged

**Page 12**

   1   other than $600 an hour?
   2     A.  No.  It's always been $600 an hour.
   3     Q.  You've had your deposition taken many
   4   times; is that correct?
   5     A.  I -- I was trying to count that yesterday.
   6   I think it's about 10.  I've had 10 depositions.
   7     Q.  Based on the 10 depositions, you're
   8   comfortable that you understand the deposition
   9   process; is that correct?
  10     A.  I -- I believe I understand the deposition
  11   process.
  12     Q.  And you were prepared for deposition today
  13   by counsel for Sequenom in this matter; is that
  14   correct?
  15     A.  That's correct.
  16     Q.  How much time did you spend preparing for
  17   today?
  18     A.  I don't know.  I came in on Sunday, and I
  19   know we spent a couple of days in preparation.  I
  20   was involved in writing a report, and I -- I didn't
  21   review how much time I spent doing that.
  22     Q.  Based on the fact that you were prepared
  23   for deposition by counsel and that you've
  24   substantial experience in the deposition process,
  25   I'm going to assume that you understand the

**Page 13**

   1   deposition process generally.
   2       If at any point you have a question,
   3   please let me know.
   4       Do you understand that?
   5     A.  I do understand that.
   6     Q.  If, during the course of the deposition,
   7   you'd like to take a break to use the lavatory or
   8   otherwise stretch your legs, let me know and at an
   9   appropriate time we'll take a break.
  10       Do you understand that?
  11     A.  I do understand that.
  12     Q.  If, during the course of the deposition,
  13   you don't understand a question or any aspect of a
  14   question that I'm asking, please let me know.  If
  15   not, I'll assume you understood my question.
  16       Is that fair?
  17     A.  I understand that as well.
  18     Q.  Are you taking any medication at this
  19   point today?
  20     A.  Baby aspirin according to my doctor.  But
  21   other than that, no.
  22     Q.  All right.  And is there any reason at all
  23   that you can think of why you can't give your best,
  24   most accurate testimony today?
  25     A.  No, I cannot.

DR. MICHAEL E. METZKER - 3/21/2013

**Page 14**

08:26:53  Q. And in terms of your response to my questions, your plan is to be as candid and forthcoming as you can; is that correct?
A. That is my intention.
Q. When were you first retained in this matter?
A. I think it was late 2001 -- I'm sorry -- 2011.
Q. And is there some benchmark in your mind, the holidays or something like that, that brings to mind late 2011?
A. It could have been that, something like that. It just sticks in my mind it was in 2011.
Q. But in terms of being more precise, when you say "late," are you thinking of sort of November, December?
A. Yeah. That's -- that's a reasonable time period.
Q. What was your first assignment?
A. I was first asked to help out on the interference side of this case.
Q. And please describe the task that you had in connection with the interference.
A. Well, I generally --
MS. COHEN: Just caution you not to

**Page 15**

disclose any privileged information.
THE WITNESS: Okay. I generally remember being asked to help in writing a declaration in support of an interference that Sequenom was planning on submitting.
BY MR. REINES:
Q. And which patents did the interference involve with applications?
A. I don't remember the application number on the Sequenom side, but I do believe that for the issued patent it was the '018 patent. I believe that's correct.
Q. What was the next assignment that you had?
A. Well, then there was a big gap in time where nothing -- nothing was happening at all.
And then sometime, I think, in the middle of last year, I was asked to help with claim construction.
Q. When you say mid last year, just for the record, that's 2012; is that correct?
A. 2012, that's correct.
Q. In terms of the '540 patent, that's included in your current declaration; is that correct?
A. That is correct.

**Page 16**

Q. Okay. Now, with respect to the claim construction you became involved in in 2012, what were the patents involved in that?
A. It's the four patents that are described in my declaration.
Q. What was your task?
A. Well, to help give an understanding from a person of ordinary skill in art what certain terms would mean in the context of the claims of those four patents.
Q. Did you generate work product?
A. Yeah, I -- the report was a work product.
Q. So you began work on...
The report was executed in November 2012; is that correct?
A. I believe that's correct.
Q. When did you begin work on that report?
A. Like I said, I think it was somewhere in the middle of 2012 that I started working on, you know, discussions and then drafting the report.
Q. Could you be any more precise?
I mean, why don't we do it this way. How many months was it before you actually submitted the report that you started your preparation process?
A. I don't know -- I don't know exactly how

**Page 17**

many months it was.
Q. What's your best approximation with a reasonable degree of confidence?
A. Three to five months, something like that.
Q. How much time did you spend preparing your report, the November 12 report that you submitted on the claim construction?
A. I don't know.
Q. Was it a more or less than 50 hours?
A. For preparing the report?
Q. Yes.
A. I don't know. I did not look at how many hours I've spent in preparing the report.
Q. Was it more or less than 200 hours?
A. Again, my answer is I just don't know.
Q. So it could have been less than 50 hours or more than 200 hours, you would just have no idea; is that correct?
A. I just don't know. My answer is I don't know how many hours I put on the case for the report.
Q. Understood. But I'm asking a very specific question, and so I'm entitled to an answer to that, which is you don't have a reasonable basis to say whether it was more or less than 50 hours; is

Page 42

1  construction, that included reviewing the
2  declaration of Ms. Gabriel before it was submitted
3  to the patent office to ensure that was -- that you
4  were comfortable with it?
5      A.  Right.  And, again, I included that in my
6  report, that I reviewed this document in support of
7  the claim construction --
8      Q.  Right.  I wasn't --
9      A.  -- opinions that I was giving in my
10 declaration.
11     Q.  Right.  Right.  I wasn't questioning that.
12 I was just asking that part of the work that you
13 considered to be your claim construction work in
14 this case was reviewing the interference submissions
15 from Sequenom before they were made.  Right?
16     A.  I don't -- I don't know about submissions,
17 but I did review this particular declaration.
18     Q.  That's what -- I should have been more
19 precise.  The Gabriel declaration?
20     A.  Correct.
21     Q.  Okay.  And are you saying you didn't
22 review anything else in the interference submissions
23 before they were made other than the Gabriel
24 declaration?
25     A.  I don't believe so.

