UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERINATA HEALTH, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SEQUENOM, INC., et al.,<br><br>Defendants. | Case No.  12-cv-00865-SI<br><br>**ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT AND STAYING CASE** |

On January 23, 2015 the Court heard argument on the parties' cross motions for summary judgment. Having considered the arguments of the parties and the papers submitted, the Court hereby **DENIES** the parties' motions for summary judgment. Additionally, the Court **STAYS** this proceeding as set forth below.

## BACKGROUND

### I.    Factual Background

The innovations at issue involve methods to conduct non-invasive prenatal DNA testing. Fetal DNA testing can aid sex determination, blood typing and other genotyping, and detection of pre-eclampsia in the mother. It can also detect fetal aneuploidy, which is a disorder in which the fetus has an abnormal number of chromosomes, instead of the normal 23 pairs. Common aneuploidy disorders include Down syndrome (a third copy, or "trisomy," of chromosome 21), Edwards syndrome (a third copy of chromosome 18), and Patau syndrome (a third copy of chromosome 13).

On February 15, 2011, the PTO issued the ′017 patent, entitled "Non-invasive Fetal Genetic Screening by Digital Analysis," and on August 30, 2011, it issued the ′018 patent, entitled

"Determination of Fetal Aneuploidies by Massively Parallel DNA Sequencing." The ′018 patent is a continuation of the ′017 patent, and has a nearly identical specification. Stanford is the patent owner and Verinata is the exclusive licensee of these patents. They previously alleged that Sequenom was infringing these patents. *See Verinata I, infra.*

The patents explain that "[s]ince aneuploidies do not present a mutational change in sequence, and are merely a change in the number of chromosomes, it has not been possible to detect them in a fetus without resorting to invasive techniques," because researchers believed that determining whether a fetus was carrying an extra chromosome required distinguishing fetal DNA from maternal DNA. The ′018 Patent, Abstract. However, the patent inventors discovered that "digital amplification allows the detection of aneuploidy using massively parallel amplification and detection methods." *Id.* By using sophisticated molecular counting techniques, the researchers could determine small under or over-representations of a chromosome that would reveal fetal aneuploidy, without the need to distinguish between the maternal and fetal DNA. *See id.* 21:10–30.

II.     **Procedural Background**

This dispute began in 2011, when Ariosa[1] filed a declaratory relief action against Sequenom, seeking a declaration that Ariosa's "Harmony Test" does not infringe any claims of U.S. Patent No. 6,258,540 ("the ′540 patent"). *Aria Diagnostics, Inc. v. Sequenom, Inc.,* C 11–6391–SI (filed Dec. 19, 2011). Sequenom filed a counterclaim against Ariosa, asserting infringement of Sequenom's ′540 patent. Subsequently, two other companies, Natera and Verinata, also filed declaratory judgment actions in this Court seeking judgments that their products do not infringe Sequenom's ′540 patent and asserting that the ′540 patent is invalid. *See Natera Inc. v.*

---

[1] Formerly known as Aria Diagnostics, Inc.

*Sequenom, Inc.,* C 12–0132–SI (filed Jan. 6, 2012) (regarding Natera's "Non–Invasive Paternity Test"); *Verinata Health, Inc. v. Sequenom, Inc. (Verinata I),* C 12–0865–SI (filed Feb. 22, 2012) (regarding Verinata's "Verifi Prenatal Test"). Sequenom then filed counterclaims alleging that Natera, DNA Diagnostics Center, Verinata, and Stanford are infringing the ′540 patent. *See id.* On October 30, 2013, this Court held the ′540 patent to be invalid. Sequenom has appealed this ruling to the Federal Circuit, and that appeal is pending. C 11–cv–6391 SI, Docket No. 254.

In *Verinata I,* Verinata[2] and Stanford also alleged that Sequenom was infringing U.S. Patent Nos. 7,888,017 ("the ′017 patent"), 8,008,018 ("the ′018 patent"), and 8,195,415 ("the ′415 patent"). In addition, Verinata and Stanford filed a case alleging that Ariosa and LabCorp are infringing U.S. Patent Nos. 8,296,076 ("the ′076 patent") and 8,318,430 ("the ′430 patent"). *See Verinata Health, Inc. v. Ariosa Diagnostics, Inc. (Verinata II),* C 12–5501–SI (filed Oct. 25, 2012). Finally, Illumina filed a case alleging that Ariosa is infringing U.S. Patent No. 7,955,794 ("the ′794 patent"). *See Illumina, Inc. v. Ariosa Diagnostics, Inc.,* C 14–1921–SI (filed April 25, 2014). This final action was consolidated with *Verinata II.*

Verinata and Sequenom ultimately reached a settlement in *Verinata I* which resolved all of their respective claims, save the issue of written description of the '018 Patent and '833 Application, Docket No. 320, which is the subject of the present motion.