Page 43

1      Q.  What -- when you reviewed the Gabriel
2  declaration, you're saying your purpose, then, was
3  to get comfortable with it because you anticipated
4  relying on it for purposes of your claim
5  construction position in the litigation?
6      A.  Well, I'd like to -- if I can see my
7  report, I can see how I specifically relied on it.
8  I do know I reviewed it and I noted in my report.
9  But how I used it, I would rather look at my report
10 to see --
11     Q.  Right.
12     A.  -- to be -- to be accurate in answering
13 your question.
14     Q.  Understood.  And I have no problem giving
15 you the declaration, and I'll do that in a second.
16 But I don't -- I don't want to conflate two things
17 which I view as discrete.  One is the fact that
18 you're relying on the ultimate declaration, and the
19 other thing is your purpose in reviewing it before
20 it was submitted.
21     A.  Okay.
22     Q.  Do you understand the difference between
23 those two things?
24     A.  I do.  I do understand the difference.
25     Q.  Okay.  And in terms of that latter

Page 44

1  question, you need your November submission in order
2  to answer one way or the other what your purpose was
3  in reviewing the draft of the Gabriel declaration?
4      A.  So tell me the last one again, because now
5  I'm confused.
6      Q.  Sure.
7         So let me just ask the simple question and
8  you answer it in your own words.
9      A.  Okay.
10     Q.  What was your purpose in reviewing a draft
11 of the Gabriel declaration before it was submitted
12 to the patent office, if you could be as precise as
13 possible?
14     A.  From what I remember, it was to read over
15 the contents of declaration and to make sure that
16 the opinions that she was giving were consistent
17 with the way I was viewing the claim construction as
18 I was preparing my declaration.
19     Q.  Let me -- I don't want you to be
20 distracted by the fact that your -- your declaration
21 is not a -- an exhibit.  So I may make it -- so I
22 may not ask you immediate questions on it.  But
23 let's just put that on the table so you get that
24 comfort.
25     A.  Thank you.

Page 45

1         MR. REINES:  Marked as Exhibit 2 to the
2  Metzker deposition is the declaration of
3  Dr. Michael Metzker regarding claim construction.
4         (Deposition Exhibit 2 was marked for
5          identification.)
6  BY MR. REINES:
7      Q.  Please confirm this is your submission
8  from November on claim construction.
9         (Witness reviewing document.)
10     A.  Yes, it is my declaration on claim
11 construction from November 2012.
12     Q.  All right.  While we're on the Gabriel
13 declaration, why don't you review your declaration
14 and show where you are saying that you relied on the
15 Gabriel declaration.
16     A.  Okay.  It may take me a minute to find it.
17     Q.  Sure.
18     A.  All right.  I note on paragraph 159 on
19 page 54, and I state:  "I have also read and
20 considered the declaration of Stacey Bolt" [sic] --
21 and I've misspelled her middle name as Bulk --
22 "Gabriel, Ph.D., submitted in the prosecution of
23 U.S. Patent Application No. 13/070,275, which
24 addresses the disclosures of the '018 patent.  I
25 agree with the opinions of Dr. Gabriel and her

DR. MICHAEL E. METZKER - 3/21/2013

**Page 46**

08:55:31  1  reasons set forth in her declaration."
08:55:34  2  Q. Okay. And with respect to that -- the
08:55:36  3  reason you're referring to the Gabriel declaration
08:55:39  4  there is that you're relying on her opinions for
08:55:40  5  your opinions; is that correct?
08:55:43  6  A. I don't know if I'm relying on it. I'm
08:55:45  7  just noting that I agree with her opinions.
08:55:47  8  Q. Okay. Then why would you include it in
08:55:50  9  your -- why would you gratuitously include the fact
08:55:55  10  that you agree in your -- in your declaration?
08:55:59  11  A. Well, it's in the section of the
08:55:58  12  '018 patent, and I thought it was a relevant thing
08:56:03  13  to say.
08:56:03  14  Q. Okay. Let me maybe -- let me handle it
08:56:06  15  this way: Is part of the reasoning and basis for
08:56:08  16  your claim construction opinions in this case the
08:56:15  17  opinions of Dr. Gabriel?
08:56:18  18  A. No. My opinions stand on their own.
08:56:28  19  Q. Okay. So you're not -- you're not relying
08:56:29  20  on the Gabriel declaration; is that correct?
08:56:31  21  A. All I said in my declaration is I agree
08:56:34  22  with her opinions.
08:56:34  23  Q. Yeah.
08:56:36  24  A. But I -- my opinions stand on their own.
08:56:38  25  Q. Right. So let me just ask this: You're

**Page 47**

08:56:42  1  not relying on the Gabriel reasoning for -- to
08:56:45  2  support your claim constructions; is that correct?
08:56:46  3  A. That's correct. I just agree with her
08:56:48  4  opinions.
08:56:59  5  Q. To be clear, you considered the Gabriel
08:57:03  6  opinions in formulating your claim constructions,
08:57:05  7  but you -- you've decided not to rely on them for
08:57:58  8  your positions; is that correct?
08:59:02  9  MS. COHEN: Objection.
08:59:04  10  THE WITNESS: Well, all I did was I
08:59:06  11  reviewed the document and made the -- made the
08:59:09  12  statement that I agree with her opinions. That's --
08:59:21  13  that's -- that's the extent of the Gabriel
08:59:25  14  declaration in how I came up with my own opinions.
08:59:28  15  But I didn't rely on her opinions to form my own
08:59:30  16  opinions.
08:59:33  17  BY MR. REINES:
08:59:34  18  Q. Okay.
09:00:08  19  A. Those are my opinions.
09:00:10  20  Q. But why would you include in your
09:00:13  21  declaration that you considered someone else's
09:00:43  22  opinions and agree with them but not rely on them in
09:00:46  23  your report?
09:12:17  24  MS. COHEN: Objection.
09:12:22  25