Beginning in March 2013, the Patent Trial and Appeal Board ("PTAB") declared three interferences between (1) patents and patent applications listing as inventors Drs. Yuk–Ming Dennis Lo, Rossa Wai Kwun Chiu, and Kwan Chee Chan of the Chinese University Hong Kong ("CUHK") (collectively, "Lo") and (2) patents and patent applications listing as inventors Drs. Stephen Quake and Hei–Mun Christina Fan of Stanford University, (collectively, "Quake"). On April 7, 2014, the PTAB issued orders finding that the claims of the '018 Patent and '833

---

[2] In January of 2013, Illumina acquired Verinata

Application lack a sufficient written description as required by 35 U.S.C. § 112(a).[3] Docket No. 252, Bosch Decl. Exhs. 3-5.

Stanford appealed the PTAB's decision pursuant to 35 U.S.C. § 146. Now before the Court are Stanford and CUHK's cross-motions for summary judgment on the issue of written description. Docket Nos. 252, 255.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In deciding a summary

---

[3] The '018 Patent and '833 Application share the same specification. Docket No. 255-3, Pl. Mot. at 1 nt. 1.

United States District Court
Northern District of California

judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

## II.     35 U.S.C. § 146

"District court review of an interference proceeding under section 146 is an equitable remedy of long standing." *Gen. Instrument Corp. v. Scientific-Atlanta, Inc.*, 995 F.2d 209, 214 (Fed. Cir. 1993), *citing Standard Oil Co. v. Montedison S.p.A,* 540 F.2d 611, 616-17 (3d Cir.1976). A Section 146 proceeding "is not a new claim, but an authorized phase of the interference proceeding that is conducted by the PTO and is subject to judicial review." *Vas–Cath, Inc. v. Curators of the Univ. of Mo.,* 473 F.3d 1376, 1382 (Fed.Cir.2007). If the parties present no new evidence, then the district shall review the factual findings of the PTAB for "substantial evidence." *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1345 (Fed. Cir. 2000), *citing Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). However, as is the case here, if the parties present new evidence that was not before the PTAB, then the district court conducts *de novo* review of the PTAB's factual findings. *Winner Int'l Royalty Corp* 202 F.3d at 1345.

## DISCUSSION

### I.     Cross Motions for Summary Judgment

Both parties agree that claims in the '018 Patent and '833 Application recite a technique for random massive parallel sequencing ("MPS"). However, CUHK argues that the specification

only describes *targeted* sequencing techniques (such as PCR), and therefore does not meet the written description requirement for random MPS. Specifically, CUHK argues that the specification (1) does not describe, or even mention "random massively parallel sequencing," or (2) disclose any examples or experiments using random MPS. Docket No. 252, CUHK Mot. at 11. Conversely, Stanford argues that, when accounting for the knowledge of one skilled in the art, there is ample discussion of random MPS to satisfy the written description requirement.

It is well established that a patent is presumed valid, and "the burden of persuasion to the contrary is and remains on the party asserting invalidity." *Ralston Purina Co. v. Far–Mar–Co, Inc.,* 772 F.2d 1570, 1573 (Fed.Cir.1985). To be valid, however, 35 U.S.C. § 112 requires that every patent contain a written description of the invention. The purpose of this requirement is to "ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date." *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.,* 264 F.3d 1111, 1118 (Fed.Cir.2001). "The test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharms, Inc. v. Eli Lilly and Co.,* 598 F.3d 1336, 1351 (Fed.Cir.2010). While the written description requirement does not require that the original disclosure provide *in haec verba* support for the claimed subject matter at issue, *Fujikawa v. Wattanasin,* 93 F.3d 1559, 1570 (Fed.Cir.1996), the original disclosure must convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention. *Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563–64 (Fed.Cir.1991). In a section 146 proceeding, the party asserting invalidity must show, by a preponderance of the evidence, that the specification fails to meet the written description requirement. *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 659 F.3d 1186, 1191-92 (Fed. Cir. 2011).