**Page 48**

1  BY MR. REINES:
2  Q. I'm just trying to make sense of the
3  situation.
4  A. Well, I don't say that I considered her
5  opinions. All -- all I note in this paragraph is
6  that I read and considered the declaration, and that
7  was submitted and I just agree with them. But I
8  didn't consider them in a way of forming my
9  opinions.
10       So maybe -- maybe the wording there is a
11  little misleading, because the opinions that I have
12  in my declaration are my -- they're my opinions.
13  Q. Okay. Understood.
14       You do say in paragraph 159 that you
15  considered her opinions, didn't you?
16  A. I considered them to the extent of what
17  she's saying in her declaration, and that I agree
18  with what she says in her declaration.
19  Q. Okay.
20  A. I consider them to that extent.
21  Q. All right. So you're not denying that you
22  considered those, correct?
23  A. Well, in the context of -- of seeing what
24  she said and making a determination whether I agree
25  with her or not, yeah, I don't deny that I

**Page 49**

1  considered them in that respect.
2  Q. Why did you think it would be helpful to
3  the court -- to inform the court that you considered
4  opinions of someone else and that you agreed with
5  them but you weren't relying on them? Why did you
6  think that would be helpful?
7  A. Well, I -- I guess, because there are
8  different parts to this case, I was just pointing
9  out that the opinions that I hold I agree with --
10  the opinions that I hold are within my document.
11  I've reviewed the Gabriel document, and I consider
12  those consistent with my opinions.
13  Q. Okay. But it's enough to say that -- just
14  for clarity -- that for your opinions on claim
15  construction in this matter, you're not relying on
16  the Gabriel declaration; is that correct?
17  MS. COHEN: Objection.
18  THE WITNESS: That's correct.
19  MR. REINES: Why don't we take a quick
20  break and return.
21  THE VIDEOGRAPHER: Going off the record.
22  The time is 9:00 o'clock.
23       (Off the record at 9:00 a.m. and back on
24        the record at 9:12 a.m.)
25  THE VIDEOGRAPHER: We're back on the

DR. MICHAEL E. METZKER - 3/21/2013

## Page 50

```
09:12:20   1   record.  The time is 9:12.
09:12:23   2   BY MR. REINES:
09:12:26   3       Q.  I'd like to look at your declaration,
09:12:28   4   please.
09:12:35   5           Do you have that in front of you?
09:12:36   6       A.  Yes, I do.
09:12:38   7       Q.  Okay.  The first thing I'd like to ask you
09:12:54   8   about is LaserGen, which is in the first paragraph
09:13:00   9   of your background section.
09:15:02  10       A.  Okay.
09:15:03  11       Q.  And it states there you founded LaserGen.
09:15:09  12           What is your current relationship to
09:15:10  13   LaserGen?
09:15:18  14       A.  I have no relationship with LaserGen at
09:15:22  15   this point.
09:15:22  16       Q.  Do you own any equity?
09:15:24  17       A.  I do.
09:15:23  18       Q.  Okay.  So you're a shareholder?
09:15:30  19       A.  I am a shareholder of common stock.
09:15:39  20       Q.  Well, yeah.  I mean, whether preferred or
09:15:37  21   common or whatever, but you're a shareholder, right?
09:15:35  22       A.  Correct.
09:15:35  23       Q.  Okay.  And are you a substantial
09:15:36  24   shareholder?
09:15:37  25           MS. COHEN:  Objection.
```

## Page 51

```
09:16:09   1           THE WITNESS:  What do you mean by
09:16:18   2   "substantial"?
09:16:19   3   BY MR. REINES:
09:16:29   4       Q.  Why don't you describe the degree of your
09:16:24   5   holding of stock in LaserGen.
09:16:26   6       A.  I currently own about 10 percent of stock
09:16:27   7   in LaserGen.
09:16:00   8       Q.  And what were -- at one point you were in
09:16:02   9   management?
09:16:03  10           MS. COHEN:  Objection.
09:16:05  11           THE WITNESS:  At LaserGen?
09:16:06  12   BY MR. REINES:
09:16:08  13       Q.  Yes.
09:16:06  14       A.  Yes.
09:16:06  15       Q.  And were you on the board of directors?
09:16:43  16       A.  Yes.
09:16:45  17       Q.  When did you leave those positions?
09:16:42  18       A.  When I founded LaserGen, I started off as
09:16:43  19   chief executive officer, or CEO.  I held that
09:16:49  20   position for 10 years.
09:16:58  21           As we were raising new money, I recruited
09:16:24  22   a new CEO and stepped down in April 2012 to chief
09:16:50  23   technology officer.  And I held that position for
09:16:58  24   five or six months, resigning at the end of
09:17:05  25   October 2012 as chief technology officer.
```

## Page 52

```
 1       And then within a few days after that,
 2   resigned from the board of directors from LaserGen.
 3       Q.  Okay.  And that was just as you were
 4   finalizing your declaration here; is that correct?
 5       A.  Actually, I think it was before I
 6   finalized my declaration.
 7       Q.  By a couple of weeks?
 8       A.  Yeah.  I think the declaration is
 9   November 19th, and I believe my letter to the board
10   was November 2nd.
11           I was going to look in the back to
12   confirm.
13       Q.  Any relationship?
14       A.  Sorry?
15       Q.  Any relationship between the two events?
16       A.  Not at all.
17           November 21st.  I'm sorry.
18       Q.  Now let me show you your CV.
19       A.  Oh, it's in the back of --
20       Q.  I think we may have separated that out.
21       A.  Okay.
22           (Deposition Exhibit 3 was marked for
23            identification.)
24   BY MR. REINES:
25       Q.  So this is your CV marked as Exhibit 3.
```