### A.    PTAB Interference Orders

On April 7, 2014, the PTAB issued orders finding that the claims of the '018 Patent and '833 Application lack a sufficient written description for the claimed random MPS technique.

6

Specifically, the Board found that while the specification included certain "isolated words and references" that could support the random MPS method, in light of the specification's "main focus" on targeted sequencing methods (namely, PCR), "those of skill in the art would not have had a credible reason to interpret the isolated words and references as supporting a method using random [MPS]." Docket 252, Bosch Decl. Exh. 3 at 21. The interference order also found that the specification never discloses "a complete analysis of aneuploidy using random [MPS]," and that as a result those of skill in the art would not have understood the inventors to have put "these pieces together into a complete method of [random MPS]." *Id.* at 22. In sum, while the specification contained certain buzzwords related to random MPS, it failed to meet the written description requirement because it is never "explained with sufficient detail." *Id.*

Both parties agree that the Court must conduct *de novo* review of the PTAB's findings of fact. However, CUHK urges the Court to give weight to the PTAB's orders, while Stanford maintains that the PTAB was "misled" into an "erroneous approach" and that the orders should therefore be ignored for purposes of the present motions. The PTAB interference orders presented a thorough and persuasive analysis of the issue now before the Court, and the Court may therefore consider the PTAB's findings. However, Stanford is correct to stress that when new evidence is introduced in a Section 146 appeal, the Court must conduct a *de novo* review of the facts, and is not bound by the PTAB's prior ruling. Furthermore, the Court notes that the PTAB's conclusion was based at least in part on its determination of the relative credibility and probative value of the evidence before it. See e.g. Bosch Decl. Exh. 3 at 19 ("we credit Dr. Gabriel's testimony that those of skill in the art could have considered the references in the [specification] to Illumina products to indicate targeted sequencing."). On summary judgment, the Court may not engage in such fact finding, and may only grant relief if there is no genuine issue of material fact that would preclude summary judgment.

**B.    Description of Random MPS**

While the parties discuss various sections of the specification in arguing whether certain discrete steps in the random MPS technique were adequately disclosed, much of the parties'

1   disagreement centers on the following two paragraphs of the specification.

2       The genomic DNA from the tissue taken from the mother, i.e. *the*
3       *mixture of fetal and maternal genetic material, may be distributed*
        *into discrete samples which are anchored to a surface and*
4       *sequenced or monitored by labeled probes to detect a target specific*
        *sequence*, e.g., a unique region of chromosome 21, e.g., AML1.
5       *Further guidance for the preparation of chromosome 21-unique*
        *sequences* may be found, for example, in Fuscoe et al., "An Efficient
6       Method for Selecting Unique-Sequence Clones from DNA Libraries
        and Its Application To Fluorescent Staining of Human Chromosome
7       21 Using in Situ Hybridization," *Genomics*, vol. 5, 1989, pp. 100-
        109. A methodology useful in the present invention platform is
8       based on **massively parallel sequencing of millions of fragments**
        **using attachment of randomly fragmented genomic DNA to a**
9       **planar, optically transparent surface** and solid phase
        amplification to create a high density sequencing flow cell with
10      millions of clusters, each containing ~1,000 copies of template per
        sq. cm. These templates are sequenced using four-color DNA
11      sequencing-by-synthesis technology. See, products offered by
        Illumina, Inc., San Diego Calif. Also, see US 2003/0022207 to
12      Balasubramanian, et al., published Jan. 30, 2003, entitled "Arrayed
        polynucleotides and their use in genome analysis."

13      Sequencing may be combined with amplification-based methods in
        a microfluidic chip having reaction chambers for both PCR and
14      microscopic template-based sequencing. **Only about 30 bp of**
        **random sequence information are needed to identify a sequence**
15      **as belonging to a specific human chromosome.** Longer sequences
        can uniquely identify more particular targets. An algorithm for
16      designing unique sequences is described in Yamada, et al.
        "PrimerStation: a highly specific multiplex genomic PCR primer
17      design server for the human genome," *Nucleic Acids Res.*, Jul. 1,
        2006; 34(Web Server issue): W665-W669, illustrative of **software**
18      **methods that can be used to identify a sequence in comparison**
        **to the known genome sequence.** See, also Zhu et al., "Single
19      molecule profiling of alternative pre-mRNA splicing," *Science.*
        2003 Aug. 8; 301(5634):836-838, describing a single-molecule-
20      based technology for studying mRNA.