## Page 53

```
 1           And this was your up-to-date CV as of the
 2   submission of your declaration in November; is that
 3   correct?
 4           Is this a different one?
 5       A.  It looks -- it looks older.
 6       Q.  Oh, I'm sorry.
 7       A.  And it looks different than the one that's
 8   attached to Exhibit 2.
 9       Q.  I'm sorry.  I just made a mistake.  I made
10   an assumption.  Perhaps I shouldn't have.
11           Do you know what -- do you recognize the
12   one that's been marked as Exhibit 3?
13       A.  Oh, it would definitely be a CV.  I don't
14   know what time period it came from.
15       Q.  Okay.  All right.
16       A.  Of mine.  A CV of mine.
17       Q.  We know it was at least sometime in 2012,
18   right?
19       A.  Yeah, probably in 2012.
20       Q.  Now, on -- on the -- and I apologize for
21   that miscommunication.  I guess they look similar.
22   I made an assumption I shouldn't have.
23       A.  They have the same name, so that -- that
24   could be a head start.
25       Q.  And the format is at least similar, but I
```

**Page 74**

09:42:03  1   Q. And in that grant application, you
09:42:08  2  envisioned something that would be next-generation
09:42:05  3  sequencing; is that correct?
09:42:07  4   MS. COHEN: Objection.
09:42:08  5   THE WITNESS: I -- it was definitely
09:43:04  6  technology that did not require electrophoresis and
09:43:07  7  Sanger sequencing.
09:43:18  8   I mean, I've been working in this field
09:43:20  9  since 1994. In fact, as a graduate student, I
09:43:22 10  published one of my first papers on reversible
09:43:29 11  terminators in nucleic acids research. So -- so I
09:43:30 12  already had a track record in this area.
09:43:37 13   After my Ph.D., I went to Merck. But when
09:43:30 14  I came back to Baylor, completing the human genome
09:43:36 15  with a need for developing new technology -- saw
09:43:39 16  this as a way of meeting that need.
09:43:52 17  BY MR. REINES:
09:43:58 18   Q. Were you aware of competing projects for
09:45:00 19  moving beyond Sanger at the time, in this 2004 time
09:45:05 20  period?
09:45:02 21   MS. COHEN: Objection.
09:46:03 22   THE WITNESS: Yes.
09:46:04 23  BY MR. REINES:
09:46:05 24   Q. What were those?
09:46:06 25   A. There have been competing projects since

**Page 75**

09:46:08  1  Sanger actually was -- was launched. For example,
09:46:10  2  Maxim Gilbert was a competing technology at the
09:46:12  3  time.
09:46:18  4   In the late 1980s and early 1990s,
09:46:28  5  sequencing by hybridization was an alternative
09:46:28  6  strategy to Sanger sequencing.
09:46:32  7   Q. And how about in the 2004 time period?
09:46:35  8  What were you focused on as the competitive
09:46:39  9  alternatives for new post-Sanger sequencing
09:46:32 10  approaches?
09:46:36 11   A. In 1988, the first paper comes out on a
09:46:50 12  pyrosequencing, and then that's further developed in
09:46:53 13  the late '90s. So pyrosequencing was one of the
09:46:58 14  technologies that won an award in 2004 for
09:46:05 15  developing alternative or next-generation sequencing
09:46:05 16  technologies.
09:46:07 17   There were other groups working on
09:46:09 18  reversible terminators, including our group, and
09:46:53 19  awards were made in that area.
09:46:56 20   For example, Jing Yue Ju up in -- Jing,
09:47:00 21  J-I-N-G, Y-U-E, last name J-U -- was working on
09:47:08 22  reversible terminator chemistries from Columbia --
09:47:06 23  Columbia University, and he was awarded a big grant
09:47:38 24  in 2004 for these technologies.
09:47:40 25   There were grants that were being awarded

**Page 76**

 1  for nanotechnology, of basically making small little
 2  holes and threading DNA through holes as a way of
 3  trying to sequence DNA.
 4   Q. When did you first heard -- hear the term
 5  "next-generation sequencing"?
 6   A. I don't know. I don't know that. I'm
 7  sure it was after my review, because it wasn't a
 8  word that I was using at the time. But probably in
 9  2006. I mean, we were calling it different names.
10  But as I've mentioned to you, massively parallel
11  sequencing, to me, has the same meaning as
12  next-generation sequencing.
13   Q. And when did you first hear the term
14  "massively parallel sequencing"?
15   A. Well, there was a technology that came out
16  of Lynx back in 2000, founded by Sydney Brenner,
17  that used the term "massively parallel signature
18  sequencing."
19   And, you know, I would give Sydney
20  actually credit for massively parallel sequencing
21  back -- back in 2000.
22   Q. Sam Eletr was involved in founding Lynx?
23   A. Yeah.
24   MS. COHEN: Objection.
25   THE WITNESS: That's correct.

**Page 77**

 1  BY MR. REINES:
 2   Q. Massively parallel signature sequencing,
 3  is that -- is that still being used now?
 4   A. Not to my knowledge.
 5   Q. Was that ever commercially popular?
 6   MS. COHEN: Objection.
 7   THE WITNESS: I'm not sure about popular.
 8  There was a commercial product, and there were a
 9  handful of papers that were published on that
10  technology.
11  BY MR. REINES:
12   Q. Why -- why did that approach die, and why
13  was it just a few papers?
14   MS. COHEN: Objection.
15  BY MR. REINES:
16   Q. At least based on your sequencing
17  expertise.
18   A. It was a very complicated method.
19   I remember talking with -- trying to
20  remember his name. First name is Kevin. I'm
21  drawing a blank on his last name. He was CEO at the
22  time. They had huge efficiency losses from cycle to
23  cycle where they couldn't reproduce the same data
24  set over and over.
25   So -- so based on those -- based on that

## Page 78

09:40:19  1  information, that's why I don't think it was that
09:40:28  2  successful.
09:40:30  3      Q.  Do you teach your students about massively
09:40:32  4  parallel signature sequencing now?
09:40:33  5      MS. COHEN:  Objection.
09:40:33  6      THE WITNESS:  No.
09:40:35  7  BY MR. REINES:
09:40:36  8      Q.  Why not?
09:40:40  9      A.  Well, it's not a technology that's used.
09:40:48 10  And I tried to give my students a flavor of some
09:40:51 11  history, so they do do that.  But also what
09:40:55 12  everyone's using today.  So I try to keep more
09:40:58 13  current with the platforms that are in the market.
09:48:54 14      Q.  Do you -- sitting here now, are you
09:48:56 15  familiar with the details of the Lynx massively
09:48:57 16  parallel signature sequencing approach?
09:48:00 17      A.  Yes, I am.
09:48:04 18      Q.  For any particular reason?
09:48:09 19      A.  Yes.
09:48:32 20      Q.  What for?
09:48:36 21      A.  I was involved in a previous case, and
09:48:39 22  Brenner's patent was used as prior art, and I had to
09:48:43 23  review it.  I knew it -- I've known it for a while,
09:48:46 24  but I've recently reviewed it in a separate case.
09:48:54 25      Q.  Okay.  I was wondering.