21  The' 018 Patent, 19:48-20:20 (emphasis added).

22      Stanford seizes on the bolded passages to show that the specification describes random

23  MPS. It points to testimony of CUHK's expert, Dr. Gabriel, wherein she states that the phrase

24  "randomly fragmented genomic data," bolded *supra*, is associated with random rather than

25  targeted sequencing. Docket No. 276-6 at 134:21-25. Dr. Gabriel has also noted that the

26  Balasubramanian publication quoted above discloses a sequencing platform that can be used for

27  either targeted or random sequencing. Docket No. 255-3, Stanford Mot. at 15. Stanford also points

28

United States District Court
Northern District of California

8

to testimony from Dr. Gabriel and its own expert, Dr. Weinstock[4], to show that the above excerpt amply discloses "alignment" and "comparison," two necessary steps in the random MPS technique. Docket No. 255-3, Exh. 21 at 110:4-17; Docket No. 255-5 at 112:9-20. In particular, Stanford highlights that Dr. Gabriel's definition of "alignment" is reflected in the passage of the specification which Stanford argues discloses alignment. See Stanford Opp'n at 17. Stanford also contends that its reference to "massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA," by its plain meaning, describes random MPS.

Stanford additionally points to a number of factors that would explain the relatively short description of random MPS in the specification. First, it points to testimony from Dr. Metzker, Sequenom's expert, showing that one of skill in the art would have understood that both targeted and random sequencing could be used with the claimed inventions. Docket No. 255, Exh. 25 at 444:4-18. It also points to testimony from Dr. Gabriel that someone of skill in the art would be motivated to try different methods of detection in order to perform the entire scope of the invention, not just targeted sequencing methods. Docket No. 276-6, Exh. 37 at 95:1-18. Similarly, Stanford cites an article published by Drs. Quake and Fan in 2008 which describes random MPS as merely a "variant" of targeted sequencing. Stanford Opp'n at 11-12. Stanford therefore concludes that "[a]lthough the disclosure of random sequencing in the patent encompasses only a few paragraphs, this disclosure is more than adequate because the data gathering technique was well-within the competency of one of ordinary skill in the art." Docket No. 275, Stanford Opp'n at

---

[4] CUHK argues that due to certain errors in his testimony and expert report, Dr. Weinstock's opinions are "irrelevant" and should therefore be disregarded for purposes of ruling on these motions. CUHK  Mot. at 22. First, CUHK points to testimony wherein Dr. Weinstock appears to admit that he applied the incorrect "clear and convincing" standard to whether the written description requirement was met, rather than the proper "preponderance" standard as required in Section 146 appeal. Bosch. Decl. Exh. 7 at 10:13-12:3. Stanford has failed to rebut this contention in its briefs, and it appears that it has made a similar error in its own motion. Stanford Mot. at 7. Second, CUHK points to testimony tending to show that Dr. Weinstock did not appreciate the difference between the requirements for written description and enablement. Bosch Decl. Exh. 7 at 109:10-16. Stanford has introduced evidence tending to show that Dr. Weinstock indeed did understand the difference between these two standards. *Id.* at 22:6-17.

United States District Court
Northern District of California

9.