## Page 79

09:48:58  1      And when you recently reviewed it, did
09:49:06  2  that -- I mean, did it refresh your recollection
09:49:07  3  about the subject matter, or did you kind of learn
09:49:04  4  it for the first time?
09:49:05  5      MS. COHEN:  Objection.
09:49:05  6      THE WITNESS:  Oh, it was definitely a
09:49:10  7  review.
09:49:32  8  BY MR. REINES:
09:49:33  9      Q.  If you could look at your description, you
09:49:44 10  included a description of the history of massively
09:49:47 11  parallel sequencing, next-generation sequencing,
09:49:52 12  correct, at page 15?
09:49:56 13      A.  Yeah.  I see the title.  It says
09:49:59 14  "Next-Generation Sequencing."
09:50:00 15      Q.  And this is your attempt to describe the
09:50:08 16  history of the evolution as a person skilled in the
09:50:06 17  art would be familiar?
09:50:09 18      MS. COHEN:  Objection.
09:50:09 19      THE WITNESS:  No, I don't think I was
09:50:30 20  trying to describe the complete history of all the
09:50:38 21  systems that I used.  I -- I was describing just the
09:50:47 22  first couple.  And, in fact, I think somewhere in
09:50:46 23  here I just reference my 2010 review paper, and that
09:50:30 24  describes a lot more of the current technologies.
09:52:50 25

## Page 80

 1  BY MR. REINES:
 2      Q.  I didn't mean it had every --
 3      A.  Okay.
 4      Q.  -- exhaustive history --
 5      A.  Okay.
 6      Q.  -- of the subject.  That wouldn't be what
 7  I was asking.
 8      Would you agree that you attempted to
 9  include in your report an overview of the beginning
10  of next-generation sequencing and how it came to be?
11      MS. COHEN:  Objection.
12  BY MR. REINES:
13      Q.  Are you comfortable with that?
14      A.  No, I don't think -- I don't think that's
15  true.  I was -- in my previous testimony, I was
16  trying to make the point that some of the elements
17  that you see in commercial systems today were
18  published a long time ago.  What I was trying to do
19  is talk about some of the early commercial systems
20  that came to market.
21      Q.  Okay.  So all that you were trying to do
22  in this Section C here in your declaration was refer
23  to some of the early commercial systems; is that
24  correct?
25      A.  Correct.  And I only really talk about

## Page 81

 1  two, which is the 454 technology and then the genome
 2  analyzer from Illumina.
 3      Q.  And the massively parallel signature
 4  sequencing system from Lynx, you don't mention that
 5  in your description of next-generation sequencing;
 6  is that correct?
 7      A.  I don't consider it a next-generation
 8  sequencing method.
 9      Q.  Why not?
10      A.  Well, massively parallel signature
11  sequencing was focused on gene expression or CDNA.
12  And that's really all it was used to do.  It could
13  generate very short reads, enough to tag or count
14  individual MRNA molecules.  MRNA molecules.
15      The next-generation sequencing
16  technologies are really geared towards sequencing
17  genomes or characterizing genomes in a much broader,
18  more comprehensive way than the massively parallel
19  signature sequencing could do.
20      Q.  Why didn't you think massively parallel
21  signature sequencing was relevant enough to -- to
22  claim construction issues that you didn't even
23  include it in your declaration?
24      MS. COHEN:  Objection.
25      THE WITNESS:  I don't consider it a

DR. MICHAEL E. METZKER - 3/21/2013

---

11:11:45   1  graduate training, meaning they would have at least
11:13:47   2  a master's or a Ph.D. or M.D. as part of their
11:13:51   3  training.
11:13:53   4  BY MR. REINES:
11:13:53   5      Q.  So can you give me -- I mean, can you make
11:13:56   6  a more general statement regarding the relationship
11:14:00   7  between the type of people that would be operating
11:14:08   8  the sequencers at Baylor relative to the ordinary
11:14:03   9  skill -- person of ordinary skill in the art in the
11:14:06  10  '017 and '018 patents?
11:14:09  11      MS. COHEN:  Objection.
11:00:17  12  BY MR. REINES:
11:14:20  13      Q.  Were they generally in that category?
11:14:33  14  Generally, it's a different class of people?  Can
11:14:34  15  you make that -- a generalization like that?
11:14:36  16      MS. COHEN:  Objection.
11:14:45  17      THE WITNESS:  I can't make that
11:14:46  18  generalization.  I think we would have to evaluate
11:14:20  19  each person on a case-by-case basis to determine
11:14:22  20  whether they would meet the standard of a person of
11:14:25  21  ordinary skill in the art or not.
11:14:27  22  BY MR. REINES:
11:14:53  23      Q.  And do you have what -- what -- what
11:14:56  24  portion of the 200 or so workers at the Baylor
11:14:54  25  Genome Center would be a person of ordinary skill in