CUHK argues that the passage from the specification quoted above must be read in light of the first two sentences (in italics), which describe targeted sequencing. Echoing the reasoning of the PTAB, it argues that while certain phrases that Stanford points to could describe random MPS, the first two sentences of the paragraph make clear that the subject of the entire passage is directed toward targeted sequencing. CUHK points to testimony from Drs. Gabriel and Weinstock tending to show that they both agree that these two sentences indeed address targeted sequencing. CUHK Mot. at 16. In her expert report, Dr. Gabriel notes that the word "sequence," and similar derivations, appear in only six paragraphs of the specification, and they all refer to targeted sequencing. Docket No. 252, Gabriel Decl. Exh A. ¶ 70. Dr. Gabriel further notes that all working examples in the specification use PCR to detect target sequences in DNA. *Id.* ¶ 67. She also notes that the specification never discloses certain necessary steps in the random MPS process such as "alignment," "sequence reads," "fractional representation," or "comparison" *Id.* ¶ 68, 71, 123, 146. Dr. Gabriel also identified a number of terms that one skilled in the art would have used to describe random MPS, none of which appears in the specification of February, 2007.  Gabriel Decl. Exh. A ¶ 71, Exh. B ¶¶ 49-50.  Dr. Gabriel notes, however, that these terms do appear in a later 2008 Quake publication on the subject of random MPS. Gabriel Decl. Exh. A ¶ 84. Stanford rebuts this by highlighting that many of Dr. Gabriel's definitions of certain claim terms relating to random MPS are nearly identical to language disclosed in the specification. Stanford Opp'n at 13-15.

While new evidence has been introduced since the PTAB decision, the parties essentially echo the arguments that they made before the Board. Stanford argues that the two paragraphs from the specification quoted *supra*, while relatively terse, are enough to satisfy the written description requirement when read in light of the knowledge of one skilled in the art. Conversely, CUHK contends that isolated buzzwords cannot be read to describe random MPS in light of the

specification's focus on targeted sequencing.

No "length requirement exists for a disclosure to adequately describe an invention. While some inventions require more disclosure, the adequacy of the description of an invention depends on its content in relation to the particular invention, not its length." *In re Hayes Microcomputer Products, Inc. Patent Litig.*, 982 F.2d 1527, 1534 (Fed. Cir. 1992). However, in deciding whether the written description requirement is satisfied, "the specification as a whole must be considered." *In re Wright*, 866 F.2d 422, 425 (Fed. Cir. 1989). It is not enough that an "invention is an obvious variant of that which is disclosed in the specification… all the limitations must appear in the specification." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

The PTAB examined the same question now before the Court. It conducted a thorough and reasoned analysis, which the Court finds to be compelling. However, the Board's persuasive exposition of the issues is not a sufficient basis to grant summary judgment. In light of the conflicting evidence presented by the parties – some of which was never presented to the PTAB – the Court finds that the question of whether the specification would have adequately described the random MPS technique to one of ordinary skill in the art requires resolving questions of fact not suitable for summary judgment. Accordingly, the Court **DENIES** both parties' motions for summary judgment.

## II.    Staying the Case

"Courts have inherent power to manage their dockets and stay proceedings." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) (citations omitted); *see also Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").  Courts often stay patent cases to "avoid inconsistent results, narrow the issues, obtain guidance from the PTO, or simply…avoid the

needless waste of judicial resources." *Pragmatus AV, LLC v. Facebook, Inc.*, No. 11-CV-02168-EJD, 2011 WL 4802958, at *2 (N.D. Cal. Oct. 11, 2011) (internal citations omitted).

On January 27, 2014, CUHK filed a notice of a pending Federal Circuit appeal which may affect the ultimate disposition of this case. Specifically, in *Biogen Idec MA, Inc. v. Japanese Found. for Cancer Research*, No. CIV. 13-13061-FDS, 2014 WL 2167677 (D. Mass. May 22, 2014), the district court held that under the America Invents Act ("AIA") of 2011, the proper forum for § 146 appeals from PTAB interference proceedings declared *after* September 16, 2012 is the Federal Circuit, not a district court. The *Biogen Idec* case had been appealed, and the Federal Circuit is set to hear oral argument on March 4, 2015. Docket Nos. 342, 344. In an unrelated proceeding on December 26, 2014, the PTAB expressed approval of the *Biogen* court's reasoning. Docket No. 342, Exh. B.

The three interferences at issue here were all declared after September 16, 2012. A bench trial in this case is currently set for March 10, 2015. Should the Federal Circuit affirm in *Biogen*, it would deprive this Court of subject matter jurisdiction over this action. Therefore, in the interest of judicial economy, and to spare the parties the expense of prosecuting a trial that may ultimately prove to have been brought in the wrong forum, the Court hereby **STAYS** this action pending the resolution of the appeal of *Biogen* to the Federal Circuit.

**IT IS SO ORDERED**.

Dated: February 2, 2015

_____
SUSAN ILLSTON
United States District Judge

12