Page 138

11:14:43   1  the art as that's defined in the -- with respect to
11:14:46   2  the '017 and '018 patents?
11:14:49   3      MS. COHEN:  Objection.
11:15:00   4      THE WITNESS:  I don't know.  I think I
11:15:50   5  would have to look at education as we've talked
11:15:54   6  about, but also experience, and determine whether
11:15:57   7  they would meet the difference of two or more --
11:15:00   8  well, two years of experience with nucleic acid
11:15:06   9  chemistry and DNA sequencing technologies.
01:59:52  10  BY MR. REINES:
11:15:26  11      Q.  Would you say that would be more than half
11:15:29  12  or less than half of the people at Baylor, the 200
11:15:30  13  or so people?
11:15:30  14      MS. COHEN:  Objection.
11:15:32  15      THE WITNESS:  Without digging into their
11:15:34  16  credentials, I -- I would not know what the answer
11:15:38  17  is.
11:15:38  18  BY MR. REINES:
11:15:38  19      Q.  Would you say it would be more or less
11:15:38  20  than 75 percent?
11:15:39  21      MS. COHEN:  Objection.
11:15:40  22      THE WITNESS:  Again, without digging into
11:15:47  23  their credentials and measuring them against the
11:15:49  24  standard of a person of ordinary skill in the art, I
11:15:45  25  couldn't give you an answer.

Page 139

---

 1  BY MR. REINES:
 2      Q.  And would it be more or less than
 3  25 percent?  You couldn't say one way or the other?
 4      MS. COHEN:  Objection.
 5      THE WITNESS:  I give you the same answer.
 6  I don't know until I've looked at their credentials
 7  and compared it to this definition of a person of
 8  ordinary skill in the art.
 9  BY MR. REINES:
10      Q.  Now, in terms of your own experience, do
11  you have an advanced degree in computational
12  biology?
13      A.  My degree is in molecular and human
14  genetics.
15      Q.  Would you -- is that equivalent to an
16  advanced degree in computational biology?
17      MS. COHEN:  Objection.
18      THE WITNESS:  It's -- I would consider it
19  a related discipline.
20  BY MR. REINES:
21      Q.  And in terms of -- but you don't have an
22  advanced degree in mathematics or statistics, right?
23  That's easy to say.
24      A.  Yeah, I don't have an advanced degree.
25      Q.  Thank you.

Page 140

 1      A.  My advanced degree is in genetics --
 2  molecular and human genetics.
 3      Q.  Okay.  And -- now, one of skill in the art
 4  for the '017 and '018 -- first of all, for the '017
 5  and '018, the person skilled in the art, you use the
 6  same definition for both; is that correct?
 7      A.  That is correct.
 8      Q.  Okay.  And as to whether an advanced
 9  degree in computational biology, whether that's
10  equivalent to an advanced degree in genetics, do you
11  have an opinion one way or the other on that
12  subject?
13      MS. COHEN:  Objection.
14      THE WITNESS:  I don't understand the
15  question.
16  BY MR. REINES:
17      Q.  The question is:  Is an advanced degree in
18  computational biology equivalent to an advanced
19  degree in genetics?
20      MS. COHEN:  Objection.
21      THE WITNESS:  It could be.  It could be.
22  BY MR. REINES:
23      Q.  What's it depend on?
24      A.  Well, it depends on the person that's
25  obtaining that degree and the actual graduate work

Page 141

## Page 142

11:17:54  1  that that person had done for their doctoral
11:17:04  2  studies.  In fact, they may have lots of overlap
11:17:04  3  although they're in different degreed programs.
11:17:08  4      Q.  Okay.  And in terms of whether your -- do
11:17:08  5  you believe your advanced degree work in terms of
11:17:56  6  your actual graduate work had overlap with an
11:18:02  7  advanced degree in mathematics?
11:18:07  8      MS. COHEN:  Objection.
11:18:08  9      THE WITNESS:  What do you mean by "an
11:18:20  10 advanced degree"?  Beyond a bachelor's degree?
11:18:20  11 BY MR. REINES:
11:18:28  12     Q.  Yes.
11:18:28  13     A.  Is that what you're asking?
11:18:23  14     Q.  Yes.
11:18:27  15     A.  I've worked with mathematics.  I do not
11:18:26  16 have an advanced degree in mathematics.
11:18:30  17     Q.  And same with statistics?  You don't have
11:18:32  18 an advanced degree in statistics either?  You
11:18:35  19 wouldn't say that you're --
11:18:35  20     A.  My advanced degree is in molecular and
11:18:37  21 human genetics.
11:18:38  22     Q.  Did you take mathematics courses as part
11:18:39  23 of that advanced work?
11:18:40  24     A.  I worked on research projects that
11:18:48  25 involved complicated mathematical stuff, so -- but I

Page 142

## Page 143

11:16:58  1  didn't take a class.  But I've published work in
11:16:59  2  this area, so...
11:18:02  3      Q.  And, again, I may have asked this a moment
11:18:07  4  ago.  Your definition of the '017 person skilled in
11:19:04  5  the art is the same as the '018; is that right?
11:19:08  6      A.  That's correct.  I lump them together in
11:19:00  7  the same paragraph.
11:19:10  8      Q.  And it's the same -- it's the same, right?
11:19:13  9  Is it the same or not the same?
11:19:13  10     When you say "lump together," it's almost
11:19:14  11 like there's two parts and they're separate.
11:19:18  12     A.  The '018 is a continuation of the '017.
11:19:20  13 Sorry.
11:19:26  14     Q.  Can you simply agree that your definition
11:19:26  15 of a person of ordinary skill in the art for the
11:19:30  16 '017 is the same as it is for the '018?
11:19:38  17     A.  Yes.
11:19:34  18     Q.  Okay.  And that person of ordinary skill
11:19:36  19 in the art would understand both the operation and
11:19:38  20 application of massively parallel DNA sequencing
11:19:48  21 platforms, correct?
11:19:43  22     MS. COHEN:  Objection.
11:19:45  23     THE WITNESS:  Well, that's not my
11:19:46  24 definition.  I believe that definition came from
11:19:56  25 Dr. Brown.

Page 143

## Page 144

11:  1  BY MR. REINES:
11:  2      Q.  Okay.  Well, let's -- let's actually see
11:  3  where...
11:  4      Now, you agreed with the definition in
11:  5  Dr. Gabriel.  Why don't we -- why don't we do it
11:  6  that way.
11:  7      This is at page 27.
11:  8      A.  Oh.  Of Gabriel as well?
11:  9      Q.  Yeah.
11:  10     A.  Oh, wow.  How coincidental.
11:  11     Q.  That is coincidental.  Although maybe
11:  12 that's just where it comes in the analysis.
11:  13     Okay.  And, again, because you understood
11:  14 the importance of the skill level in the art, this
11:  15 was one of the aspects of the Gabriel declaration
11:  16 that you looked at closely when you first reviewed
11:  17 it before it was signed off on?
11:  18     MS. COHEN:  Objection.
11:  19     THE WITNESS:  I think I testified that I
11:  20 had reviewed it.
11:  21 BY MR. REINES:
11:  22     Q.  Right.  And you reviewed --
11:  23     A.  I didn't give any qualifications that it
11:  24 was clearly or closely or anything like that.
11:  25     Q.  So you didn't closely review the Gabriel

Page 144

## Page 145

11:  1  declaration; is that correct?
11:  2      A.  I reviewed it.  I read through it, and I
11:  3  gave my opinion that I thought it -- it looked good.
11:  4      Q.  Okay.  You pushed back on the idea that
11:  5  you closely reviewed the Gabriel declaration in
11:  6  preparing your opinions.  Why did you do that?
11:  7      A.  That was a word you inserted that I didn't
11:  8  use previously.  And I was just making clear my
11:  9  testimony was that I just reviewed.
11:  10     Q.  Okay.
11:  11     A.  And I didn't qualify that review.
11:  12     Q.  Okay.  I think, in general, you can assume
11:  13 that the words and questions I'm asking are my own
11:  14 and that you haven't already answered them because
11:  15 otherwise it would be objectionable and your counsel
11:  16 would -- would be upset.  So I wouldn't take that as
11:  17 a basis to just sort of push back because that will
11:  18 slow down the deposition.
11:  19     Let me ask you the question:  Before you
11:  20 stated you considered and agreed with the opinions
11:  21 of Ms. Gabriel, you closely reviewed her
11:  22 declaration; isn't that correct?
11:  23     A.  Well, I would say that I reviewed it.
11:  24     Q.  Okay.
11:  25     A.  I won't qualify it by saying I closely

Page 145

DR. MICHAEL E. METZKER - 3/21/2013

Page 146

```
11:19:45   1   reviewed it.  I just remember reviewing it, and I
11:19:47   2   read it from top to bottom, and I gave my opinion.
11:19:50   3       Q.  Okay.  And you did that once before it was
11:19:55   4   submitted, right, to see if you agreed with it
11:20:08   5   generally, correct?
11:20:03   6       A.  I believe that's correct.
11:20:03   7       Q.  And you did it again before you finalized
11:20:04   8   your own report.  You specifically wanted to include
11:20:08   9   a paragraph -- remember we were looking before in
11:20:16  10   your declaration saying, "I've reviewed and
11:20:16  11   considered the Gabriel declaration in formulating my
11:20:26  12   opinions here," correct?
11:20:27  13       A.  Well, wait a minute.  I'm confused.
00:59:57  14           MS. COHEN:  Objection.
11:20:29  15           THE WITNESS:  So I think I testified that
11:20:34  16   I had reviewed the declaration in prepare -- in
11:20:38  17   preparing my declaration.  I don't remember saying
11:20:33  18   that I had reviewed it before she had submitted it.
11:20:36  19   I thought -- it's my understanding -- and if I got
11:20:40  20   that wrong, I apologize, but it seemed like I
11:20:43  21   reviewed it.
11:20:46  22   BY MR. REINES:
11:20:47  23       Q.  The record's going to be what the record
11:20:50  24   is.
11:20:53  25       A.  If the record -- if the record says that,
```

Page 147

```
11:20:54   1   then I guess that's true, but I -- I remember
11:20:58   2   reviewing it.  I believed I reviewed it as a final
11:20:58   3   copy.  That's what I remember.
11:20:59   4       Q.  Okay.  Are you denying now that you
11:23:02   5   reviewed the Gabriel declaration before it was
11:23:05   6   submitted in September?
11:23:06   7           MS. COHEN:  Objection.
11:23:06   8           THE WITNESS:  I remember reviewing it
11:23:07   9   once, not twice.  And that's why I'm -- I'm making a
11:23:10  10   distinction that I only reviewed it once in
11:23:14  11   preparing for my declaration, and I believe the copy
11:23:46  12   that I reviewed was the final copy.
11:23:49  13   BY MR. REINES:
11:23:50  14       Q.  Do you have any reason to believe -- do
11:23:53  15   you have any -- do you know one way or the other
11:23:56  16   whether -- let me...
11:23:59  17           Do you deny that you reviewed the Gabriel
11:23:59  18   declaration before it was submitted in September --
11:24:06  19           MS. COHEN:  Objection.
11:24:03  20   BY MR. REINES:
11:24:06  21       Q.  -- of 2012?  Is that what you're now
11:24:09  22   denying?
11:24:00  23       A.  I'm trying to make the point that I've
11:24:42  24   only reviewed it once.
11:24:44  25       Q.  That's not the question.
```

Page 148

```
 1   A.  And I believe I reviewed -- well, I think
 2   "deny" is not the right word.  I -- I think I
 3   reviewed it once, and it was after the copy was
 4   finalized.  That's my recollection.
 5       And if that came out confusing, I
 6   apologize for that.
 7   Q.  I don't think it's confusing at all.
 8       So you're saying that when you stated in
 9   your declaration that you reviewed the Gabriel
10   declaration, considered it, and agreed with the
11   opinions in there, that you'd only read it once; is
12   that correct?
13       MS. COHEN:  Objection.
14   BY MR. REINES:
15   Q.  I'm sure the court may be interested in
16   the extent that you did that review.
17   A.  Yeah.
18   Q.  Okay.  And, again, do you still agree that
19   the level of ordinary skill in the art for the '017
20   and '018 patent, that's an important part of your
21   opinions in this case?
22   A.  Yes, it is.
23   Q.  And you agreed with the standard of skill
24   in the art set forth by Ms. Gabriel; is that
25   correct?
```

Page 149

```
 1   A.  Can I have a moment so -- to review it?
 2   Q.  Sure.
 3       Do you remember it?  I'm not asking you to
 4   review it now and say what you think now.
 5   A.  I don't remember the details of her
 6   definition of one of ordinary skill in the art.
 7   Q.  Okay.  Why don't you review it now and see
 8   if you believe your prior testimony both here and in
 9   your declaration that you agreed with her opinions
10   changes.
11   A.  Can you repeat the question, please?
12   Q.  Sitting here now, do you -- you recall
13   your testimony that -- well, you remember in your
14   declaration you swore that you read and understood
15   and agreed with the opinions of Ms. Gabriel?
16       MS. COHEN:  Objection.
17   BY MR. REINES:
18   Q.  Do you want to go back to your declaration
19   cite?
20   A.  I'm just trying to -- I'm just going
21   through the question.
22   Q.  All right.  Let's just go to the
23   declaration.
24   A.  I think it's 159.
25   Q.  Yeah.  Thanks.
```

DR. MICHAEL E. METZKER - 3/21/2013

```
11:24:03   1        Do you remember we looked at paragraph 159
11:24:06   2   before?
11:24:08   3        A.  Yes, I do.
11:24:09   4        Q.  Okay.  And this is where you said you read
11:24:09   5   and considered the declaration of Ms. Gabriel.
11:24:20   6        Do you see that?
11:24:23   7        A.  Yes, I do.
11:24:28   8        Q.  And you see where you say:  "I agree with
11:24:26   9   the opinions of Dr. Gabriel and her reasons set
11:24:33  10   forth in her declaration"?
11:24:34  11        A.  Yes, I do.
11:24:35  12        Q.  And you understood one of the reasons for
11:24:34  13   her opinions set forth in her declaration was the
11:24:36  14   level of skill in the art?
11:24:37  15        A.  Yes, I would agree with that.
11:24:39  16        Q.  And you agree with her level of skill in
11:24:42  17   the art that's set forth in her declaration; is that
11:24:47  18   correct?
11:24:53  19        A.  Yes, I do.
11:24:54  20        Q.  Okay.  And you agree that one of ordinary
11:24:57  21   skill in the art of the '017 and '018 patent at the
11:25:03  22   relevant time, which you've emphasized is important,
11:25:06  23   would have understood both the operation and
11:25:00  24   application of massively parallel DNA sequencing
11:25:12  25   platforms; is that correct?
                                                       Page 150
```

```
11:25:12   1        A.  Yep.  That's correct.
11:25:19   2        Q.  And they would have had direct --
11:25:23   3   significant direct experience in performing and
11:25:26   4   applying these techniques?
11:25:28   5        A.  That's correct.
11:25:19   6        Q.  Okay.  And you understand the relevant
11:25:20   7   time period for this is -- there's two relevant time
11:25:23   8   periods:  2006 and 2007?
11:25:26   9        A.  I understand that.
11:25:33  10        Q.  And you agree with that for those times
11:25:38  11   periods; is that correct?
11:25:38  12        A.  I -- I agree to the extent that that's
11:25:52  13   when the provisional was filed and that's when the
11:26:00  14   utility was filed.
11:26:05  15        Q.  And one of ordinary skill in the art would
11:26:40  16   understand and have experience with techniques for
11:26:43  17   aligning sequencing reads generated by massively
11:26:46  18   parallel sequencing to a referenced genome.
11:26:48  19        Do you see that?
11:26:50  20        A.  Yes, I do.
11:26:50  21        Q.  And that would be within the skill level
11:26:52  22   in the art for those of ordinary skill in the '017
11:26:57  23   and '018 patent, correct?
11:26:59  24        A.  She's only talking about the '01- --
11:27:00  25   '018 patent in her declaration.
                                                       Page 151
```

```
1        Q.  Right.  But that -- for you, it's the
2   same -- the definition is the same for '017 and
3   '018?
4        A.  That's correct.
5        Q.  Okay.  So there is -- there is no
6   distinction as it relates to your opinion, correct?
7        A.  Right.  I was just making the distinction
8   she doesn't -- she doesn't include the '017 patent
9   in her opinions.
10        Q.  Okay.  And Dr. Gabriel includes those
11   competencies in -- for the person of ordinary skill
12   in the art in paragraph 48 of the opinions; is that
13   correct?
14        A.  Yes, that's correct.
15        Q.  And this is something that you read and
16   considered for your opinions in the case?
17        A.  Yes, that's correct.
18        Q.  And turning to your declaration, you have
19   a -- this is at -- the paragraph numbers are
20   different.  At paragraph 70.
21        Do you see that?
22        A.  Yes, I do.
23        Q.  And in terms of the -- you reference these
24   basic competencies for a person of ordinary skill in
25   the art in your terser definition, through the
                                                       Page 152
```

```
1   reference to that they would have two years of
2   experience with nucleic acid chemistry and DNA
3   sequencing technologies?
4            MS. COHEN:  Objection.
5            THE WITNESS:  Yes.
6   BY MR. REINES:
7        Q.  And regarding Dr. Gabriel's requirement of
8   at least a master's degree or Ph.D. in computational
9   biology, mathematics, or statistics, or equivalent
10   training, is that your position that you have -- you
11   meet that requirement?
12        A.  Yes, I do.
13        Q.  And is it your belief that in February
14   2006 that you would have understood both the
15   operation and application of massively parallel DNA
16   sequencing platforms?
17        A.  Yes.
18        Q.  And is it also your belief that in
19   February 2006 that you would have understood and had
20   experience with techniques for aligning sequencing
21   reads generated by massively parallel sequencing to
22   a reference genome?
23        A.  Yes, that's correct.
24        Q.  Turning back to in terms of -- let me step
25   back.
                                                       Page 153
```